# EXHIBIT A

1 | Shilpi Agarwal (SBN 270749)
  |    sagarwal@aclunc.org
2 | Avram D. Frey (MJP 804789)
  |    afrey@aclunc.org
3 | Emi Young (SBN 311238)
  |    eyoung@aclunc.org
4 | Hannah Kieschnick (SBN 619011)
  |    hkieschnick@aclunc.org
5 | AMERICAN CIVIL LIBERTIES UNION
  | FOUNDATION OF NORTHERN CALIFORNIA, INC.
6 | 39 Drumm Street
  | San Francisco, CA 94111
7 | Telephone: (415) 621-2493
  | Facsimile: (415) 255-1478
8 |
9 | Justina Sessions (SBN 270914)
  |    jsessions@wsgr.com
10 | John P. Flynn (SBN 141094)
   |    jflynn@wsgr.com
11 | Colleen Bal (SBN 167637)
   |    cbal@wsgr.com
12 | Dylan G. Savage (SBN 310452)
   |    dsavage@wsgr.com
13 | Malavika F. Lobo (SBN 317635)
   |    mlobo@wsgr.com
14 | WILSON, SONSINI, GOODRICH & ROSATI
   | One Market Plaza
15 | Spear Tower, Suite 3300
   | San Francisco, CA 94105
16 | Telephone: (415) 947-2197
   | Facsimile: (415) 947-2000
17 | *Attorneys for Plaintiffs*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/08/2022**
**Clerk of the Court**
BY: KAREN VALDES
Deputy Clerk

**CGC-22-601686**

18 |                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

19 |                    **FOR THE COUNTY OF SAN FRANCISCO**

20 | JOSHUA SIMON, DAVID BARBER, AND JOSUE BONILLA, | CASE NO.
   | individually and on behalf of all others similarly
21 | situated, DIANA BLOCK, an individual and
   | COMMUNITY RESOURCE INITIATIVE, an organization, |
22 |                                                | **COMPLAINT FOR DECLARATORY**
   |                          Plaintiffs,           | **AND INJUNCTIVE RELIEF FOR**
23 |                                                | **VIOLATION OF ARTICLE I,**
   |                                                | **SECTIONS 1, 7, AND 13 OF THE**
24 | v.                                             | **CALIFORNIA CONSTITUTION,**
   |                                                | **ARTICLE III, SECTION 3 OF THE**
25 | CITY AND COUNTY OF SAN FRANCISCO, PAUL         | **CALIFORNIA CONSTITUTION, AND**
   | MIYAMOTO, IN HIS OFFICIAL CAPACITY AS SAN      | **THE FOURTH AND FOURTEENTH**
26 | FRANCISCO SHERIFF,                             | **AMENDMENTS OF THE UNITED**
   |                                                | **STATES CONSTITUTION**
27 |                          Defendants.

28 |

---

                                COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiffs Joshua Simon, David Barber, and Josue Bonilla, individually and on behalf of all others similarly situated, and Plaintiffs Diana Block and Community Resource Initiative, as taxpayers in the County of San Francisco, are informed and believe, and thereon allege, as follows:

**INTRODUCTION**

1.      This action challenges the constitutionality of the San Francisco Sheriff's Office's ("Sheriff" or "SFSO") systematic intrusions on the privacy of individuals released pretrial on electronic monitoring ("EM"). After the Superior Court orders individuals released on EM, the Sheriff requires them to agree to a set of "Program Rules," several of which are not authorized by the Court's release order. In particular, Rule 5 purports to authorize the Sheriff to conduct warrantless, suspicionless searches of an individual's person, property, home, and automobile at any time (often called a "four-way search clause"). Rule 13 purports to authorize the Sheriff to share participant GPS location data with any law enforcement agency upon request and in perpetuity, a limitless intrusion on privacy given that the Sheriff's EM Program seemingly allows GPS location data to be retained indefinitely.

2.      Conditions like Rules 5 and 13 cannot be imposed as a matter of course on every single individual released pretrial with an EM condition; nor may they be imposed by the Sheriff acting alone. Instead, only a court may set particular conditions of pretrial release, and only after determining on an individualized basis that such conditions are a reasonable means to ensure future appearances and to protect the public. That is not what is happening with EM participants in San Francisco. Rules 5 and 13, as well as the Sheriff's indefinite data retention practices, are therefore unlawful. Specifically, these practices violate Article I, Sections 1, 7, and 13, and Article III, Section 3 of the California Constitution, as well as the Fourth and Fourteenth Amendments to the United States Constitution.

3.      More than 200 people in San Francisco are currently subject to the Sheriff's unlawful EM conditions while awaiting trial. This number is continuously increasing as release on EM becomes a growing alternative to pretrial detention. But release on EM is not a license for limitless law enforcement surveillance of some of San Francisco's most vulnerable residents. This action seeks declaratory and injunctive relief to enjoin the Sheriff from imposing or enforcing Program Rules 5 and 13 going forward, and to require the Sheriff to expunge the GPS data of individuals whose cases have

COMPLAINT

1    now concluded.

2    <u>**JURISDICTION AND VENUE**</u>

3      4.     This Court has jurisdiction under California Code of Civil Procedure Section 410.10 and

4    Article IV, Section 10 of the California Constitution.

5      5.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395

6    because Defendant City and County of San Francisco is located in San Francisco County, and because

7    all of the conduct alleged occurred and is occurring in San Francisco County. In addition, Sheriff

8    Miyamoto is employed by the County of San Francisco.

9    <u>**PARTIES**</u>

10      6.     Plaintiff Joshua Simon is 19 years old and pending trial on criminal charges in the San

11    Francisco Superior Court. He was placed on EM by the Court on May 27, 2022 and is presently subject

12    to the Sheriff's Program Rules 5 and 13.

13      7.     Plaintiff David Barber is 43 years old and pending trial on criminal charges in the San

14    Francisco Superior Court. He was placed on EM by the Court on August 13, 2021 and is presently

15    subject to the Sheriff's Program Rules 5 and 13.

16      8.     Plaintiff Josue Bonilla is 40 years old and pending trial on criminal charges in the San

17    Francisco Superior Court. He was placed on EM by the Court on May 30, 2022 and is presently subject

18    to the Sheriff's Program Rules 5 and 13.

19      9.     Plaintiff Diana Block is a taxpayer and resident of San Francisco, California. She owns

20    real property in the County of San Francisco and has been assessed for and paid property taxes to the

21    County within the last year. Plaintiff Block has also in the last year paid both San Francisco and

22    California sales and use taxes, which fund the County, including the Sheriff's Office. Plaintiff Block

23    opposes the use of EM as an unnecessary punishment that does not improve public safety and believes

24    that the challenged Rules violate the presumption of innocence and the right to privacy. Plaintiff Block

25    is a founding member of the California Coalition for Women Prisoners ("CCWP"), which is part of the

26    No New SF Jail Coalition. Both coalitions oppose the use of EM. As part of a campaign organized by

27    the No New SF Jail Coalition, Plaintiff Block has given public comment opposing the use of EM before

28    the Budget and Finance Committee of the San Francisco Board of Supervisors.

COMPLAINT

10.     Plaintiff Community Resource Initiative ("CRI") is a non-profit corporation based in San Francisco, California. Plaintiff CRI has been assessed for and paid unsecured property taxes to the County within the last year. Also in the last year, Plaintiff CRI has paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. Plaintiff CRI provides death penalty defense investigation and resources. In addition to that work, Plaintiff CRI engages in significant advocacy and organizing campaigns to advocate for real public safety based on social services and investment in community. Plaintiff CRI opposes the use of EM as another form of incarceration that increases surveillance on already-surveilled communities and does not promote safety. CRI is also part of the No New SF Jail Coalition and played a central role in the Coalition's campaign against the Sheriff's use of EM by, for example, preparing talking points for community members to provide public comment on EM; drafting and sending a letter to Sheriff Miyamoto in December 2020 calling on the Sheriff to, among other things, eliminate the four-way search clause; and helping to draft a report on the use of EM in San Francisco that focuses on individuals impacted by EM. The Coalition anticipates releasing this report in the fall.

11.     Defendant City and County of San Francisco is a local government entity organized under the laws of the State of California. The San Francisco Sheriff's Office ("Sheriff" or "SFSO") is a division of San Francisco county government. SFSO's Community Programs Unit supervises and operates the EM Program.

12.     Defendant Paul Miyamoto, in his official capacity as San Francisco Sheriff, is an official of Defendant City and County of San Francisco with respect to SFSO's Community Programs Unit and the EM Program.

## FACTUAL BACKGROUND

### A.     Court-Ordered Pretrial Electronic Monitoring

13.     In San Francisco, individuals who are arrested for a criminal offense and taken into custody are booked into San Francisco County Jail #1. SFSO's Custody Division performs booking processes on all arrested individuals.

14.     The San Francisco Pretrial Diversion Project evaluates all individuals held in jail after arrest and provides a "public safety assessment," either recommending against release or recommending

4

pretrial release under one of three levels of supervision: (1) Own Recognizance ("OR") No Active Supervision, (2) OR Minimum Supervision, and (3) Assertive Case Management ("ACM").

15.     Generally, a Superior Court judge then makes a release determination and may order one of the levels of supervision, or set bail in accordance with *In re Humphrey*, 11 Cal. 5th 135 (2021).

16.     For individuals released pretrial, the Superior Court may, and sometimes does, impose particular conditions such as warrantless drug testing, warrantless searches, participation in programming (e.g., anger management), or a prohibition on gun possession. In such instances, the judge makes individualized findings on the record to substantiate the reasonableness of the conditions imposed in the particular case.

17.     Pertinent here, the Superior Court also may impose EM—for the limited purposes of ensuring future court appearances and protecting public safety—under any level of supervision. As of November 2020, approximately 52% of individuals released pretrial on EM were released with minimal supervision requirements.

18.     The Superior Court typically orders EM following a hearing. During these hearings, the Court does not mention or discuss the Sheriff's EM Program Rules in form or substance. There is no colloquy on the record concerning the scope of any privacy intrusions inherent in the Sheriff's EM Program, and no discussion of the four-way search condition or the indefinite retention and sharing of GPS location data. The Superior Court also does not, in connection with imposing EM, elicit a general waiver of Fourth Amendment rights on the record. Indeed, there is no record evidence that the Court itself is aware of—let alone has approved—the content of the Sheriff's EM Program Rules. Certainly, the Superior Court judge does not make any individualized determination concerning the reasonableness of any conditions imposed by the Sheriff's EM Program Rules as applied to the individual at bar.

19.     When the Court orders release on EM, it executes a pretrial order using a form titled, "County of San Francisco Sheriff's Office / Superior Court Pre-Sentenced Defendant Electronic Monitoring – Court Order." A true and correct copy of this form is attached as Exhibit A. The form requires those released on EM to "obey all orders given by any SFSO employee(s) or contract service provider(s) and live within 50 driving miles of the Sheriff's Electronic Monitoring office." The form also lists other "court-ordered conditions" that the Court may check off in its discretion, such as

mandatory drug testing and not possessing weapons. At the top, the form provides, "the Court indicates that the defendant has waived their 4th Amendment rights and understands the restrictions ordered by the Court." The form does not address the Sheriff's Program Rules; contains no reference to search of the individual's person, residence, automobile, or property; and contains no information concerning the retention, storage, or sharing of GPS location data.

20.     Individuals released on EM are not required or even requested to review, initial, or sign the Court's EM form order.

21.     The cases of Plaintiffs Simon, Barber, and Bonilla exemplify the process described above. The Superior Court did not at any point in their cases alert these Plaintiffs to the existence of the Sheriff's Program Rules or their contents. The Superior Court likewise did not seek a waiver from them or explain the scope of any implicit waiver of their Fourth Amendment rights. These Plaintiffs received no information concerning what would happen to any GPS location data generated by the ankle monitor. And none of them initialed or signed the Court's EM form order in their respective cases.

**B.     Enrollment in the Electronic Monitoring Program**

22.     Following a Court order, the Sheriff and its private contractor, Sentinel Offender Services, LLC ("Sentinel"), formally enroll individuals in the EM Program. EM releasees are either transported in restraints or released and ordered to report to Sentinel's office at 70 Oak Grove, inside the Sheriff's Community Programs building. There, EM releasees are outfitted with an ankle monitor and enrolled in the EM Program.

23.     During enrollment at Sentinel's office, individuals are first informed of the Sheriff's "Electronic Monitoring (EM) Program Rules [for] Pre-Sentenced Participants" ("Program Rules" or "Rules"). A true and correct copy of this document is attached as Exhibit B. A Sentinel employee provides the Rules to the releasee, together with several other forms and papers, and instructs the releasee to review and initial each rule, and to sign and date at the bottom. No one explains the Program Rules to EM releasees, and they are not provided access to counsel while at Sentinel's office.

24.     While they are permitted to review the Rules before signing, in all cases, individuals understand from the circumstances that they must initial, sign, and date the Program Rules or face return to jail. Each of Plaintiffs Simon, Barber, and Bonilla believed that they were required to initial and sign

the Sheriff's Program Rules while at Sentinel's office or else be immediately returned to jail.

25.    Among the rules that EM releasees must assent to are Rules 5 and 13. Rule 5 states, "I shall submit to a search of my person, residence, automobile or property by any peace officer at any time."

26.    Rule 13 states, "I acknowledge that my EM data may be shared with other criminal justice partners."

27.    During the enrollment process, EM releasees must also separately initial, acknowledge, and agree to rules contained in a "San Francisco Sheriff's Dept. Electronic Monitoring Program Participant Contract: Pre-Sentenced Individuals" ("Participant Contract"). A true and correct copy of this document is attached as Exhibit C. The Participant Contract contains provisions substantively equivalent to Program Rules 5 and 13.

28.    Paragraph 8 of the Participant Contract provides, "I acknowledge that in court, I knowingly waived my 4th Amendment rights and agree to submit my person, property, place of residence and / or personal effects to search at any time, with or without a warrant and with or without probable cause."

29.    Paragraph 9 of the Participant Contract provides, "I acknowledge that my electronic monitoring data may be shared with other criminal justice partners."

30.    No provision of the Program Rules, Participant Contract, or any other policy or agreement provides for the destruction or expungement of releasees' GPS location data after their participation in the EM Program or at the conclusion of their case.

31.    EM releasees initial and sign the Program Rules and the Participant Contract requirements to avoid the threat of continued detention pending trial. Many do not comprehend the forms or the conditions imposed, and most believe that the substance of the forms is irrelevant given the alternative: continued detention. Virtually all face a critical need to avoid further incarceration. Some face the possibility of losing employment, housing, or custody of children; some need to care for elderly, sick, or child dependents. On information and belief, no prospective EM releasee has ever refused to initial the Sheriff's EM Program Rules or Participant Contract.

32.    Plaintiff Simon consented to release on EM because he was eager to get out of jail so that

he could attend his high school graduation. He recalls reviewing the Sheriff's Program Rules when they were presented to him at Sentinel's office; Rules 5 and 13 in particular bothered him. But Plaintiff Simon believed he had no choice in the matter if he wanted to remain out of jail, so he initialed and signed as he was instructed to do.

33.     Plaintiff Barber consented to release on EM because he was anxious to get out of jail to try and retain his apartment and employment. He was also concerned about the care of his pet cat. He recalls reviewing the Sheriff's Program Rules when they were presented to him at Sentinel's office, and he recalls reading Rules 5 and 13. These rules offended him because they seemed punitive in nature and he had not been convicted of any crime in conjunction with his charges. He nonetheless initialed and signed the Sheriff's Program Rules under what he describes as "duress."

34.     Plaintiff Bonilla consented to release on EM because he has a physical disability that made his detention especially uncomfortable and burdensome. He was also eager to be released so that he could see his young son. He does not clearly recall events at Sentinel's offices. He believes he may have initialed and signed papers but does not know for certain. He did whatever he was told to do because he believed he had no choice unless he was willing to go back to jail.

35.     For each releasee, a Sentinel employee also completes an "initial assessment" and generates a schedule of their approved activities and locations. Sentinel purportedly considers where releasees live and work, whether they participate in any court-mandated programs, and whether they are associated with any stay-away orders. This information is entered into each participant's case file stored on Sentinel's servers and is used to program the GPS ankle cuff and box.

36.     Pursuant to its contract with the Sheriff, Sentinel maintains these participant case files for at least the duration of a participant's enrollment in the EM Program. In addition to the initial assessment and approved schedule, the Sentinel file also contains the Superior Court's initial EM form order, the enrollment forms, all out-of-residence movement and GPS monitoring data, any violations or sanctions, and chronological case notes.

37.     Sentinel has administered the Sheriff's home detention and EM programs since August 1, 2019. The Sheriff's contract with Sentinel expired on July 31, 2022. By its terms, the contract authorizes renewal by the San Francisco Board of Supervisors on a yearly basis, but the Board has not renewed the

contract to date. Upon information and belief, Sentinel continues to administer the Sheriff's pre- and post-trial EM programs. Under the now-expired contract, the City and County pay Sentinel more than $1.1 million each year.

**C.      The EM Program Poses Great Challenges for Individuals Awaiting Trial**

38.      The Sheriff and Sentinel monitor all EM participants' movements 24 hours a day, seven days a week.

39.      Regardless of the level of supervision ordered by the Superior Court, Sentinel, acting on behalf of the Sheriff, also meets with all pretrial EM participants on a regular basis, often twice per month. During these check-in meetings, participants must provide documentation or verification of their attendance at permitted activities, such as receipts from grocery shopping and signed doctor's notes from medical appointments. The Sheriff and Sentinel also check the functionality of the ankle monitor and remind releasees about upcoming court dates.

40.      The EM Program can be extremely onerous for participants. EM releasees describe receiving frequent phone calls at random times from Sheriff deputies or contractors, asking them to change their location or go outside so that the GPS ankle cuff can receive service and confirm the individual's location. They also describe instances when the ankle cuff malfunctions by making loud beeping and other noises—including at work. The constant possibility that the cuff will malfunction, create a disruption, and lead to further scrutiny can cause great anxiety. The physical GPS ankle cuff is also incompatible with certain work uniforms, such as heavy work boots necessary for safety on construction sites. Moreover, wearing an ankle cuff can cause injury and/or pain by, for example, digging into the ankle bone or compressing sensitive nerves in the area. It also frequently disrupts sleep.

41.      Although the Sheriff and Sentinel promise to provide technical support 24 hours a day, seven days a week, participants in the EM Program report that administrators are often unable or unwilling to resolve technical issues quickly.

**D.      Program Rule 5 Exposes Individuals to Invasive and Suspicionless Searches at Any Time by Any Law Enforcement Officer**

42.      Once an individual is enrolled in the EM Program, notice of the four-way search condition described in Program Rule 5 is entered into the California Law Enforcement

Telecommunications System ("CLETS"). All members of law enforcement in the state have access to the CLETS database. Accordingly, whenever a member of any California law enforcement agency runs a check on an individual released on EM, CLETS notifies the officer of the four-way search condition, purportedly authorizing search of the individual's person, residence, property, and automobile, without a warrant or any degree of articulable suspicion. This means that any law enforcement member may search a releasee's person, home, belongings, and car at any time for any reason.

43.    It is unknown how frequently individuals released on EM are subject to warrantless, suspicionless searches under this condition. Neither law enforcement nor releasees are required to report when these searches occur. Moreover, because releasees are unaware that Program Rule 5 is unlawful and because they may fear returning to jail or other consequences, pretrial EM participants are unlikely to register complaints. And even where such warrantless, suspicionless searches uncover evidence that leads to additional charges, the case will likely resolve in a guilty plea and the search will accordingly go unnoticed.

44.    Public information about searches conducted pursuant to Rule 5, therefore, is generally available only in the unusual circumstance where the uncovered evidence is the subject of a motion to suppress. Plaintiffs are aware of only two such instances in San Francisco. In January 2021, officers with the San Francisco Police Department ("SFPD") used GPS location data shared by the Sheriff to track an individual on EM and then relied on the four-way search condition described in Rule 5 and entered in CLETS to search that individual's apartment. The Superior Court of San Francisco granted the defendant's motion to suppress evidence discovered in the apartment, finding that Rule 5 was not a legally valid search condition and that the defendant had not waived his Fourth Amendment rights in court or otherwise consented to the search. In the second case, SFPD officers used GPS location data shared by SFSO to track an individual's car while he drove through San Francisco. Police officers detained the individual and then relied on the four-way search clause to search his car. At the preliminary hearing, the Superior Court initially denied the defendant's motion to suppress evidence obtained from that search. Before the defendant could pursue the issue further, the charges were dismissed.

45.    Plaintiff Barber has been searched pursuant to the four-way search condition described in

Rule 5. On the evening of August 30, 2022, Barber was pulled over by California Highway Patrol for speeding. After running a check on his driver's license, the officers presumably learned of the existence of the four-way search clause from CLETS—law enforcement asked Barber why he was on probation or parole, although he is not on any form of post-conviction supervision, and told him they were authorized to search his person and his vehicle. They placed him in handcuffs, patted him down and searched his pockets, then searched his car for an extended period of time.

46.     Plaintiff Barber suffers from anxiety and depression as a result of feeling that he is being surveilled at all times. He states that the possibility of being searched by any member of law enforcement at any time compounds this stress and his resulting psychological symptoms.

