SHILPI AGARWAL (SBN 270749)
AVRAM D. FREY (MJP 804789) (*Admitted Pro Hac Vice*)
EMI YOUNG (SBN 311238)
HANNAH KIESCHNICK (SBN 319011)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478
Email:  sagarwal@aclunc.org
afrey@aclunc.org
eyoung@aclunc.org
hkieschnick@aclunc.org

JUSTINA SESSIONS, State Bar No. 270914
JOHN P. FLYNN, State Bar No. 141094
COLLEEN BAL, State Bar No. 167637
MALAVIKA F. LOBO, State Bar No. 317635
ANA ALICIA SONTAG, State Bar No. 340602 (*Admission pending*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA  94105
Telephone:  (415) 947-2197
Facsimile:  (415) 947-2000
Email:  jsessions@wsgr.com
jflynn@wsgr.com
cbal@wsgr.com
mlobo@wsgr.com
asontag@wsgr.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| JOSHUA SIMON, DAVID BARBER, AND JOSUE BONILLA, individually and on behalf of all others similarly situated, DIANA BLOCK, an individual, and COMMUNITY RESOURCE INITIATIVE, an organization,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, PAUL MIYAMOTO, in his official capacity as SAN FRANCISCO SHERIFF,<br><br>Defendants. | CASE NO.:  4:22-CV-05541-JST<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: January 12, 2023<br>Time: 2:00 p.m.<br>Place: Courtroom 6<br>Judge: Hon. Jon S. Tigar |

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND ...................................................................................................... 2

    A.   Court-Ordered Electronic Monitoring ...................................................... 2

    B.   The Sheriff's Program Rules ...................................................................... 3

    C.   Program Rules 5 and 13 and the Sheriff's Indefinite Retention of GPS
       Location Data ............................................................................................. 4

III. ARGUMENT ........................................................................................................... 6

    A.   Legal Standard ........................................................................................... 6

    B.   Plaintiffs Are Likely to Prevail on the Merits of Their Claims. ............... 6

        1.   Sheriff's Program Rules 5 and 13 Violate the Separation of Powers. ........ 6

        2.   Sheriff's Program Rules 5 and 13 Violate the Prohibition on
            Unreasonable Searches and Seizures. ........................................................ 9

        3.   The Sheriff's Indefinite Retention and Sharing of GPS Location
            Data Pursuant to Program Rule 13 Violates the Right to Privacy. ........... 13

    C.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief. ................... 16

    D.   The Balance of Harms and the Public Interest Weigh in Favor of a
       Preliminary Injunction ............................................................................. 17

IV.  CONCLUSION ...................................................................................................... 18

1

## TABLE OF AUTHORITIES

2

3

4

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)....................................................................... 6

*Bumper v. North Carolina*,
   391 U.S. 543 (1968) ................................................................................... 13

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018) ......................................................................... 11, 15

*Cnty. of Los Angeles v. Los Angeles Cnty. Emp. Relations Comm'n*,
   56 Cal. 4th 905 (2013) ............................................................................... 15

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................... 16

*Ferguson v. City of Charleston*,
   532 U.S. 67 (2001) ..................................................................................... 16

*Gerstein v. Pugh*,
   420 U.S. 103 (1975) ..................................................................................... 8

*Hill v. Nat'l Collegiate Athletic Ass'n*,
   7 Cal. 4th 1 (1994)................................................................... 13, 14, 15, 16

*In re Danielle W.*,
   207 Cal. App. 3d 1227 (1989) ................................................................ 8, 9

*In re Humphrey*,
   11 Cal. 5th 135 (2021).................................................................... 2, 7, 14

*In re Walter E.*,
   13 Cal. App. 4th 125 (1992) ...................................................................... 7

*In re York*,
   9 Cal. 4th 1133 (1995)......................................................................... 7, 10

*Johnson v. United States*,
   333 U.S. 10 (1948) .................................................................................. 8, 13

*Laisne v. State Bd. of Optometry*,
   19 Cal. 2d 831 (1942) .................................................................................. 7

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ................................................................... 17

*Loder v. City of Glendale*,
   14 Cal. 4th 846 (1997)......................................................................... 13, 14

*Mathews v. Becerra*,
   8 Cal. 5th 756 (2019)......................................................................... 15, 16

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)..................................................................... 16, 17

*Nelson v. Nat'l Aeronautics & Space Admin.*,
    530 F.3d 865 (9th Cir. 2008), *rev'd on other grounds by Nat'l Aeronautics*
    *& Space Admin v. Nelson*, 562 U.S. 134 (2011) ............................................. 17

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................ 17

*Payton v. New York*,
    445 U.S. 573 (1980) ........................................................................................ 11

*People v. Bunn*,
    27 Cal. 4th 1 (2002) .......................................................................................... 7

*People v. Buza*,
    4 Cal. 5th 658 (2018) ........................................................................................ 9

*People v. Cervantes*,
    154 Cal. App. 3d 353 (1984) ............................................................................. 8

*Pettus v. Cole*,
    49 Cal. App. 4th 402 (1996).......................................................................... 14, 16

*Recycle for Change v. City of Oakland*,
    856 F.3d 666 (9th Cir. 2017) ............................................................................ 6

*United States v. Jones*,
    565 U.S. 400 (2012) ...................................................................................... 8, 11

*United States v. Ocheltree*,
    622 F.2d 992 (9th Cir. 1980) .......................................................................... 12

*United States v. Salerno*,
    481 U.S. 739 (1987) ........................................................................................ 14

*United States v. Scott*,
    450 F.3d 863 (9th Cir. 2006)....................................................................*passim*

*United States v. Shaibu*,
    920 F.2d 1423 (9th Cir. 1990) ........................................................................ 12

*United States v. Stephens*,
    424 F.3d 876 (9th Cir. 2005) ............................................................................ 9

