# EXHIBIT G
# TO THE DECLARATION OF
# KAITLYN MURPHY

1          SUPERIOR COURT OF CALIFORNIA

2           COUNTY OF SAN FRANCISCO

3   BEFORE THE HONORABLE A. MARISA CHUN, JUDGE PRESIDING

4                DEPARTMENT 9

5                 ---oOo---

6   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
7          Plaintiff,          )   Court No. CRI-22009321
                               )   CRI-22004124
8          vs.                 )   CRI-22008383
                               )   **PRELIMINARY HEARING**
9   MICHELE DAVID GARABATO,     )
                               )   Pages 1 - 48
10          Defendant.          )
    _____)

11

12

13      **Reporter's Transcript of Proceedings**

14       Thursday, September 8, 2022

15

16

17  **APPEARANCES OF COUNSEL:**

18      For the People:

19          Brooke Jenkins - District Attorney
            350 Rhode Island Street
20          North Building, Suite 400N
            San Francisco, California 94103
21          BY:  **JOSEPH LEVERONI**, Assistant District Attorney

22

23      For Defendant:

24          Manohar Raju, Public Defender
            555 Seventh Street - Suite 205
25          San Francisco, California  94103
            BY:  **BAO DOAN**, Deputy Public Defender
26          BY:  **KIRA NIKOLAIDES**, Certified Legal Intern

27

28  Reported By:  Jacqueline Chan, CSR No. 10276

**I N D E X**

**SESSIONS**

PROCEEDINGS                                    PAGE

Thursday – September 8, 2022

    AFTERNOON SESSION                              5

**I N D E X**

**PEOPLE'S WITNESSES**                                    **PAGE** **VOL.**


**SHARRON, ANTHONY**                                         **7**     **1**
Direct Examination by Mr. Leveroni                        7      1
Cross-Examination by Ms. Nikolaides                      24      1
Redirect Examination by Mr. Leveroni                     28      1
Recross-Examination by Ms. Nikolaides                    29      1

4

## I N D E X (cont'd)

### E X H I B I T S

| PEOPLE'S EXHIBITS | DESCRIPTION | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 1 | 8x11 paper with photograph | 15 | 16 | 1 |
| 2 | 8x11 paper document | 16 | 17 | 1 |
| 3 | 8X11 paper with photo | 18 | 18 | 1 |
| 4 | 8x11 photograph | 18 | 19 | 1 |
| 5 | 8x11 paper document | 21 | 38 | 1 |

```
 1   SEPTEMBER 8, 2022
 2                      P-R-O-C-E-E-D-I-N-G-S
 3                           ---oOo---
 4                      (AFTERNOON SESSION)
 5       THE COURT:  So let's turn to Mr. Garabato's matter.
 6   That is at lines 17, 18, and 19, People versus Michele
 7   Garabato.
 8       Appearances, please.
 9       MR. LEVERONI:  Joseph Leveroni for the People.
10       MS. NIKOLAIDES:  Court certified law student, Kira
11   Nikolaides, under the supervision of Bao Doan for Mr.
12   Garabato.
13       THE COURT:  Thank you.
14       THE CLERK:  Can we get the spelling of your name,
15   please.
16       MS. NIKOLAIDES:  K-I-R-A N-I-K-O-L-A-I-D-E-S.
17       THE COURT:  Okay.  So good morning, Counsel.
18       And good morning, Mr. Garabato.
19       So we're on today for a preliminary hearing on line 19,
20   which is Mr. Garabato's newest case, Case No. 22009321.
21       Are the People and the defense ready to proceed?
22       MR. LEVERONI:  People are ready, Your Honor.
23       THE COURT:  Okay.
24       MS. NIKOLAIDES:  The defense is ready, Your Honor.
25       THE COURT:  Okay.  Thank you.  Any motions that we need
26   to take up?
27       MR. LEVERONI:  No, Your Honor.
28       THE COURT:  And does the defense waive reading of the
```

1    complaint?

2    **MS. NIKOLAIDES:**  We'd like to make a motion to exclude

3    any nontestifying witnesses from the courtroom.

4    And then what did you ask, Your Honor?

5    **THE COURT:**  Oh.  Does the defense waive reading of the

6    complaint?

7    **MS. NIKOLAIDES:**  Yes.

8    **THE COURT:**  So Mr. Leveroni, is this a one witness

9    case?

10   **MR. LEVERONI:**  No.

11   **THE COURT:**  How many witnesses are there?

12   **MR. LEVERONI:**  Two.

13   **THE COURT:**  Okay.  So the Court will grant the

14   defense's motion to exclude any nontestifying witnesses

15   from the courtroom.

16   So the People may call their first witness.

17   **MR. LEVERONI:**  Thank you, Your Honor.

18   The People will call Officer Sharron, S-H-A-R-R-O-N.

19   **THE CLERK:**  Good morning, Officer.  Could you please

20   come to the witness stand.

21   **THE WITNESS:**  Good morning.

22   **THE COURT:**  Let's go off the record.

23   (Discussion off the record.)

24   **THE COURT:**  Let's go back on the record.

25   Would you like to swear the witness in, please.

26   **THE CLERK:**  Yes.  Please raise your right hand.

27

28

1       <u>**ANTHONY SHARRON**</u>,

2   called as a witness for the People, having been duly sworn,

3   testified as follows:

4       **THE CLERK:**   Thank you.  Please be seated.

5       Can you please state and spell your first and last name

6   for the record slowly.

7       **THE WITNESS:**  Anthony Sharron.  A-N-T-H-O-N-Y.

8   S-H-A-R-R-O-N.

9       **THE CLERK:**  Thank you.

10                      <u>**DIRECT EXAMINATION**</u>

11      **MR. LEVERONI:  Q.**  Good morning, Officer Sharron.

12  **A.**  Good morning.

13  **Q.**  Can you please tell me how you're employed?

14  **A.**  Peace officer with the City and County of San

15  Francisco.

16  **Q.**  And how long have you worked in that capacity?

17  **A.**  Seven and a half years.

18  **Q.**  And were you working in that capacity on August 22nd,

19  2022?

20  **A.**  Yes.

21  **Q.**  What were you doing on that date?

22  **A.**  I was working patrol in Northern District on a midnight

23  hours.

24  **Q.**  And can you please describe what that patrol entails?

25  **A.**  So that entails -- the area?  You want to know the

26  area?

27  **Q.**  The area.  Thank you.

28  **A.**  So it kind of goes from Market Street on the southern

1  border to the water, the bay on the north border, and then

2  it goes from Polk Street on the eastern border to

3  Divisadero Street on the western border.

4  **Q.**  And is this -- for clarification, this is in the city

5  and county of San Francisco?

6  **A.**  Yes, it is.

7  **Q.**  Did you receive any calls on this date?

8  **A.**  Yes.

9  **Q.**  And can you describe what you received?

10 **A.**  So I received a call over radio from co-worker, Officer

11 Smith, that they had just had a black Harley Davidson evade

12 them while they attempted to do a traffic stop.

13 **Q.**  Did you receive any further information?

14 **A.**  We received the --

15     **MS. NIKOLAIDES:**  Objection.  Hearsay.

16     **THE COURT:**  I think it's untimely, but this is a Prop

17 115 officer so he's permitted to testify as to hearsay.

18 Overruled.

19     **THE WITNESS:**  The person operating the motorcycle had a

20 plaid shirt on and had a vest that had a mix breed patch on

21 it and it was -- the motorcycle was last seen going

22 southbound on 101, Highway 101.

