# EXHIBIT A

1       SUPERIOR COURT OF CALIFORNIA

2        COUNTY OF SAN FRANCISCO

3   BEFORE THE HONORABLE CHARLES CROMPTON, JUDGE PRESIDING

4          DEPARTMENT 15

5           ---ooXoo---

6

7   PEOPLE OF THE STATE OF CALIFORNIA,      )
                                            )
8                   Plaintiff,              )
                                            )
9   VS.                                     )   Case No. CRI-22004986
                                            )          CRI-22015590
10  JOSHUA ISIAH SIMON,                     )          CRI-23007617
                                            )
11                  Defendant.              )
    _____)
12

13

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17          FRIDAY, AUGUST 25, 2023

18

19

20

21

22

23

24

25

26

27

28  Reported By:  Maria Viscio, CSR No. 12353

```
 1  A P P E A R A N C E S:
 2  For Plaintiff:              Brooke Jenkins, District Attorney
                                350 Rhode Island Street, Suite 400N
 3                              San Francisco, California 94103
                                BY:  SHEILA JOHNSON
 4                              Assistant District Attorney
 5
 6  For Defendant:             Manohar Raju, Public Defender
                                555 Seventh Street
 7                              San Francisco, California 94103
                                BY:  ILONA YANEZ
 8                              Deputy Public Defender
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

1                    INDEX - (Pages 1-17)

2                         SESSIONS

3   PROCEEDINGS                                  PAGE

4   AUGUST 25, 2023

5       MORNING SESSION                           4

1  FRIDAY, AUGUST 25, 2023                    MORNING SESSION

2                  P R O C E E D I N G S

3                     ---ooXoo---

4      **THE COURT**:  On the record on lines 40 through 42, Simon.

5  Ms. Yanez for Mr. Simon who is present in custody.  Ms. Johnson

6  for the People.  Good morning.  This is a petition for mental

7  health diversion.  And I've got the updated treatment plan that

8  the defense forwarded from Seneca Family of Agencies dated

9  August 2nd.  And then I've also got the petition and the

10 People's opposition.

11     So why don't we start with you, Ms. Yanez.  What do you

12 want me to know beyond what's in your papers?

13     **MS. YANEZ**:  So, your Honor, Mr. Simon has housing through

14 AB12 through the foster care system.  And if -- I keep getting

15 e-mails regularly from the juvenile person in charge of that to

16 know when they think he might be getting released to find out

17 if they can keep his housing for him.  So that's something I'm

18 really concerned about because I don't want him to lose those

19 services.

20     In addition with respect to the Seneca, as the Court is

21 aware Mr. Simon was really excelling in this program and having

22 positive reports.  He had anger management, and he was getting

23 treatment for some of the issues related to the case with

24 respect to his ex-girlfriend.

25     Thereafter he did pick up a new case after his

26 ex-girlfriend contacted him and wanted to get back together.

27 And they met up and an incident occurred whereby there was no

28 injury and she was fine.  And it's my understanding that she

1  has contacted the DA -- well, I know that she has and said she
2  was not interested in prosecution and that she essentially took
3  some responsibility for contacting him and then also indicated
4  that, you know, she was mistaken about what had happened to her
5  phone.

6      There were some other issues.  Point being he's been in
7  custody for a significant amount of time -- the most amount of
8  time he has ever been in custody.  And he, while in the jail,
9  had some significant struggles with mental health and those
10 resulted in him being brought to CJ2 for a little bit.  I'm not
11 gonna say too much more about that.

12     He has been stabilized.  He's now in the psych treatment
13 pod.  And I believe he is taking medication that has been
14 prescribed to him.  In addition the Court had requested an
15 updated treatment plan.  There were a few continuances.  And
16 Seneca has offered to essentially upgrade him from just having
17 anger management and therapy to full wraparound care which I
18 believe is a significant upgrade.