47.     Plaintiffs Simon and Bonilla have not been searched pursuant to the four-way search condition described in Rule 5. But both express anxiety and a sense of violation that they may be searched by any member of law enforcement at any time while they are on EM.

48.     Plaintiff Simon grew up in Hunter's Point, San Francisco, and has experienced being stopped and searched by members of the SFPD for no apparent reason. He is concerned that Rule 5 makes such searches more likely and leaves him vulnerable to harassment by local law enforcement.

49.     Plaintiff Bonilla believes that his right to privacy ordinarily offers some protection against potential misconduct by police officers, but that he has lost any protection against officers who might harass him by virtue of Rule 5. He also believes that the Rule undermines his presumption of innocence until proven guilty.

**E.      Program Rule 13, Coupled with the Sheriff's Retention Practices, Allows the Sheriff to Share GPS Location Data with Any Law Enforcement Agency Without a Warrant and in Perpetuity**

50.     An ankle monitor that is charged and functioning gives the Sheriff and Sentinel continuous GPS location coordinates, 24 hours a day, seven days a week, for the duration of an individual's participation in the EM Program. A participant's GPS information can be viewed contemporaneously to track real-time location and movements. This minutely detailed tracking data is also saved and stored on Sentinel's servers, permitting historical tracking as well. Data gathering is constant and—hardware permitting—unbroken for the duration of a releasee's participation in the EM

Program; *i.e.*, data is gathered from the time of enrollment at 70 Oak Grove until EM is terminated, either by an intermediate court order or, more commonly, when the individual's criminal charge is resolved.

51.     Under its contract, Sentinel uses GPS location data to provide monthly reports to the Sheriff of all EM participants for the 12 months prior to the date of the report. Sentinel's contract does not specify whether these reports include individuals whose participation in the program has ceased but who were on EM at some point during the previous 12 months.

52.     Pursuant to its contract, Sentinel also offers what it terms "advanced reporting features." For example, the contract describes a "crime scene correlation" report that allows users to see whether any EM participants were near a specified location at a specified time, and offers "zone activity" reports that allow users to see which individuals on EM were in certain geographic zones, including zones identified as "known drug areas."

53.     In response to California Public Records Act requests, the Sheriff has represented that because "GPS data is kept by Sentinel, not the SFSO," Sentinel's "contract would govern any retention or destruction policies" regarding that data. Sentinel's contract with San Francisco, a true and correct copy of which is attached as Exhibit D, does not address what happens to an EM participant's data once their participation in the program has ceased. Instead, the contract provides, "[u]pon termination of Agreement or request of City, Contractor shall within forty-eight (48) hours return all Confidential Information which includes all original media" and then "purge all Confidential Information from its servers, any hosted environment Contractor has used in performance of this Agreement, work stations that were used to process the data or for production of the data, and any other work files stored by Contractor in whatever medium." Accordingly, unless or until Sentinel's contract is terminated, Sentinel has the authority to retain the complete GPS location data of anyone who has *ever* participated in San Francisco's EM Program since Sentinel began administering the program, regardless of whether their participation has ceased or their case closed. Sentinel's contract with the City and County has been operational since August 1, 2019. Thus, under the terms of its agreement, the Sheriff retains access to at least the past three years of GPS location data for all individuals released on EM during any portion of that period.

COMPLAINT

54.     Pursuant to Program Rule 13, SFSO routinely shares participant GPS location data with other law enforcement agencies. To acquire this data, a requesting agency or officer need only submit a form titled, "Electronic Monitoring Location Request" to the Sheriff. A true and correct copy of this form is attached as Exhibit E. To complete the form, the requestor must represent that they are "requesting this information as part of a current criminal investigation"—no warrant or even articulable suspicion is required. The requesting agency may obtain either the GPS location data of a specific individual on EM across a particular time period, or the GPS location data "of anyone on GPS tracking" in a specific location. As one officer with the SFPD testified regarding how easily he was able to obtain 10 days' worth of GPS location data as well as live continuous GPS updates for a defendant, he "[j]ust made the request." *See* Preliminary Hearing Transcript at 41:28-42:2, *People v. Robinson*, MCN 2100 0279 (San Francisco Sup. Ct. Feb. 19, 2021).

55.     Law enforcement agencies request this GPS location data from the Sheriff with increasing frequency. In response to California Public Records Act requests, SFSO disclosed that in 2019, the Sheriff shared the GPS location data of four individuals with other law enforcement agencies; in 2020, the number increased to 41; and in 2021, it swelled to 179. The vast majority of these requests came from the SFPD, but the Sheriff also received requests from other local law enforcement agencies, including Adult Probation and the District Attorney's Office. These trends suggest that law enforcement agencies in San Francisco are increasingly relying on Rule 13 to obtain sensitive and robust GPS location data—ostensibly collected by the Sheriff for the limited purpose of monitoring compliance with the court-ordered pretrial release conditions—for general law enforcement purposes and without any judicial oversight.

56.     Each of Plaintiffs Simon, Barber, and Bonilla is unaware of whether his GPS location data has been shared with any member of law enforcement. Each feels it is a violation of his personal privacy that such data might be retained in perpetuity and shared widely pursuant to Rule 13. Those possibilities are a source of stress and aggravation for each.

57.     Plaintiff Simon also reports that, on one occasion during the time he has been on EM, he observed an assault in public. He immediately became concerned that law enforcement would wrongfully identify him as a suspect by virtue of his GPS location data. He left the area quickly but

suffered substantial anxiety thereafter, wondering if he would be mistakenly arrested and charged.

**F.    The San Francisco Board of Supervisors Has Not Authorized the Sheriff's EM Program**

58.    As part of California's realignment, and to enable reduction of local jail populations, the California Legislature provided county boards of supervisors the power to authorize their sheriff's departments to release on EM certain pretrial defendants. Penal Code section 1203.018 empowers sheriffs to make EM release decisions provided that the local board of supervisors prescribes reasonable rules for release on EM and subsequently reviews those rules on an annual basis. Section 1203.018 does not define what constitutes "reasonable" EM release conditions and does not purport to—nor could it—alter established constitutional law on this issue.

59.    SFSO acknowledges that it is not running a Section 1203.018 program. In response to a demand letter from undersigned counsel preceding this litigation, a true and correct copy of which is attached as Exhibit F, the Sheriff admitted that the San Francisco Board of Supervisors has never authorized the Sheriff to make release decisions and, more to the point, has never prescribed nor approved the specific Contract and Program Rules for release on EM that are currently being imposed by the Sheriff. A true and correct copy of the Sheriff's July 6, 2022 response is attached as Exhibit G. In fact, in 2014, the San Francisco Board of Supervisors rejected a proposed ordinance that would have authorized the Sheriff to exercise its Penal Code section 1203.018 powers.

60.    The San Francisco Board of Supervisors has in 2019, by contrast, authorized the Sheriff to make *post-trial* EM release decisions for sentenced individuals as permitted under Penal Code section 1203.016. That authorization has since expired and not been renewed. Individuals participating in the post-trial EM program make up approximately 1% of individuals in the Sheriff's EM Program.

61.    In this suit, Plaintiffs challenge only the Sheriff's unilateral imposition of the four-way search condition (Rule 5), the data-sharing condition (Rule 13), and the Sheriff's indefinite data retention practices. But it bears noting that the Sheriff's entire EM program, pre- and post-trial, is without valid legal authorization by the San Francisco Board of Supervisors.

## **CLASS ACTION ALLEGATIONS**

62.     Named Plaintiffs Simon, Barber, and Bonilla bring this action on behalf of themselves and on behalf of the following proposed class ("Class"): All individuals, past, present, and future, charged with a criminal offense in San Francisco and released pretrial on EM who were or will be required to agree to the Sheriff's EM Program Rules for Pre-Sentenced Individuals and the EM Program Participant Contract.

63.     This action is appropriately suited for a class action pursuant to California Code of Civil Procedure Section 382 because there exists an ascertainable and sufficiently numerous Class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.

64.     *Numerosity and Ascertainability*. The proposed Class is ascertainable because it is defined in terms of objective characteristics that will make ultimate determination of Class members possible. The precise number of members in this Class is unknown but readily determinable by the Sheriff upon review of existing records. Available information already demonstrates that the Class is substantial. While the precise number of members can only be determined through discovery, the Sheriff estimates that in 2018, 701 individuals participated in the pretrial EM Program; in 2019, 1,380 individuals participated in the pretrial EM Program; in 2020, 1,602 individuals participated in the pretrial EM Program; in 2021, 1,720 individuals participated in the pretrial EM Program; and, in just the first half of 2022, 808 individuals participated in the pretrial EM Program. Moreover, the Class includes prospective members. Plainly, the Class is numerous, and joinder of every member would be impracticable.

65.     *Predominant Common Questions of Law and Fact*. Common questions of law and fact exist as to all members of the Class and predominate over the questions, if any, affecting only individual members. The common questions include, but are not limited to, the following:

a.    Whether the Sheriff violates Class members' rights under the United States and California Constitutions by blanketly and unilaterally imposing on all individuals released pretrial on EM a four-way search condition that can be executed by any law enforcement agency at any time and a condition whereby their detailed GPS location data

15

can be shared with any law enforcement agency without a warrant at any time and in perpetuity;

    b.    Whether declaratory relief that the Sheriff's policies and practices are unconstitutional and unlawful should be ordered by the Court; and

    c.    Whether injunctive relief restraining further unconstitutional and unlawful acts by the Sheriff should be ordered by the Court and, if so, the nature of that injunctive relief.

66.    *Typicality*. The Named Plaintiffs' claims are typical of the claims of the members of the Class because they all challenge the same unconstitutional conduct by SFSO, namely the unconstitutional four-way search and data-sharing conditions as described in Program Rules 5 and 13 and the Sheriff's data retention practices, all of which apply equally to all proposed Class members. Relatedly, Defendants are likely to assert the same defenses against all Named Plaintiffs and proposed Class members.

67.    *Adequacy of Representation*. The Named Plaintiffs will fairly and adequately represent the interests of the members of the Class. The Named Plaintiffs have no interests separate from, or in conflict with, those of the proposed Class they seek to represent, and they seek equitable relief on behalf of the entire proposed Class. The Named Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel who are competent and experienced in both class actions and constitutional litigation. Counsel have the resources, expertise, and experience to prosecute this action.

68.    *Superiority of Class Mechanism*. A class action is superior to other methods for the fair and efficient adjudication of the claims asserted in this action. Were separate actions to be brought individually by members of the Class, the resulting duplication of lawsuits would cause undue hardship and expense to both the Court and the litigants. The prosecution of separate individual actions would also impair the interests of the individual Named Plaintiffs and create a risk of inconsistent rulings against Defendants, thus substantially prejudicing all litigants. Absent a class action, the Sheriff and the City and County would almost certainly continue their wrongdoing, causing substantial injustice.

16

COMPLAINT

**FIRST CAUSE OF ACTION**
(U.S. Constitution, Fourth Amendment, 42 U.S.C. § 1983)
Violation of the Right to Be Free from Unreasonable Searches and Seizures
(All Plaintiffs against all Defendants)

69.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

70.     The Sheriff's blanket imposition of a four-way search clause on all individuals released pretrial on EM violates Plaintiffs' Fourth Amendment rights under the United States Constitution. *See In re York*, 9 Cal. 4th 1133, 1150–51 & n.10 (1995).

71.     The Sheriff's blanket imposition of a condition purportedly authorizing indefinite retention and sharing of GPS location data without a warrant, any degree of reasonable suspicion, or consent, on all individuals released pretrial on EM, violates Plaintiffs' Fourth Amendment rights under the United States Constitution. *Id.*; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2217–18 (2018).

72.     Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. As alleged more fully below in paragraph 91, within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in the last year, Taxpayer Plaintiffs have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. As alleged more fully below in Paragraph 92, Defendant County of San Francisco receives public funds. Taxpayer Plaintiffs contend that Defendants' actions as described in this Complaint violate Plaintiffs' rights under the United States Constitution; constitute an illegal expenditure of taxpayer funds; and constitute an abuse of discretion. Taxpayer Plaintiffs seek a judicial declaration of rights and duties of the respective parties with respect to the instant matter.

**SECOND CAUSE OF ACTION**
(California Constitution, Art. I, § 13)
Violation of the Right to Be Free from Unreasonable Searches and Seizures
(All Plaintiffs against all Defendants)

73.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

17

COMPLAINT

74.     The Sheriff's blanket imposition of a four-way search clause on all individuals released pretrial on EM violates Plaintiffs' rights under Article I, Section 13 of the California Constitution. *See York*, 9 Cal. 4th at 1150–51 & n.10.

75.     The Sheriff's blanket imposition of a condition purportedly authorizing indefinite retention and sharing of GPS location data without a warrant, any degree of reasonable suspicion, or consent, on all individuals released pretrial on EM, violates Plaintiffs' rights under Article I, Section 13 of the California Constitution. *Id.*; *see also Carpenter*, 138 S. Ct. at 2217–18.

76.     Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. As alleged more fully below in paragraph 91, within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in the last year, Taxpayer Plaintiffs have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. As alleged more fully below in Paragraph 92, Defendant County of San Francisco receives public funds. Taxpayer Plaintiffs contend that Defendants' actions as described in this Complaint violate Plaintiffs' rights under the California Constitution; constitute an illegal expenditure of taxpayer funds; and constitute an abuse of discretion. Taxpayer Plaintiffs seek a judicial declaration of rights and duties of the respective parties with respect to the instant matter.

### THIRD CAUSE OF ACTION
(California Constitution, Art. I, § 1)
Violation of the Right to Privacy
(All Plaintiffs against all Defendants)

77.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

78.     The Sheriff's indefinite retention of the GPS location data of all individuals released pretrial on EM, violates Plaintiffs' right to privacy under Article I, Section 1 of the California Constitution. *See generally Hill v. NCAA*, 7 Cal. 4th 1 (1994).

79.     The Sheriff's blanket imposition of a condition purportedly authorizing sharing of GPS location data without a warrant, any degree of reasonable suspicion, or consent, and in perpetuity, on all individuals released pretrial on EM, violates Plaintiffs' right to privacy under Article I, Section 1 of the

18

California Constitution. *See generally Hill*, 7 Cal. 4th 1.

80.     Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. As alleged more fully below in paragraph 91, within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in the last year, Taxpayer Plaintiffs have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. As alleged more fully below in Paragraph 92, Defendant County of San Francisco receives public funds. Taxpayer Plaintiffs contend that Defendants' actions as described in this Complaint violate Plaintiffs' rights under the California Constitution; constitute an illegal expenditure of taxpayer funds; and constitute an abuse of discretion. Taxpayer Plaintiffs seek a judicial declaration of rights and duties of the respective parties with respect to the instant matter.

### **FOURTH CAUSE OF ACTION**
(California Constitution, Art. III, § 3)
Violation of the Separation of Powers
(All Plaintiffs against all Defendants)

81.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

82.     The Sheriff's unilateral imposition of the four-way search and data retention and sharing conditions, as described in EM Program Rules 5 and 13 and the related provisions of the Participant Contract, on Named Plaintiffs and the Class they seek to represent, absent authorizing judicial findings and orders, violates of the Separation of Powers under Article III, Section 3 of the California Constitution. *See People v. Cervantes*, 154 Cal. App. 3d 353, 358 (1984).

83.     Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. As alleged more fully below in paragraph 91, within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in the last year, Taxpayer Plaintiffs have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. As alleged more fully below in Paragraph 92, Defendant County of San Francisco receives public funds. Taxpayer Plaintiffs contend that Defendants' actions as described in this

Complaint violate Plaintiffs' under the California Constitution; constitute an illegal expenditure of taxpayer funds; and constitute an abuse of discretion. Taxpayer Plaintiffs seek a judicial declaration of rights and duties of the respective parties with respect to the instant matter.

### FIFTH CAUSE OF ACTION
(U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983)
Violation of the Right to Due Process of Law
(All Plaintiffs against all Defendants)

84.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

85.     The Sheriff's unilateral imposition of the four-way search and data retention and sharing conditions, as described in EM Program Rules 5 and 13 and the related provisions of the Contract, on Named Plaintiffs and the Class they seek to represent, absent authorizing judicial findings and orders, violates Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment of the United States Constitution. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *United States v. Salerno*, 481 U.S. 739, 746, 749–50 (1987).

86.     Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. As alleged more fully below in paragraph 91, within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in the last year, Taxpayer Plaintiffs have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. As alleged more fully below in Paragraph 92, Defendant County of San Francisco receives public funds. Taxpayer Plaintiffs contend that Defendants' actions as described in this Complaint violate Plaintiffs' rights under the United States Constitution; constitute an illegal expenditure of taxpayer funds; and constitute an abuse of discretion. Taxpayer Plaintiffs seek a judicial declaration of rights and duties of the respective parties with respect to the instant matter.

### SIXTH CAUSE OF ACTION
(California Constitution, Art. I, § 7)
Violation of the Right to Due Process of Law
(All Plaintiffs against all Defendants)

87.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully

20

COMPLAINT

set forth herein.

88.     The Sheriff's unilateral imposition of the four-way search and data retention and sharing conditions, as described in EM Program Rules 5 and 13 and the related provisions of the Contract, on Named Plaintiffs and the Class they seek to represent, absent authorizing judicial findings and orders, violates Plaintiffs' rights to Due Process of Law under Article I, Section 7 of the California Constitution. *See People v. Ramirez*, 25 Cal. 3d 260, 267 (1979); *Humphrey*, 11 Cal. 5th at 156.

89.     Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. As alleged more fully below in paragraph 91 , within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in the last year, Taxpayer Plaintiffs have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office. As alleged more fully below in Paragraph 92, Defendant County of San Francisco receives public funds. Taxpayer Plaintiffs contend that Defendants' actions as described in this Complaint violate Plaintiffs' rights under the California Constitution; constitute an illegal expenditure of taxpayer funds; and constitute an abuse of discretion. Taxpayer Plaintiffs seek a judicial declaration of rights and duties of the respective parties with respect to the instant matter.

## SEVENTH CAUSE OF ACTION
(Cal. Code of Civil Proc. § 526A)
Taxpayer Action to Prevent Illegal Expenditure of Funds
(Plaintiffs Diana Block and Community Resource Initiative against all Defendants)

90.     Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

91.     Code of Civil Procedure section 526a provides that a taxpayer has standing to sue to prevent a public official from the waste or illegal expenditure of public funds. Plaintiffs Block and CRI bring this action through California Code of Civil Procedure section 526a as taxpayer plaintiffs. Taxpayer Plaintiffs have, within the last year, each been assessed for, and are liable to pay, on their property, income, or other taxes in the County of San Francisco, and pay taxes to the State of California. In particular, within the last year, Plaintiff Block has been assessed for and paid property taxes to the County and Plaintiff CRI has been assessed for and paid unsecured property taxes to the County. Also in

COMPLAINT

the last year, Plaintiffs Block and CRI have paid both San Francisco and California sales and use taxes, which fund the County, including the Sheriff's Office.

92. Defendants receive state and county funds. Defendants' expenditure of state and county funds to impose and enforce EM Program Rules 5 and 13, including the related practice of indefinitely retaining GPS location data, in violation of the United States and California Constitutions, as challenged herein, is unlawful. Defendants have therefore unlawfully used public funds, and injured the public fisc, and threaten to continue unlawfully using public funds and injuring the public fisc in violation of Sections 1, 7, and 13 of Article I of the California Constitution and Section 3 of Article III of the California Constitution as well as the Fourth and Fourteenth Amendments of the United States Constitution. Taxpayer Plaintiffs further contend that Defendants' policies and practices constitute an abuse of discretion and constitute an illegal expenditure of taxpayer funds.

93. Taxpayer Plaintiffs have an interest in enjoining the unlawful expenditure of tax funds. Pursuant to California Code of Civil Procedure section 526a and this Court's equitable power, Taxpayer Plaintiffs seek declaratory and injunctive relief to prevent continued harm and to protect Taxpayer Plaintiffs and the public from Defendants' unlawful policies and practices. There is an actual controversy between Taxpayer Plaintiffs and Defendants concerning their respective rights and duties. Taxpayer Plaintiffs seek a judicial declaration of the rights and duties of the respective parties with respect to the instant matter.

94. As a direct and proximate consequence of the Sheriff expending public funds to impose and enforce these rules in violation of the California and United States Constitutions, Taxpayer Plaintiffs are entitled to permanent injunctive and declaratory relief, as previously alleged herein.