*Vallindras v. Mass. Bonding & Ins. Co.*,
    42 Cal. 2d 149 (1954)........................................................................................ 8

*Wyoming v. Houghton*,
    526 U.S. 295 (1999) .......................................................................................... 7

*Younger v. Superior Court*,
    21 Cal. 3d 102 (1978)........................................................................................ 7

**STATUTES**

Cal. Const. art. I, § 1 ................................................................................................... 6, 13

Cal. Const. art. I, § 13 .................................................................................................... 6, 9

Cal. Const. art. III, § 3 .................................................................................................... 6, 7

U.S. Const. amend. IV .................................................................................................... 6, 9

**MISCELLANEOUS**

Bob Egelko, "S.F. courts won't be forced to lift COVID restrictions despite
hundreds of backlogged criminal trials," S.F. Chronicle (May 12, 2022) ...................... 5

Samantha K. Brooks & Neil Greenberg, *Psychological Impacts of Being
Wrongfully Accused of Criminal Offences: A Systematic Literature Review*,
Medicine, Science, and the Law (2021) .......................................................................... 15

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Joshua Simon, David Barber, and Josue Bonilla ("Plaintiffs") on January 12, 2023 at 2:00 p.m. Pacific Time, or as soon thereafter as the matter may be heard by the Honorable Jon S. Tigar in Courtroom 6, United States District Court for the Northern District of California, Oakland Courthouse, 2nd Floor, 1301 Clay Street, Oakland, CA 94612, shall, and hereby do, move for a preliminary injunction against San Francisco City and County and Paul Miyamoto, in his official capacity, under 35 U.S.C. § 283 and Fed. R. Civ. P. 65(a), enjoining San Francisco City and County and Paul Miyamoto from imposing and enforcing the Sheriff's Electronic Monitoring Program Rules 5 and 13.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This action challenges the San Francisco Sheriff's Office's ("Sheriff" or "SFSO") systematic intrusions on the privacy of individuals released pretrial on electronic monitoring ("EM") in San Francisco. After the Superior Court orders individuals released on EM, the Sheriff requires them to agree to a set of "Program Rules," several of which are not authorized by the Court's release order. In particular, Program Rule 5 purports to authorize any law enforcement officer to conduct warrantless, suspicionless searches of an individual's person, property, home, and automobile at any time ("four-way search clause"). Rule 13 purports to authorize the Sheriff to share participant GPS location data with any law enforcement agency upon request and in perpetuity—an ongoing encroachment given that the Sheriff's EM Program seemingly allows GPS data to be retained indefinitely.

Plaintiffs move for a preliminary injunction prohibiting SFSO from imposing or enforcing Rules 5 and 13. Plaintiffs are likely to succeed on the merits of their claims under the Separation of Powers Clause, Article III, section 3 of the California Constitution; the prohibitions against unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution and Article I, section 13 of the California Constitution; and the right to privacy under Article I, section 1 of the California Constitution. Further, the balance of harms weighs in

favor of Plaintiffs, as the Sheriff's ongoing violations of constitutional law are *per se* injurious to Plaintiffs, and the Sheriff will suffer no harm if the injunction is granted. The Court should preliminarily enjoin the Sheriff's unauthorized and illegal surveillance of individuals released on EM pending trial.

## II.     BACKGROUND

### A.     Court-Ordered Electronic Monitoring

The Superior Court of San Francisco may order an individual facing criminal charges released on EM, but the Superior Court does not authorize the Sheriff's rules challenged here. After the filing of criminal charges, a Superior Court judge may order release with varying degrees of supervision, set bail in accordance with *In re Humphrey*, 11 Cal. 5th 135 (2021), or, in limited circumstances, order detention. Kim Decl. ¶ 4. For individuals released pretrial, a Superior Court judge may impose EM—purportedly to ensure future court appearances and to protect public safety—under any level of supervision. *Id.* ¶ 6.

The Superior Court typically orders EM following a hearing. *Id.* During these hearings, the court does not mention the Sheriff's EM Program Rules in form or substance. *Id.*; *see also* Simon Decl. ¶ 3; Bonilla Decl. ¶ 3; Barber Decl. ¶ 5. There is no colloquy on the record concerning the scope of any privacy intrusions imposed by the Sheriff in its administration of EM, no discussion of any four-way search condition or indefinite retention and sharing of GPS location data, and no general waiver of Fourth Amendment rights. Kim Decl. ¶ 6; Simon Decl. ¶ 3; Bonilla Decl. ¶ 3; Barber Decl. ¶ 5.

When the Superior Court orders release on EM, it executes a pretrial form order labeled "County of San Francisco Sheriff's Office / Superior Court Pre-Sentenced Defendant Electronic Monitoring – Court Order." *See* Kieschnick Decl. Ex. 4 (hereinafter "Court Form Order"). The form requires those released on EM to obey all orders given by any SFSO employee or service provider and to live within 50 driving miles of the Sheriff's EM office. *Id.* The form also lists other "court-ordered monitoring conditions" that the Superior Court may check off in its discretion. *Id.* Near the top, the form provides, "the Court indicates that the defendant has waived their 4th Amendment rights and understands the restrictions ordered by the Court." *Id.* Releasees

have no opportunity to view this form order before the judge signs it, and they do not sign it themselves thereafter. *See* Barber Decl. ¶ 7.

### B.     The Sheriff's Program Rules

Separately, the Sheriff requires EM releasees to sign the Sheriff's own EM Program Rules. Following a court order, EM releasees are outfitted with an ankle monitor and enrolled in the EM Program at the office of SFSO's private contractor, Sentinel Offender Services, LLC ("Sentinel"), located within the Sheriff's Community Programs building. Kim Decl. ¶ 7; Simon Decl. ¶ 4; Bonilla Decl. ¶¶ 4-5; Barber Decl. ¶ 8.