23     **MR. LEVERONI:  Q.**  Did this description mean anything

24 to you?

25 **A.**  Yes.

26 **Q.**  What was that?

27 **A.**  It made me believe I had a prior arrest involving a

28 stolen motorcycle and a person was wearing a similar vest

1    with the mix breed patch on it.

2    **Q.**  And do you have any -- can you describe what the mix

3    breed patch is?

4         **MS. NIKOLAIDES:**  Objection.

5         **MR. LEVERONI:**  Sorry, Your Honor.  Can I just finish

6    the question?

7         **THE COURT:**  Yes.  Let him finish the question.  Go

8    ahead.

9         **MR. LEVERONI:  Q.**  Can you describe what a mix breed

10   patch is or what it means?

11        **THE COURT:**  Okay.  Your objection?

12        **MS. NIKOLAIDES:**  Objection.  Relevance.

13        **THE COURT:**  Overruled.

14        **THE WITNESS:**  So mix breed is a motorcycle club and mix

15   breed is -- colors are purple, silver, and black.  And from

16   my knowledge and my prior contacts, the mix breed

17   association is with stolen bikes, firearms, and narcotics.

18        **MS. NIKOLAIDES:**  Objection.

19        **MR. LEVERONI:**  There's no question.

20        **THE COURT:**  There's no question pending.

21        **MR. LEVERONI:  Q.**  That's from your personal

22   experience?

23   **A.**  Yes.

24        **MS. NIKOLAIDES:**  Objection, Your Honor.  352 as to mix

25   breed having to do with stolen motorcycles.  Impermissible

26   character evidence.

27        **THE COURT:**  Overruled.

28        Go ahead, Mr. Leveroni.

1    **MR. LEVERONI:   Q.   Aside from the mix breed motorcycle**

2    **club, was there anything more specific that this**

3    **information lent to you?**

4    **A.   So what I believe -- with all that information, I**

5    **believe I knew who the person was riding the motorcycle.**

6    **And based on the knowledge that I had, I knew that there**

7    **were -- there was a criminal record involved with this**

8    **person.   So I did computer work and I did research and saw**

9    **that he was on probation out of San Francisco so I**

10   **contacted the sheriffs to see if he was being monitored.**

11   **Q.   And who was the person that he had in mind?**

12   **A.   Michele Garabato.**

13   **Q.**   And why was this person in mind?

14   **A.**   Because I know from prior arrests and prior knowledge

15   that he's involved with stolen motorcycles and firearms.

16   **Q.**   And when you say prior arrests for those different

17   penal code violations, you're talking about your personal

18   prior arrests?

19   **A.**   One personally and then the other one that I learned

20   about since then.

21   **Q.**   Okay.  And the mix breed motorcycle patch that you see,

22   is that common in the city and county of San Francisco or

23   not common?

24   **A.**   It's become common in the area that I patrol in the

25   past six months.

26   **Q.**   Okay.  But how many individuals do you know -- are you

27   aware of that wear that patch?

28   **A.**   I'm aware of two that are wearing that patch in San

```
1    Francisco in the area that I patrol.
2    Q.  Just two?
3    A.  Correct.
4    Q.  When you received this information from Officer Smith
5    regarding a traffic stop, a description of the bicycle and
6    individual riding it that there was an evasion when they
7    tried to do the traffic stop, what did you do next?
8    A.  I went to the station, did the computer work based on
9    Garabato, called the sheriffs, their ankle -- their
10   monitoring unit, and they informed me that Garabato had
11   been in the Northern District and was last seen going
12   southbound or was tracking southbound 101.  I asked them
13   for a current location.  They provided it.  Said he was in
14   the area of 8th and Moraga.
15   Q.  What did you do next?
16       MS. NIKOLAIDES:  Objection.  Multiple levels of hearsay
17   as to the electronic monitoring record.  The electronic
18   monitoring record is also subject to the business records
19   requirement for authentication.
20       THE COURT:  So Mr. Leveroni, do you want to lay some
21   foundation to address the objection?
22       MR. LEVERONI:  I don't think we need to, but I'm happy
23   to lay some foundation for what specifically did the Court
24   want for --
25       THE COURT:  I think what the objection is is that the
26   information from the sheriff's department is not just from
27   the sheriff's department but then is from a different
28   record.  And so if you can just establish -- because a
```

```
1    business record is a hearsay exception, if you can just
2    establish the exceptions or elicit the information --
3         MR. LEVERONI:  Sure.
4         THE COURT:  -- to address counsel's objection.
5         MR. LEVERONI:  Q.  Mr. Garabato was on electronic
6    monitoring?
7    A.  Yes.
8    Q.  Okay.  And you established that with the sheriff's
9    department when you contacted them?
10   A.  Yes.
11   Q.  And they had him actively on monitoring?
12   A.  Yes.
13   Q.  And when you asked them to review their monitoring,
14   they're able to give you coordinates for Mr. Garabato based
15   on his monitoring?
16   A.  Yes.
17   Q.  And is that something that you've done before?
18   A.  Yes.
19   Q.  Okay.  Is that something that the sheriff's office is
20   charged with doing in their official capacity?
21   A.  Yes.
22   Q.  Okay.  So ankle monitoring is run and overseen by the
23   sheriff department and that's the source of the information
24   that you received?
25   A.  Yes.
26        MS. NIKOLAIDES:  Objection, Your Honor.  The business
27   records requirement requires a custodian to authenticate
28   the record and that is what we're objecting to here.
```

1   **MR. LEVERONI:**  And this is just not on point, Your

2   Honor.

3      **THE COURT:**  So I don't think he's --

4      **MR. LEVERONI:**  And furthermore, this is just to show

5   what the officer did next.  It's not for the truth of the

6   matter asserted.

7      **THE COURT:**  Okay.  So that's very helpful.  So I will

8   admit it only for its impact on this witness and not for

9   the truth of the matter.  So I'll sustain Ms. Nikolaides'

10  objection to the extent that it objects to the truth of the

11  matter.

12     **MR. LEVERONI:  Q.**  When you received this information

13  from the sheriff's department what did you do next?

14  **A.**  I informed another unit that Garabato was possibly in

15  the area of 8th and Moraga and we went out to that area.

16  **Q.**  And what happened next?

17  **A.**  As we got to the area of 8th and Moraga, the other unit

18  advised me that they located a black Harley Davidson that

19  had been reported stolen.  So at that time I'm also still

20  on the phone with the sheriffs department, their monitoring

21  unit, getting updated information, location regarding

22  Garabato.  It stays within a two block radius of 8th and

23  Moraga.  Eventually they tell me that it's on 9th and

24  Noriega.  Exit our patrol vehicle.  I start walking

25  southbound on 9th and Mr. Garabato comes out of a

26  porta-potty.

27  **Q.**  And this is occurring in the city and county of San

28  Francisco?

1    **A.**   Yes.

2    **Q.**   What happens when you see Mr. Garabato -- strike that.

3    Am I to assume then -- strike that.   You recognize Mr.

4    Garabato as he exited the porta-potty?

5    **A.**   Yes.

6    **Q.**   And how do you recognize him?

7    **A.**   Prior contact.

8    **Q.**   What did you do next?

9    **A.**   I asked him what his name was.   He said Michele

10   Garabato.   I told him turn around and we placed him in

11   handcuffs.

12   **Q.**   And why was that?

13   **A.**   Because he was under arrest for a stolen motorcycle.

14   **Q.**   And you had already observed the motorcycle in

15   question?

16   **A.**   Yes.