19     So I think with the new treatment plan and Mr. Simon's
20 history of success and I think the significant impact of
21 spending a significant amount of time in custody more than he
22 has ever spent in his life -- that the Court should accept him
23 into MHD, release him on an ankle monitor back to housing at
24 AB12, and implement the treatment plan of full wraparound care
25 with Xochitl Sosa.

26     And so that's our request at this time.  We do believe that
27 Mr. Simon's history of compliance prior to picking up the new
28 case and the circumstances thereof and how his mental health

1  condition led to him accepting when the complaining witness

2  wanted -- when reached out to him and wanted to have contact to

3  get back together how that would impact someone like him who

4  suffers from his conditions.

5      So for all those reasons, we think he's a good candidate.

6  He's not at risk of committing a super strike.  And so I'm

7  happy to answer any further questions and respond after the

8  district attorney -- I will note that when Ms. Wagner appeared

9  previously she had suggested if not MHD then potentially BHC

10  which I don't know exactly what the difference that would be

11  suggested would be, but I don't think that --

12      I think it's a distinction with -- if it makes a big

13  difference to somebody, then that would be all right if there's

14  other services that the BHC folks recommend beyond what I've

15  suggested.  But I think full wraparound care is a significant

16  upgrade, and I think it would protect public safety and help

17  Mr. Simon's mental health which clearly being in custody has

18  not helped.

19      **THE COURT:**  Let me ask this before I turn to Ms. Johnson.

20  The newer case at line 42 -- that involves the same victim as

21  the previous cases?

22      **MS. YANEZ:**  Yes, the one who contacted him; that's right.

23      **THE COURT:**  All right.  I thought there were two different

24  victims.

25      **MS. YANEZ:**  No.  He's only had the case with the one

26  person.

27      **THE COURT:**  All right.

28      Ms. Johnson.

1    MS. JOHNSON:  Yes.  Your Honor has received our opposition,
2  so I won't go through all of that, but the defendant strangled
3  the victim to a pretty severe degree.  And as your Honor knows,
4  you know, strangling somebody can lead to their death.  So I
5  think super strikes are not far from the type of conduct that
6  he's already demonstrated.
7     The other concern -- I think the violence in and of itself
8  is very concerning and indicates a serious threat, but they
9  also found a firearm in his trunk that looked exactly like what
10 the victim had said she had seen in his trunk that same day.
11 He had referenced that gun.  We got the DNA results and his DNA
12 is on that gun.
13    The firearm, the strangulation, the -- despite having I
14 think two -- at least two open DV cases at the time he went and
15 met up with her -- it was a fight according to her about
16 jealousy over something on her phone.  I'm aware she's -- she
17 doesn't want to testify.
18    I'm aware of that, but unfortunately the conduct is such
19 that I can't just agree to do exactly what we've been doing.
20 That hasn't worked.  So I will say I think if the defendant
21 would plead to a 273.5 felony for the domestic violence
22 string -- I think that would be a fair resolution.
23    And we haven't had a chance to pretrial conference this
24 case, so I just wanted to put that out there.  I know it's not
25 the Court's concern right now, but I'll just say that.
26    MS. YANEZ:  May I respond.
27    THE COURT:  Let me just ask.  Are you talking about a
28 nonstrike resolution?

1    **MS. JOHNSON:**  Yeah.

2    **THE COURT:**  And when you say he referred to the gun, did he

3  threaten the victim with the gun?

4    **MS. JOHNSON:**  No.

5    **THE COURT:**  All right.  Go ahead.

6    **MS. YANEZ:**  Thank you, your Honor.  First of all, I dispute

7  the notion that this was a severe strangulation.  There were

8  none of the hallmarks of a, quote/unquote, "severe

9  strangulation."  There was no injury to her.  There was a

10  little bit of redness allegedly which I can't even see in the

11  photographs or body-worn camera.

12    There's no difficulty swallowing.  There's no petechiae.

13  There was no involuntary urination, no loss of consciousness --

14  absolutely none of the hallmarks of those things.  While she