**EIGHTH CAUSE OF ACTION**
(Cal. Code of Civil Proc. § 1060 *et seq.*)
Declaratory Judgement
(All Plaintiffs against all Defendants)

95. Plaintiffs incorporate by reference the allegations of the above paragraphs as though fully set forth herein.

96. An actual controversy has arisen and now exists between the parties relating to the legal rights and duties of the parties as set forth above, for which Plaintiffs desire a declaration of rights and

22

COMPLAINT

other relief available pursuant to the California Declaratory Judgment Act, Cal. Code of Civil Proc. § 1060 *et seq.*

97.     A declaratory judgment is necessary and property in that Plaintiffs contend that Defendants have committed and continue to commit the violations set forth above and Defendants deny that they have done so and will continue to commit such acts.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for entry of judgment in their favor and against Defendants as follows:

1.     An order certifying the proposed Plaintiff Class together with any necessary and appropriate sub-classes under California Code of Civil Procedure section 382;

2.     An injunction enjoining Defendants, each of their agents, employees, assigns, and all other persons acting in concert or participating with any of them from imposing the four-way search and data-sharing conditions, as described in EM Program Rules 5 and 13 and the corresponding provisions of the Contract, as conditions of pretrial release on EM;

3.     An injunction requiring Defendants, each of their agents, employees, assigns, and all other persons acting in concert or participating with any of them to automatically expunge all GPS location data collected over the course of an individual's participation in EM as soon as their criminal case concludes, and requiring them to expunge all GPS location data still located within their position for individuals whose criminal matters have already concluded;

4.     A declaration of the rights of the parties, including but not limited to a declaration that Rules 5 and 13 of the Sheriff's EM Program Rules and the corresponding provisions of the Contract are unconstitutional under Sections 1, 7, and 13 of Article I of the California Constitution and Section 3 of Article III of the California Constitution as well as the Fourth and Fourteenth Amendments of the United States Constitution;

5.     Plaintiffs' costs of suit incurred herein, including attorneys' fees pursuant to California Code of Civil Procedure Section 1021.5 and 42 U.S.C. § 1988; and

6.     Such other and further relief as the Court deems proper and just.

COMPLAINT

Dated: September 8, 2022

Respectfully submitted,

By:

Shilpi Agarwal (SBN 270749)
  sagarwal@aclunc.org
Avram D. Frey (SBN 804789)
  afrey@aclunc.org
Emi Young (SBN (SBN 311238)
  eyoung@aclunc.org
Hannah Kieschnick (SBN 619011)
  hkieschnick@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478

Justina Sessions (SBN 270914)
  jsessions@wsgr.com
John P. Flynn (SBN 141094)
  jflynn@wsgr.com
Colleen Bal (SBN 167637)
  cbal@wsgr.com
Dylan G. Savage (SBN 310452)
  dsavage@wsgr.com
Malavika F. Lobo (SBN 317635)
  mlobo@wsgr.com
WILSON, SONSINI, GOODRICH & ROSATI
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2197
Facsimile: (415) 947-2000

*Attorneys for Plaintiffs*

24

COMPLAINT

# EXHIBIT A

County of San Francisco Sheriff's Office Superior Court

# Pre-Sentenced Defendant Electronic Monitoring - Court Order

| | | |
|---|---|---|
| Defendant's Last Name | Defendant's First Name | SF Number / DOB |

| | | |
|---|---|---|
| Court Number(S) | Department # | Date |

By checking boxes below, the Court will indicate what supervision the San Francisco Sheriff's Office (SFSO) will employ and the expectations the Court has of the defendant. By signing these instructions and affixing a seal, the Court indicates that the defendant has waived their 4th Amendment rights and understands the restrictions ordered by the Court.

---

Defendant will be monitored via: ☐ GPS Only     ☐ Alcohol Monitoring Only*   ☐ GPS and Alcohol Monitoring*

**\* No consuming alcohol on alcohol monitoring**

Release with coordinated pickup** ☐      Release to CP contingent on EM placement ☐      Condition of Bail ☐

*\*\*Home Detention and Curfew orders will be the Coordinated Pickup only.*

---

● Defendant will adhere to the following court-ordered conditions of Pre-Trial Electronic Monitoring until the Court orders the removal of conditions. Upon removal of conditions, all issued equipment shall be returned to SFSO.

● All participants on pre-trial electronic monitoring shall obey all orders given by any SFSO employee(s) or contract service provider(s) and live within 50 driving miles of the Sheriff's Electronic Monitoring office. Participants can not travel more than 50 driving miles from the Sheriff's Electronic Monitoring office without prior approval of the Court.

● Participants shall report any change in residence immediately to an SFSO Community Programs employee or contract service provider. The particpant shall operate and maintain monitoring device(s) as instructed and not tamper with, defeat or remove monitoring device(s). Particpant shall report any arrest, citation or law enforcement contact to an SFSO Community Programs employee within 24 hours. Particpant shall not possess or consume any controlled substance without a valid legal prescription.

☐ Submit to a drug test when directed to do so by a SFSO sworn employee.

☐ Not possess any weapons.

☐ Not consume any alcohol / marijuana

☐ Remain confined within interior premises of residence (Home Detention) unless authorized by a SFSO sworn employee.
Approved Home Detention activities: _____

☐ Curfew, remain confined within the interior premises of residence during the following hours: _____

☐ Attend counseling / groups as directed. _____

☐ Abide by any stay away order or other restriction not on this form. (If checked, those must be attached to this form.)

☐ Other _____

*If there is a violation of any of the above court-ordered monitoring conditions, the SFSO may evaluate the violation and report to the Court, prepare an affidavit to revoke their OR or bail status and/or place under arrest for contempt of court.*

| | |
|---|---|
| Date | Judge |

---

**Cleared for EM by CP** ☐ Yes ☐ No   Deputy Name / Badge _____

If not cleared, enter the reason: _____

# EXHIBIT B



# San Francisco Sheriff's Department
# Electronic Monitoring (EM) Program Rules
# Pre-Sentenced Participants

Name: _____  DOB: _____  Court No: _____

We want you to succeed in this opportunity to remain out of custody during your court involvement. **Please review and indicate by initialing after each item that you understand your obligations.** If you do not follow the rules, you may be taken into custody by order of the court for any of the following reasons:

- Failure to follow program rules and/or regulations
- Failure to call or come in when instructed to either replace or return troublesome or problematic equipment
- Any articulable adverse behavior that prevents your successful completion of the program

## Program Rules-*Participant to review and initial each requirement*

1. I shall obey all orders given by any sworn employee or EM employee. _____

2. I shall obey all laws. _____

3. I shall notify an SFSD sworn employee of any arrest, citation or peace officer contact no later than the day after it occurs. _____

4. I shall immediately notify an SFSD sworn employee of any change in address or phone number_____

5. I shall submit to a search of my person, residence, automobile or property by any peace officer at any time. _____

6. If I am court ordered to enroll for alcohol monitoring, via a urine sample and/or breath alcohol test, I will do so as instructed by sworn SFSD or EM staff. _____

7. I shall not possess any illegal weapons or drugs. If I am enrolled in alcohol monitoring, I will not possess any alcohol. _____

8. I shall not tamper with, remove or cause the equipment to malfunction. Any of these acts is considered as an overt attempt to avoid monitoring or detection. Violation of this rule may result in a court order for my return to secure custody and filing of additional criminal charges. _____

9. I am responsible for all issued equipment.
   a. I may be criminally charged with theft for failure to return any issued equipment. _____
   b. I may be criminally charged with vandalism for damage to any issued equipment. _____

10. All participants must live within 50 miles of the San Francisco Sheriff's Department Community Programs office located at 70 Oak Grove Street, San Francisco, CA. Absent permission by SFSD I shall not travel farther than 50 miles from 70 Oak Grove Street, San Francisco, CA. _____

11. I am responsible to keep the device charged. Failure to do so is a violation the program. _____

12. I shall call in and report as directed to the office located at 70 Oak Grove Street, San Francisco, CA. Failure to do so is a violation of the program. _____

**EM Office Phone Number: 415-575-6461 – 24 HOURS A DAY**
**Location: 70 Oak Grove, San Francisco, CA, 94103 – 24 HOURS A DAY**

Number: SF-F-5
Revision No: 2.0

Issue Date: 11.18.19
Revision Date: 09.18.20

Location: Operations SharePoint Tab | SF
Page 1 of 2



# San Francisco Sheriff's Department
## Electronic Monitoring (EM) Program Rules
### Pre-Sentenced Participants

Name: _____  DOB: _____  Court No: _____

## Program Rules continued - *Participant to review and initial each requirement*

13. I acknowledge that my EM data may be shared with other criminal justice partners. _____

14. I agree to respond to all telephone calls from the Sheriff's Department and/or the Electronic Monitoring Program. _____

## The Following Home Detention/Curfew Considerations do not apply to participants who are on EM Tracking only

15. I must remain within the interior premises of my residence during designated curfew hours. _____

16. I may engage in only pre-approved activities per the court order. _____

17. I am granted 2.5 hours per week of errand time to attend personal needs such as church services or grocery shopping. After one successful month of compliance, I will be granted four hours per week at a consistent time (to be scheduled before 9pm). _____

18. I may attend counseling, 12-step meetings and programmatic groups if they are scheduled and verified. This may not exceed eight hours per week. _____

19. I must request any change in schedule 48 hours in advance. Request for schedule changes can only be made by phone Monday through Friday from 10:00 am to 5:00 pm. This includes court and medical appointments. _____

20. Any approved days spent out of zone will not be counted towards any calculation of credit for time served by the court. _____

21. A hearing may be convened for three incidents of non-compliance that may result in a court ordered return to custody. _____

22. An affidavit for return to custody will be submitted to the court and may result in a warrant for one incident of serious non-compliance. _____

I have read and initialed each item to indicate understanding. I agree to comply with these rules and conditions of the SFSD Electronic Monitoring Program.

Participant Signature: X_____     Date: _____

Sworn Staff Name:_____     Star: _____

Sworn Staff Signature: _____     Date:_____

## EM Office Phone Number: 415-575-6461 – 24 HOURS A DAY
## Location: 70 Oak Grove, San Francisco, CA, 94103 – 24 HOURS A DAY

Number: SF-F-5
Revision No: 2.0

Issue Date: 11.18.19
Revision Date: 09.18.20

Location: Operations SharePoint Tab | SF
Page 2 of 2

# EXHIBIT C



## SAN FRANCISCO SHERIFF'S DEPT. ELECTRONIC MONITORING PROGRAM
## PARTICIPANT CONTRACT: PRE-SENTENCED INDIVIDUALS

### INTRODUCTION

You have been placed in the Electronic Monitoring Program (EMP) as an alternative to incarceration. Based on the monitoring equipment you are issued, this program uses technology to alert a central monitoring station each time you leave and enter your home (GPS based monitoring), track your movements in the community (GPS), or test positively for the consumption of alcohol (Breath Alcohol Testing or Transdermal Alcohol Testing). The monitoring system will also report equipment tampering, low battery alarms, power outages that impact equipment recharging, and loss of telecommunication service that impacts equipment reporting capabilities.

Upon enrollment, the required equipment will be installed or issued to you. This equipment can only be removed or returned after you complete the program, unless otherwise directed by the Court or the Sheriff's Department.

The Court decides your level of supervision. If your supervision includes Home Detention while on the monitoring program, you are required to remain inside your home except for activities authorized by the Court. An alert will be sent to the Sheriff's Department for any violation as set by the Court, and/or the attached Program Rules.

### PROGRAM EQUIPMENT

Any monitoring, tracking, or testing equipment issued to you is the property of Sentinel Offender Services, LLC ("Sentinel"). It is your responsibility to prevent damage to or loss of all issued equipment. Your failure to return such equipment, upon request by Sentinel and/or the San Francisco Sheriff's Department may result in the filing of additional criminal charges against you.

### PROGRAM SCHEDULE

At the time of enrollment, Sheriff's staff will establish a daily activity schedule based on your permitted activities such as employment, counseling, drug or alcohol abuse treatment and any other permitted activities.

The Court may establish a curfew based on your work schedule and other permitted activities. All requests for schedule changes must be handled by the program administrator or designated staff. Requests for schedule changes can only be made by phone Monday through Friday from 10:00 am to 5:00 pm and only if made 48 hours in advance. It is your responsibility to plan your approved activities in advance so that last minute schedule changes do not occur.

Participant's Initials_____



# SAN FRANCISCO SHERIFF'S DEPT. ELECTRONIC MONITORING PROGRAM
## PARTICIPANT CONTRACT: PRE-SENTENCED INDIVIDUALS

### DRIVING PRIVILEGES

If you are driving a vehicle while on the program, you will be required to provide a valid driver's license at the time of your enrollment in the program. A participant whose license has been suspended or revoked shall not operate a motor vehicle.

### NOTIFICATIONS

In the event of a medical emergency, it is your responsibility to notify the San Francisco Sheriff's Department after hours by calling 415-575-6461 or Sentinel during business hours at 650-449-9004. You will be responsible for providing written proof of the emergency to the program administrator the following business day, no later than 3 p.m. You will remain in violation of the program rules until proof of any time away is received.

### PARTICIPANT AGREEMENT

1. I acknowledge that I am voluntarily enrolling in the Electronic Monitoring Program. I understand that the services provided by Sentinel are subject to technical issues or environmental situations out of the control of Sentinel that may impact the performance of any of the monitoring equipment. This may compromise the effective monitoring ordered by the SFSD to include court ordered obligations resulting in my removal from the program and/or remand into custody. These include:

    (a) Loss of telecommunication network service
    (b) Loss of local electrical service that impacts the ability to recharge the monitoring equipment
    (c) Equipment damage that affects its performance
    (d) Failure of the participant to recharge the monitoring equipment; and
    (e) Any unforeseen situation that prevents the equipment or monitoring service from effectively operating (collectively the "Outside Factors").

2. I acknowledge that Sentinel warrants that its services under this Agreement will materially conform as described above, but Sentinel does not warrant that the services will be available on a specified date or time or that the services will function on an error-free basis. At any given time, the equipment or software used in connection with this Agreement may malfunction and failures in the services may occur from time to time. Sentinel is not responsible for (a) outside factors, or (b) any claim arising out of uses of the monitoring equipment not in accordance with the applicable instructions for use and labeling.

    SENTINEL EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANT ABILITY, NON-INFRINGEMENT AND FITNESS FOR PARTICULAR PURPOSE.

Participant's Initials_____

Document No: SF-F-4
Revision No: 2.0
Issue Date: 11.18.19
Revision Date: 09.18.20
Location: Operations SharePoint Tab | SF
Page 2 of 5



## SAN FRANCISCO SHERIFF'S DEPT. ELECTRONIC MONITORING PROGRAM
## PARTICIPANT CONTRACT: PRE-SENTENCED INDIVIDUALS

3. I acknowledge that Sentinel's total aggregate liability under this Agreement shall not exceed the aggregate fees or other amounts paid by you to Sentinel for products and/or services pursuant hereto. I further acknowledge that Sentinel would not be able to provide monitoring services or would not be able to provide monitoring services to you at an affordable price without this limitation.

4. I ACKNOWLEDGE THAT TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL SENTINEL, OR ITS MEMBERS, DIRECTORS, OFFICERS, AGENTS, STAFF, OR EMPLOYEES, BE LIABLE FOR ANY SPECIAL, INCIDENTAL, DIRECTOR, OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING WITHOUT LIMITATION) DAMAGES FOR LOSS OF PROFITS OR CONFIDENTIAL OR OTHER INFORMATION, BUSINESS INTERRUPTION, PERSONAL INJURY, LOSS OF PRIVACY, YOUR INCARCERATION OR ARREST, FAILURE TO MEET ANY DUTY (INCLUDING THOSE OF GOOD FAITH OR OF REASONABLE CARE, NEGLIGENCE, OR ANY OTHER MONETARY OR OTHER LAWS WHATSOEVER) ARISING OUT OF OR IN ANY WAY RELATED TO THE SERVICE PROVIDED BY SENTINEL EVEN IF THE EXCLUSIVE REMEDIES STATED HEREIN FAIL OF THEIR ESSENTIAL PURPOSE.

5. I agree to the use of electronic monitoring or supervising devices for the purpose of verifying my compliance with the rules and regulations of the program. The devices shall not be used to eavesdrop or record any other conversation, except those between me and the National Monitoring Center personnel, which is required to record all telephone interaction with program participants.

6. I agree to respond to all telephone calls from the Sheriff's Department and/or the Electronic Monitoring Program.

7. I agree to attend scheduled court appearances, if required.

8. I acknowledge that in court, I knowingly waived my 4th Amendment rights and agree to submit my person, property, place of residence and /or personal effects to search at my time, with or without a warrant and with or without probable cause.

9. I acknowledge that my electronic monitoring data may be shared with other criminal justice partners.

10. If I am on home detention, I understand that if I am returned to custody for any reason, I may not be entitled to receive Credit for Time Served (CTS) equivalent to the period that I am no longer monitored because of my action/s or inaction/s.

Participant's Initials_____

Document No: SF-F-4
Revision No: 2.0

Issue Date: 11.18.19
Revision Date: 09.18.20

Location: Operations SharePoint Tab | SF
Page 3 of 5



## SAN FRANCISCO SHERIFF'S DEPT. ELECTRONIC MONITORING PROGRAM
## PARTICIPANT CONTRACT: PRE-SENTENCED INDIVIDUALS

### ATTESTATION

I have been advised that my participation in the Electronic Monitoring Program (EMP) is voluntary and that, if I prefer, I may stay in custody at a jail facility. These program guidelines have been explained to me and a copy given to me. I agree to comply with all program rules and regulations, mandated by the Court and the SFSD. I further understand that failure to follow program guidelines may result in my immediate return to custody.

I have read and received a copy of the aforementioned rules and regulations and agree to comply with the terms and conditions of the Electronic Monitoring Program.

Today I was issued device with serial number #: _____

_____

Participant Name (Print)


_____                    _____

Participant Signature                                                    Date


_____

Sentinel Representative (Print)


_____                    _____

Sentinel Representative Signature                                 Date


Sentinel Phone Number: 650-449-9004                    SFSD Phone Number: 415-575-6461


Participant's Initials_____

Document No: SF-F-4
Revision No: 2.0

Issue Date: 11.18.19
Revision Date: 09.18.20

Location: Operations SharePoint Tab | SF
Page 4 of 5



## SAN FRANCISCO SHERIFF'S DEPT. ELECTRONIC MONITORING PROGRAM
## PARTICIPANT CONTRACT: PRE-SENTENCED INDIVIDUALS

### CURFEWS, PERMITTED ACTIVITIES & STAY AWAYS

Name: _____

Curfew schedule (if applicable):

| DAY | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|------|--------|--------|---------|-----------|----------|--------|----------|
| TIME | | | | | | | |
| TIME | | | | | | | |
| TIME | | | | | | | |
| TIME | | | | | | | |

NOTE: You are not entitled to receive Credit for Time Served (CTS) unless you are under mandatory court-imposed curfew, while you are enrolled in the Electronic Monitoring Program.

Approved activities (if applicable):

| ACTIVITY / TIME | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|-----------------|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Stay away orders (if applicable):

_____

_____

_____

_____

Participant's Initials_____

Document No: SF-F-4
Revision No: 2.0

Issue Date: 11.18.19
Revision Date: 09.18.20

Location: Operations SharePoint Tab | SF
Page 5 of 5

# EXHIBIT D

**City and County of San Francisco**
**Office of Contract Administration**
**Purchasing Division**
**City Hall, Room 430**
**1 Dr. Carlton B. Goodlett Place**
**San Francisco, California 94102-4685**

Agreement between the City and County of San Francisco and

**Sentinel Offender Services, LLC**
**Contract ID 1000013942**

This Agreement is made this First day of August, 2019, in the City and County of San Francisco ("City"), State of California, by and between Sentinel Offender Services, LLC ("Contractor" or "Sentinel"), 1290 N. Hancock St., Suite 103 Anaheim, CA 92807 and City.

**Recitals**

WHEREAS, the San Francisco Sheriff's Department ("Department" or "SFSD") wishes to contract for electronic monitoring services and case management programming; and,

WHEREAS, this Agreement was competitively procured as required by San Francisco Administrative Code Chapter 21.1 through a Request for Proposal ("RFP") SHF2019-01 issued on September 28, 2018, in which City selected Contractor as the highest qualified scorer pursuant to the RFP; and

WHEREAS, there is no Local Business Entity ("LBE") subcontracting participation requirement for this Agreement; and

WHEREAS, Contractor represents and warrants that it is qualified to perform the Services required by City as set forth under this Agreement; and

WHEREAS, the City's Civil Service Commission approved Contract number PSC 44727-17/18 on March 4, 2019;

Now, THEREFORE, the parties agree as follows:

### Article 1    Definitions

The following definitions apply to this Agreement:

1.1     "Agreement" means this contract document, including all attached appendices, and all applicable City Ordinances and Mandatory City Requirements which are specifically incorporated into this Agreement by reference as provided herein.

1.2     "City" or "the City" means the City and County of San Francisco, a municipal corporation, acting by and through both its Director of the Office of Contract Administration or the Director's designated agent, hereinafter referred to as "Purchasing" and "the San Francisco Sheriff's Department."

1.3     "CMD" means the Contract Monitoring Division of the City.

1.4    "Confidential Information" means confidential City information including, but not limited to, personally-identifiable information ("PII"), protected health information ("PHI"), or individual financial information (collectively, "Proprietary or Confidential Information") that is subject to local, state or federal laws restricting the use and disclosure of such information, including, but not limited to, Article 1, Section 1 of the California Constitution; the California Information Practices Act (Civil Code § 1798 et seq.); the California Confidentiality of Medical Information Act (Civil Code § 56 et seq.); the federal Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801(b) and 6805(b)(2)); the privacy and information security aspects of the Administrative Simplification provisions of the federal Health Insurance Portability and Accountability Act (45 CFR Part 160 and Subparts A, C, and E of part 164); and San Francisco Administrative Code Chapter 12M (Chapter 12M).