At Sentinel's office, individuals are first informed of the Sheriff's "Electronic Monitoring Program Rules [for] Pre-Sentenced Participants." *See* Kieschnick Decl. Ex. 5 (hereinafter "Program Rules" or "Rules"). A Sentinel employee provides the Rules to releasees and instructs them to initial each rule and sign and date at the bottom. *See* Simon Decl. ¶ 6; Bonilla Decl. ¶ 7; Barber Decl. ¶ 9. No one explains the Program Rules to EM releasees, and releasees are not provided access to counsel while at Sentinel's office. *See* Simon Decl. ¶ 6; Barber Decl. ¶ 9; Kim Decl. ¶ 8. In all cases, releasees understand from the circumstances that they must initial, sign, and date the Program Rules or face return to jail. *See* Simon Decl. ¶ 6; Bonilla Decl. ¶ 7; Barber Decl. ¶ 10.

Among the rules that EM releasees must assent to are Rules 5 and 13. Rule 5 states, "I shall submit to a search of my person, residence, automobile or property by any peace officer at any time." Kieschnick Decl. Ex. 5, Program Rules at 1. Rule 13 states "I acknowledge that my EM data may be shared with other criminal justice partners." *Id.* EM releasees must also separately initial, acknowledge, and agree to rules contained in a "San Francisco Sheriff's Dept. Electronic Monitoring Program Participant Contract: Pre-Sentenced Individuals," which contain provisions substantively equivalent to Rules 5 and 13. *See* Kieschnick Decl. Ex. 6 (hereinafter "Participant Contract") at 3, 4. No provision of the Program Rules, or any other policy or agreement, provides for the destruction or expungement of releasees' GPS location data after their participation in the EM Program.

1   EM releasees initial and sign the Program Rules and Participant Contract requirements to

2   avoid the threat of continued detention pending trial. *See* Simon Decl. ¶ 6; Bonilla Decl. ¶ 7;

3   Barber Decl. ¶ 10. Many do not comprehend the forms or the conditions imposed, and virtually

4   all need to avoid further pre-trial detention, whether to care for elderly, sick, or child dependents,

5   to retain employment, housing, or child custody, or for a litany of other personal reasons. *See*

6   Simon Decl. ¶¶ 5-6; Bonilla Decl. ¶¶ 6-7; Barber Decl. ¶ 3. On information and belief, no

7   prospective EM releasee has ever refused to initial and sign the Program Rules or Participant

8   Contract. *See* Kim Decl. ¶ 9.

9         **C.**      **Program Rules 5 and 13 and the Sheriff's Indefinite Retention of GPS**

10                  **Location Data**

11        Program Rules 5 and 13, in concert with the Sheriff's indefinite retention of participant

12  location data, subject some of San Francisco's most vulnerable residents to enormous privacy

13  intrusions. Once an individual is enrolled in the EM Program, notice of the four-way search

14  condition described in Rule 5 is entered into the California Law Enforcement

15  Telecommunications System ("CLETS"), a database to which all members of law enforcement

16  in the state have access. *See* Kieschnick Decl. Ex. 9 ("General Search Condition Request" form

17  that SFSO uses to enter search conditions "into the criminal justice system (CLETS)"); Ex. 10 at

18  2 (instructs SFSO employees and/or contractors to submit "General Search Condition Request"

19  form and enter search conditions into CLETS as part of EM enrollment). Whenever any member

20  of law enforcement in California runs a check on an individual released pretrial on EM, CLETS

21  notifies the officer of the four-way search condition, purportedly authorizing expansive searches

22  without a warrant or any degree of articulable suspicion. Plaintiff Barber was subjected to a

23  search of his person and vehicle in precisely this manner. On August 30, 2022, Barber was

24  pulled over by California Highway Patrol for speeding. *See* Barber Decl. ¶ 13. After running a

25  check on his driver's license, the officers presumably learned of the existence of the four-way

26  search condition from CLETS—they told him they were authorized to search his person and his

27  vehicle, placed him in handcuffs, patted him down and searched his pockets, and then searched

28  his car for an extended period of time. *Id.* ¶¶ 13-15.

No data is publicly available regarding the frequency of warrantless searches conducted pursuant to Rule 5. Such searches are publicly visible only in the unusual circumstance where evidence gathered thereby is challenged in court. On information and belief, there have been two such cases in San Francisco. *See* Kim Decl. ¶¶ 10-12. In one, the court suppressed the evidence, finding that Rule 5 was not a legally valid search condition as the defendant had not waived his rights. *See id.* ¶ 11. In the second, the superior court denied the motion to suppress, and the district attorney dropped the charges before the issue could be appealed. *Id.* ¶ 12.

The data-sharing condition of Rule 13—which "acknowledge[s]" the Sheriff's sharing of GPS data with "criminal justice partners"—is arguably more intrusive still. A functioning ankle monitor gives SFSO and Sentinel continuous GPS location coordinates 24 hours a day, 7 days a week. *See* Kieschnick Decl. Ex. 7 at Appendix A, Part I(E)(6) (hereinafter "Sheriff-Sentinel Contract"). A participant's GPS information can be viewed contemporaneously to track real-time location and movements. Sentinel also saves this data on its servers, permitting historical tracking. *Id.* at Appendix A, Part I(E)(6)(iv). The volume and scope of this data is immense. Program participation typically lasts at least several months but can span multiple years, particularly given the backlog in San Francisco's Superior Court criminal docket, which has been greatly exacerbated by COVID-19. *See* Kim Decl. ¶ 13; *see also* Bob Egelko, "S.F. courts won't be forced to lift COVID restrictions despite hundreds of backlogged criminal trials," S.F. CHRONICLE (May 12, 2022), https://www.sfchronicle.com/bayarea/article/S-F-courts-won-t-be-forced-to-lift-COVID-17169273.php.