17   **Q.**   Okay.   What did you do next?

18   **A.**   So then I asked Mr. Garabato where his jacket was, his

19   vest.   He said he wasn't wearing it.   I asked him where his

20   helmet was and all he said was I wasn't riding.   So I then

21   from prior contacts believed that we could possibly have an

22   outstanding firearm.

23      **MS. NIKOLAIDES:**   Objection, Your Honor.   Speculation.

24      **THE COURT:**   Can you let the witness complete his

25   response and then I'll entertain your objection.

26      **THE WITNESS:**   So I backtracked from where we were to

27   where the stolen motorcycle was.   While I was backtracking,

28   I located a discarded black vest with mix breed patch, a

1   blue -- navy blue and orange flannel shirt, and a black

2   helmet, motorcycle helmet.

3       **THE COURT:**  So Ms. Nikolaides, your objection.

4       **MS. NIKOLAIDES:**  I'll withdraw the objection.

5       **THE COURT:**  Okay.  Thank you.

6       **MR. LEVERONI:**  And, Your Honor, I have what I'd like to

7   have marked as People's Exhibit 1.

8                           (People's Exhibit 1 marked for

9                           identification)

10      **MR. LEVERONI:**  And I'm showing that to both counsel.

11  May I approach, Your Honor?

12      **THE COURT:**  Yes.

13      **MR. LEVERONI:**  **Q.**  And I'm handing the exhibit which is

14  People's Exhibit 1, eight and a half by eleven piece of

15  paper with a photograph.

16      Officer, do you recognize this document?

17  **A.**  Yes.

18  **Q.**  Can you describe what it is?

19  **A.**  It is the black vest with the mix breed patch and a

20  navy blue orange flannel that I retrieved from bushes on

21  Eighth Avenue just south of Moraga.

22      **MR. LEVERONI:**  And, Your Honor, at this time the People

23  would like to have People's Exhibit 1 moved into evidence.

24      **THE COURT:**  Any objection?

25      **MS. NIKOLAIDES:**  No.

26      **THE COURT:**  People's Exhibit 1 is moved into evidence,

27  and that's an eight and a half by eleven photo of the black

28  vest with the mix breed patch and the flannel shirt.

1                    (People's Exhibit 1 received in

2                    evidence)

3    **MR. LEVERONI:  Q.**  So you located this vest while you

4    were searching the area between the motorcycle and the area

5    where you found Mr. Garabato, correct?

6    **A.**  Yes.

7    **Q.**  You stated that you located another item.  What was

8    that item?

9    **A.**  A black helmet, motorcycle helmet.

10   **Q.**  And where was that located?

11   **A.**  It was going to be -- it was located just northeast of

12   where the vest and shirt were found and it was hidden under

13   a set of stairs.  I believe -- I don't remember the exact

14   address, but it was within 15 feet, 20 feet of the black

15   vest and shirt.

16   **Q.**  And again, 15 feet from the vest and the shirt that you

17   located, and this is also though in the area between the

18   motorcycle and where you found Mr. Garabato?

19   **A.**  Correct, yes.

20   **MR. LEVERONI:**  Your Honor, I'd like to approach again.

21   **THE COURT:**  Yes, you may.

22                    (People's Exhibit 2 marked for

23                    identification)

24   **MR. LEVERONI:  Q.**  And first showing what I'd like to

25   have marked as People's Exhibit 2 to defense counsel.

26   And handing the eight and a half by eleven piece of

27   paper to the witness.  Do you recognize that document?

28   **A.**  Yes.

1    **Q.**  Can you describe what it is?

2    **A.**  The photo showing where the black motorcycle helmet was

3    when we located it underneath the stairs.

4    **Q.**  And this photo shows the helmet still hidden beneath

5    the stairs?

6    **A.**  Yes.

7        **MR. LEVERONI:**  Okay.  Your Honor, I'd like to have this

8    exhibit marked as People's 2 moved into evidence, please.

9        **THE COURT:**  Any objection?

10       **MS. NIKOLAIDES:**  No.

11       **THE COURT:**  People's Exhibit 2 is moved into evidence.

12   It is an eight and a half by eleven photograph of the black

13   motorcycle helmet hidden underneath bushes.

14                        (People's Exhibit 2 received in

15                         evidence)

16       **MR. LEVERONI:**  **Q.**  What happened next after you made

17   contact with Mr. Garabato and after you found the items

18   that you just identified?

19   **A.**  I then made my way to the motorcycle.  I inspected the

20   motorcycle and saw that the steering -- the front steering

21   column lock had been damaged.

22   **Q.**  And can you describe damage?  What does that mean?

23   **A.**  So when motorcycles are taken, based on my prior

24   experience and knowledge, there's a lock for the front

25   steering wheel so that you cannot maneuver the front wheel.

26   However, if you're able to cut this lock, it then frees up

27   the wheel so the motorcycle can be maneuvered.  This lock

28   had been cut.

1    **MR. LEVERONI:**  And may I approach again, Your Honor?

2    **THE COURT:**  Yes, you may.

3                              (People's Exhibit 3 marked for

4                              identification)

5    **MR. LEVERONI:**  Showing to defense counsel what I'd like

6    to have marked as People's Exhibit 3, another eight and a

7    half by eleven piece of paper with a photograph.

8         And handing it to the witness.

9    **Q.**  Do you recognize this photo?

10   **A.**  Yes.

11   **Q.**  And can you describe what it is?

12   **A.**  So this depicts where the steering lock has been cut on

13   the Harley Davidson.

14   **MR. LEVERONI:**  And I'd like to have this moved into

15   evidence, Your Honor, as People's Exhibit 3.

16   **THE COURT:**  Any objection?

17   **MS. NIKOLAIDES:**  No.

18   **THE COURT:**  People's Exhibit 3 is moved into evidence.

19   It is an eight and a half by eleven photograph of the

20   motorcycle lock.

21                              (People's Exhibit 3 received in

22                              evidence)

23                              (People's Exhibit 4 marked for

24                              identification)

25   **MR. LEVERONI:**  Finally, Your Honor, actually

26   penultimate, People's Exhibit 4, another eight and a half

27   by eleven photograph that I'm showing to defense counsel

28   now and providing it to the witness.

1   **Q.**  Do you recognize this photograph?

2   **A.**  Yes.

3   **Q.**  And can you describe what it is?

4   **A.**  It is the rear of the Harley Davidson with the affixed

5   license plate 25 Tom 8009.

6   **MR. LEVERONI:**  I'd like to have this moved into

7   evidence, Your Honor, as People's Exhibit 4.

8   **THE COURT:**  Any objection?

9   **MS. DOAN:**  No.

10  **THE COURT:**  People's Exhibit 4 is moved into evidence,

11  eight and a half by eleven photograph of the rear of a

12  Harley Davidson motorcycle.

13                          (People's Exhibit 4 received in

14                          evidence)

15  **MR. LEVERONI:  Q.**  What, if anything, did you do with

16  the information you received?  You just described the

17  motorcycle -- you described as a black Harley Davidson and

18  the corresponding license plate?

19  **A.**  So then I attempted to contact the registered owner of

20  the motorcycle to get details regarding the motorcycle

21  being stolen.

22  **Q.**  And what happened next?