15  may have told the police when she was angry that one minute --

16  he strangled her for a minute, that is plainly not true because

17  that's impossible.  She would have had all these things happen

18  and given --

19    **THE COURT:**  I understood she felt pain in her neck,

20  difficulty swallowing, and ringing in her ears.

21    **MS. YANEZ:**  She had none of those things.

22    **THE COURT:**  Those are in the report as I understand it,

23  but --

24    **MS. YANEZ:**  I don't know where -- that is -- I don't know

25  where that came from because there's none of those things.

26    **THE COURT:**  Okay.  Go ahead.

27    **MS. YANEZ:**  Moreover with respect to the firearm, there is

28  DNA, but it's -- there's 60/40 basically.  And the other DNA,

1  I'm informed and believe, actually belongs to the complaining

2  witness.  So I think that that's relevant, but beyond that when

3  Ms. Johnson refers to, quote, "two open DV cases," one of them

4  is a 166 misdemeanor wherein the complaining witness broke into

5  my client's home, stole his stuff, and then told him if he

6  wanted it back to meet up with her in -- near Powell I believe.

7       And he was subsequently arrested for a 166 when she called

8  the police.  However, it's not at all -- oh, sorry, two more

9  things, with respect to jealousy and the phone, that's also

10 incorrect.  What occurred was that Mr. Simon saw a message from

11 someone who has threatened his life before and he was in fear

12 for his safety and he believed that the complaining witness had

13 set him up to be harmed by this individual whose message popped

14 up on her phone.

15      It was not a jealousy of another -- that she was dating or

16 doing something with someone else.  It was specifically in

17 reference to his safety and his fear of being set up.  And he

18 also told that to -- I believe he told that to the police.

19 Lastly this is not exactly what we have been doing.  What we've

20 been doing is anger management.

21      And this is full wraparound care, so it is different.  And

22 if there's a concern about safety beyond that, the Court could

23 impose an ankle monitor for a time as a test mechanism to

24 determine his amenability.  And I have absolutely no doubt that

25 Mr. Simon will comply with all court orders.

26      I think this has been a really massive wake-up experience.

27 He's only 20 years old.  He's a lifelong foster child.  And I

28 think that he has a proven track record.  He messed up, of that

1  there is no doubt.  He should not have met up with the
2  complaining witness, but his fear in that moment is what led to
3  what occurred.

4      And moreover before that even happened, even according to
5  the complaining witness he asked her to get out of the car and
6  she refused.  So I think the argument had more to do with her
7  refusing to get out of the car, but plainly she wasn't
8  strangled.  She clearly wasn't strangled for a minute and --

9      **THE COURT**:  I think we can all agree it's a toxic
10  relationship.  I'm not really equipped to resolve all the
11  differences --

12     **MS. YANEZ**:  One last thing which is that even in a recent
13  meeting with Mr. Simon, I couldn't remember her name.  I said
14  what is it?  Yesenia?  And he said I don't want to say that
15  name ever again; I'm done with that.  So I -- he does not want
16  to say her name.

17     I don't believe that he -- I have no doubt he will not have
18  any further contact with her.  She's done -- I think he can see
19  the damage to his life.  He was in school and when he got
20  arrested in May, he missed the final exam and he didn't get the
21  credit for his City College classes.

22     He had two jobs at the time.  He's going to have to get
23  those back.  So I think the lesson's been learned is what I'm
24  trying to say.  And even if she were to contact him again to
25  get back together -- which I don't think she will because he is
26  going to get a new phone number and be off of social media is
27  what he informed me.  And I think all those things are
28  reasonable safeguards.  So that is our request at this time.

1     **THE COURT:**  And the supportive housing that he would get --

2     **MS. YANEZ:**  He has it.

3     **THE COURT:**  -- or he has -- has he lived there before or

4 it's a new place?

5     **MS. YANEZ:**  He was living there and they've been holding