1.5    "Contractor" or "Consultant" means Sentinel, 1290 N. Hancock St., Suite 103 Anaheim, CA 92807.

1.6    "Deliverables" means Contractor's work product resulting from the Services that are provided by Contractor to City during the course of Contractor's performance of the Agreement, including without limitation, the work product described in the "Scope of Services" attached as Appendix A.

1.7    "Effective Date" means the date upon which the City's Controller certifies the availability of funds for this Agreement as provided in Section 3.1.

1.8    "Mandatory City Requirements" means those City laws set forth in the San Francisco Municipal Code, including the duly authorized rules, regulations, and guidelines implementing such laws, that impose specific duties and obligations upon Contractor.

1.9    "Party" and "Parties" mean the City and Contractor either collectively or individually.

1.10    "Services" means the work performed by Contractor under this Agreement as specifically described in the "Scope of Services" attached as Appendix A, including all services, labor, supervision, materials, equipment, actions and other requirements to be performed and furnished by Contractor under this Agreement.

### Article 2    Term of the Agreement

2.1    The term of this Agreement shall commence on the later of: (i) August 1, 2019; or (ii) the Effective Date and expire on July 31, 2022, unless earlier terminated as otherwise provided herein.

2.2    The City has two (2) options to renew the Agreement for a period of one year each. The City may extend this Agreement beyond the expiration date by exercising an option at the City's sole and absolute discretion and by modifying this Agreement as provided in Section 11.5, "Modification of this Agreement."

### Article 3    Financial Matters

3.1    **Certification of Funds; Budget and Fiscal Provisions; Termination in the Event of Non-Appropriation**. This Agreement is subject to the budget and fiscal provisions of the City's Charter. Charges will accrue only after prior written authorization certified by the Controller, and the amount of City's obligation hereunder shall not at any time exceed the amount certified for the purpose and period stated in such advance authorization. This

Agreement will terminate without penalty, liability or expense of any kind to City at the end of any fiscal year if funds are not appropriated for the next succeeding fiscal year. If funds are appropriated for a portion of the fiscal year, this Agreement will terminate, without penalty, liability or expense of any kind at the end of the term for which funds are appropriated. City has no obligation to make appropriations for this Agreement in lieu of appropriations for new or other agreements. City budget decisions are subject to the discretion of the Mayor and the Board of Supervisors. Contractor's assumption of risk of possible non-appropriation is part of the consideration for this Agreement.

THIS SECTION CONTROLS AGAINST ANY AND ALL OTHER PROVISIONS OF THIS AGREEMENT.

3.2    **Guaranteed Maximum Costs**. The City's payment obligation to Contractor cannot at any time exceed the amount certified by City's Controller for the purpose and period stated in such certification. Absent an authorized Emergency per the City Charter or applicable Code, no City representative is authorized to offer or promise, nor is the City required to honor, any offered or promised payments to Contractor under this Agreement in excess of the certified maximum amount without the Controller having first certified the additional promised amount and the Parties having modified this Agreement as provided in Section 11.5, "Modification of this Agreement."

3.3    **Compensation.**

3.3.1    **Payment**. Contractor shall provide an invoice to the City on a monthly basis for Services completed in the immediate preceding month, unless a different schedule is set out in Appendix B, "Calculation of Charges (City-Paid Service Fees)." The Parties acknowledge that SFSD and Contractor may also initiate collection of participant fees as identified in **Appendix A Scope of Services, D. Initial Assessment and Case File**, item **10. Financial Assessment**. Compensation shall be made for Services identified in the invoice that the Sheriff, in his or her sole discretion, concludes has been satisfactorily performed. Payment shall be made within 30 calendar days of receipt of the invoice, unless the City notifies the Contractor that a dispute as to the invoice exists. In no event shall the amount of this Agreement exceed Three Million Four Hundred Thousand Dollars ($3,400,000). The breakdown of charges associated with this Agreement appears in Appendix B, "Calculation of Charges," attached hereto and incorporated by reference as though fully set forth herein. A portion of payment may be withheld until conclusion of the Agreement if agreed to both parties as retainage, described in Appendix B. In no event shall City be liable for interest or late charges for any late payments.

3.3.2    **Payment Limited to Satisfactory Services.** Contractor is not entitled to any payments from City until the SFSD approves Services, including any furnished Deliverables, as satisfying all of the requirements of this Agreement. Payments to Contractor by City shall not excuse Contractor from its obligation to replace unsatisfactory Deliverables, including equipment, components, materials, or Services even if the unsatisfactory character of such Deliverables, equipment, components, materials, or Services may not have been apparent or detected at the time such payment was made. Deliverables, equipment, components, materials and Services that do not conform to the requirements of this Agreement may be rejected by City and in such case must be replaced by Contractor without delay at no cost to the City.

3.3.3 **Withhold Payments.** If Contractor fails to provide Services in accordance with Contractor's obligations under this Agreement, the City may withhold any and all payments due Contractor until such failure to perform is cured, and Contractor shall not stop work as a result of City's withholding of payments as provided herein.

3.3.4 **Invoice Format**. Invoices furnished by Contractor under this Agreement must be in a form acceptable to the Controller and City and must include a unique invoice number. Payment shall be made by City as specified in 3.3.6, or in such alternate manner as the Parties have mutually agreed upon in writing.

3.3.5 **Reserved. (LBE Payment and Utilization Tracking System.)**

3.3.6 **Getting paid by the City for goods and/or services.**

(a)     All City vendors receiving new contracts, contract renewals, or contract extensions must sign up to receive electronic payments through the City's Automated Clearing House (ACH) payments service/provider. Electronic payments are processed every business day and are safe and secure. To sign up for electronic payments, visit www.sfgov.org/ach.

(b)     The following information is required to sign up: (i) The enroller must be their company's authorized financial representative, (ii) the company's legal name, main telephone number and all physical and remittance addresses used by the company, (iii) the company's U.S. federal employer identification number (EIN) or Social Security number (if they are a sole proprietor), and (iv) the company's bank account information, including routing and account numbers.

3.4     **Audit and Inspection of Records**. Contractor agrees to maintain and make available to the City, during regular business hours, accurate books and accounting records relating to its Services. Contractor will permit City to audit, examine and make excerpts and transcripts from such books and records, and to make audits of all invoices, materials, payrolls, records or personnel and other data related to all other matters covered by this Agreement, whether funded in whole or in part under this Agreement. Contractor shall maintain such data and records in an accessible location and condition for a period of not fewer than five years after final payment under this Agreement or until after final audit has been resolved, whichever is later. The State of California or any Federal agency having an interest in the subject matter of this Agreement shall have the same rights as conferred upon City by this Section. Contractor shall include the same audit and inspection rights and record retention requirements in all subcontracts.

3.5     **Submitting False Claims**. The full text of San Francisco Administrative Code Chapter 21, Section 21.35, including the enforcement and penalty provisions, is incorporated into this Agreement. Pursuant to San Francisco Administrative Code §21.35, any contractor or subcontractor who submits a false claim shall be liable to the City for the statutory penalties set forth in that section. A contractor or subcontractor will be deemed to have submitted a false claim to the City if the contractor or subcontractor: (a) knowingly presents or causes to be presented to an officer or employee of the City a false claim or request for payment or approval; (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the City; (c) conspires to defraud the City by getting a false claim allowed or paid by the City; (d) knowingly makes, uses, or causes to be made or used a

false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the City; or (e) is a beneficiary of an inadvertent submission of a false claim to the City, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the City within a reasonable time after discovery of the false claim.

3.6     **Reserved. (Payment of Prevailing Wages.)**

### Article 4     Services and Resources

4.1     **Services Contractor Agrees to Perform**. Contractor agrees to perform the Services provided for in Appendix A, "Scope of Services." Officers and employees of the City are not authorized to request, and the City is not required to reimburse the Contractor for, Services beyond the Scope of Services listed in Appendix A, unless Appendix A is modified as provided in Section 11.5, "Modification of this Agreement."

4.2     **Qualified Personnel**. Contractor shall utilize only competent personnel under the supervision of, and in the employment of, Contractor (or Contractor's authorized subcontractors) to perform the Services. Contractor will comply with City's reasonable requests regarding assignment and/or removal of personnel, but all personnel, including those assigned at City's request, must be supervised by Contractor. Contractor shall commit adequate resources to allow timely completion within the project schedule specified in this Agreement.

4.3     **Subcontracting**.

4.3.1     Contractor may subcontract portions of the Services only upon prior written approval of City. Contractor is responsible for its subcontractors throughout the course of the work required to perform the Services. All Subcontracts must incorporate the terms of Article 10 "Additional Requirements Incorporated by Reference" of this Agreement, unless inapplicable. Neither Party shall, on the basis of this Agreement, contract on behalf of, or in the name of, the other Party. Any agreement made in violation of this provision shall be null and void.

4.3.2     City's execution of this Agreement constitutes its approval of the subcontractors listed below.

Contractor will not employ subcontractors.

4.4     **Independent Contractor; Payment of Employment Taxes and Other Expenses.**

4.4.1     **Independent Contractor**. For the purposes of this Section 4.4, "Contractor" shall be deemed to include not only Contractor, but also any agent or employee of Contractor. Contractor acknowledges and agrees that at all times, Contractor or any agent or employee of Contractor shall be deemed at all times to be an independent contractor and is wholly responsible for the manner in which it performs the services and work requested by City under this Agreement. Contractor, its agents, and employees will not represent or hold themselves out to be employees of the City at any time. Contractor or any agent or employee of Contractor shall not have employee status with City, nor be entitled to participate in any plans, arrangements, or distributions by City pertaining to or in connection with any retirement, health

or other benefits that City may offer its employees. Contractor or any agent or employee of Contractor is liable for the acts and omissions of itself, its employees and its agents. Contractor shall be responsible for all obligations and payments, whether imposed by federal, state or local law, including, but not limited to, FICA, income tax withholdings, unemployment compensation, insurance, and other similar responsibilities related to Contractor's performing services and work, or any agent or employee of Contractor providing same.  Nothing in this Agreement shall be construed as creating an employment or agency relationship between City and Contractor or any agent or employee of Contractor. Any terms in this Agreement referring to direction from City shall be construed as providing for direction as to policy and the result of Contractor's work only, and not as to the means by which such a result is obtained.  City does not retain the right to control the means or the method by which Contractor performs work under this Agreement. Contractor agrees to maintain and make available to City, upon request and during regular business hours, accurate books and accounting records demonstrating Contractor's compliance with this section. Should City determine that Contractor, or any agent or employee of Contractor, is not performing in accordance with the requirements of this Agreement, City shall provide Contractor with written notice of such failure. Within five (5) business days of Contractor's receipt of such notice, and in accordance with Contractor policy and procedure, Contractor shall remedy the deficiency. Notwithstanding, if City believes that an action of Contractor, or any agent or employee of Contractor, warrants immediate remedial action by Contractor, City shall contact Contractor and provide Contractor in writing with the reason for requesting such immediate action.

4.4.2   **Payment of Employment Taxes and Other Expenses**. Should City, in its discretion, or a relevant taxing authority such as the Internal Revenue Service or the State Employment Development Division, or both, determine that Contractor is an employee for purposes of collection of any employment taxes, the amounts payable under this Agreement shall be reduced by amounts equal to both the employee and employer portions of the tax due (and offsetting any credits for amounts already paid by Contractor which can be applied against this liability). City shall then forward those amounts to the relevant taxing authority. Should a relevant taxing authority determine a liability for past services performed by Contractor for City, upon notification of such fact by City, Contractor shall promptly remit such amount due or arrange with City to have the amount due withheld from future payments to Contractor under this Agreement (again, offsetting any amounts already paid by Contractor which can be applied as a credit against such liability). A determination of employment status pursuant to the preceding two paragraphs shall be solely for the purposes of the particular tax in question, and for all other purposes of this Agreement, Contractor shall not be considered an employee of City. Notwithstanding the foregoing, Contractor agrees to indemnify and save harmless City and its officers, agents and employees from, and, if requested, shall defend them against any and all claims, losses, costs, damages, and expenses, including attorneys' fees, arising from this section.

4.5   **Assignment**. The Services to be performed by Contractor are personal in character. Neither this Agreement, nor any duties or obligations hereunder, may be directly or indirectly assigned, novated, hypothecated, transferred, or delegated by Contractor, or, where the Contractor is a joint venture, a joint venture partner, (collectively referred to as an "Assignment") unless first approved by City by written instrument executed and approved in the same manner as this Agreement in accordance with the Administrative Code. The City's approval of any such Assignment is subject to the Contractor demonstrating to City's reasonable satisfaction that the proposed transferee is: (i) reputable and capable, financially and

otherwise, of performing each of Contractor's obligations under this Agreement and any other documents to be assigned, (ii) not forbidden by applicable law from transacting business or entering into contracts with City; and (iii) subject to the jurisdiction of the courts of the State of California. A change of ownership or control of Contractor or a sale or transfer of substantially all of the assets of Contractor shall be deemed an Assignment for purposes of this Agreement. Contractor shall immediately notify City about any Assignment. Any purported assignment made in violation of this provision shall be null and void.

      4.6    **Warranty**. Contractor warrants to City that the Services will be performed with the degree of skill and care that is required by current, good and sound professional procedures and practices, and in conformance with generally accepted professional standards prevailing at the time the Services are performed so as to ensure that all Services performed are correct and appropriate for the purposes contemplated in this Agreement.

      4.7    **Liquidated Damages.** By entering into this Agreement, Contractor agrees that in the event Sentinel fails to deliver the Services, as provided under Article 4 herein, City will suffer actual damages that will be impractical or extremely difficult to determine. Contractor agrees that the greater of the sum of:

      (a) $1,000.00 per day;

      OR

      (b) All actual costs associated with the SFSD's assumption of Sentinel's obligations under this Agreement in the event that Sentinel cannot timely fulfill those obligations, for a total amount not to exceed $1,000 per day, including, but not limited to:

          1.  Vehicle use and gas as associated with Field Check

          2.  Overtime pay costs for Deputy Sheriff

      Sentinel's aggregate liability to City relating to or arising out of this Agreement, whether in contract, tort, or otherwise, shall not exceed the total amounts paid by City to Sentinel during the twelve (12) month period immediately preceding the event which gave rise to City's claims.

      City may deduct a sum representing the liquidated damages from any money due to Contractor after the Contractor is notified in writing, subject to the opportunity to cure set forth below. Such deductions shall not be considered a penalty, but rather agreed monetary damages sustained by City because of Contractor's failure to deliver to City within the time fixed or such extensions of time permitted in writing by the City.

      Liquidated damages will be suspended due to any force majeure event. A force majeure event is defined as Acts of God (including fire, flood, earthquake, storm, hurricane or other natural disaster), war, invasion, act of foreign enemies, hostilities (regardless of whether war is declared), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption or failure of electricity or telephone service.

      Contractor is responsible to use reasonable commercial effort to collect client fees. In the event Contractor does not collect the required participant's program fees, the City, upon advance notice to Contractor, may deduct a sum representing the liquidated damages from

any money due to Contractor from the monthly billing, and such deductions shall not be considered a penalty, but rather agreed liquidated damages sustained by City because of Contractor's failure to collect the fees, as required by the contract. If Contractor is unable to collect fees due to a change in circumstances of a participant, Contractor shall refer the case to the SFSD for a determination of a full or partial waiver within 24 hours of client's refusal to pay. As long as Contractor submits a timely incident report detailing clients' change in circumstances or willfully refusing to pay within 24 hours, there will be no deduction of those uncollected fees from Contactor's monthly billing.

Opportunity to Cure. If Contractor breaches any provision of this Agreement, City will give written notice; with confirm receipt, to Contractor per Section 11.1, entitled "Notices to the Parties" detailing Contractor violations. If such violation is not corrected to the reasonable satisfaction of City within twenty-four (24) hours after the notice of violation, or within such a reasonable time as may be required to cure the violation (provided the acts to cure the violation are commenced within twenty-four (24) hours and thereafter diligently pursued to completion), the City may, without further notice, declare Contractor to be in breach of this Agreement. Upon City's declaration of Contractor's breach, City may collect liquidated damages and may pursue any remedy available under local, state, or federal law, including those specifically provided for in this section.

## Article 5     Insurance and Indemnity

### 5.1   Insurance.

5.1.1   **Required Coverages.** Without in any way limiting Contractor's liability pursuant to the "Indemnification" section of this Agreement, Contractor must maintain in force, during the full term of the Agreement, insurance in the following amounts and coverages:

(a)      Workers' Compensation, in statutory amounts, with Employers' Liability Limits not less than $1,000,000 each accident, injury, or illness; and

(b)      Commercial General Liability Insurance with limits not less than $1,000,000 each occurrence for Bodily Injury and Property Damage, including Contractual Liability, Personal Injury, Products and Completed Operations; and

(c)      Commercial Automobile Liability Insurance with limits not less than $1,000,000 each occurrence, "Combined Single Limit" for Bodily Injury and Property Damage, including Owned, Non-Owned and Hired auto coverage, as applicable.

(d)      Professional liability insurance, applicable to Contractor's profession, with limits not less than $1,000,000 each claim with respect to negligent acts, errors or omissions in connection with the Services.

(e)      Technology Errors and Omissions Liability coverage, with limits of $1,000,000 each occurrence and each loss. The policy shall at a minimum cover professional misconduct or lack of the requisite skill required for the performance of services defined in the contract and shall also provide coverage for the following risks:

(i)      Network security liability arising from the unauthorized access to, use of, or tampering with computers or computer systems, including hacker attacks; and

    (ii) Liability arising from the introduction of any form of malicious software including computer viruses into, or otherwise causing damage to the City's or third person's computer, computer system, network, or similar computer related property and the data, software, and programs thereon.

    (f) Contractor shall maintain in force during the full life of the agreement Cyber and Privacy Insurance with limits of not less than $1,000,000 per occurrence. Such insurance shall include coverage for liability arising from theft, dissemination, and/or use of confidential information, including but not limited to, bank and credit card account information or personal information, such as name, address, social security numbers, protected health information or other personally identifying information, stored or transmitted in electronic form.

    5.1.2 Commercial General Liability and Commercial Automobile Liability Insurance policies must be endorsed to name as Additional Insured the City and County of San Francisco, its Officers, Agents, and Employees.

    5.1.3 Contractor's Commercial General Liability and Commercial Automobile Liability Insurance policies shall provide that such policies are primary insurance to any other insurance available to the Additional Insureds, with respect to any claims arising out of this Agreement, and that the insurance applies separately to each insured against whom claim is made or suit is brought.

    5.1.4 All policies shall be endorsed to provide thirty (30) days' advance written notice to the City of cancellation for any reason, intended non-renewal, or reduction in coverages. Notices shall be sent to the City address set forth in Section 11.1, entitled "Notices to the Parties."

    5.1.5 Should any of the required insurance be provided under a claims-made form, Contractor shall maintain such coverage continuously throughout the term of this Agreement and, without lapse, for a period of three years beyond the expiration of this Agreement, to the effect that, should occurrences during the contract term give rise to claims made after expiration of the Agreement, such claims shall be covered by such claims-made policies.

    5.1.6 Should any of the required insurance be provided under a form of coverage that includes a general annual aggregate limit or provides that claims investigation or legal defense costs be included in such general annual aggregate limit, such general annual aggregate limit shall be double the occurrence or claims limits specified above.

    5.1.7 Should any required insurance lapse during the term of this Agreement, requests for payments originating after such lapse shall not be processed until the City receives satisfactory evidence of reinstated coverage as required by this Agreement, effective as of the lapse date. If insurance is not reinstated, the City may, at its sole option, terminate this Agreement effective on the date of such lapse of insurance.

    5.1.8 Before commencing any Services, Contractor shall furnish to City certificates of insurance and additional insured policy endorsements with insurers with ratings comparable to A-, VIII or higher, that are authorized to do business in the State of California,

and that are satisfactory to City, in form evidencing all coverages set forth above. Approval of the insurance by City shall not relieve or decrease Contractor's liability hereunder.

       5.1.9    The Workers' Compensation policy(ies) shall be endorsed with a waiver of subrogation in favor of the City for all work performed by the Contractor, its employees, agents and subcontractors.

       5.1.10    If Contractor will use any subcontractor(s) to provide Services, Contractor shall require the subcontractor(s) to provide all necessary insurance and to name the City and County of San Francisco, its officers, agents and employees and the Contractor as additional insureds.

    5.2    **Indemnification**. Contractor shall indemnify and hold harmless City and its officers, agents and employees from, and, if requested, shall defend them from and against any and all claims, demands, losses, damages, costs, expenses, and liability (legal, contractual, or otherwise) arising from or in any way connected with any: (i) injury to or death of a person, including employees of City or Contractor; (ii) loss of or damage to property; (iii) violation of local, state, or federal common law, statute or regulation, including but not limited to privacy or personally identifiable information, health information, disability and labor laws or regulations; (iv) strict liability imposed by any law or regulation; or (v) losses arising from Contractor's execution of subcontracts not in accordance with the requirements of this Agreement applicable to subcontractors; so long as such injury, violation, loss, or strict liability (as set forth in subsections (i) – (v) above) arises directly or indirectly from Contractor's performance of this Agreement, including, but not limited to, Contractor's use of facilities or equipment provided by City or others, regardless of the negligence of, and regardless of whether liability without fault is imposed or sought to be imposed on City, except to the extent that such indemnity is void or otherwise unenforceable under applicable law, and except where such loss, damage, injury, liability or claim is the result of the active negligence or willful misconduct of City and is not contributed to by any act of, or by any omission to perform some duty imposed by law or agreement on Contractor, its subcontractors, or either's agent or employee. The foregoing indemnity shall include, without limitation, reasonable fees of attorneys, consultants and experts and related costs and City's costs of investigating any claims against the City.