Pursuant to Program Rule 13, SFSO routinely shares participant GPS location data with other law enforcement agencies. To acquire the data, a requesting officer need only submit a form titled "Electronic Monitoring Location Request" to the Sheriff representing that they are "requesting this information as part of a current criminal investigation"—no warrant or articulable suspicion is required. *See* Kieschnick Decl. Ex. 8 ("Electronic Monitoring Location Request" form); *see also* Kieschnick Decl. ¶ 11 & Ex. 2 (SFSO's July 1, 2022 written response labeled "ii"). The requesting agency may obtain either the GPS location data of a specific individual on EM across a period of time, or the GPS location data "of anyone on GPS tracking"

1  in a specific location. Kieschnick Decl. Ex. 8. Requesting agencies may obtain this data in

2  perpetuity; because Sentinel may retain the complete GPS location data of all current and

3  historical EM releasees unless or until Sentinel's contract is terminated, location data is available

4  to be shared indefinitely. *See* Kieschnick Decl. ¶ 10 & Ex. 2 (SFSO's July 1, 2022 written

5  response labeled "ix"); *see also* Kieschnick Decl. Ex. 7, Sheriff-Sentinel Contract at 13.4.3

6  (covering "Disposition of Confidential Information").

7        Use of Rule 13 to obtain GPS data without court oversight is on the rise. In 2019, the

8  Sheriff shared GPS location data of four individuals on pretrial EM; in 2021, that number

9  swelled to 179. *See* Kieschnick Decl. ¶ 12 & Ex. 2 (SFSO's July 1, 2022 written response

10  labeled "viii").

11  **III.  ARGUMENT**

12        **A.  Legal Standard**

13        To obtain a preliminary injunction, a plaintiff must establish:

14              that [it] is [1] likely to succeed on the merits, [2] that [it] is likely to suffer
              irreparable harm in the absence of preliminary relief, [3] that the balance
15              of equities tips in [its] favor, and [4] that an injunction is in the public
              interest.
16

17  *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (citation omitted)

18  (modifications in original). These factors are weighed on a sliding scale, such "that a stronger

19  showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*

20  *v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Here, all four factors weigh sharply in

21  Plaintiffs' favor.

22        **B.  Plaintiffs Are Likely to Prevail on the Merits of Their Claims**

23        Plaintiffs are likely to prevail on their claims that Program Rules 5 and 13, together with

24  the Sheriff's indefinite retention of GPS location data, collectively violate the separation of

25  powers, Cal. Const. art. III, § 3, the prohibition on unreasonable search and seizure, U.S.

26  Const. amend. IV; Cal. Const. art. I, § 13, and the right to privacy, Cal. Const. art. I, § 1.

27              **1.  Sheriff's Program Rules 5 and 13 Violate the Separation of Powers**

28        Imposing conditions of pretrial release is a judicial function such that the Sheriff's

1  usurping of that function violates the separation of powers. Article III, section 3 of the California

2  Constitution states, "[t]he powers of state government are legislative, executive, and judicial.

3  Persons charged with the exercise of one power may not exercise either of the others . . . ." CAL.

4  CONST. art. III, § 3.

5    A branch of government violates the separation of powers under the California

6  Constitution when it wrests "complete" control of a power charged to another branch. *Laisne v.*

7  *State Bd. of Optometry*, 19 Cal. 2d 831, 835 (1942). To determine when this happens, courts first

8  analyze which branch "properly exercise[s]" the power in question, *i.e.*, to which branch is "the

9  function . . . primary." *In re Walter E.*, 13 Cal. App. 4th 125, 136 (1992); *accord People v. Bunn*,

10  27 Cal. 4th 1, 14 (2002) ("[T]he Constitution . . . vest[s] each branch with certain 'core' or

11  'essential' functions that may not be usurped by another branch.") (citation omitted). Where one

12  branch exercises a power entrusted to another, courts then examine whether:

13    (1) the exercise . . . is incidental or subsidiary to a function or power
   otherwise properly exercised by such department or agency, and (2) the
14    department to which the function so exercised is primary retains some sort
   of ultimate control over its exercise . . . .

15

16  *In re Danielle W.*, 207 Cal. App. 3d 1227, 1236 (1989) (citation omitted); *accord Younger v.*

17  *Superior Court*, 21 Cal. 3d 102, 117 (1978).

18    Unquestionably, the judiciary is charged with imposing conditions of pretrial release

19  under California law. In the seminal case authorizing imposition of conditions on OR releasees,

20  *In re York*, 9 Cal. 4th 1133 (1995), the California Supreme Court held that to determine what

21  conditions are "reasonable," "*a court* must balance 'the nature and quality of the intrusion on the

22  individual's Fourth Amendment interests against the importance of the governmental interests

23  alleged to justify the intrusion.'" *Id.* at 1149 (citation omitted) (emphasis added). Such

24  constitutional balancing is understood to be a judicial function in California in the related

25  contexts of setting bail and imposing conditions of release on parole and probation, as well. *See*

26  *Humphrey*, 11 Cal. 5th at 156 ("[a] *court's* procedures for entering an order resulting in pretrial

27  detention must [] comport with [] traditional notions of due process") (emphasis added);

28  *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999) (holding in the parole context, "*we* must

1   evaluate . . . reasonableness by assessing, on the one hand, the degree to which it intrudes upon

2   an individual's privacy and, on the other, the degree to which it is needed for the promotion of

3   legitimate governmental interests") (emphasis added); *see also People v. Cervantes*, 154 Cal.

4   App. 3d 353, 358 (1984) (holding that determination of probation conditions is an "essentially

5   judicial function[]" given the "close questions" requiring individualized analysis and the taking

6   and weighing of conflicting evidence).