23  **A.**  I eventually made contact over the phone with the owner

24  of the motorcycle and he informed me that the motorcycle

25  had been stolen August 19th from Parnassus hospital on

26  the fourth floor.  He stated that he didn't give anyone

27  permission while it was parked to use the motorcycle.  He

28  stated that no one else has the keys to it and that he

```
 1   filed a police report with UC Police Department on the

 2   19th.

 3   Q.  And you spoke with this individual directly?

 4   A.  Yes.  I believe his last name was Borhas.

 5   Q.  Would it refresh your recollection to review your

 6   report?

 7   A.  Yeah.

 8       MR. LEVERONI:  With the Court's permission?

 9       THE COURT:  Yes, you may do so.

10       MR. LEVERONI:  Q.  And when your memory's refreshed,

11   please look up.

12   A.  Yes.  Mr. Borhas.

13   Q.  Okay.  And when you spoke with Mr. Borhas, did you ask

14   any confirming questions, for example, confirmation of a

15   license plate number and make and model?

16   A.  Yes.

17   Q.  And was he able to confirm that information for you?

18   A.  Yes.

19       THE COURT:  And just one clarifying question.

20       Officer, are you saying that the motorcycle was on the

21   fourth floor of the hospital?

22       THE WITNESS:  The parking -- I'm sorry, the parking

23   garage.

24       THE COURT:  Oh.  Okay.

25       THE WITNESS:  At Parnassus hospital.

26       THE COURT:  Okay.  Thank you.

27       THE WITNESS:  I think it was on the fourth floor of

28   their parking garage.
```

1    **THE COURT:**  Thank you.

2    **THE WITNESS:**  Sorry about that.

3    **MR. LEVERONI:**  And one more exhibit, at this time at

4    least, an eight and a half by eleven piece of paper I'd

5    like to have marked as People's Exhibit 5.

6                              (People's Exhibit 5 marked for

7                              identification)

8    **MR. LEVERONI:**  And showing that to defense counsel and

9    approaching the witness.

10   **Q.**  Officer, do you recognize this photo?

11   **A.**  Yes.

12   **Q.**  And can you describe what it is?

13   **A.**  This is the gentleman that stepped out of the

14   porta-potty and it's Michele Garabato.

15   **Q.**  And does this photograph depict Mr. Garabato on a date

16   that you made contact with him?

17   **A.**  Yes.

18   **Q.**  This is the individual that was leaving the porta-potty

19   that you described earlier?

20   **A.**  Yes.

21   **Q.**  Do you see that individual today?

22   **A.**  Yes.

23   **Q.**  Can you describe him?

24   **A.**  He's sitting in front of me in orange.

25   **MR. LEVERONI:**  Your Honor, may the record reflect that

26   the officer has identified the defendant, Mr. Garabato?

27   **THE COURT:**  Yes, the record will so reflect.

28   **MR. LEVERONI:**  **Q.**  You mentioned at the -- what

1  happened next?

2  **A.**  We just did -- at that point we did our paperwork and

3  Mr. Garabato was eventually transported to county jail.

4  **Q.**  You mentioned at the outset that you initially received

5  a call of a traffic stop by Officer Smith, and that the

6  individual evaded him and that caused Mr. Smith to put out

7  a call, correct?

8  **A.**  Correct.

9  **Q.**  Did Mr. Smith ever make contact with Mr. Garabato again

10  on this date?

11  **A.**  Yes.

12  **Q.**  And was that to confirm that Mr. Garabato was the same

13  individual that he saw evading him?

14  **A.**  Yes.

15  **Q.**  And did Officer Smith confirm that it was Mr. Garabato?

16  **A.**  Yes.

17  **Q.**  And is that the same Mr. Garabato that you identified

18  in the picture in People's Exhibit 5?

19  **A.**  Yes.

20  **Q.**  And that's the same individual that you see sitting

21  before you today?

22  **A.**  Yes.

23      **MR. LEVERONI:**  At this time, Your Honor, those are our

24  questions for the officer.

25      **THE COURT:**  Thank you.

26      Any cross-examination?

27      **MS. NIKOLAIDES:**  Yes.  Could we have a moment, Your

28  Honor?

1      **THE COURT:**  Sure.

2      **MR. LEVERONI:**  And actually, Your Honor, may I just ask

3  a few more questions to clarify -- to address one more

4  item?

5      **THE COURT:**  Sure.

6      **MR. LEVERONI:**  Very briefly.

7  **Q.**  Did you run any other record checks for Mr. Garabato to

8  see if he was allowed to be or permitted to be driving a

9  motor vehicle?

10 **A.**  Yes.  I had ran a records check.

11 **Q.**  And what did that return?

12 **A.**  It showed that he did not have a valid California

13 driver's license.

14 **Q.**  Okay.  And is that a routine record that you run?

15 **A.**  Yes.

16 **Q.**  In all your vehicle stops?

17 **A.**  Yes.

18 **Q.**  And are you familiar with the database that you used to

19 retrieve that information?

20 **A.**  Yes.

21 **Q.**  And you use it often every day?

22 **A.**  Yes.

23 **Q.**  In the regular course of your official duties as an

24 officer of the San Francisco Police Department?

25 **A.**  Yes.

26     **MR. LEVERONI:**  Those are my last questions, Your Honor.

27 **THE COURT:**  Thank you.

28     **MS. NIKOLAIDES:**  Objection, Your Honor.  Moving to

1  strike the previous answer upon multiple levels of hearsay.

2     **MR. LEVERONI:**  And I believe that we have the

3  foundation from the officer.  He's a Prop 115 officer.

4     **THE COURT:**  I will overrule the objection.  This is a

5  Prop 115 officer and he can testify as to information he

6  received through official channels.

7     **MS. NIKOLAIDES:**  It's to multiple levels of hearsay as

8  to the records and not just the one level.

9     **THE COURT:**  Overruled.

10    Would you like to proceed?

11    **MS. NIKOLAIDES:**  Yes.  Just one more quick thing I need

12  to clarify.

13    Okay.  We're ready, Your Honor.

14                    <u>**CROSS-EXAMINATION**</u>

15    **MS. NIKOLAIDES:**  **Q.**  Good morning, Officer.

16  **A.**  Good morning.

17  **Q.**  So you wrote a police report for the case involved

18  here?

19  **A.**  Yes.

20  **Q.**  You were trained how to document investigations in your

21  police reports?

22  **A.**  Yes.

23  **Q.**  When writing your reports there, you were trained to

24  write them completely, accurately, and truthfully?

25  **A.**  Yes.

26  **Q.**  The reports include all relevant details to the

27  investigation?

28  **A.**  Best of my ability, yes.

1  **Q.**  Did you review your report prior to coming to court

2  today?

3  **A.**  Yes.

4  **Q.**  And would you say that this report is complete,

5  accurate, and truthful?

6  **A.**  Yes.

7  **Q.**  Okay.  So you were on duty on August 22nd, 2022?

8  **A.**  Yes.

9  **Q.**  You were on duty around 3:30 a.m. that day?

10  **A.**  Yes.

11    **MR. LEVERONI:**  Objection, Your Honor.  Asked and

12  answered.

13    **THE COURT:**  Overruled.

14    **MS. NIKOLAIDES:**  **Q.**  You were on patrol when you heard

15  Officer Smith radio about a possible motorcyclist evading

16  him?

17  **A.**  Yes.

18  **Q.**  Officer Smith provided a description of that

19  motorcyclist?

20  **A.**  Yes.

21  **Q.**  You immediately assumed that that motorcyclist was Mr.

22  Garabato?

23    **MR. LEVERONI:**  Objection, Your Honor.  Misstates the

24  evidence.

25    **THE COURT:**  I'll sustain the objection.  Can you just

26  rephrase because I don't think that's what he testified on

27  direct.