6 the location for him.  It's not in the city.  It's actually in

7 Contra Costa County I believe -- Pleasant Hill.  He's been

8 there for some time.  I have an e-mail from even just a few

9 days ago from the social worker through the juvenile court

10 system who inquired how much longer he'll be in custody because

11 they've been holding his bed.  And I can show the Court if the

12 Court needs to see it.

13     **THE COURT:**  Oh, no, that's all right.  I'm just trying -- I

14 was just trying to get more familiar with what the kind of

15 setup was.

16     **MS. YANEZ:**  I mean, we can really make this a tight --

17     **THE COURT:**  It's an individual unit that he would live

18 in -- is that --

19     **MS. YANEZ:**  It's a housing program.  I think it's a

20 supportive housing.  They have services there.  He has a unit I

21 think he shares with a roommate -- oh no, it's just his own

22 room.  He has his own unit room and supportive treatment on

23 site.

24     So the Court could impose some really tight conditions as

25 far as ankle monitoring and whatnot.  And I think once he gets

26 back to his routine of school -- and if he can get out in time

27 to start school -- I don't know if City College has resumed

28 classes yet, but he can get back into school.

1    He can get his full wraparound treatment from Seneca.  He
2  can wear an ankle monitor.  He can hopefully get his jobs back
3  that he was doing.  And I think that keeping him busy and
4  keeping him in a higher level of treatment, after this lengthy
5  period of incarceration, would do the trick of the lessons that
6  have been learned.  It's very clear to me, and I have a lot of
7  concerns about --
8      **THE COURT:**  And he's been in custody since when, I'm sorry?
9      **MS. YANEZ:**  He was arrested on the new case in June.  He
10  spent the whole summer in custody -- May 23rd actually.  His
11  arraignment was actually on May 25th.  He was arrested May
12  23rd.
13      **THE COURT:**  So three months.
14      **MS. YANEZ:**  It's a significant period for someone of his
15  age and lack of experience incarcerated.
16      **THE COURT:**  Well, it's a significant period for anybody in
17  custody.
18      **MS. YANEZ:**  I mean, the Court could also impose a search
19  condition.  I don't think that -- while I normally would never
20  offer that, I do think that that would be amenable and
21  acceptable at least for a time period -- just for a couple
22  months that would be okay.
23    I think there are lots of things that the Court can impose
24  and we can -- as he shows his compliance and his progress, we
25  can revisit those in the future, but there's clearly a lot of
26  potential with this young man.  He's highly intelligent.  He's
27  very motivated to succeed.  He's goal oriented.
28    He's been reading self-help books in the jail that we've

1  discussed.  He's really a very promising ambitious young man

2  who has a bright future ahead of him.  And I think that he

3  wants a chance to show, your Honor, that he's really remorseful

4  for having met up with her and for what occurred thereafter and

5  his losing of his -- control over his anger and his speeding.

6      **THE COURT**:  I'm prepared to accept him over the People's

7  objection.  I understand certainly the objections.  I think

8  they're well founded.  I don't think that I can find that

9  he's -- that there's a risk of a super strike which is the

10  public safety criteria I have to apply.  So I'll accept him

11  into mental health diversion.  I will have him put on

12  electronic monitor.

13      Couple things, Mr. Simon, first off, on mental health

14  diversion, you won't be in the normal criminal court system,

15  but of course you have to obey all laws.  You have to obey your

16  treatment plan which is clearly spelled out by Seneca, but it

17  may change over time.

18      But it includes, for example, the medication compliance,

19  their requirements that you meet with your case manager and

20  your other providers, that you do your anger management.  You

21  have to comply with the criminal protective order in this

22  case -- particularly important.

23      You have to come to court when you're ordered to do so.

24  And you have to agree to be responsible for restitution.  If

25  you fail to do any of those things, then mental health

26  diversion can be terminated and you would be sent back to