    In addition to Contractor's obligation to indemnify City, Contractor specifically acknowledges and agrees that it has an immediate and independent obligation to defend City from any claim which actually or potentially falls within this indemnification provision, even if the allegations are or may be groundless, false or fraudulent, which obligation arises at the time such claim is tendered to Contractor by City and continues at all times thereafter.

    Contractor shall indemnify and hold City harmless from all loss and liability, including attorneys' fees, court costs and all other litigation expenses for any infringement of the patent rights, copyright, trade secret or any other proprietary right or trademark, and all other intellectual property claims of any person or persons arising directly or indirectly from the receipt by City, or any of its officers or agents, of Contractor's Services.

### Article 6    Liability of the Parties

   6.1    **Liability of City**. CITY'S PAYMENT OBLIGATIONS UNDER THIS AGREEMENT SHALL BE LIMITED TO THE PAYMENT OF THE COMPENSATION

PROVIDED FOR IN SECTION 3.3.1, "PAYMENT," OF THIS AGREEMENT.
NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT
SHALL CITY BE LIABLE, REGARDLESS OF WHETHER ANY CLAIM IS BASED ON
CONTRACT OR TORT, FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT OR
INCIDENTAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS,
ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES
PERFORMED IN CONNECTION WITH THIS AGREEMENT.

6.2    **Liability for Use of Equipment.** City shall not be liable for any damage to
persons or property as a result of the use, misuse or failure of any equipment used by
Contractor, or any of its subcontractors, or by any of their employees, even though such
equipment is furnished, rented or loaned by City.

6.3    **Liability for Incidental and Consequential Damages**. Contractor shall be
responsible for incidental and consequential damages resulting in whole or in part from
Contractor's acts or omissions.

### Article 7    Payment of Taxes

7.1    **Contractor to Pay All Taxes.** Except for any applicable California sales and use
taxes charged by Contractor to City, Contractor shall pay all taxes, including possessory interest
taxes levied upon or as a result of this Agreement, or the Services delivered pursuant hereto.
Contractor shall remit to the State of California any sales or use taxes paid by City to Contractor
under this Agreement. Contractor agrees to promptly provide information requested by the City
to verify Contractor's compliance with any State requirements for reporting sales and use tax
paid by City under this Agreement.

7.2    **Possessory Interest Taxes.** Contractor acknowledges that this Agreement may
create a "possessory interest" for property tax purposes. Generally, such a possessory interest is
not created unless the Agreement entitles the Contractor to possession, occupancy, or use of
City property for private gain. If such a possessory interest is created, then the following shall
apply:

7.2.1    Contractor, on behalf of itself and any permitted successors and assigns,
recognizes and understands that Contractor, and any permitted successors and assigns, may be
subject to real property tax assessments on the possessory interest.

7.2.2    Contractor, on behalf of itself and any permitted successors and assigns,
recognizes and understands that the creation, extension, renewal, or assignment of this
Agreement may result in a "change in ownership" for purposes of real property taxes, and
therefore may result in a revaluation of any possessory interest created by this Agreement.
Contractor accordingly agrees on behalf of itself and its permitted successors and assigns to
report on behalf of the City to the County Assessor the information required by Revenue and
Taxation Code section 480.5, as amended from time to time, and any successor provision.

7.2.3    Contractor, on behalf of itself and any permitted successors and assigns,
recognizes and understands that other events also may cause a change of ownership of the
possessory interest and result in the revaluation of the possessory interest. (see, e.g., Rev. & Tax.
Code section 64, as amended from time to time). Contractor accordingly agrees on behalf of

itself and its permitted successors and assigns to report any change in ownership to the County Assessor, the State Board of Equalization or other public agency as required by law.

       7.2.4   Contractor further agrees to provide such other information as may be requested by the City to enable the City to comply with any reporting requirements for possessory interests that are imposed by applicable law.

   7.3   **Withholding**. Contractor agrees that it is obligated to pay all amounts due to the City under the San Francisco Business and Tax Regulations Code during the term of this Agreement.  Pursuant to Section 6.10-2 of the San Francisco Business and Tax Regulations Code, Contractor further acknowledges and agrees that City may withhold any payments due to Contractor under this Agreement if Contractor is delinquent in the payment of any amount required to be paid to the City under the San Francisco Business and Tax Regulations Code. Any payments withheld under this paragraph shall be made to Contractor, without interest, upon Contractor coming back into compliance with its obligations.

**Article 8     Termination and Default**

   8.1   **Termination for Convenience**

       8.1.1   City shall have the option, in its sole discretion, to terminate this Agreement, at any time during the term hereof, for convenience and without cause. City shall exercise this option by giving Contractor written notice of termination. The notice shall specify the date on which termination shall become effective.

       8.1.2   Upon receipt of the notice of termination, Contractor shall commence and perform, with diligence, all actions necessary on the part of Contractor to effect the termination of this Agreement on the date specified by City and to minimize the liability of Contractor and City to third parties as a result of termination. All such actions shall be subject to the prior approval of City. Such actions shall include, without limitation:

         (a)   Halting the performance of all Services under this Agreement on the date(s) and in the manner specified by City.

         (b)   Terminating all existing orders and subcontracts, and not placing any further orders or subcontracts for materials, Services, equipment or other items.

         (c)   At City's direction, assigning to City any or all of Contractor's right, title, and interest under the orders and subcontracts terminated. Upon such assignment, City shall have the right, in its sole discretion, to settle or pay any or all claims arising out of the termination of such orders and subcontracts.

         (d)   Subject to City's approval, settling all outstanding liabilities and all claims arising out of the termination of orders and subcontracts.

         (e)   Completing performance of any Services that City designates to be completed prior to the date of termination specified by City.

         (f)   Taking such action as may be necessary, or as the City may direct, for the protection and preservation of any property related to this Agreement which is in the possession of Contractor and in which City has or may acquire an interest.

8.1.3    Within 30 days after the specified termination date, Contractor shall submit to City an invoice, which shall set forth each of the following as a separate line item:

(a)      The reasonable cost to Contractor, without profit, for all Services prior to the specified termination date, for which Services City has not already tendered payment. Reasonable costs may include a reasonable allowance for actual overhead, not to exceed a total of 10% of Contractor's direct costs for Services. Any overhead allowance shall be separately itemized. Contractor may also recover the reasonable cost of preparing the invoice.

(b)      A reasonable allowance for profit on the cost of the Services described in the immediately preceding subsection (a), provided that Contractor can establish, to the satisfaction of City, that Contractor would have made a profit had all Services under this Agreement been completed, and provided further, that the profit allowed shall in no event exceed 5% of such cost.

(c)      The reasonable cost to Contractor of handling material or equipment returned to the vendor, delivered to the City or otherwise disposed of as directed by the City.

(d)      A deduction for the cost of materials to be retained by Contractor, amounts realized from the sale of materials and not otherwise recovered by or credited to City, and any other appropriate credits to City against the cost of the Services or other work.

8.1.4    In no event shall City be liable for costs incurred by Contractor or any of its subcontractors after the termination date specified by City, except for those costs specifically listed in Section 8.1.3. Such non-recoverable costs include, but are not limited to, anticipated profits on the Services under this Agreement, post-termination employee salaries, post-termination administrative expenses, post-termination overhead or unabsorbed overhead, attorneys' fees or other costs relating to the prosecution of a claim or lawsuit, prejudgment interest, or any other expense which is not reasonable or authorized under Section 8.1.3.

8.1.5    In arriving at the amount due to Contractor under this Section, City may deduct: (i) all payments previously made by City for Services covered by Contractor's final invoice; (ii) any claim which City may have against Contractor in connection with this Agreement; (iii) any invoiced costs or expenses excluded pursuant to the immediately preceding subsection 8.1.4; and (iv) in instances in which, in the opinion of the City, the cost of any Service performed under this Agreement is excessively high due to costs incurred to remedy or replace defective or rejected Services, the difference between the invoiced amount and City's estimate of the reasonable cost of performing the invoiced Services in compliance with the requirements of this Agreement.

8.1.6    City's payment obligation under this Section shall survive termination of this Agreement.

8.2    **Termination for Default; Remedies.**

8.2.1    Each of the following shall constitute an immediate event of default ("Event of Default") under this Agreement:

(a)      Contractor fails or refuses to perform or observe any term, covenant or condition contained in any of the following Sections of this Agreement:

| 3.5 | Submitting False Claims. | 10.10 | Alcohol and Drug-Free Workplace |
|---|---|---|---|
| 4.5 | Assignment | 10.13 | Working with Minors |
| Article 5 | Insurance and Indemnity | 11.10 | Compliance with Laws |
| Article 7 | Payment of Taxes | Article 13 | Data and Security |

(b)     Contractor fails or refuses to perform or observe any other term, covenant or condition contained in this Agreement, including any obligation imposed by ordinance or statute and incorporated by reference herein, and such default is not cured within ten days after written notice thereof from City to Contractor. If Contractor defaults a second time in the same manner as a prior default cured by Contractor, City may in its sole discretion immediately terminate the Agreement for default or grant an additional period not to exceed five days for Contractor to cure the default.

(c)     Contractor (i) is generally not paying its debts as they become due; (ii) files, or consents by answer or otherwise to the filing against it of a petition for relief or reorganization or arrangement or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy, insolvency or other debtors' relief law of any jurisdiction; (iii) makes an assignment for the benefit of its creditors; (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers of Contractor or of any substantial part of Contractor's property; or (v) takes action for the purpose of any of the foregoing.

(d)     A court or government authority enters an order (i) appointing a custodian, receiver, trustee or other officer with similar powers with respect to Contractor or with respect to any substantial part of Contractor's property, (ii) constituting an order for relief or approving a petition for relief or reorganization or arrangement or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy, insolvency or other debtors' relief law of any jurisdiction or (iii) ordering the dissolution, winding-up or liquidation of Contractor.

8.2.2     On and after any Event of Default, City shall have the right to exercise its legal and equitable remedies, including, without limitation, the right to terminate this Agreement or to seek specific performance of all or any part of this Agreement. In addition, where applicable, City shall have the right (but no obligation) to cure (or cause to be cured) on behalf of Contractor any Event of Default; Contractor shall pay to City on demand all costs and expenses incurred by City in effecting such cure, with interest thereon from the date of incurrence at the maximum rate then permitted by law. City shall have the right to offset from any amounts due to Contractor under this Agreement or any other agreement between City and Contractor: (i) all damages, losses, costs or expenses incurred by City as a result of an Event of Default; and (ii) any liquidated damages levied upon Contractor pursuant to the terms of this Agreement; and (iii), any damages imposed by any ordinance or statute that is incorporated into this Agreement by reference, or into any other agreement with the City.

8.2.3     All remedies provided for in this Agreement may be exercised individually or in combination with any other remedy available hereunder or under applicable laws, rules and regulations. The exercise of any remedy shall not preclude or in any way be

deemed to waive any other remedy. Nothing in this Agreement shall constitute a waiver or limitation of any rights that City may have under applicable law.

      8.2.4    Any notice of default must be sent by registered mail to the address set forth in Article 11.

    8.3    **Non-Waiver of Rights**. The omission by either party at any time to enforce any default or right reserved to it, or to require performance of any of the terms, covenants, or provisions hereof by the other party at the time designated, shall not be a waiver of any such default or right to which the party is entitled, nor shall it in any way affect the right of the party to enforce such provisions thereafter.

    8.4    **Rights and Duties upon Termination or Expiration.**

      8.4.1    This Section and the following Sections of this Agreement listed below, shall survive termination or expiration of this Agreement:

| 3.3.2 | Payment Limited to Satisfactory Services | 9.1 | Ownership of Results |
|---|---|---|---|
| 3.3.7(a) | Grant Funded Contracts – Disallowance | 9.2 | Works for Hire |
| 3.4 | Audit and Inspection of Records | 11.6 | Dispute Resolution Procedure |
| 3.5 | Submitting False Claims | 11.7 | Agreement Made in California; Venue |
| Article 5 | Insurance and Indemnity | 11.8 | Construction |
| 6.1 | Liability of City | 11.9 | Entire Agreement |
| 6.3 | Liability for Incidental and Consequential Damages | 11.10 | Compliance with Laws |
| Article 7 | Payment of Taxes | 11.11 | Severability |
| 8.1.6 | Payment Obligation | Article 13 | Data and Security |

      8.4.2    Subject to the survival of the Sections identified in Section 8.4.1, above, if this Agreement is terminated prior to expiration of the term specified in Article 2, this Agreement shall be of no further force or effect. Contractor shall transfer title to City, and deliver in the manner, at the times, and to the extent, if any, directed by City, any work in progress, completed work, supplies, equipment, and other materials produced as a part of, or acquired in connection with the performance of this Agreement, and any completed or partially completed work which, if this Agreement had been completed, would have been required to be furnished to City.

### Article 9    Rights In Deliverables

    9.1    **Ownership of Results**. Any interest of Contractor or its subcontractors, in the Deliverables, including any drawings, plans, specifications, blueprints, studies, reports, memoranda, computation sheets, computer files and media or other documents prepared by Contractor or its subcontractors for the purposes of this agreement, shall become the property of and will be transmitted to City. However, unless expressly prohibited elsewhere in this Agreement, Contractor may retain and use copies for reference and as documentation of its experience and capabilities.

9.2    **Works for Hire**. If, in connection with Services, Contractor or its subcontractors creates Deliverables including, without limitation, artwork, copy, posters, billboards, photographs, videotapes, audiotapes, systems designs, software, reports, diagrams, surveys, blueprints, source codes, or any other original works of authorship, whether in digital or any other format, such works of authorship shall be works for hire as defined under Title 17 of the United States Code, and all copyrights in such works shall be the property of the City. If any Deliverables created by Contractor or its subcontractor(s) under this Agreement are ever determined not to be works for hire under U.S. law, Contractor hereby assigns all Contractor's copyrights to such Deliverables to the City, agrees to provide any material and execute any documents necessary to effectuate such assignment, and agrees to include a clause in every subcontract imposing the same duties upon subcontractor(s). With City's prior written approval, Contractor and its subcontractor(s) may retain and use copies of such works for reference and as documentation of their respective experience and capabilities.

### Article 10    Additional Requirements Incorporated by Reference

10.1    **Laws Incorporated by Reference**. The full text of the laws listed in this Article 10, including enforcement and penalty provisions, are incorporated by reference into this Agreement. The full text of the San Francisco Municipal Code provisions incorporated by reference in this Article and elsewhere in the Agreement ("Mandatory City Requirements") are available at http://www.amlegal.com/codes/client/san-francisco_ca/ .

10.2    **Conflict of Interest**. By executing this Agreement, Contractor certifies that it does not know of any fact which constitutes a violation of Section 15.103 of the City's Charter; Article III, Chapter 2 of City's Campaign and Governmental Conduct Code; Title 9, Chapter 7 of the California Government Code (Section 87100 *et seq.*), or Title 1, Division 4, Chapter 1, Article 4 of the California Government Code (Section 1090 *et seq.*), and further agrees promptly to notify the City if it becomes aware of any such fact during the term of this Agreement.

10.3    **Prohibition on Use of Public Funds for Political Activity.** In performing the Services, Contractor shall comply with San Francisco Administrative Code Chapter 12G, which prohibits funds appropriated by the City for this Agreement from being expended to participate in, support, or attempt to influence any political campaign for a candidate or for a ballot measure. Contractor is subject to the enforcement and penalty provisions in Chapter 12G.

10.4    **Consideration of Salary History.** Contractor shall comply with San Francisco Administrative Code Chapter 12K, the Consideration of Salary History Ordinance or "Pay Parity Act." Contractor is prohibited from considering current or past salary of an applicant in determining whether to hire the applicant or what salary to offer the applicant to the extent that such applicant is applying for employment to be performed on this Agreement or in furtherance of this Agreement, and whose application, in whole or part, will be solicited, received, processed or considered, whether or not through an interview, in the City or on City property. The ordinance also prohibits employers from (1) asking such applicants about their current or past salary or (2) disclosing a current or former employee's salary history without that employee's authorization unless the salary history is publicly available. Contractor is subject to the enforcement and penalty provisions in Chapter 12K. Information about and the text of Chapter 12K is available on the web at https://sfgov.org/olse/consideration-salary-history.

Contractor is required to comply with all of the applicable provisions of 12K, irrespective of the listing of obligations in this Section.

   10.5   **Nondiscrimination Requirements.**

   10.5.1   **Non Discrimination in Contracts**. Contractor shall comply with the provisions of Chapters 12B and 12C of the San Francisco Administrative Code. Contractor shall incorporate by reference in all subcontracts the provisions of Sections12B.2(a), 12B.2(c)-(k), and 12C.3 of the San Francisco Administrative Code and shall require all subcontractors to comply with such provisions. Contractor is subject to the enforcement and penalty provisions in Chapters 12B and 12C.

   10.5.2   **Nondiscrimination in the Provision of Employee Benefits**. San Francisco Administrative Code 12B.2. Contractor does not as of the date of this Agreement, and will not during the term of this Agreement, in any of its operations in San Francisco, on real property owned by San Francisco, or where work is being performed for the City elsewhere in the United States, discriminate in the provision of employee benefits between employees with domestic partners and employees with spouses and/or between the domestic partners and spouses of such employees, subject to the conditions set forth in San Francisco Administrative Code Section12B.2.

   10.6   **Local Business Enterprise and Non-Discrimination in Contracting Ordinance.** Contractor shall comply with all applicable provisions of Chapter 14B ("LBE Ordinance").  Contractor is subject to the enforcement and penalty provisions in Chapter 14B.

   10.7   **Minimum Compensation Ordinance**. If Administrative Code Chapter 12P applies to this contract, Contractor shall pay covered employees no less than the minimum compensation required by San Francisco Administrative Code Chapter 12P, including a minimum hourly gross compensation, compensated time off, and uncompensated time off. Contractor is subject to the enforcement and penalty provisions in Chapter 12P. Information about and the text of the Chapter 12P is available on the web at http://sfgov.org/olse/mco. Contractor is required to comply with all of the applicable provisions of 12P, irrespective of the listing of obligations in this Section. By signing and executing this Agreement, Contractor certifies that it is in compliance with Chapter 12P.

   10.8   **Health Care Accountability Ordinance.** If Administrative Code Chapter 12Q applies to this contract, Contractor shall comply with the requirements of Chapter 12Q. For each Covered Employee, Contractor shall provide the appropriate health benefit set forth in Section 12Q.3 of the HCAO. If Contractor chooses to offer the health plan option, such health plan shall meet the minimum standards set forth by the San Francisco Health Commission. Information about and the text of the Chapter 12Q, as well as the Health Commission's minimum standards, is available on the web at http://sfgov.org/olse/hcao. Contractor is subject to the enforcement and penalty provisions in Chapter 12Q. Any Subcontract entered into by Contractor shall require any Subcontractor with 20 or more employees to comply with the requirements of the HCAO and shall contain contractual obligations substantially the same as those set forth in this Section.

   10.9   **First Source Hiring Program.** Contractor must comply with all of the provisions of the First Source Hiring Program, Chapter 83 of the San Francisco Administrative Code, that

apply to this Agreement, and Contractor is subject to the enforcement and penalty provisions in Chapter 83.

   10.10 **Alcohol and Drug-Free Workplace.** City reserves the right to deny access to, or require Contractor to remove from, City facilities personnel of any Contractor or subcontractor who City has reasonable grounds to believe has engaged in alcohol abuse or illegal drug activity which in any way impairs City's ability to maintain safe work facilities or to protect the health and well-being of City employees and the general public. City shall have the right of final approval for the entry or re-entry of any such person previously denied access to, or removed from, City facilities. Illegal drug activity means possessing, furnishing, selling, offering, purchasing, using or being under the influence of illegal drugs or other controlled substances for which the individual lacks a valid prescription. Alcohol abuse means possessing, furnishing, selling, offering, or using alcoholic beverages, or being under the influence of alcohol.

   10.11 **Limitations on Contributions.** By executing this Agreement, Contractor acknowledges that it is familiar with section 1.126 of the City's Campaign and Governmental Conduct Code, which prohibits any person who contracts with, or is seeking a contract with, any department of the City for the rendition of personal services, for the furnishing of any material, supplies or equipment, for the sale or lease of any land or building, or for a grant, loan or loan guarantee, from making any campaign contribution to (i) a City elective office if the contract must be approved by the individual, a board on which that individual serves, or the board of a state agency on which an appointee of that official serves, (ii) a candidate for that City elective office, or (iii) a committee controlled by such elected official or a candidate for that office, at any time from the submission of a proposal for the contract until the later of either the termination of negotiations for such contract or twelve months after the date the City approves the contract. The prohibition on contributions applies to each prospective party to the contract; each member of Contractor's board of directors; Contractor's chairperson, chief executive officer, chief financial officer and chief operating officer; any person with an ownership interest of more than 10 percent in Contractor; any subcontractor listed in the bid or contract; and any committee that is sponsored or controlled by Contractor. Contractor certifies that it has informed each such person of the limitation on contributions imposed by Section 1.126 by the time it submitted a proposal for the contract, and has provided the names of the persons required to be informed to City department with whom it is contracting.