7           Indeed, as a matter of due process, such balancing must be the exclusive domain of the

8   judiciary. Weighing privacy rights against law enforcement objectives cannot be entrusted to the

9   executive, an interested party, but instead calls for a neutral, detached decisionmaker. *See*

10   *Gerstein v. Pugh*, 420 U.S. 103, 112-13 (1975) ("[T]he Court has required that the existence of

11   probable cause be decided by a neutral and detached magistrate whenever possible."); *Johnson v.*

12   *United States*, 333 U.S. 10, 13-14 (1948) ("The point of the Fourth Amendment . . . consists in

13   requiring that [privacy intrusions] be drawn by a neutral and detached magistrate instead of being

14   judged by the officer . . . ."); *see also United States v. Jones*, 565 U.S. 400, 416-17 (2012)

15   (Sotomayor, J., concurring) (questioning, in the context of GPS monitoring, "the appropriateness

16   of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so

17   amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary

18   exercises of police power and prevent 'a too permeating police surveillance'") (citation omitted).

19           Thus, curtailment of individuals' rights as a condition of pretrial release is fundamentally

20   a judicial function. That is dispositive of the separation of powers inquiry under the California

21   Constitution, as imposition of Rules 5 and 13 is neither (1) "incidental or subsidiary" to the

22   Sheriff's authority to administer EM, nor (2) subject to the Court's "ultimate control . . . ."

23   *Danielle W.*, 207 Cal. App. 3d at 1236 (citation omitted). First, the Sheriff's role with regard to

24   individuals released pretrial on EM is to *administer* the conditions determined by the Superior

25   Court, not to unilaterally impose new conditions that present additional burdens on constitutional

26   rights. *See Vallindras v. Mass. Bonding & Ins. Co.*, 42 Cal. 2d 149, 154 (1954) (holding in the

27   context of a court's detention order, "a judgment of commitment . . . is ultimately for the courts,

28   not the sheriff, to decide. A sheriff is a ministerial or executive, not a judicial, officer") (citations

1   omitted). Second, there is no mechanism for EM releasees to appeal the Sheriff's Program Rules

2   to the Superior Court in their criminal cases. EM releasees can challenge Rules 5 and 13 only by

3   filing a petition or civil action, as Plaintiffs have done here. This possibility of an ancillary civil

4   action is insufficient to cure the separation of powers violation. *See*, *e.g.*, *Danielle W.*, 207 Cal.

5   App. 3d at 1237 (Department of Children's Services exercise of judicial function of determining

6   child visitation violates separation of powers even though subject to judicial review); *United*

7   *States v. Stephens*, 424 F.3d 876, 880 n.2 (9th Cir. 2005) (citing cases holding that Executive's

8   determination of post-sentencing release conditions concerning drug testing, mental health

9   treatment, and restitution payments, violated separation of powers even though judicially

10  reviewable). For these reasons, Plaintiffs are likely to succeed on the merits of their article III,

11  section 3 Separation of Powers claim.

12          **2.      Sheriff's Program Rules 5 and 13 Violate the Prohibition on
                       Unreasonable Searches and Seizures**
13

14          Individuals released pretrial on EM retain rights against unreasonable search and seizure

15  under the Fourth Amendment of the U.S. Constitution and Article I, Section 13 of the California

16  Constitution. *See* U.S. CONST., amend. IV; CAL. CONST. art. 1, § 13; *see People v. Buza*, 4 Cal.

17  5th 658, 686 (2018) (California courts "constru[e] the Fourth Amendment and article I, section

18  13 in tandem."). Program Rules 5 and 13 violate both rights.

19          Under *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006), pretrial releasees retain

20  the right to an individualized determination before a court may impose a condition that infringes

21  upon Fourth Amendment rights. *Scott* is directly on point. There, a court ordered the defendant to

22  consent to warrantless drug-testing and search of his home as a condition of pretrial release. *Id.*

23  at 865. The Ninth Circuit rejected these conditions as violative of the Fourth Amendment. *Id.* at

24  874.

25          The release conditions were not automatically permissible under a theory of consent or

26  waiver, *Scott* held, because the "'unconstitutional conditions' doctrine"—"especially important

27  in the Fourth Amendment context"—"limits the government's ability to extract waivers of rights

28  as a condition on benefits . . . ." *Id.* at 866-67. Otherwise, the government would "abuse its

1   power by attaching strings strategically, striking lopsided deals and gradually eroding

2   constitutional protections." *Id.* at 866. Any purported consent thus did not shield the release

3   conditions from Fourth Amendment scrutiny; to pass muster, the conditions themselves needed

4   to be reasonable. *Id.*

5          But the conditions were not reasonable, *Scott* held, under either the "special needs" or

6   "totality of the circumstances" doctrines. They were not "special needs" because the

7   government's first purpose, "protecting the community," was not special, *id.* at 870 (calling

8   public safety needs the "quintessential general law enforcement purpose"), and its second,

9   "ensuring that pretrial releasees appear in court," did not actually justify the conditions imposed,

10  *id.* (calling the connection "tenuous" and "hypothetical").