28    **MS. NIKOLAIDES:**  **Q.**  After you heard the description of

1  the motorcyclist, you assumed that the motorcyclist was Mr.

2  Garabato?

3  **A.**  Suspected.

4  **Q.**  Okay.  You assumed it was Mr. Garabato without seeing

5  that motorcyclist yourself?

6  **A.**  Suspected that based on the information provided.

7  **Q.**  Based on that assumption, you performed a records check

8  on Mr. Garabato with the sheriff's office?

9  **MR. LEVERONI:**  Objection, Your Honor.  Misstates the

10  evidence.

11  **THE COURT:**  Overruled.

12  **MS. NIKOLAIDES:**  Withdrawn.

13  **Q.**  So after receiving this call you went to Ninth Avenue

14  and Noriega Street, correct, or --

15  **A.**  No.  I went to the police station.

16  **Q.**  At some point later that evening or later that morning,

17  you went to Ninth Avenue and Noriega Street?

18  **A.**  Yes.

19  **Q.**  You saw an individual on the sidewalk?

20  **A.**  No.

21  **Q.**  You saw an individual coming out of a porta-potty?

22  **A.**  Yes.

23  **Q.**  Onto the sidewalk?

24  **A.**  Yes.

25  **Q.**  And that individual was wearing a gray sweatshirt?

26  **A.**  Correct.

27  **Q.**  That individual identified himself as Mr. Garabato?

28  **A.**  Yes.

1   **Q.**  Mr. Garabato was not wearing a flannel shirt when you

2   saw him?

3   **A.**  Correct.

4   **Q.**  Mr. Garabato was not wearing a leather vest when you

5   saw him?

6   **A.**  Correct.

7   **Q.**  Mr. Garabato denied having a leather vest with him that

8   night?

9   **A.**  Correct.

10  **Q.**  Mr. Garabato denied having a motorcycle helmet with him

11  that night?

12  **A.**  Correct.

13  **Q.**  And Mr. Garabato denied riding a motorcycle that night?

14  **A.**  Correct.

15  **Q.**  You never saw Mr. Garabato driving a motorcycle that

16  night?

17  **A.**  I did not.

18  **Q.**  When you were around this area, you saw a Harley

19  Davidson motorcycle, correct?

20      **MR. LEVERONI:**  Objection.  Vague.

21      **THE COURT:**  Can you just rephrase and be a little bit

22  more specific.

23      **MS. NIKOLAIDES:**  **Q.**  On direct you testified that

24  you -- there was a Harley Davidson motorcycle in the

25  vicinity where you saw Mr. Garabato, correct?

26  **A.**  Yes.

27  **Q.**  And you went to examine that motorcycle?

28  **A.**  Yes.

1  **Q.**  And you testified that the steering wheel lock had been

2  cut?

3  **A.**  Yes.

4  **Q.**  But the ignition had not been tampered with, correct?

5  **A.**  That I was unaware of.  I looked and couldn't tell if

6  it was tampered or not.  I don't believe.  I don't know.

7  **Q.**  You did not see any damage to the ignition?

8  **A.**  No.

9  **Q.**  Okay.

10      **MS. DOAN:**  Can we have just a moment, Your Honor?

11      **THE COURT:**  Sure.

12      Do you have any further questions?

13      **MS. NIKOLAIDES:**  Okay.  We have no further questions.

14      **THE COURT:**  Okay.  Thank you.

15      Do you have any redirect?

16      **MR. LEVERONI:**  It will be very brief.  Just three

17  questions, Your Honor.

18              <u>**REDIRECT EXAMINATION**</u>

19      **MR. LEVERONI:  Q.**  Officer, I previously asked if

20  Officer Smith who initially made this report of an evasion,

21  he identified Mr. Garabato after you had detained him?

22  **A.**  Yes.

23  **Q.**  And did he also review the mix breed vest that you

24  located?

25  **A.**  Yes.

26  **Q.**  Did he confirm that that was the vest that he saw on

27  the motorcycle that evaded him?

28  **A.**  Yes.

1    **Q.**  Did he review the motorcycle that you located on scene,

2    the black Harley Davidson motorcycle with the license plate

3    that you previously identified?

4    **A.**  I believe so, yes.

5    **Q.**  Okay.  And did he confirm that was the motorcycle that

6    evaded him?

7    **A.**  Yes.

8       **MR. LEVERONI:**  Okay.  No further questions, Your Honor.

9       **THE COURT:**  Okay.  Thank you.

10      Officer Sharron, you are excused.  Thank you very much.

11      **MS. DOAN:**  Wait.  We had further recross based on what

12   he did.

13      **THE COURT:**  Okay.  Really briefly.  Go ahead.

14                    **RECROSS-EXAMINATION**

15      **MS. NIKOLAIDES:  Q.**  So Officer, you testified that

16   Officer Smith confirmed that Mr. Garabato was the man he

17   saw driving the motorcycle?

18   **A.**  Yes.

19   **Q.**  It's your testimony today that Officer Smith identified

20   Mr. Garabato as that man?

21   **A.**  Based on the clothing.  Not based on -- I think I know

22   what you're saying is -- I don't -- so let me take that

23   back.  The person, no.  The -- I guess the -- the

24   person wearing the clothes, yes.  I -- so I think I know

25   what you're saying.  Did he see Mr. Garabato, I guess,

26   positively identify him as the one on the bike from that

27   photo with the white shirt?  I would -- to that I think I

28   would say no to the clothing.  Yes.

1  **Q.**  So Officer Smith identified the clothing that was

2  recovered, correct?

3  **A.**  From that being worn by the person who evaded him on

4  the black Harvey Davidson.

5  **Q.**  But he did not see Mr. Garabato and identify him --

6  **A.**  I would not --

7      **THE REPORTER:**  I'm sorry.  Hold on.  Finish the

8  question.

9      **MS. NIKOLAIDES:**  **Q.**  Officer Smith did not identify Mr.

10  Garabato as the man driving the motorcycle?

11  **A.**  He did not.

12  **Q.**  Okay.  Officer Smith did not see the face of the man

13  driving the motorcycle?

14  **A.**  I do not believe so.

15      **MS. NIKOLAIDES:**  Okay.  No further questions.

16      **THE COURT:**  Thank you.

17      You are excused.  Thank you, Officer Sharron.

18      **THE WITNESS:**  Thank you.

19      (Witness excused.)

20      **THE COURT:**  Do you want to call your next witness?

21      **MR. LEVERONI:**  At this time, Your Honor, I don't think

22  we need the other witness.  So I'd like to see if the Court

23  has anything further in its mind in terms of further

24  evidence that the People need to produce because I think

25  the Court has everything it needs.

26      **THE COURT:**  No, I don't.  So do you want to --

27      **MR. LEVERONI:**  Reserve.

28      **THE COURT:**  Present closing?  Okay.  Thank you.

1   So Ms. Nikolaides, would you like to present closing

2   argument?

3   **MS. NIKOLAIDES:**  Yes.

4   So in this case no officer can affirmatively say that

5   they saw Mr. Garabato either stealing the motorcycle or

6   driving the allegedly stolen motorcycle.  So this fact

7   alone calls into question the validity of all the charges

8   and questions whether there is probable cause for any of

9   them.  The -- as to -- I'll start with Count 3, the

10  2800.2(a) charge.