27  criminal court and be right back where you started.  I don't

28  think that's going to happen, but I just need you to understand

1  that that's the way this works.  Okay?

2      **THE DEFENDANT:**  Yes, sir.

3      **THE COURT:**  Also since you're going to start out on

4  electronic monitor, that requires you to agree that your

5  person, your residence, your automobile, any property under

6  your custody and control can be searched by any San Francisco

7  Sheriff's Department peace officer at any time of the day or

8  night with or without a warrant, your consent, reasonable

9  suspicion or probable cause.

10      Your movements can be tracked and recorded and the

11  information preserved and maintained and that your GPS location

12  data can be shared with law enforcement agencies.  And the

13  search condition I mentioned -- it's not just sheriff's

14  department personnel who are authorized to do the search.  It's

15  anybody acting at their request or with their authorization.

16  Are you agreeable to those terms?

17      **THE DEFENDANT:**  Yes, sir.

18      **THE COURT:**  The address of his...

19      **THE DEFENDANT:**  1460 Contra Costa Boulevard, Apartment 123.

20      **MS. YANEZ:**  Did you hear that, your Honor?

21      **THE COURT:**  I heard Contra Costa Boulevard.

22      **THE DEFENDANT:**  1460 Contra Costa Boulevard, Apartment 123.

23      **THE COURT:**  123?

24      **THE DEFENDANT:**  Yes, sir.

25      **THE COURT:**  That's easy.  Okay.  Here's the form for you to

26  sign.  That just reflects what we just agreed.  And then we're

27  going to come back for progress report --

28      **MS. YANEZ:**  Oh, I'm sorry, your Honor.  So your Honor is

1  placing him on home detention?

2      **THE COURT:**  Yes.

3      **MS. YANEZ:**  So can -- for the activities that are allowed,

4  would that be education, employment, and treatment?

5      **THE COURT:**  Yes.  Has he got a job already?

6      (Discussion held off the record.)

7      **MS. YANEZ:**  He teaches martial arts classes for kids.

8      **THE COURT:**  So whenever he wants to leave, he just has to

9  notify the sheriff and let them know that it's for one of

10 those --

11     **THE BAILIFF:**  If that's approved by you.

12     **THE COURT:**  Yes.  Those three things are approved by me.

13     **MS. YANEZ:**  Do you have to write that on here?

14     **THE BAILIFF:**  You probably should.

15     **THE COURT:**  Okay.  All right.  We'll come back in one week

16 to check on his progress and placement -- September 1st.

17     **MS. YANEZ:**  Can we do, not a Friday, please.

18     **THE COURT:**  The following Monday is Labor Day.  That's the

19 only problem.

20     **MS. YANEZ:**  Oh, okay.  I guess just this once I'll make an

21 exception.  It's just I have to be in a lot of places on

22 Fridays.  It's not usually helpful.

23     (Brief pause.)

24     **THE COURT:**  Withdraw not guilty pleas?

25     **MS. YANEZ:**  Yes, your Honor.  Time is waived.

26     You have a right to a speedy trial.  Do you give up that

27 right at this time?

28     **THE DEFENDANT:**  Yeah.

```
 1        (Discussion held off the record.)
 2      THE CLERK:  Ms. Yanez, you also have pending dates in
 3  Department 22 and 29.
 4      MS. YANEZ:  We'd like to vacate those at this point -- all
 5  dates outside of this courtroom and we have September 1st as
 6  the next court date.
 7      THE CLERK:  That's correct.
 8        (Proceedings were concluded.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

State of California                )
                                  )
City and County of San Francisco  )

       I, Maria Viscio, an Official Court Reporter for the Superior Court of the City and County of San Francisco, State of California, do hereby certify:

       That I was present at the time of the above proceedings;

       That I took down in machine shorthand notes all proceedings had and testimony given;

       That I thereafter transcribed said shorthand notes with the aid of a computer;

       That the above and foregoing is a full, true, and correct transcription of said shorthand notes, and a full, true, and correct transcript of all proceedings had and testimony taken;

       That I am not a party to the action or related to a party or counsel;

       That I have no financial or other interest in the outcome of the action.

Dated:  12-27-2023

_____

      Maria Viscio, CSR No. 12353