   10.12 **Reserved. (Slavery Era Disclosure.)**

   10.13 **Reserved. (Working with Minors.)**

   10.14 **Consideration of Criminal History in Hiring and Employment Decisions.**

      10.14.1 Contractor agrees to comply fully with and be bound by all of the provisions of Chapter 12T, "City Contractor/Subcontractor Consideration of Criminal History in Hiring and Employment Decisions," of the San Francisco Administrative Code ("Chapter 12T"), including the remedies provided, and implementing regulations, as may be amended from time to time. The provisions of Chapter 12T are incorporated by reference and made a part of this Agreement as though fully set forth herein. The text of the Chapter 12T is available on the web at http://sfgov.org/olse/fco. Contractor is required to comply with all of the applicable provisions of 12T, irrespective of the listing of obligations in this Section. Capitalized terms used in this Section and not defined in this Agreement shall have the meanings assigned to such terms in Chapter 12T.

10.14.2 The requirements of Chapter 12T shall only apply to a Contractor's or Subcontractor's operations to the extent those operations are in furtherance of the performance of this Agreement, shall apply only to applicants and employees who would be or are performing work in furtherance of this Agreement, and shall apply when the physical location of the employment or prospective employment of an individual is wholly or substantially within the City of San Francisco. Chapter 12T shall not apply when the application in a particular context would conflict with federal or state law or with a requirement of a government agency implementing federal or state law.

10.15  **Reserved. (Public Access to Nonprofit Records and Meetings.)**

10.16  **Food Service Waste Reduction Requirements.** Contractor shall comply with the Food Service Waste Reduction Ordinance, as set forth in San Francisco Environment Code Chapter 16, including but not limited to the remedies for noncompliance provided therein.

10.17  **Reserved. (Distribution of Beverages and Water.)**

10.17.1 Contractor agrees that it shall not sell, provide, or otherwise distribute Packaged Water, as defined by San Francisco Environment Code Chapter 24, as part of its performance of this Agreement.

10.18  **Tropical Hardwood and Virgin Redwood Ban.** Pursuant to San Francisco Environment Code Section 804(b), the City urges Contractor not to import, purchase, obtain, or use for any purpose, any tropical hardwood, tropical hardwood wood product, virgin redwood or virgin redwood wood product.

10.19  **Reserved. (Preservative Treated Wood Products.)**

### Article 11      General Provisions

11.1  **Notices to the Parties.** Unless otherwise indicated in this Agreement, all written communications sent by the Parties may be by U.S. mail or e-mail, and shall be addressed as follows:

To City:        Crispin Hollings, Chief Financial Officer
                San Francisco Sheriff's Department
                1 Dr. Carlton B. Goodlett Place, Room 456
                San Francisco, CA 94103
                crispin.hollings@sfgov.org

To Contractor: Leo Carson
                Sentinel Offender Services
                1290 N Hancock St, Suite 103
                Anaheim, CA 92807
                lcarson@sentineladvantage.com
                with a copy to
                help.desk@sentineladvantage.com

Any notice of default must be sent by registered mail. Either Party may change the address to which notice is to be sent by giving written notice thereof to the other Party. If email notification is used, the sender must specify a receipt notice.

11.2   **Compliance with Americans with Disabilities Act**. Contractor shall provide the Services in a manner that complies with the Americans with Disabilities Act (ADA), including but not limited to Title II's program access requirements, and all other applicable federal, state and local disability rights legislation.

11.3   **Incorporation of Recitals.** The matters recited above are hereby incorporated into and made part of this Agreement.

11.4   **Sunshine Ordinance.** Contractor acknowledges that this Agreement and all records related to its formation, Contractor's performance of Services, and City's payment are subject to the California Public Records Act, (California Government Code §6250 et. seq.), and the San Francisco Sunshine Ordinance, (San Francisco Administrative Code Chapter 67). Such records are subject to public inspection and copying unless exempt from disclosure under federal, state or local law.

11.5   **Modification of this Agreement**. This Agreement may not be modified, nor may compliance with any of its terms be waived, except as noted in Section 11.1, "Notices to Parties," regarding change in personnel or place, and except by written instrument executed and approved in the same manner as this Agreement. Contractor shall cooperate with Department to submit to the Director of CMD any amendment, modification, supplement or change order that would result in a cumulative increase of the original amount of this Agreement by more than 20% (CMD Contract Modification Form).

11.6   **Dispute Resolution Procedure**.

11.6.1   **Negotiation; Alternative Dispute Resolution.** The Parties will attempt in good faith to resolve any dispute or controversy arising out of or relating to the performance of services under this Agreement. If the Parties are unable to resolve the dispute, then, pursuant to San Francisco Administrative Code Section 21.36, Contractor may submit to the Contracting Officer a written request for administrative review and documentation of the Contractor's claim(s). Upon such request, the Contracting Officer shall promptly issue an administrative decision in writing, stating the reasons for the action taken and informing the Contractor of its right to judicial review. If agreed by both Parties in writing, disputes may be resolved by a mutually agreed-upon alternative dispute resolution process. If the parties do not mutually agree to an alternative dispute resolution process or such efforts do not resolve the dispute, then either Party may pursue any remedy available under California law. The status of any dispute or controversy notwithstanding, Contractor shall proceed diligently with the performance of its obligations under this Agreement in accordance with the Agreement and the written directions of the City. Neither Party will be entitled to legal fees or costs for matters resolved under this section.

11.6.2   **Government Code Claim Requirement.** No suit for money or damages may be brought against the City until a written claim therefor has been presented to and rejected by the City in conformity with the provisions of San Francisco Administrative Code Chapter 10 and California Government Code Section 900, et seq. Nothing set forth in this Agreement shall operate to toll, waive or excuse Contractor's compliance with the California Government Code

Claim requirements set forth in San Francisco Administrative Code Chapter 10 and California Government Code Section 900, et seq.

11.7   **Agreement Made in California; Venue**. The formation, interpretation and performance of this Agreement shall be governed by the laws of the State of California. Venue for all litigation relative to the formation, interpretation and performance of this Agreement shall be in San Francisco.

11.8   **Construction.** All paragraph captions are for reference only and shall not be considered in construing this Agreement.

11.9   **Entire Agreement.** This contract sets forth the entire Agreement between the parties, and supersedes all other oral or written provisions. This Agreement may be modified only as provided in Section 11.5, "Modification of this Agreement."

11.10 **Compliance with Laws**. Contractor shall keep itself fully informed of the City's Charter, codes, ordinances and duly adopted rules and regulations of the City and of all state, and federal laws in any manner affecting the performance of this Agreement, and must at all times comply with such local codes, ordinances, and regulations and all applicable laws as they may be amended from time to time.

11.11 **Severability**. Should the application of any provision of this Agreement to any particular facts or circumstances be found by a court of competent jurisdiction to be invalid or unenforceable, then (a) the validity of other provisions of this Agreement shall not be affected or impaired thereby, and (b) such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties and shall be reformed without further action by the parties to the extent necessary to make such provision valid and enforceable.

11.12 **Cooperative Drafting**. This Agreement has been drafted through a cooperative effort of City and Contractor, and both Parties have had an opportunity to have the Agreement reviewed and revised by legal counsel. No Party shall be considered the drafter of this Agreement, and no presumption or rule that an ambiguity shall be construed against the Party drafting the clause shall apply to the interpretation or enforcement of this Agreement.

11.13 **Order of Precedence.** Contractor agrees to perform the services described below in accordance with the terms and conditions of this Agreement, implementing task orders, the RFP, and Contractor's proposal dated November 5, 2018. The RFP and Contractor's proposal are incorporated by reference as though fully set forth herein. Should there be a conflict of terms or conditions, this Agreement and any implementing task orders shall control over the RFP and the Contractor's proposal.

11.14 **Notification of Legal Requests**. Contractor shall immediately notify City upon receipt of any subpoenas, service of process, litigation holds, discovery requests and other legal requests ("Legal Requests") related to all data given to Contractor by City in the performance of this Agreement ("City Data" or "Data"), or which in any way might reasonably require access to City's Data, and in no event later than 24 hours after it receives the request. Contractor shall not respond to Legal Requests related to City without first notifying City other than to notify the requestor that the information sought is potentially covered under a non-disclosure agreement. Contractor shall retain and preserve City Data in accordance with the City's instruction and requests, including, without limitation, any retention schedules and/or litigation hold orders provided by the City to Contractor, independent of where the City Data is stored.

Article 12      Department Specific Terms

12.1   Reserved.

Article 13      Data and Security

13.1   **Nondisclosure of Private, Proprietary or Confidential Information.**

13.1.1 **Protection of Private Information**. If this Agreement requires City to disclose "Private Information" to Contractor within the meaning of San Francisco Administrative Code Chapter 12M, Contractor and subcontractor shall use such information only in accordance with the restrictions stated in Chapter 12M and in this Agreement and only as necessary in performing the Services. Contractor is subject to the enforcement and penalty provisions in Chapter 12M.

13.1.2 **Confidential Information**. In the performance of Services, Contractor may have access to City's proprietary or confidential information, the disclosure of which to third parties may damage City. If City discloses proprietary or confidential information to Contractor, such information must be held by Contractor in confidence and used only in performing the Agreement. Contractor shall exercise the same standard of care to protect such information as a reasonably prudent contractor would use to protect its own proprietary or confidential information.

13.2   **Payment Card Industry ("PCI") Requirements.** Contractors providing services and products that handle, transmit or store cardholder data, are subject to the following requirements:

13.2.1          Applications shall be compliant with the Payment Application Data Security Standard (PA-DSS) and validated by a Payment Application Qualified Security Assessor (PA-QSA). A Contractor whose application has achieved PA-DSS certification must then be listed on the PCI Councils list of PA-DSS approved and validated payment applications.

13.2.2          Gateway providers shall have appropriate Payment Card Industry Data Security Standards (PCI DSS) certification as service providers (https://www.pcisecuritystandards.org/index.shtml). Compliance with the PCI DSS shall be achieved through a third party audit process. The Contractor shall comply with Visa Cardholder Information Security Program (CISP) and MasterCard Site Data Protection (SDP) programs.

13.2.3          For any Contractor that processes PIN Debit Cards, payment card devices supplied by Contractor shall be validated against the PCI Council PIN Transaction Security (PTS) program.

13.2.4          For items 13.2.1 to 13.2.3 above, Contractor shall provide a letter from their qualified security assessor (QSA) affirming their compliance and current PCI or PTS compliance certificate.

13.2.5          Contractor shall be responsible for furnishing City with an updated PCI compliance certificate 30 calendar days prior to its expiration.

13.2.6          Bank Accounts. Collections that represent funds belonging to the City and County of San Francisco shall be deposited, without detour to a third party's bank

account, into a City and County of San Francisco bank account designated by the Office of the Treasurer and Tax Collector.

    13.3  **Reserved. (Business Associate Agreement.)**

    13.4  **Management of City Data and Confidential Information**

        13.4.1  Access to City Data. City shall at all times have access to and control of all data given to Contractor by City in the performance of this Agreement ("City Data" or "Data"), and shall be able to retrieve it in a readable format, in electronic form and/or print, at any time, at no additional cost.

        13.4.2  **Use of City Data and Confidential Information.**  Contractor agrees to hold City's Confidential Information received from or created on behalf of the City in strictest confidence. Contractor shall not use or disclose City's Data or Confidential Information except as permitted or required by the Agreement or as otherwise authorized in writing by the City. Any work using, or sharing or storage of, City's Confidential Information outside the United States is subject to prior written authorization by the City. Access to City's Confidential Information must be strictly controlled and limited to Contractor's staff assigned to this project on a need-to-know basis only. Contractor is provided a limited non-exclusive license to use the City Data or Confidential Information solely for performing its obligations under the Agreement and not for Contractor's own purposes or later use.  Nothing herein shall be construed to confer any license or right to the City Data or Confidential Information, by implication, estoppel or otherwise, under copyright or other intellectual property rights, to any third-party.  Unauthorized use of City Data or Confidential Information by Contractor, subcontractors or other third-parties is prohibited.  For purpose of this requirement, the phrase "unauthorized use" means the data mining or processing of data, stored or transmitted by the service, for commercial purposes, advertising or advertising-related purposes, or for any purpose other than security or service delivery analysis that is not explicitly authorized.

        13.4.3  **Disposition of Confidential Information**. Upon termination of Agreement or request of City, Contractor shall within forty-eight (48) hours return all Confidential Information which includes all original media. Once Contractor has received written confirmation from City that Confidential Information has been successfully transferred to City, Contractor shall within ten (10) business days purge all Confidential Information from its servers, any hosted environment Contractor has used in performance of this Agreement, work stations that were used to process the data or for production of the data, and any other work files stored by Contractor in whatever medium. Contractor shall provide City with written certification that such purge occurred within five (5) business days of the purge.

Article 14     MacBride And Signature

    14.1  **MacBride Principles - Northern Ireland**. The provisions of San Francisco Administrative Code §12F are incorporated herein by this reference and made part of this

Agreement. By signing this Agreement, Contractor confirms that Contractor has read and understood that the City urges companies doing business in Northern Ireland to resolve employment inequities and to abide by the MacBride Principles, and urges San Francisco companies to do business with corporations that abide by the MacBride Principles.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day first mentioned above.

**CITY**

Recommended by:

*Vicki L. Hennessy*

**Vicki Hennessy**
Sheriff
San Francisco Sheriff's Department

**CONTRACTOR**

**Sentinel Offender Services, LLC**

*D. Fuller*

**Dennis Fuller**
Chief Financial Officer
1290 N Hancock St, Suite 103
Anaheim, CA 92807

City Supplier number: **0000037240**

Approved as to Form:

Dennis J. Herrera
City Attorney

By: _____
     Jana Clark
     Deputy City Attorney

Approved:

*Alaric Degrafinried*

**Alaric Degrafinried**
Director of the Office of Contract Administration,
and Purchaser

**Appendices**
A:     Scope of Services
B:     Calculation of Charges

Received By:
JUN 12 '19 AM 10:07
Purchasing Department

Appendix A
Scope of Services

## I.   Description of Services

Contractor will provide electronic home detention monitoring and case management services for inmates who qualify for home detention as an alternative to incarceration. Home detention monitoring participants may include pre-trial, post-sentence, and in custody. Services include adjunct case management to monitor inmate's outpatient participation in substance abuse or mental health programs and administer drug test to monitor sobriety (i.e. urinalysis, saliva swab and alcohol testing).

Contractor agrees to perform the following Services:

### A. Electronic Monitoring Service and Case Management Requirements

Contractor will operate in compliance with any available standards and all laws applicable to the operation of electronic monitoring programs and the supervision of offenders in an electronic monitoring program.

Contractor will operate in compliance with any available standards promulgated by state correctional agencies and bodies, including the Corrections Standards Authority, and all statutory provisions and mandates, federal, state and county, as appropriate and applicable to the operation of home detention programs and the supervision of sentenced offenders in a home detention program.

1. As per California Penal Code section 1203.018, Sentinel will "operate in compliance with any available standards and all state and county laws applicable to the operation of electronic monitoring programs and the supervision of offenders in an electronic monitoring program," and

2. As per California Penal Code section 1203.016, Sentinel will "operate in compliance with any available standards promulgated by state correctional agencies and bodies, including the Corrections Standards Authority, and all statutory provisions and mandates state and county, as appropriate and applicable to the operation of home detention programs ant the supervision of sentenced offenders in a home detention program."

### B. Referrals

All referrals to the Electronic Monitoring and Case Management Program will be made by the San Francisco Sheriff's Department, the Courts, or the detainee's attorney. The SFSD will screen all referrals and determine which detainees can be safely supervised via electronic monitoring. The SFSD may allow out-of-county participants to be monitored, provided they meet the SFSD criteria and SFSD approves their participation. Contractor may only place individuals referred by the Sheriff's Department, the Courts, or the detainee's attorney. Contractor will accept all referrals from SFSD, the Courts, or the detainee's attorney.

## C. Orientation and Equipment Installations

1. The SFSD will notify the Contractor regarding a detainee's impending participation in the City's Electronic Monitoring (EM) program.

2. Contractor will install, orient, and activate the EM equipment on the same day SFSD schedules installation. This will occur at the SFSD's facilities at 70 Oak Grove or 930 Bryant St., or at an SFSD pre-determined location. In addition, the Contractor will install, replace, repair, and activate EM equipment in the field at off-site locations authorized by SFSD.

3. As part of this process, Contractor will provide participants with a program schedule for the first seven (7) days of their Electronic Monitoring during the EM equipment installation.

4. Following installation, the Contractor will confirm that the EM equipment is activated and operational on Sentinel DNA Internet-enabled monitoring and case management software platform and will send an email notification to SFSD Program staff immediately following the successful installation and initial download of the EM device and equipment.

5. The Contractor will ensure that all EM equipment is activated and operational the same day it is installed.

6. Option for 24/7 installation of electronic monitoring devices on people in the county jail.

   i. During normal business hours, SFSD may take a Contractor's employee to the County Jail Facility to install and activate the electronic monitoring device on a program participant.

   ii. Contractor will provide training to SFSD sworn staff to ensure SFSD can install and activate electronic monitoring devices to participants in the Field or in a County Jail Facility outside of normal business hours.

## D. Initial Assessment and Case File

1. Contractor will complete an initial assessment of each participant, which will identify list and schedule of approved activities and locations and most appropriate equipment and equipment settings, prior to equipment installation. Pending SFSD provision of Compass or an equivalent assessment software, the Department's Electronic Needs Assessment software, and associated training, SFSD will reimburse the Contractor for additional labor cost required to perform Compass Assessment. Contractor will propose 24/7 schedules for each participant corresponding to the requirements of the SFSD program and their needs assessment, as defined and measured by Compass Electronic Needs Assessment software, and in line with evidence-based practices. This includes recommendations for education, vocational support, and other pro-social activities. The proposed schedules must be approved by SFSD in advance of their start date. All out of range activities must to be approved in advance ONLY by SFSD sworn supervisors.

2. Contractor will have face to face meetings with participants two times per month and will verify documentation of work, school, and any approved community activities bi-weekly.

3. Based on the initial assessment, defined above, the Contractor will create and maintain an electronic case file for each participant within their web-based case management system, Sentinel DNA. The SFSD will have access to the electronic case file for each participant. The electronic case file will form the basis for the Participant Case File, once the client is accepted into the program. The electronic case file will allow access and storage of the initial assessment and supporting documents for each participant for the duration of their enrollment in the EM program. Collectively, these documents will be referred to as the "Participant File."

4. The electronic case file shall contain detailed information from the participant's initial assessment, program activities, employment, out-of-residence movement, and all other relevant activities. At a minimum the electronic case file for each participant will include the following:

    i. Personal Data

        1) Name, address, telephone numbers, Picture, Social Security Number, ID/Driver's License, emergency contacts

        2) List of all verified sources of income (applies only in the event SFSD and Contractor initiate collection of participant fees as identified in **Appendix A Scope of Services, D. Initial Assessment and Case File**, item **10. Financial Assessment)**.

    ii. Program Data

        1) Court Order or Referral

        2) Supervision Fee Agreement (applies only in the event SFSD and Contractor initiate collection of participant fees as identified in **Appendix A Scope of Services, D. Initial Assessment and Case File**, item **10. Financial Assessment)**.

        3) Enrollment Form

        4) Pre-authorized Work Treatment Agreement

        5) Employer Confirmation Form

        6) Urinalysis Orientation Form and Agreement

        7) Co-Resident Agreements

        8) Drug and Alcohol Test Results

        9) Receipts for co-payments (applies only in the event SFSD and Contractor initiate collection of participant fees as identified in **Appendix A Scope of Services, D. Initial Assessment and Case File**, item **10. Financial Assessment)**.

        10) Equipment Agreement

11) Initial assessment

12) Orientation checklist

13) Appropriate equipment and equipment settings

14) Result of initial drug test performed by Contractor within the first week of enrollment

15) Program Plan and Progress to include treatment plans

16) Start/End Date Schedule

17) Participant's schedule (i.e. curfew, school, work, programs, etc.)

18) Detailed information on participant's program activities

19) All program violations including date, time, and type

20) Restrictions, such as, but not limited to: Inclusion and Exclusion Zones, curfews, and travel

21) Sanctions imposed

22) Approved locations

23) Verification of employment and/or proof of education class enrollment and school schedule, as appropriate

24) All special needs

25) Chronological Notes

iii. Once the participant is enrolled, the following information will be added to the file:

1) Ongoing program participation activities

2) Ongoing employment and/or job search activities

3) Restriction imposed, such as exclusion zones, curfews, travel restrictions, as approved by SFSD

4) Updates to participants' schedule

5) All related addresses (home, work, etc.) and contract phone numbers (cell, home, work, etc.)