11         Nor was the search condition reasonable under the "totality of the circumstances," a test

12  that balances privacy intrusion against the government's legitimate objectives. *Id.* at 872-73. The

13  privacy intrusion was great, the Ninth Circuit held, because the release conditions implicated the

14  home, where privacy "is at its zenith." *Id.* at 871. Meanwhile, the government's interest was

15  minimal, because the government had no greater need to surveil pretrial releasees than any other

16  member of the public. "[P]retrial releasees are ordinary people who have been accused of a crime

17  but are presumed innocent." *Id.* The mere fact of being charged "cannot, as a constitutional

18  matter, give rise to any inference that [the defendant] is more likely than any other citizen to

19  commit a crime . . . ." *Id.* at 874. Thus, the Court concluded that an "individualized

20  determination" was essential to the Fourth Amendment, as "search of [Defendant] or his house

21  on anything less than probable cause [was] not supported . . . ." *Id.*

22         In *York*, the California Supreme Court likewise concluded that intrusions on the privacy

23  of pretrial releasees cannot be "of an unlimited nature," as "Fourth Amendment considerations

24  place constraints upon the circumstances under which . . . warrantless search and seizure

25  conditions may be imposed." 9 Cal. 4th at 1150. To comply with the Fourth Amendment, *York*

26  clarified, courts must assess "the reasonableness of a condition . . . [based] upon the relationship

27  of the condition to the crime or crimes with which the defendant is charged and to the

28  defendant's background, including his or her prior criminal conduct." *Id.* at 1151 n.10.

The holding in *Scott* compels the conclusion that Rules 5 and 13 violate the rights of pretrial releasees under the Fourth Amendment and Article I, section 13. These rules purport to broadly authorize enormous intrusions on protected privacy interests in *every* case, for *every* EM releasee, without any individualized determination of reasonableness by a court.

Rule 5 authorizes warrantless, suspicionless searches of person, property, automobile, and of the home, precisely as in *Scott*. 450 F.3d at 871; *see also Payton v. New York*, 445 U.S. 573, 589 (1980) ("In [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ."). Moreover, because notice of this "four-way search condition" is entered into CLETS, it purports to authorize search "by any peace officer at any time," without any articulable degree of suspicion, a truly vast intrusion untethered to any reasonableness determination. *See* Kieschnick Decl. Ex. 9 & Ex. 10 at 2.

Location data shared pursuant to Rule 13 likewise implicates constitutional privacy interests. In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the U.S. Supreme Court held that government collection of location data (there, from cell phone towers) is an insidious affront to privacy because it provides a "detailed, encyclopedic" and "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 2217 (citation omitted); *see also Jones*, 565 U.S. at 415 (Sotomayor, J., concurring) ("'Disclosed in [GPS] data . . . will be . . . trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.'") (citation omitted). Rule 13 directly invokes the privacy interests articulated in these cases because it threatens to provide any member of law enforcement with a complete record of a releasee's movements over a period of months or years without a warrant or even articulable suspicion. And because the Sheriff's policies permit indefinite retention of GPS location data, *see* Kieschnick Decl. ¶ 10 & Ex. 2 (SFSO's July 1, 2022 written response labeled "ix"); *see also* Kieschnick Decl. Ex. 7, Sheriff-Sentinel Contract at

13.4.3 (covering "Disposition of Confidential Information"), releasees are subject to this invasion of privacy in perpetuity—a continuing intrusion of unprecedented scope.

Just as in *Scott*, no Fourth Amendment theory justifies these blanket privacy intrusions on all pretrial EM releasees. Under the unconstitutional conditions doctrine, any alleged "consent" would not excuse the Sheriff of establishing the reasonableness of the conditions imposed. The unconstitutional conditions doctrine "limits the government's ability to exact waivers of rights as a condition of benefits, . . . . eroding constitutional protections"—exactly as the Sheriff has attempted, here—by holding that even legally valid consent exchanged for a benefit will not shield an otherwise unlawful search. *Scott*, 450 F.3d at 866.

But neither the Superior Court's form order nor an EM releasee's signature on the Sheriff's Program Rules constitutes legally valid consent in any event. Whatever is intended by the statement on the Superior Court's form order that "the defendant has waived their 4th Amendment rights," *see* Kieschnick Decl. Ex. 4, Court Form Order, individuals released on EM never agree to that broad language: they make no election before the Superior Court relative to Rules 5 and 13; they make no statement of waiver as part of any colloquy with the Court, and they do not sign the Court's form order. *See* Kim Decl. ¶ 6; Simon Decl. ¶ 3; Bonilla Decl. ¶ 3; Barber Decl. ¶¶ 5, 7. Nor does the Superior Court or the district attorney provide any notice that these conditions will be imposed. *See* Simon Decl. ¶ 3; Bonilla Decl. ¶¶ 3-4; Barber Decl. ¶¶ 5, 10. Where releasees thus give no manifestation of assent and have no idea what they have purportedly agreed to, legally binding consent is plainly absent. *See United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990) (consent to warrantless search must be "unequivocal and specific and [given] freely and intelligently") (citation omitted).

Nor does the Sheriff extract voluntary consent to the Program Rules. EM releasees initial and sign Rules 5 and 13 because the Sheriff's private contractor tells them they must do so under implicit threat of return to jail despite a court order authorizing their release. *See* Simon Decl. ¶ 6; Bonilla Decl. ¶ 7; Barber Decl. ¶ 10. These circumstances not only invoke the unconstitutional conditions doctrine, they also undermine the voluntariness of any consent as a matter of law. *See United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir. 1980) (holding consent

to search involuntary where given in response to "a threat that unreasonable detention . . . would result if consent were denied"); *Bumper v. North Carolina*, 391 U.S. 543, 549 n.14 (1968) ("Orderly submission to law-enforcement officers . . . was not [valid] consent . . . .") (citation omitted); *Johnson*, 333 U.S. at 13 (acquiescence "granted in submission to authority" does not constitute "an understanding and intentional waiver of a constitutional right").

Finally, precisely as in *Scott*, Rules 5 and 13 are not reasonable under either a "special needs" or "totality of the circumstances" theory. There is no special need, separate from a general law enforcement interest in crime prevention, that is meaningfully furthered by either the four-way search clause or limitless GPS data-sharing. And these conditions cannot be justified for ***all*** releasees under the totality of the circumstances. The privacy intrusions are significant and the government's interest in surveilling pretrial releasees is minimal because releasees are presumed innocent and may not, as a constitutional matter, be treated as more likely to engage in criminality. *See Scott*, 450 F.3d at 871-72. Rules 5 and 13 are simply unconstitutional absent an individualized determination that such conditions are necessary.