11  The People have failed to provide sufficient evidence

12  to prove willful or wanton disregard for the safety of

13  person or property.  There was no property damage in this

14  case.  None was alleged.  The other way to prove willful or

15  wanton disregard for the safety of person or property is to

16  prove three violations resulting in a point under Vehicle

17  Code 12810 which is cited in 2800.2.  There has been no

18  evidence offered today that three violations occurred.  So

19  the People have not provided probable cause to believe that

20  there was willful or wanton disregard for the safety of

21  person or property.

22  As to Count 1 -- Counts 1 and 2, there is insufficient

23  evidence to believe that Mr. Garabato was ever in

24  possession of the motorcycle.  The motorcycle was found

25  about a block away.  Mr. Garabato was not next to the

26  motorcycle.  The officers never -- like I said, the

27  officers never saw him with the motorcycle.  They also have

28  not proven that Mr. Garabato had knowledge of that

```
1    motorcycle being stolen and these facts are necessary to

2    support those charges.

3        MR. LEVERONI:  I'll be very brief.

4        MS. DOAN:  Hold on.  I --

5        MS. NIKOLAIDES:  Oh, one moment.

6        Before the holding order, we want to make a 17(b)

7    motion, but we can do that after the People make their

8    argument.

9        THE COURT:  Okay.  Thank you.  So we are actually at

10   12:00 o'clock so we have to break for lunch.  So we will

11   come back at 1:30.  And I apologize, but we really do need

12   to be respectful of our teams' breaks and everybody's

13   breaks.  So we'll come back at 1:30 to finish up Mr.

14   Garabato's preliminary hearing.

15       MR. LEVERONI:  Absolutely.  Understood.  And I want to

16   respect everyone's breaks.  If at all possible to --

17       THE COURT:  No, it's not.  Okay.  Thank you.

18       MR. LEVERONI:  Understood.

19       THE COURT:  All right.  We're off the record.

20       (Lunch recess taken.)

21                        ---oOo---

22

23

24

25

26

27

28
```

```
 1   SEPTEMBER 8, 2022

 2                    P-R-O-C-E-E-D-I-N-G-S

 3                         ---oOo---

 4                  (AFTERNOON SESSION)

 5      THE COURT:  So let's call Mr. Garabato's matter from

 6   the main calendar, line 17, 18, and 19.  Okay.  So we are

 7   back on after the lunch recess for Mr. Garabato's

 8   preliminary hearing.

 9      Mr. Leveroni, I think it is your turn to present

10   closing argument.

11      MR. LEVERONI:  And I'll just start by asking if the

12   Court had anything specific that the People needed to

13   address.

14      THE COURT:  So one question I did have was

15   Ms. Nikolaides's argument regarding the evidence on

16   willfulness for the 2800.1 charge.

17      MR. LEVERONI:  Right.  And I wasn't quite following

18   some of the argument, but I do know that it hinged, at

19   least at the beginning, on property damage.  And what we

20   have here is clear testimony, not just testimony, but

21   documentary evidence in the form of People's Exhibit 3 I

22   believe it was where the officer testified about the

23   vehicle, motorcycle in this case, have the steering cords

24   cut which is how --

25      THE COURT:  No, no.  So at least I had understood

26   defense counsel's argument to be that the evasion of

27   Officer Smith, that there wasn't sufficient evidence that

28   such evasion was willful.
```

1    **MR. LEVERONI:**  And, Your Honor, even in that regard, I

2    think the evidence speaks for itself where the whole

3    impetus for this was a call from Officer Smith who was

4    trying to effectuate a traffic stop and the defendant

5    evaded him which necessitated a call out of APB to officers

6    to respond to an individual on a black Harley David

7    motorcycle with a very distinct description of the articles

8    of clothing being worn, including this vest with a

9    motorcycle patch or the mix breed motorcycle club evading

10   the traffic stop.  So that is clear evidence of the very

11   issue for the evasion.

12       **THE COURT:**  Okay.  Thank you.

13       The other question that I had was I did not get an

14   opportunity to review any of the exhibits.  Could I please

15   do that?

16       **MR. LEVERONI:**  Of course.

17       **MS. NIKOLAIDES:**  Your Honor, we had an issue we wanted

18   to raise with one of the exhibits that we were able to

19   review.

20       **THE COURT:**  Sure.

21       **MS. NIKOLAIDES:**  So Exhibit -- People's Exhibit 1 I

22   think.  Yeah.  It wasn't clear if Officer Sharron was

23   making this -- I don't think the officer was as frank as he

24   should have been.  He went back and reviewed the body worn

25   from the previous arrest involving Mr. Garabato and the

26   jackets are clearly different.  And we just want to be

27   clear that the jackets were different, and it wasn't clear

28   if the officer was trying to say they were the same or just

1    that they had a similar patch.  And we have a screenshot of

2    the previous body worn if Your Honor would like to see it.

3       **MR. LEVERONI:**  Your Honor, evidence is closed.

4       **THE COURT:**  Yeah.  So I think what you're saying is

5    that the jacket in People's Exhibit 1 is not the jacket

6    that was found near Mr. Garabato on the day of the arrest?

7       **MS. NIKOLAIDES:**  No.  No.  So Officer Sharron testified

8    that the jacket described by Officer Smith and the jacket

9    found --

10      **THE COURT:**  Near 9th and Noriega.

11      **MS. NIKOLAIDES:**  Yes.  That jacket he said was --

12      **MR. LEVERONI:**  Careful about the facts.  That's not

13   what --

14      **THE COURT:**  Okay.  Can we please let Ms. Nikolaides

15   make her argument uninterrupted and then you can respond,

16   okay.

17      **MS. NIKOLAIDES:**  Thank you, Your Honor.

18      That jacket he said was similar to the jacket that Mr.

19   Garabato was allegedly wearing on an arrest in February and

20   that's how he knew Mr. Garabato previously.  We just want

21   to be clear that the officer was not saying that the

22   jackets were the same because we have photographic evidence

23   that they were different jackets.

24      **THE COURT:**  Right.

25      **MS. NIKOLAIDES:**  Yeah.

26      **THE COURT:**  I think he said that it was similar, right.

27   He was just basing it based upon his recollection of an

28   arrest he had made of Mr. Garabato.  So I don't think that

1    the testimony was that they were the exact same jacket.

2    **MS. NIKOLAIDES:**  Okay.

3    **THE COURT:**  So that's fine.

4    **MS. NIKOLAIDES:**  Okay.  Thank you, Your Honor.

5    **THE COURT:**  Yes.  Okay.  So I think other -- well, let

6    me just look at these exhibits.  I just want to make sure I

7    don't have any questions.

8         So People's Exhibit 1 is -- is this the entire jacket,

9    but it has the patch on the sleeves of the jacket?

10    **MR. LEVERONI:**  No.  So the patch is the mix breed patch

11    that's shown there.

12    **THE COURT:**  So when you say that this is a patch, not

13    having seen the photos, I assumed that it was some sort of

14    logo that was sewn on to a jacket.

15         Did I misunderstood what Officer Sharron was testifying

16    to when he was testifying about a patch?  What do you mean

17    by a patch?

18    **MR. LEVERONI:**  May I approach, Your Honor?

19    **THE COURT:**  Yes.

20    **MR. LEVERONI:**  So this is the article that was found at

21    the scene.  These are the patches here and here --

22    **THE COURT:**  Right.

23    **MR. LEVERONI:**  -- that we're referring to.

24    **THE COURT:**  Right.  But is People's Exhibit 1 depicting

25    a jacket?  A vest, right?  It's a vest?