6) Program violations and sanctions imposed, as identified by SFSD

iv. Upon completion, the following information will be added to the file:

1) Close out notes

2) Award of completion if applicable

3) Termination reason

4) Eligibility for re-enrollment

5) Return of equipment in working order is required for successful completion

5. SFSD may require Contractor to maintain in hard copy the initial assessment and supporting documents that are not accessible through the electronic case file in Sentinel DNA.

6. Contractor will document in Sentinel DNA all interactions between Sentinel case managers and program participants.

7. All updates to participants' schedules and contact information will be updated within 24 hours of the requested changed.

8. SFSD will have direct access to participants' case file and all case notes in Sentinel DNA 24 hours/365 days at no additional cost to the City and may be integrated with the SFSD's systems upon request.

9. Contractor will use Sentinel DNA to manage work flow related to participants' activity, including alerts and incidents, with access available to SFSD sworn staff. Contractor will review to determine any deviations from the approved schedule, equipment problems or tamper attempts.

10. **Financial Assessment**. At present, there is no cost to participants in the Electronic Monitoring Program. All electronic monitoring device fees for participants are paid by SFSD as per Appendix B Calculation of Charges (City-Paid Service Fees). In the event that there is a SFSD policy change, the SFSD has an option to request the Contractor to collect a registration fee and a daily device fee for their participation in the program following a financial assessment. The Contractor will work with SFSD Programs to develop a Financial Assessment Table based upon the individual's income, housing needs and number of dependents to determine the registration fee and daily device fees to be collected whereby Appendix B Calculation of Charges (City-Paid Service Fees) will be modified as provided in Section 11.5, "Modification of this Agreement" to add the Financial Assessment Table and Participant-Paid Service fees as an "Appendix B Calculation of Charges (Participant-Paid Service Fees)."

      i. **Approved Payment Plan and Payment Schedule**. The Contractor will perform a financial assessment based on the Financial Assessment Table to determine the participant's fees and payment schedule and make a recommendation to the SFSD's Community Programs Supervisor for review and approval. The Contractor may recommend waiving fees to the client for SFSD approval. Upon SFSD approval, the Contractor will collect program fees from participants and report fee collection to the SFSD when the Contractor submits the monthly invoice. The Contractor will credit all collected program fees from the amount billed to the SFSD. The SFSD will pay for all program costs defined in the contract, at the rates defined in the contract, less the amount of fees collected by the Contractor.

## E. Client Monitoring

1. **Sentinel Site/Program Manager**. Contractor will provide, at a minimum, a full-time dedicated Site/Program Manager to supervise Contractor's staff and coordinate efforts with SFSD. The Site/Program Manager will supervise up to ten

(10) clients at one time when the participant numbers are below 70, provide technical expertise during violation hearings and enforcement actions, attend monthly staff meetings, and liaison between SFSD and other agencies. The Site/Program Manager will provide continuous training for all SFSD Community Programs and Sentinel staff on all participant tracking software and EM devices. The Site/Program Manager will be the point of communication between Sentinel and the SFSD for billing purposes and will collect payment and resolve any discrepancies that may occur. The Site/Program Manager will be based at and servicing SFSD sites such as 70 Oak Grove or the Women's Resource Center (WRC), Monday through Friday for eight (8) hours per day to perform equipment installations and removals, meet with program participants, troubleshoot equipment problems and provide program assistance to SFSD. The Site/Program Manager for this program will perform the following additional activities on behalf of the SFSD:

    i.    Meet with SFSD staff each morning for daily case conference to discuss violations from the prior night, identify new program enrollments;

    ii.    Respond to any SFSD technical questions regarding the Sentinel products;

    iii.    Perform urinalysis, saliva swab and alcohol testing and coordinate lab verifications upon request of SFSD:

    iv.    Perform field compliance checks evaluating residences for proper equipment placement as requested by SFSD;

    v.    Assist SFSD staff with reconciling the daily, weekly and monthly counts of participants on the EM program;

    vi.    Assist SFSD staff in statistical analysis of participants (successful, unsuccessful, absconded, returned to custody);

    vii.    Assist SFSD staff with case file information that may be updated or revised on a daily basis;

    viii.    Assist SFSD staff with monthly totals for billing purposes;

    ix.    Assist SFSD with EM presentations to law enforcement agencies, courts, judges, public/district attorney;

    x.    Act as liaison to law enforcement agencies as requested by SFSD with investigations/locating participants;

    xi.    Attend Community Based Organization (CBO) monthly meeting for SFSD Programs regarding services offered; and

    xii.    Will be available to meet with SFSD personnel as part of the ongoing operation of the program and provide required court testimony.

    xiii.    Will provide technical expertise during violation hearings and enforcement actions, attend monthly staff meetings, and liaison between SFSD and the District Attorney, the Public Defender, the Courts and other criminal justice agencies. The Contractor is required to communicate with these entities in order to ensure efficient implementation of the program.

        xiv.    Will provide continuous training for all SFSD Community Programs Staff and Contractor staff on all participant tracking software and electronic monitoring devices.

2. SFSD will provide two workstations at 70 Oak Grove for Contractor.

3. Local Contractor management or the Sentinel Monitoring Center will be available 24/7, 365 days a year, to monitor all electronic monitoring participants and to handle any issues or discuss any concerns.

4. **Case Manager(s).** The Contractor will provide Case Manager(s) at a ratio of one (1) Case Manager to every thirty-five (35) clients enrolled in electronic monitoring, and will provide the following case management services for each participant:

        i.    **Compliance Appointments (Face to Face Meetings)**. Case Manager will meet with each program participant at an SFSD site, such as 70 Oak Grove or an SFSD-approved site at a minimum of two (2) times per month. The Case Manager will review and verify the participant's activities during the previous period and inspect the EM equipment and verify it is operational and re-verify it is securely attached to the participant's ankle. After the Orientation, the participant will be required to report to his/her Case Manager at a pre-determined frequency as set by the SFSD. At these Compliance Appointments, the Case Manager will review the daily activity reports since the last compliance meeting. The participant will have to provide documentation to verify his/her attendance at the permitted activities. The Case Managers may require the following as adequate verification for each activity:

        1)    **Employment**: Verified through paycheck stubs, time cards, or employer letters

        2)    **School**: Proof of enrollment and subsequent progress reports

        3)    **Counseling (AA, NA, etc)**: A class attendance sign-in sheet with a signature from the program/class moderator

        4)    **Medical/Dental Appointments**: A signed doctor's note listing the date and time of the medical appointment

        5)    **Grocery Shopping**: A valid grocery store receipt for the date and time that the activity

        6)    **Court**: An activity signature form (provided by our Case Manager) signed by the Court Clerk or similar authorized personnel verifying the inmate's presence at court

        ii.    **Employment/School Verification**. Every 30 days Contractor will collect a copy of the program participant's latest paycheck stub to confirm their employment status, and will be submitted to the participant's case file. Contractor will collect a copy of the program participant's most recent school registration form, class schedule, and upon completion of the

school term, will collect a copy of their report card, and will submit this information to the participant's case file.

iii.     **Status/Progress Reports**. Case Manager will provide Status or Progress reports to the SFSD at the required frequency. These reports can contain any of the required information including:

   1)     Change of residence (only after approval from the Department)

   2)     Change of employment information

   3)     Overall status of the participant (compliance, etc.)

   4)     Any other item requested by the SFSD staff

iv.     **Employment Search**. For unemployed participants, the case manager will assist the participant in developing tangible strategies to obtain suitable employment. Referrals will be made to employment agencies and other community resources in an effort to ensure the participant's success in the community. The Case Manager will require participants to participate in a scheduled job search plan and to submit verifying documentation.

v.     **Urinalysis and Drug and Alcohol Screening**. Contractor will collect a urine sample or saliva swab drug test from each participant at least once every 30 days, or at the direction of the SFSD, and will test the sample for marijuana, heroin, amphetamine, PCP and cocaine via a Substance Abuse Screening Device, such as Redi-Cup, at no cost to the SFSD. Both timing and methodology of test are at the discretion of SFSD. Contractor will test blood alcohol content at least once every 30 days via portable Alcohol Screening Device (PAS) or Breathalyzer, as determined by SFSD. All urine samples, saliva swab tests, and blood alcohol tests will be administered at no cost to SFSD. Contractor will promptly carry out any additional testing orders requested by a Judge, or by the SFSD. If the participant wishes to appeal the results of a SFSD or Contractor administered test, Contractor will administer another sample and send to an independent lab for testing at no additional cost to the SFSD. The Contractor will provide all test results to the SFSD immediately in writing or within seven (7) days of receipt if more conclusive analysis is needed. The Contractor will collect the fee for lab verification from participants and will net the fee collection from the amount invoiced to the SFSD. Participants are required to pay for lab verifications prior to the samples being sent to the lab. If the participant is unable to pay, the SFSD reserves the right to waive the fee and will pay for the cost of the lab test. All tests will be sent to the laboratory identified by the SFSD. The Contractor will bill the cost of the lab tests directly to the SFSD. Contractor will record all test results in the participant's case file and provide all test results to SFSD immediately in writing or within seven (7) days if a more conclusive analysis is needed, but no later than the next business day after the test results are obtained.

5. **Training** – The Contractor will provide continuous comprehensive training for all SFSD Supervisory and Community Programs staff in the use of equipment and monitoring techniques. Training will be provided at no cost to SFSD.

   i. Contractor will establish training schedules to ensure all SFSD staff are both confident and comfortable in the use of the equipment, software and monitoring techniques,

   ii. Training will be provided by a comprehensive Sentinel Team to ensure that agency staff has a thorough understanding of the program and equipment. Officer training may include classroom, in-field, hands-on, and webinar training sessions on the following topics:

      1) All GPS and alcohol equipment/system (use, installation, removal, and troubleshooting)

      2) Enrollment (enrollment, un-enrollment and the setting of all monitoring parameters including curfew schedules and GPS zones)

      3) Tracking and monitoring of offenders

      4) Alarm processes and resolution procedures (SFSD-specific protocols)

      5) Notification processes and reports (SFSD-specific protocols)

      6) Monitoring System (complete instruction on the use of the monitoring software system including, but not limited to, offender enrollment, modifications, reports, schedules, and terminations)

      7) Additional training as needed to keep current on monitoring equipment and software

      8) Additional training as requested by SFSD for new staff

   iii. Training will be provided in classroom setting and in the field for the term of this agreement

   iv. Contractor will provide equipment operator manuals, training material, sample reports and instructions

6. **24-Hour Monitoring** – The Contractor will monitor electronic monitoring devices to determine any deviations from the approved schedule, equipment problems or tamper attempts. Contractor will monitor all EM participants 24 hours a day, seven (7) days a week, as described below.

   i. One time per week, the Contractor will provide SFSD with an electronic master list of all individuals participating in the EM program containing at a minimum:

      1) Participant name

      2) Participant address

      3) Start Date

      4)      Participant violations

      5)      Case Manager Name

      6)      Contact information

ii.    The list will contain participant name, participant violations, case manager name and contact information.

iii.    Contractor will provide SFSD access to participants' location and monitoring data 24 hours a day, seven (7) days a week via Sentinel DNA web-based monitoring system. Sentinel DNA monitoring and case management application can be accessed via any leading Internet-enabled device standard desktop, laptop, mobile device browsers without the need to download applications/software.

iv.    Contractor will provide SFSD with a web-based interface to access all monitoring data. All data will be stored on secure servers/cloud that belong to, monitored and maintained by the Contractor.

v.    Sentinel DNA and SCRAM software will provide monitoring of all units that are in service in the field. Regardless whether the unit is a GPS tracking device or alcohol monitoring unit.

vi.    Contractor will notify SFSD via BOTH email and by phone, as soon as possible but no later than one hour after a participant has been Absent Without Official Leave (AWOL), defined as four (4) hours without communication from the electronic monitoring devices or verbal communication from the participant, or an alarm is triggered due to tampering, dead battery, loss of equipment communication or location data or a cut bracelet and there is no communication with the participant. The Contractor will provide an electronic written report of all AWOL incidents the next business day and a final written summary report within 24 hours of resolution.

vii.    Contractor supervisory staff will also review all daily alerts to ensure they have been cleared and managed.  In order to keep SFSD apprised of potential violations, Sentinel will provide an electronic written report **of all incidents the next business day** while an alert is being investigated. An electronic written incident report detailing the event, investigation, and results, including corroborating documentation and client statements, will be available within 24 hours following resolution of the incident.

viii.    The Contractor will provide a 24 hour technical support center that can be accessed by the SFSD 24 hours a day, seven (7) days a week, 365 days a year to provide a safety net of technical support during exigent circumstances at no additional cost to the SFSD. Contractor will provide toll-free telephone access to technicians and customer service representatives, 24 hours a day, 7 days a week, capable of resolving technical problems over the telephone or through remote diagnostics. The support will cover:

1)      Monitoring issues

2)      Sentinel DNA Web/System interface navigation questions

3)      Equipment questions

4)      Report requests

ix.    Contractor will provide and utilize OM400 GPS equipment, with twenty-four hour technical support provided by Contractor. Contractor will maintain the tracking equipment with current industry standards and practices.

x.    Contractor will provide SFSD with two (2) iPad Minis plus mobile data service plans for use by SFSD in accessing Sentinel DNA via portable tracking devices for field enforcement and compliance activities. Contractor will disable all non-work-related applications prior to the distribution of iPad to SFSD.

7. **High Security Monitoring**. SFSD will have the option to assign participants as High Scrutiny Monitoring. High Scrutiny Monitoring will require the Contractor to provide 24-Hour Monitoring as detailed in Section E.6 and will require the Contractor to notify SFSD via email and by phone **immediately** after a participant has been Absent Without Official Leave (AWOL), or an alarm goes off due to tampering, dead battery, loss of equipment communication or location data or a cut bracelet and there is no communication with the participant, or zone violation.

     i.    Sentinel's DNA monitoring and case management system shall have the ability to create custom notification profiles whereby each profile is a set of protocols on how to handle specific events and violation that can be prioritized by type, by officer, and by participant to alert immediately, hold for a grace period or routed immediately to a Monitoring Center staff person for High Scrutiny notification procedures that can also be customized and pre-profiled by violation type, by participant, by risk or priority level, or by officer.

     ii.    The DNA profile manager shall also support both automated and manual escalation.

     iii.    Contractor will profile DNA specifically for SFSD High Scrutiny Monitoring.

8. **Reports**. The Contractor will submit written reports, as requested, and in the format determined by the SFSD Community Programs staff. On a monthly basis, the Contractor will report, in Microsoft Excel or Comma Delimited format, a list of people who participated in electronic monitoring 12-months prior to the reporting date and participant's status. At a minimum, Contractor will provide the following:

     i.    Daily Violations Reports listing the participant's name, date, time, and type of violation, including violations of movement and/or curfew restrictions, equipment malfunctions/tampers, battery status and any other problem related to the status of the participants;

ii.     Daily Charging Reports listing the participant's name, date, and detailed charging data;

iii.    Location Correlation Reports confirming whether a particular participant was present at a specified location within a specified time frame;

iv.    Investigative Reports providing a particular participant's whereabouts during a specified time frame;

v.     Proximity Reports;

vi.    Statistical Reports providing a comprehensive annual statistical report of program participants including participants' names, program start dates and program end dates;

vii.   Master List Report available on a weekly basis, which will include:

      1)     Participant's name and address; and

      2)     Participant's program start date, violations, case manager name, and contact information.

viii.  Contractor will provide the SFSD with access to standard, system generated reports that are pre-formatted and available via any internet-enabled computer, laptop, tablet and/or smartphone through the Contractor's secure monitoring system.

ix.    Authorized user can view participant activity 24 hours a day, seven (7) days a week.

x.     Sentinel DNA Software System will be an SQL database structure and shall be capable of generating reports, eliciting statistical data and conducting queries for specific information as needed to meet SFSD requirement.

      1)     Each data field within the entire software system can be queried to generate necessary report information; and

      2)     Users shall have the option to view, save, and/or print data and/or reports from the system.

      3)     Sentinel DNA will provide a menu of advanced reporting features for participants who are being tracked with GPS. From the Reports Screen, authorized users can run reports for a single person or group of people:

- Alerts showing which actions were taken and if the notifications were successful

- Events showing all events, including alerts

- Speeding

- Proximity, allowing users to see if any of all participants were near a specific location at a specific time (crime scene Correlation)

- Zone activity to show which participants entered and left zones, such as AA, shopping malls, known drug areas, etc.

- Stops which shows where and when participants stayed in one (1) location over a given time period

- Movement which shows the participant's movement between stops, including duration, where they began and ended, etc.

- User activity which shows which users are logging into the monitoring software application system and for how long.

### F.  General Requirements

1. **Invoicing**. Contractor will submit invoices in the format required by SFSD for the previous month's service by the 15th day of the current month, and must contain all necessary documentation to verify validity. Invoices must state, but may not be limited to the following:

   i.  Each invoice must have a unique reference number;

   ii.  Client's Name;

   iii.  Individual services provided with the corresponding charge per service;

   iv.  Number of days client participated per service;

   v.  Fees collected and adjustments in which credit amount is applied against invoiced amount (applies only in the event SFSD and Contractor initiate collection of participant fees as identified in **Appendix A Scope of Services, D. Initial Assessment and Case File**, item **10. Financial Assessment**); and

   vi.  A one page Summary of Charges by Equipment, Unit Price, Number of Days Used, and Extended Price.

2. **Contractor and Contractor Employee Requirements**. All Contractor employees working in the jail will maintain current jail clearance and must attend a two hour Jail Clearance Orientation Training administered by SFSD at no cost to the Contractor. Contractors working in the field may wear bullet resistant vests provided by the Contractor at no cost to the SFSD. Industry standard bulletproof vests are estimated to cost $700-$900 each.

3. **Lost and Damaged Equipment**. Contractor will incorporate inventory shrinkage due to lost or damaged devices into total contract pricing. There will be no cost to SFSD for any lost or damaged devices. Participants who lose, damage or steal equipment will be violated from the program by SFSD and will be barred from participating in SFSD programs until participant reimburse Contractor for the equipment. Participants who fail to surrender and/or lose equipment will be violated from the program and will be barred from participating in SFSD programs until participant reimburse Contractor for the equipment. The SFSD will review each case in which the client has lost, damaged, or stolen equipment and is unable to reimburse Contractor for the equipment. On a case by case basis,

SFSD shall have the option to authorize the client to re-enroll in the electronic monitoring program and the SFSD will reimburse Contractor for equipment or arrange for a payment reimbursement plan.

    i.  The SFSD will require the participant(s) to replace or pay for any lost or damaged equipment directly to the Contractor.

    ii.  SFSD and the City and County of San Francisco shall not be responsible for damaged and/or lost equipment.

    iii.  On a case by case basis, SFSD may have the option to authorize a participant to re-enroll in the electronic monitoring program with Lost and Damaged Equipment and the SFSD will reimburse Contractor for equipment or arrange for a payment reimbursement plan.

## G. Equipment Requirements

  **1.** **Global Positioning System (GPS) Devices (Active, Passive, Optional Home Monitoring Unit (HMU) via Landline or Cellular), capable of:**

    i.  Producing mapping displays and reports that include participant location, zone violations, tampering and battery status.

    ii.  Sentinel DNA will feature mapping via Google Maps map view, satellite/aerial view, and street view.

    iii.  Monitoring integrated into Sentinel DNA system will allow authorized users' access, at any time of the day from any internet-enabled device, to produce mapping displays and reports that include participant location, zone violations, tampering, and battery status.

    iv.  Determining if a participant has violated a zone/schedule that is associated with an area on a map. System must allow for unlimited number of zones and schedules.

    v.  Sentinel DNA will have the ability to create schedules and unlimited number of inclusion and/or exclusion zones for each participant with various shapes and color-coding to differentiate zones.

    vi.  Allowing to program buffer zones around each exclusion zone for high risk cases to enable staff time to act before the participant enters an exclusion zone.

    vii.  Allowing for easy changes in scheduling software program.

    viii.  Determining geographical areas to be designated as a) Allowable, b) Unallowable, c) Optional, but can be temporarily SFSD Allowed for a specific time period, on a case-by-case basis.

    ix.  Allowing an agency to break out caseloads by branch and case manager.

    x.  Allowing the entry of narrative-style notes related to system generated alerts by SFSD personnel as well as Contractor monitoring center staff and local case worker personnel, including the documentation of steps taken to

resolve offender alerts. All entries will be date and time stamped for historical accuracy.

xi. Allowing Chrono Notes entries for individual participants. Chrono Note entries include logging any schedule changes that the offender may request, zone modifications that may have been implemented by the Department staff, or any contact initiated by SFSD to the participant. Chrono Notes will be date and time stamped for accuracy.

xii. Allowing caseworker to determine reporting intervals, Reporting intervals are 10 minutes or less.

xiii. Providing alternative location tracking using the cellular network in the absence of GPS at no additional cost.

xiv. Contractor will provide to SFSD the **OM400**, a FCC certified, one-piece/single-body-attached GPS device housing the receiver and transmitter into a single unit. All participant equipment (except a charging cable) must be included in a 1-piece, ankle attached device and must report all information exclusively through the cellular network. Must be as small and inconspicuous as possible – Dimensions shall be no larger than approximately 3.5" (L) x 2.4" 9W) x 1.6" (D) eight and four tenths (8.4) ounces or must be consistent in size and weight with the latest industry standards.

xv. Contractor will upgrade the OM400 devices to the most current devices offered by Sentinel at no additional cost to the SFSD. SFSD will have the option to accept the upgraded devices.

xvi. Attaching to participant with either a reusable or field replaceable strap that is adjustable to fit the participant and attaches at the ankle. Contractor will replace reusable straps once every year at no additional cost or will provide six (6) disposable straps per unit, per year for the term of the contract at no additional cost.

xvii. Attaching to participant with the fewest pieces possible; no screws or tools are required.

xviii. Attaching to the participant so that efforts to tamper with or remove the bracelet are obvious upon visual inspection and will provide immediate tampering detection and alert reporting. The GPS device will detect three (3) tamper types including 1) strap tamper, 2) device case tamper and 3) backplate tamper.

xix. Remaining in "tamper" mode until a Case Worker has inspected the device and cleared the alert. In the event a temper does occur, the device will not terminate the signal, shut down, or "reset" itself in any way.

xx. Functioning reliably under normal atmospheric and environmental conditions, and will be shock resistant and water proof up to 30 feet.

xxi. Allowing participant to engage in activities without posing safety hazards or undue restrictions and is FCC Specific Absorption Rate (SAR) compliant.

xxii. Tracking indoors and outdoors. In GPS-impaired environment, device will track utilizing Assisted GPS (A-GPS) and AFLT (Advanced Forward Link Trilateration), which uses the cellular network triangulation to track participants.