For these reasons, Plaintiffs are likely to succeed on the merits of their claims under the Fourth Amendment and Article I, section 13.

### 3. The Sheriff's Indefinite Retention and Sharing of GPS Location Data Pursuant to Program Rule 13 Violates the Right to Privacy

The Sheriff's handling of GPS location data violates the right to privacy under the California Constitution. CAL. CONST. art. 1, § 1. Under Article I, section 1, Plaintiffs have the initial burden of showing (1) a legally protected privacy interest, (2) a reasonable expectation of privacy under the circumstances, and (3) a serious invasion of privacy by the Sheriff. *See Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35-37 (1994). These threshold requirements do not pose a high bar. Demonstration of any "genuine, nontrivial invasion of a protected privacy interest" shifts the burden to the government to provide "justification for the conduct in question," *Loder v. City of Glendale*, 14 Cal. 4th 846, 893-94 (1997), which the plaintiff may then rebut with proof of "feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests," *Hill*, 7 Cal. 4th at 40. Ultimately, the Court balances the

severity of the privacy intrusion against the government's legitimate interests. *Loder*, 14 Cal. 4th at 894. Here, the balance weighs decidedly against Rule 13.

Plaintiffs easily meet their initial burden. First, the indefinite retention and sharing of GPS location data impacts recognized privacy interests. As discussed, *supra*, *Carpenter* held that individuals have a privacy interest in their GPS location data.

Second, Plaintiffs' expectation of privacy is objectively reasonable under the circumstances. *Hill*, 7 Cal. 4th at 36-37. Plaintiffs retain an expectation of privacy despite their pending criminal cases. As pretrial releasees, they have not been adjudicated guilty and instead "retain[] a fundamental constitutional right to liberty." *Humphrey*, 11 Cal. 5th at 150 (citing *United States v. Salerno*, 481 U.S. 739, 750 (1987)); *accord Scott*, 450 F.3d at 871 (unlike categories of individuals with diminished expectations of privacy, "pretrial releasees are ordinary people who have been accused of a crime but are presumed innocent"). Moreover, for an individual to be released pretrial, a court must necessarily determine that they are safe for release under certain conditions, setting pretrial releasees apart from those still detained. *See Humphrey*, 11 Cal. 5th at 154. As the *Humphrey* Court emphasized, in "our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.* at 155 (quoting *Salerno*, 481 U.S. at 751).

Thus, the only reduction in Plaintiffs' privacy is that commensurate with the purposes of the EM condition itself: to assure future court appearances and compliance with the court-ordered conditions of release via real-time location tracking. *See Scott*, 450 F.3d at 870 (recognizing the government's legitimate interest in surveilling pretrial releasees as "the interest in judicial efficiency," *i.e.*, assuring "appearance in court"). Plaintiffs reasonably expect, therefore, that their sensitive location data will not be handled in a manner unrelated to these purposes. *See Pettus v. Cole*, 49 Cal. App. 4th 402, 458 (1996) (plaintiff had legally protected interest "in not having his confidential medical information *mis*used by his direct supervisors as the basis for discipline") (citation omitted); *accord Hill*, 7 Cal. 4th at 27 (emphasizing government "misusing information gathered for one purpose in order to serve other purpose"). And for the same reasons that Plaintiffs do not legally waive their Fourth Amendment rights

before the Court or by signing the Sheriff's Program Rules, Plaintiffs' reasonable expectations of privacy are not diminished by any purported consent.

Third, the invasion of privacy wrought by Rule 13 is "serious." *See Hill*, 7 Cal. 4th at 37 (defining "serious" as anything more than "slight or trivial"); *see also Cnty. of Los Angeles v. Los Angeles Cnty. Emp. Relations Comm'n*, 56 Cal. 4th 905, 929 (2013) (because the "disclosure contemplated . . . was more than trivial[,] . . . [i]t rose to the level of a 'serious' invasion of privacy under *Hill*"). To determine whether an invasion is more than trivial, courts consider its "nature, scope, and actual or potential impact . . . ." *Hill*, 7 Cal. 4th at 37. The Sheriff may retain program participants' GPS location data in perpetuity, long after their pending criminal charges are resolved and their participation in the program is complete. At a minimum, therefore, Rule 13 portends that an enormous quantum of "sensitive confidential information," *Carpenter*, 138 S. Ct. at 2217-18—months or years' worth of data documenting an individual's every movement— can be accessed by any member of law enforcement after a cursory say-so. *See Hill*, 7 Cal. 4th at 27 (Article I, section 1 passed to prevent government "stockpiling" of sensitive information). Worse, this data may be used to implicate class members in a crime. If they are innocent but happen to have been in the wrong place at the wrong time, *see* Simon Decl. ¶ 10, the consequences are necessarily severe: putting aside the catastrophic prospect of wrongful conviction, the lesser harms of wrongful arrest and prosecution carry enormous, negative consequences. *See, e.g.*, Samantha K. Brooks & Neil Greenberg, *Psychological Impacts of Being Wrongfully Accused of Criminal Offences: A Systematic Literature Review*, Medicine, Science, and the Law (2021) (detailing "severe" consequences of wrongful accusations, including reputational harm, traumatic experiences in custody, loss of employment, and psychological and somatic symptoms). But even for those who commit the offenses for which they are prosecuted by virtue of Rule 13's data sharing, the harm to privacy is significant insofar as incriminating evidence was obtained in violation of their constitutional rights. *See Mathews v. Becerra*, 8 Cal. 5th 756, 779 (2019) (unauthorized data sharing was serious invasion of privacy in part because it exposed individuals to potential criminal liability). In sum, Plaintiffs are likely to surpass the threshold privacy inquiries.