26    **MR. LEVERONI:**  Yes.  It may have been -- yeah.  But

27    it's a garment out of garment with the patches that were

28    seen by Officer Smith that were later verified by Officer

1   Smith.

2       **THE COURT:**  Okay.  Thank you.

3       And with regards to People's Exhibit 3, this is the

4   photograph of the motorcycle lock.  Where is it that the

5   lock is allegedly damaged?

6       **MR. LEVERONI:**  So the officer identified this as a cord

7   being cut.  I believe needing to be connected here, but

8   it's cut there.  But these are questions that could have

9   been asked earlier.  This is the exhibit that was

10  identified by Officer Sharron and showing the steering

11  cable being cut.

12      **MS. NIKOLAIDES:**  Your Honor, I don't believe he pointed

13  out in the picture where the steering wheel was cut.

14      **MR. LEVERONI:**  And we can read from the transcript.

15  This was a clear line of questioning – what does this

16  depict.  This depicts the steering wheel being cut.  Why is

17  that important.  This is because this is how motorcycles

18  are stolen.

19      The defense had more than ample opportunity to

20  cross-examine or even object to the exhibit.  They did

21  neither.  So the testimony that's in the record is from the

22  officer who made the observations firsthand and then who

23  corroborated that evidence using this photograph.

24      **THE COURT:**  Thank you.

25      **MR. LEVERONI:**  And I would just note that there are two

26  separate pieces of evidence here.  One being the

27  photograph, but also one being the testimony of the

28  officer.

1    **THE COURT:**  Yes.  I think counsel understands that.

2    And I don't think People's Exhibit 5 was moved into

3    evidence.  I thought that that was done on purpose.

4        **MR. LEVERONI:**  I thought that I had moved all items

5    into evidence, and if not, we would like to do that.

6        **THE COURT:**  Can we go off the record.

7        (Off the record.)

8        **THE COURT:**  So let's go back on the record.

9        So Ms. Nikolaides, I understand that the defense

10   doesn't object if People's Exhibit 5 is moved into

11   evidence.

12       **MS. NIKOLAIDES:**  Yes.

13       **THE COURT:**  So the Court will move into evidence

14   People's Exhibit 5 which is an eight and a half by eleven

15   photograph of Mr. Garabato.

16                         (People's Exhibit 5 received in

17                          evidence)

18       **THE COURT:**  Okay.  So Mr. Leveroni, so I don't have any

19   further questions.  My primary questions really related to

20   what these exhibits looked like because I did not have a

21   copy of them.

22       **MR. LEVERONI:**  Thank you, Your Honor.

23       **THE COURT:**  So is there any closing argument that you

24   would like to present or respond to Ms. Nikolaides's

25   arguments?

26       **MR. LEVERONI:**  I guess then I'll just be very, very

27   brief.

28       The first point that was raised at closing by the

1  defendant was that there was no evidence of driving.  We

2  have that testimony from the officer regarding the evasion.

3  We also have the officer confirming that the bike seen

4  evading the officer is the very same bike that was located

5  on the scene where Mr. Garabato was located and where

6  there's literally a breadcrumb trail between the bike and

7  Mr. Garabato where the officers found not just the helmet

8  stuffed under a series of stairs but also the vests bearing

9  the mix breed patch that was identified previously.

10       So with that, Your Honor, we'd submit unless there's

11  anything further.

12       **THE COURT:**  Okay.  Thank you.

13       Submitted?

14       **MS. NIKOLAIDES:**  If we could speak as to Count 3 again,

15  the willful and wanton disregard.

16       **THE COURT:**  Sure.

17       **MS. NIKOLAIDES:**  So we just want to clarify our

18  argument.  Vehicle Code Section 2800.2 element three is

19  that during the alleged pursuit, the defendant drove with

20  willful or wanton disregard for the safety of persons or

21  property.  And that can be proven by a damage to property,

22  which my understanding of the statute is that the damage to

23  property needs to occur during the alleged evasion and not

24  like the motorcycle having the steering wheel lock being

25  cut prior to this.  I don't think that counts as damage to

26  property in terms of this specific charge.  It can --

27  willful or wanton disregard for safety can also be proven

28  by three or more traffic violations, each of which would

1  make the defendant eligible for a traffic violation point;

2  and that is not something that was ever testified to today

3  or proven today.

4      Additionally what needs to be proven is that in terms

5  of the peace officer's vehicle there needs to be at least,

6  one red lamp visible from the front of the peace officer's

7  vehicle; the defendant either saw or reasonably should have

8  seen the lamp; the peace officer's vehicle was sounding a

9  siren as reasonably necessary; the peace officer's vehicle

10 was distinctively marked; and the peace officer was wearing

11 a distinctive uniform.  All of these are essential to this

12 charge, and there was no evidence offered today to support

13 any of that which is why we believe Count 3 should be

14 discharged.  And we'll submit on that.

15     **THE COURT:**  Thank you.

16     Okay.  Thank you.  So the Court having heard the

17 testimony and --

18     **MS. DOAN:**  Your Honor, I apologize.  The 17(b) still

19 has to be before jurisdiction --

20     **THE COURT:**  She made the -- I thought she made the

21 motion.  Did you want to --

22     **MS. DOAN:**  I don't think she made it.

23     **MS. NIKOLAIDES:**  Yeah.  That wasn't the 17(b) motion.

24 That was arguing for it to be discharged, but we have a

25 17(b) as to Counts 1 through 3.

26     **THE COURT:**  Okay.  And what would be the basis for the

27 17(b) request?

28     **MS. NIKOLAIDES:**  Michael is a 40-year-old man.  He has

1    had a unique journey and a unique story.  Michael's last

2    conviction was in 2012.  Between 2012 and the pandemic, he

3    achieved a period of nearly eight years of sobriety.

4    During that period of sobriety he used his own journey and

5    struggled with substance abuse to make a significant

6    contribution to the community by helping others facing

7    similar challenges.  He worked as a Salvation Army detox

8    counselor for two years, worked for Glide SF for one year,

9    worked for City College Second Chance program for two

10   years, and worked as a peer support --

11        **MR. LEVERONI:**  Your Honor --

12        **THE COURT:**  Yes.

13        **MR. LEVERONI:**  Apologies for the interruption, but we

14   have no forwarning or notice of any of this information,

15   let alone the motion itself.  So we would be objecting to

16   foundation grounds, notice grounds, all of the above.

17        **THE COURT:**  So you know -- and I know you're at a

18   disadvantage because you recently joined Department 9, but

19   Mr. Garabato has a number of other cases in this

20   department.  So the Court is actually familiar with the

21   information that Ms. Nikolaides is sharing, so I'll

22   overrule -- I'm sorry.  I'll overrule the objection.

23        Go ahead, Ms. Nikolaides.

24        **MS. NIKOLAIDES:**  Thank you.

25        Additionally, Mr. Garabato has worked as a peer support

26   supervisor for the MAPS Program for the San Francisco

27   collaborative courts in this courthouse.