    1) AFLT tracking intervals can be configured on a per-participant basis to be gathered as frequently as once every minute in the absence of GPS.

    2) Both GPS and AFLT location points will be automatically displayed on the same DNA mapping screen. GPS points will be displayed as orange and AFLT points will be displayed as blue to designate the difference between the sources of the tracking points.

    3) OM400 will use the CDMA wireless digital cellular standard to transmit and communicate data directly to the monitoring system via Verizon or Sprint cellular networks.

xxiii. Wi-Fi tracking in the absence of GPS will be an option for SFSD at no additional cost, if/once available.

xxiv. Permitting secondary tracking in 30 minute intervals.

xxv. Displaying secondary and GPS tracking on a single, integrated map.

xxvi. Equipped with technology that measures and reports drift and ensures that participant's points on the map are accurate, per industry standards for civilian GPS. Sentinel DNA will have an integrated "Precision Engine" that automatically maximizes the accuracy of the multiple location technologies (GPS, Assisted GPS and/or AFLT) into one tracking point. The "Precision" feature will measure, calculate and reflect any accuracy deviation in a number of feet, visible on screen, enabling SFSD to identify overall accuracy and any potential "drift".

xxvii. Providing internal, rechargeable, non-removable battery power, with a battery life of 72 to 100+ hours on a single charge; dependent upon the rate plan used.

xxviii. Equipping GPS device with a wall charge cord for easy recharging. Contractor will provide an advanced blue-tip GPS charger for improved connectivity, longer life, and increased durability.

xxix. Providing fully recharging GPS device within 90 minutes.

xxx. Providing a low power signal (at approximately 20%), vibrating and audio alarm plus an LED light, to indicate a device should be recharged. All notifications can be disabled remotely without the participant's knowledge, except the low power vibrating alarm.

xxxi.   Providing any replacement of GPS devices and power sources for use with GPS device that fails under normal use for the term of the agreement.

xxxii.  Providing vibrating and audio tone indicators that can be disabled, and that communicate the following to participant:

    1) Six (6) hours of battery life remaining

    2) Two (2) hours of battery life remaining

    3) Charging

    4) Tamper Mode

xxxiii. Providing a vibrating and audible alarm for participant communication that can be changed remotely.

xxxiv.  Providing a remotely controlled (web based) system, via Sentinel DNA, to perform at multiple status levels including but not limited to a) Passive, b) Active, c) Others, and will enable Case Worker to increase or decrease the status intensity without needing to change equipment, come in contact with the equipment or the participant, and without alerting the participant to such a change in supervision.

xxxv.   Pinging the device at any time to receive a current location and status

xxxvi.  Collecting a tracking point at least once every 30 seconds on Active GPS, via Pursuit Mode, and must report information via the cellular network, at least once every three (3) minutes and must report tampering and zone violations immediately.

xxxvii. Collecting a tracking point at least once every minute on Passive GPS, and must report information via a cellular or landline telephone at least once every thirty (30) minutes. The passive settings can be modified.

xxxviii. Internal memory of the bracelet capable of storing up to 10,000 points and events

xxxix.  Having one (1) piece body attached GPS devices incorporating a transceiver capable of two-way communication with an optional full feature **Home Monitoring Unit (HMU)** capable of RF based presence/absence residential tracking within a dense area, such as multi-dwelling buildings in/around San Francisco, with poor GPS information. Contractor will provide the **OM400 RF Beacon**, a stationary, in-home device to verify home locations. The OM400/RF Beacon have the following features:

    1) Dimensions no larger than 3.75" x 7" x 7.75" and will weigh no more than four (4) pounds.

    2) Incorporate non-volatile memory capability of storing 2,500 events with date and time stamp.

3) Operate from 110VAC commercial electricity and have internal rechargeable batteries backup capable of performing all functions in excess of 50 hours of continuous operation.

4) Has an RJ11 landline connector and cellular communications via Verizon and Sprint.

5) Incorporates a transceiver capable of two-way communication with the 1-piece body attached GPS device.

6) Detects and reports tampering and motion/location, as well as, disconnect/reconnect of electrical power and telephone line.

7) Communicate with participants through the bracelet. All programming and monitoring performed by case manager and SFSD is accomplished through a web-based program.

8) Enable Contractor and SFSD through a web-based program to remotely and discretely perform the following:

    a. Range testing

    b. Variable tracking/reporting intervals

    c. Pairing with 1-piece body attached GPS device

    d. Diagnostic Testing

9) **Optional Victim Dual GPS Application** – Contractor offers an option in which the OM400 GPS devices worn by both the offender/perpetrator plus a second victim-carried GPS device creating a unique "Mobile Exclusion Zone" around the victim. This monitoring service will notify the victim as well as law enforcement if the offender gets too close to the victim.

2. **Mobile Breath Alcohol Testing, capable of:**

    i. Collecting and reporting a color participant image at time of test for participant verification against a "Master Reference Image" via an embedded high-resolution camera. Contractor will provide **BA/RT mobile breath alcohol testing device.**

    ii. Lightweight, handheld and mobile with the participant, and capable of testing in all locations; dimensions no larger than approximately 6" x 2.8" x 1.4" weighing no more than 8.4 ounces.

    iii. Utilizing fuel cell technology that is specific to alcohol to perform a deep lung sample and measure the exact Breath Alcohol Content (BAC) from participant being tested.

    iv. The BA/RT device, at the time of the participant test, will measure breath temperature and humidity along with the BAC to guarantee the breath sample is human.

    v. Confirming the BAC level to the central computer once testing has concluded. The monitoring of the BA/RT mobile breath alcohol testing

device will be integrated in the Sentinel DNA web-based monitoring and case management platform.

vi. Providing immediate test reporting of participant photo, BAC, and corresponding GPS coordinates via cellular communication. All communication costs are included within the proposed price.

vii. Continuing to test and store results, along with the date and time of such testing, while in a cellular disadvantaged areas; storing up to 1,500 tests.

viii. Continued attempts to report to the Monitoring Center until successful.

ix. Operating without body attached equipment, home equipment, or home phone line.

x. Performing random, scheduled and on-demand testing. Changes can be made by staff remotely without participant interaction, via Sentinel DNA.

xi. Performing tracking of participant location at time of each test via built-in GPS, displayed with Google Maps. All data immediately transmits to the Contractor's 24/7 monitoring center for notification processing by the Contractor's monitoring center staff. Results will be immediately available via Sentinel DNA, allowing SFSD immediate access to all monitoring data.

xii. Recharging of re-chargeable battery within approximately 60 minutes will provide a full 100% charge.

xiii. Providing capability for Contractor and SFSD staff to communicate to participant via text, plus participant acknowledgement.

xiv. Providing multiple methods of guidance and functionality to the participant during the testing process, including the following:

    1) Audible prompts for time to test

    2) Multiple instructional alpha-numeric display prompts to guide participant through testing.

    3) Multi-colored LED indicators

    4) Test button

    5) Acknowledgement button

    6) Front panel lights to ensure quality image

xv. Providing, at a minimum, the following:

    1) Email alerts with numeric BAC reading

    2) Device utilizes a cellular system for reporting

    3) Color facial participant image taken at the time of test

    4) Web-based geo-map of participant location at the time of test

3. **Continuous Alcohol Monitoring (CAM) via Landline or Cellular or Wi-Fi, capable of:**

   i. Measuring the ethanol concentration in a discrete sample of the ethanol vapor as insensitive perspiration or the unnoticed perspiration that occurs continuously and shall be obtained via body attached device without the need for active participation by the participant, and capable of distinguishing between environmental factors and actual consumption. Contractor will provide **SCRAM transdermal continuous alcohol monitoring (CAM) system.**

   ii. Detecting and reporting tampering/removal and be tamper evident via temperature, infra-red, or other methods and tamper detection capabilities.

   iii. All violations – Drinking events, tampers, obstructions, communication alerts, and interfering environmental alcohol – will be viewed and interpreted by a committee of certified analysts from the Contractor.

   iv. Confirmed violations will be automatically date/time stamped, emailed to agencies by 9:00 am the next day plus a daily action plan showing which participant had specific violations.

   v. Providing a range of reports and graphs, from a snapshot of a single event to a comprehensive view of an offender's behavior over time.

   vi. Reporting data via landline through a base station that plugs into an analog telephone. There is no additional charge for communication costs.

   vii. Contractor offers an optional companion cellular and Wifi transceiver (for CAM participants without landline phone lines). Contract prices are inclusive of all communication costs be it landline or cellular.

   viii. Testing automatically conducted at fixed intervals set by the Contractor or SFSD staff, as frequently as once every 30 minutes.

   ix. Incorporating replaceable batteries with a minimum 90 days life duration. SCRAM posts a low battery event seven (7) days prior to battery failure.

   x. Replacing batteries and/or ankle unit small parts (screws, clips, rails, etc.).

   xi. Providing HMUs (Home Monitoring Unit) capable of reporting data via landline.

   xii. Offering an optional modular cellular unit that can connect to the SCRAM Base Station. The SCRAM base station will have Ethernet and Wi-Fi connectivity. (for CAM participants without landline phone lines).

   xiii. Providing CAM device integrating RF presence/absence residential tracking and web-based information system.

   xiv. Offering CAM device that can be Peer reviewed, able to withstand judicial scrutiny and meet the 33 Frye Daubert Rulings and Federal Rules of Evidence (FRE) 702 and 703 admissibility standards.

xv. Providing comprehensive court support, including manufacturer testimony when needed.

xvi. Utilizing the option of two (2) Apple iPad Minis for field enforcement and compliance activities so as not to interfere with the ability of SFSD staff to actively engage participants during enforcement actions, at no cost to SFSD.

xvii. Remaining current with industry standards and practices for tracking equipment purposes or applications.

xviii. FCC Compliant

## IV.   Department Liaison

In performing the Services provided for in this Agreement, Contractor's liaison with the San Francisco Sheriff's Department will be the Community Programs Unit Commander or his/her designee during normal operational hours as defined by SFSD and rotating supervisory staff on off-hours as defined by SFSD. The current Community Programs Unit Commander is Captain Michele Fisher.

**Appendix B**
**Calculation of Charges**
**(City-Paid Service Fees)**

## 1. Equipment Fees

| Device | Unit of Measure | Price Per Day |
|---|---|---|
| Active GPS | Per Unit/Day | $8.48 |
| Additional Cost per GPS device for High Scrutiny Monitoring (per Appendix A – Section I. E. 7) | Per Unit/Day | Included @ N/C |
| Home Monitoring Unit (HMU) via Landline | Per Unit/Day | Beacons included @ N/C |
| Home Monitoring Unit (HMU) via Cellular | Per Unit/Day | Beacons included @ N/C |
| Mobile Breath Alcohol Testing | Per Unit/Day | $6.00 |
| Continuous Alcohol Monitoring (CAM) via Landline | Per Unit/Day | $9.94 |
| Continuous Alcohol Monitoring (CAM) via Cellular | Per Unit/Day | $10.04 |
| Continuous Alcohol Monitoring (CAM) via Ethernet | Per Unit/Day | $9.94 |
| Continuous Alcohol Monitoring (CAM) via Wi-Fi | Per Unit/Day | $9.94 |
| Active GPS bundled with Continuous Alcohol Monitoring (CAM) | Per Unit/Day | $13.72 |
| Volume Discount on Active GPS Device used in excess of 50 devices | % of Discount on per unit/day rate | 0.00% |
| Volume Discount on CAM Cellular Device used in excess of 50 devices | % of Discount on per unit/day rate | 0.00% |
| *Optional Victim Dual GPS Application (Per Appendix A – Section I. G. 1. xxxix. 9) | Per Unit/Day | $11.85 |

2) Appendix B, Section 1 – Equipment Fees, are inclusive of all itemized costs and hourly rates for Sentinel team members.

# EXHIBIT E



San Francisco Sheriff's Department Community Programs
415.575-6461     SHF-CommunityPrograms@sfgov.org

## ELECTRONIC MONITORING LOCATION REQUEST

*To be filled out by the requesting party and emailed to SHF-CommunityPrograms@sfgov.org*

Date of Request: _____

Name and Title: _____     Star # (if applicable): _____

Email: _____     Agency: _____

☐     I am requesting this information as part of a current criminal investigation and sent to me via the

following email:_____

Signature:  _____

☐     Request for an individuals' location information during date and time listed below

Participant's Name:  _____

Participant's SF Number:  _____

☐     Request for the location of anyone on GPS tracking (within 300 yards) during the date and
time listed below

Street Address/City:  _____

Cross Street: _____

DATE Search Range:  From: _____     To: _____

TIME Search Range:  From: _____     To: _____

*****************************************************************************************
*For Sheriff's Department Use Only*

Approved by WC: _____     Date and Time: _____

Information Provided to Requestor by: _____     Date and Time: _____

☐     Information was returned to requestor under separate cover

☐     No information is available on the individual or area

Post Order 02-10
Updated 11.18.19

# EXHIBIT F



June 24, 2022

**<u>Via U.S. Mail and Electronic Mail</u>**

Sheriff Paul Miyamoto
San Francisco Sheriff's Office
1 Dr. Carlton B Goodlett Place
San Francisco, CA  94102

**RE:    Unconstitutional pre-trial electronic monitoring conditions**

Dear Sheriff Miyamoto:

We write on behalf of the American Civil Liberties Union Foundation of Northern California as well as a putative class of individuals released on the San Francisco Sheriff's pretrial electronic monitoring program ("EM"). The Sheriff imposes additional conditions on all individuals released by the Superior Court on EM in violation of their constitutional rights. In particular, the Sheriff's blanket imposition of Rules 5 and 13 of the Sheriff's "Electronic Monitoring Program Rules" violates the Fourth Amendment to the U.S. Constitution, Article I, Section 1 of the California Constitution, and the Separation of Powers requirements of both Constitutions.

We demand that you immediately desist from imposing Rules 5 and 13, and provide notice of same, both prospectively and retroactively, in all cases in which individuals are released on pretrial EM. If you do not take these actions within 30 days of the date of this letter, we intend to sue to vindicate our rights as well as those of the putative class.

Rules 5 and 13 reflect sweeping intrusions into the privacy of all persons released on EM. Rule 5 requires those released on EM pretrial to "submit to a search of [their] person, residence, automobile or property by any peace officer at any time." This highly intrusive condition is commonly known as a "four-way" search. Rule 13 requires acknowledgement that "EM data may be shared with other criminal justice partners." The absence of any temporal, geographic, or subject matter limitations, combined with the lack of any expungement policy, means that EM data—sometimes covering a span of years—may be retained and shared in perpetuity with virtually any law enforcement authority that operates in this region.

Each of these rules reflects an enormous encroachment upon privacy interests recognized by both the United States and California Supreme Courts. *See*, *e.g. California v. Ciraolo*, 476 U.S. 207, 212 (1986) ("home" is "where privacy expectations are most heightened"); *People v. Camacho*, 23 Cal.4th 824, 837 (2000) ("The Framers' interest that we remain secure from government intrusion in our homes was a paramount concern."); *Terry v. Ohio*, 392 U.S. 1, 9

*Letter re: Unconstitutional pre-trial electronic monitoring conditions*
Page 2 of 2

(1968) ("'No right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference[.]'") (citation omitted); *Carpenter v. United States*, 138 S. Ct. 2206, 2217–18 (time-stamped location data is constitutionally protected because it "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations'") (citation omitted).

The Sheriff imposes these rules unilaterally and coercively in every case. The Superior Court's form order for release on EM pretrial, titled "County of San Francisco Sheriff's Department / Superior Court Pre-Sentenced Defendant Electronic Monitoring – Court Order," offers no language or court-ordered condition that could be construed to authorize Rules 5 or 13 or their attendant liberty intrusions. Nonetheless, the Sheriff compels every person ordered released on EM to agree to its Electronic Monitoring Program Rules in order to obtain release— an agreement compelled under threat of unlawful detention that vitiates any purported waiver. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (government bears the burden of proving consent to search is "the product of an essentially free and unconstrained choice"); *Burrows v. Sup. Ct.*, 13 Cal.3d 238, 251 (1974) ("The rule is clearly established that consent induced by an illegal search or arrest is not voluntary, and that if the accused consents immediately following an illegal entry or search, his assent is not voluntary because it is inseparable from the unlawful conduct of the officers.").

The Sheriff's compulsory imposition of Rules 5 and 13 in every case violates the constitutional rights of those released on EM pretrial. Under the Fourth Amendment, intrusions on legitimate privacy interests in the pretrial release context may be imposed only by the Superior Court upon an individualized determination of need. *In re York*, 9 Cal.4th 1133, 1150–51, 1151 n.10 (1995). The Sheriff's usurping of this fundamentally judicial function violates the Separation of Powers Doctrine. *See, e.g., People v. Cervantes*, 154 Cal.App.3d 353, 358 (1984); *United v. Stephens*, 424 F.3d 876, 880, 880 n.2 (9th Cir. 2005). And because the Sheriff's blanket imposition of these rules necessarily foregoes any individualized determination, under Article I, Section 1, the Sheriff has no justification for the resulting infringement on legitimate privacy interests. *Hill v. Nat. Coll. Athletic Assn.*, 7 Cal.4th 1, 39–40 (1994).

In light of the foregoing, we urge you to take immediate action to bring the Sheriff's EM pretrial release program into compliance with law. In the event you do not, as mentioned, we are prepared to file suit in court to seek injunctive relief.

Thank you for your time and consideration of this pressing matter. If you have any questions, please feel free to contact me at the email address below.

Sincerely,

Shilpi Agarwal
Legal Director
ACLU of Northern California
sagarwal@aclunc.org

# EXHIBIT G



# OFFICE OF THE SHERIFF
# CITY AND COUNTY OF SAN FRANCISCO

1 DR. CARLTON B. GOODLETT PLACE
ROOM 456, CITY HALL
SAN FRANCISCO, CALIFORNIA  94102



**PAUL MIYAMOTO**
**SHERIFF**

July 6, 2022
Reference: CLC 2022-027

TO:         SHILPI AGARWAL, Legal Director, ACLU of Northern California

FROM:    MARGARET W. BAUMGARTNER
              Chief Legal Counsel

RE:         **<u>ACLU Cease and Desist Letter</u>**


Dear Ms. Agarwal:

Sheriff Paul Miyamoto forwarded your June 24, 2022, letter regarding searches of persons on pre-trial electronic monitoring to me for response.  In your letter, you assert that the Sheriff's office "imposes" search conditions on electronic monitoring clients through what you refer to as Rules 5 and 13.  That is not the case.  The Court requires as a condition of the electronic monitoring placement that the client waive Fourth Amendment rights.  The Court requires this waiver in every case.  The Court's form specifically informs a person agreeing to electronic monitoring that a Fourth Amendment waiver is a condition of being placed into the program.  Thus, it is the Court, not the Sheriff's Office that "imposes" the waiver.

As you are undoubtedly aware, an individual can waive Fourth Amendment rights.  Much like with a person placed on probation, a Fourth Amendment waiver grants law enforcement the right to detain and search a person, and the person's home, vehicle, residence and property.  In the case of electronic monitoring, it also means the person waives the right to privacy as it relates to the person's location.

California Penal Code Section 1203.018 provides for sharing of electronic monitoring data upon the request of a law enforcement agency.  Although this section is not directly applicable in San Francisco as the Sheriff's Office is acting under the authority of a Court order, and not pursuant to a Board of Supervisor's approved program, it shows that a person on electronic monitoring, who has waived Fourth Amendment rights, can reasonably expect that the data will be shared with a local law enforcement agency upon the agency's request.

The SFSO uses the form you reference in regard to Rules 5 and 13 to explain to clients how the client's waiver affects the client's rights.  Its purpose is to provide additional information to the client, to increase the opportunities for the client to successfully complete the program.


Sincerely,


_____
MARGARET W. BAUMGARTNER
Chief Legal Counsel


cc: Sheriff Paul Miyamoto