1     The Sheriff, by contrast, has no particularized interest in indefinitely storing and

2  dispersing class members' GPS location data to any member of law enforcement. First, the

3  Sheriff's interest in retaining such data for contemporaneous location tracking endures only as

4  long as a pretrial releasee is on EM. Once they are not on EM, the Sheriff is no longer charged

5  with ensuring their future appearance in court or compliance with their release conditions.

6  Second, the only interest served by a data-sharing policy—as opposed to the Sheriff's own use of

7  the data for the limited purposes described above—is the general law enforcement interest in

8  solving crime. But this interest would equally justify GPS surveillance of every person in San

9  Francisco, making it "too simplistic and sweeping in its implications" to justify any intrusion on

10  privacy rights. *See Pettus*, 49 Cal. App. 4th at 446; *Mathews*, 8 Cal. 5th at 782-84 (remanding for

11  factual development because general interest in preventing crime involving the sexual

12  exploitation and abuse of children did not, as a matter of law, outweigh serious privacy

13  interests); *cf. Scott*, 450 F.3d at 870 (because "the government's interest in preventing crime by

14  *anyone* is legitimate and compelling" and "a quintessential general law enforcement purpose," it

15  is "the exact opposite of a special need" justifying deviations from the Fourth Amendment's

16  warrant requirement); *Ferguson v. City of Charleston*, 532 U.S. 67, 79-80 (2001) ("justification

17  for the absence of a warrant or individualized suspicion" must be "one divorced from the State's

18  general interest in law enforcement"). Moreover, there is a "feasible and effective alternative[]"

19  that would allow the Sheriff to turn over data in appropriate circumstances while imposing "a

20  lesser impact on privacy interests" than Rule 13's engenders. *See Hill*, 7 Cal. 4th at 40.

21  Consistent with the Fourth Amendment, the Sheriff could turn over data only when the

22  requesting agency obtained a warrant or demonstrated an exception to the warrant requirement.

23     As a result, balancing the parties' interests weighs decisively in favor of the Plaintiff

24  class and Plaintiffs are likely to succeed on the merits of their claim under Article I, section 1.

25     **C.     Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief**

26     "It is well established that the deprivation of constitutional rights 'unquestionably

27  constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

28  (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Absent injunctive relief, Plaintiffs will be

1   left with the choice of giving up supposedly inalienable rights or foregoing the possibility of

2   pretrial release. *See Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 881 (9th Cir.

3   2008) ("stark choice" between "violation of their constitutional rights or loss of their jobs"

4   constituted significant interim hardship for plaintiffs), *rev'd on other grounds by Nat'l*

5   *Aeronautics & Space Admin v. Nelson*, 562 U.S. 134 (2011). Plaintiffs and others similarly

6   situated would also suffer tangible harms. If SFSO continues to conduct warrantless searches and

7   retain and share GPS data, EM releasees are vulnerable to harassment, needless intrusions on

8   their privacy, and further criminal legal system involvement with its attendant consequences.

9   Even the knowledge of the Sheriff's purported authority presently harms Plaintiffs, causing

10  feelings of exposure, violation, and anxiety. These harms cannot be repaired subsequently and

11  also urge interim relief.

12          **D.      The Balance of Harms and the Public Interest Weigh in Favor of a
                      Preliminary Injunction**

13

14          The final factors in the preliminary injunction test—whether the balance of equities and

15  public interest favor an injunctive—merge when, as here, the government is a party. *Nken v.*

16  *Holder*, 556 U.S. 418, 435 (2009). In contrast to Plaintiffs' suffering of constitutional violations

17  and tangible harms from unlawful searches and GPS data-sharing, SFSO is not likely to suffer

18  any harm if interim relief is granted. Where probable cause supports a search or the sharing of

19  targeted GPS location data for general law enforcement purposes, any law enforcement agency

20  investigating crime in San Francisco retains the ability to seek a warrant or act within a

21  designated exception. The Sheriff cannot be harmed by having to rely on the ordinary,

22  constitutionally permissible tools of criminal investigation, as the Sheriff has no right to target a

23  vulnerable subsection of individuals for heightened, extra-legal surveillance. Moreover, "it is

24  always in the public interest to prevent the violation of a party's constitutional rights."

25  *Melendres*, 695 F.3d at 1002 (citation omitted); *see also Legend Night Club v. Miller*, 637 F.3d

26  291, 302-03 (4th Cir. 2011) (holding that government was "in no way harmed by the issuance of

27  an injunction that prevents [it] from enforcing unconstitutional restrictions"). The balance of

28  harms and the public interest thus support preliminary injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their

preliminary injunction motion and enjoin the imposition and enforcement of Rules 5 and 13.

Dated: October 7, 2022                                    Respectfully submitted,

By: _____

Shilpi Agarwal (SBN 270749)
sagarwal@aclunc.org
Avram D. Frey (MJP 804789)
afrey@aclunc.org (*Admitted Pro Hac Vice*)
Emi Young (SBN 311238)
eyoung@aclunc.org
Hannah Kieschnick (SBN 319011)
hkieschnick@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478


JUSTINA SESSIONS, State Bar No. 270914
JOHN P. FLYNN, State Bar No. 141094
COLLEEN BAL, State Bar No. 167637
MALAVIKA F. LOBO, State Bar No. 317635
ANA ALICIA SONTAG, State Bar No.
340602 (*Admission pending*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA  94105
Telephone:  (415) 947-2197
Facsimile:  (415) 947-2000


*Attorneys for Plaintiffs*
*Joshua Simon, David Barber, Josue Bonilla,*
*Diana Block, and Community Resource*
*Initiative*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Justina Sessions, am the ECF User whose identification and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories have concurred in this filing.

Dated: October 7, 2022                              _/s/ Justina Sessions_
                                                              Justina Sessions