28        Unfortunately, after a long period of success in these

1    careers, during the pandemic Mr. Garabato relapsed and
2    picked up several cases in San Francisco as he plunged
3    deeper and deeper into substance abuse.  He lost his home.
4    He lost everything.
5        In a very unconventional move when Mr. Garabato picked
6    up his most recent case, this case in San Francisco, he
7    actually asked the Court not to release him and requested
8    to be kept in custody so that he could be referred to ACM
9    ICR to be transported directly from the jail to a substance
10   treatment program so he could address his substance abuse
11   issues.
12       He has insight into the root causes of his conduct.  He
13   has succeeded in overcoming his substance abuse issues in
14   the past and he will succeed again.
15       I'm requesting that we give him the nudge towards
16   success by 17(b)ing this case as part of his long road to
17   recovery.  Hopefully one day in the near future he will
18   come back and work here like he did before and use his own
19   journey to once again help others who struggle with
20   problems like his.  It's because of these reasons that we
21   feel there is significant reason to reduce these charges to
22   misdemeanors.
23       **THE COURT:**  Okay.  Thank you.
24       So the Court having heard the testimony and considered
25   the exhibits submitted as evidence, as well as the
26   arguments of counsel, I find that the People have presented
27   satisfactory evidence establishing sufficient cause to
28   believe that the defendant committed each element of the

1   following offenses.

2       With regards to Count 1, Vehicle Code 10851 subdivision

3   (a), the Court does find that the People have provided

4   sufficient cause to believe that the offense was committed

5   by Mr. Garabato.  Having heard the testimony, the evidence

6   was clear from Officer Sharron that Mr. Garabato drove

7   someone else's motorcycle.  There was testimony that

8   Officer Sharron spoke to Mr. Borha, the victim himself; and

9   that the defendant, Mr. Garabato, was seen driving the

10  motorcycle by Officer Smith.  I believe it was on 101.

11      And the Court can certainly infer from the fact that

12  the evidence such as the motorcycle helmet, the mix breed

13  vest, the flannel shirt, they were all found I think within

14  a block or so of where Mr. Garabato was located.  And the

15  Court can infer also from People's Exhibit 3, the fact that

16  the steering lock of the motorcycle was damaged.  All these

17  things point to the fact that there was, in fact, an intent

18  to deprive the owner of his ownership or possession of the

19  vehicle.

20      And Mr. Borha testified that he did not give permission

21  to anybody to take the motorcycle from the Parnassus

22  hospital parking garage.

23      So the Court does find -- the Court does find that

24  Count 1 -- that the defendant can be held to answer on

25  Count 1.

26      With regards to the valuation, based upon the evidence

27  that the Court heard, the Court infers that the motorcycle

28  was valued at more than $950.

1    With regards to Count 2 which is the 496(d) subdivision

2   (a) under the Penal Code offense, receiving stolen

3   property, a motorcycle, the Court does find that the People

4   have presented satisfactory evidence establishing

5   sufficient cause to believe that Mr. Garabato committed

6   each element of that offense.  In particular, the same

7   evidence that the Court cited with regards to Count 1

8   supports the charge of the 496(d)(a) offense, and so the

9   Court finds that the People have provided satisfactory

10  evidence as to Count 2.

11    With regards to Count 3, Vehicle Code 2800.2

12  subdivision (a) as a felony, the Court finds that the

13  People have not produced sufficient evidence establishing

14  sufficient cause to believe that the defendant committed

15  the offense and I order that it be discharged.

16    In particular, having reviewed CALCRIM 2181, as

17  Ms. Nikolaides points out, one of the elements does seem to

18  be that all of the following needs to have been true

19  including that there was one lighted red lamp visible from

20  the front of the peace officer's vehicle, that the

21  defendant either saw or reasonably should have seen the

22  lamp, that the police officer, this is Officer's Smith's

23  vehicle, was sounding a siren as reasonably necessary, and

24  that the officer's vehicle was distinctively marked.

25    I did hear testimony that the vehicle was marked;

26  however, I don't think that I heard evidence as to some of

27  these other elements in CALCRIM 2181.  I think that Officer

28  Smith's conclusion that Mr. Garabato was willfully evading

1    Officer Smith is not sufficient to establish sufficient

2    cause to believe that Mr. Garabato committed that offense,

3    so that offense will be discharged.

4        As to Count 4, the Court does find that there is

5    sufficient evidence to certify that misdemeanor.  That's

6    Vehicle Code 12500 subdivision (a), that he was an

7    unlicensed driver at the time of the events on

8    August 22nd, 2022.

9        Accordingly, the Court orders -- and with regards to

10   the 17(b) motion, the Court will deny the 17(b) motion.

11   The Court is very familiar with Mr. Garabato's excellent

12   work in the community between 2012 and 2020.  And I think

13   in many ways this might have been a suitable case for a

14   17(b) motion.

15       The reason why I'm denying it is because the Court gave

16   Mr. Garabato an opportunity by releasing him on one of

17   these other cases; and unfortunately, within a week or so,

18   Mr. Garabato came back to this court around August 24th,

19   last week, on these new felony charges.  And I very much

20   wanted Mr. Garabato to take advantage of the opportunity

21   that the Court had provided because I see the good that you

22   can do and I know that you can do once you have your

23   substance abuse issues addressed, but I was very

24   disappointed to see that you came back so quickly on new

25   serious felony charges.  And so because of that, the Court

26   is going to deny the 17(b) motion.

27       So the Court orders that defendant appear in Department

28   22 for instruction and arraignment on September 22nd,

1   2022, at 9:00 a.m.  And the evidence should be returned to

2   the respective submitting parties.  I just wanted to make

3   sure, I thought there might be -- is there an ACM report?

4       **MS. DOAN:**  Yes.  There's an ACM ICR.  They needed one

5   more week.

6       **THE COURT:**  Okay.

7       **MS. DOAN:**  I don't remember when we continued it for

8   the return on ACM ICR.

9       **THE COURT:**  To September 13th.

10      **MS. DOAN:**  To September 13th.

11      **THE COURT:**  So I can confirm that date.  And let's hope

12  that the ACM ICR report comes back by then.  So the Court

13  will confirm also the September 13th date in Department 9

14  for line 17, 18, and 19 for the ACM ICR report.

15      **MS. DOAN:**  Thank you, Your Honor.  And then for the

16  other two dockets, we actually need to set preliminary

17  hearings on them.  They were on for preliminary hearing

18  today.

19      **THE COURT:**  Okay.

20      **MS. DOAN:**  I'm ready.  I was going to handle the other

21  two.

22      **THE COURT:**  Okay.

23      **MS. DOAN:**  But I see the Court has a number of other

24  matters.

25      **THE COURT:**  Sure.  So let's go off the record for

26  scheduling.

27      (Discussion off the record.)

28      **THE COURT:**  Let's go back on the record.

1      So for lines 17 and -- I'm sorry.  I think for line 18

2  and for line 17, we will set the prelim for Wednesday,

3  October 5th, at 9:00 a.m. in Department 9.  And defendant

4  is ordered present for those hearings.

5      And I believe we have time estimates already.

6      Okay.  So anything further, Counsel?

7      **MS. DOAN:**  Nothing further.  Thank you.

8      **THE COURT:**  We're off the record.

9      (Whereupon, the proceedings were concluded.)

10                      ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1    State of California              )
                                      )
2    County of San Francisco         )

3

4

5         I, Jacqueline K. Chan, Official Reporter for the

6    Superior Court of California, County of San Francisco, do

7    hereby certify:

8         That I was present at the time of the above

9    proceedings;

10        That I took down in machine shorthand notes all

11   proceedings had and testimony given;

12        That I thereafter transcribed said shorthand notes with

13   the aid of a computer;

14        That the above and foregoing is a full, true, and

15   correct transcription of said shorthand notes, and a full,

16   true and correct transcript of all proceedings had and

17   testimony taken;

18        That I am not a party to the action or related to a

19   party or counsel;

20        That I have no financial or other interest in the

21   outcome of the action.

22

23

24   Dated:  September 18, 2022

25

26

27        JACQUELINE K. CHAN, CSR No. 10276

28
```