**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSHUA SIMON, individually and on behalf of all others similarly situated; DAVID BARBER, individually and on behalf of all others similarly situated; DIANA BLOCK; COMMUNITY RESOURCE INITIATIVE; JOSUE BONILLA, individually and on behalf of all others similarly situated, | Nos.  24-1025 24-6052 D.C. No. 4:22-cv-05541-JST |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| CITY AND COUNTY OF SAN FRANCISCO; PAUL MIYAMOTO, In his official capacity as San Francisco Sheriff, | |
| *Defendants - Appellants*. | |

Appeal from the United States District Court for the
Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted September 10, 2024 as to No. 24-
1025[*]
San Francisco, California

Filed April 23, 2025

Before: Jay S. Bybee, Carlos T. Bea, and Salvador
Mendoza, Jr., Circuit Judges.

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Mendoza

---

## SUMMARY[**]

---

### Civil Rights/Pre-Trial Electronic Monitoring

In appeal No. 24-1025, the panel affirmed in part and
vacated in part the district court's preliminary injunction in
favor of plaintiffs in their action brought pursuant to 42
U.S.C. § 1983 and California law challenging portions of the
San Francisco Sheriff's Office (SFSO) Pre-Trial Electronic
Monitoring program (PTEM); and in appeal No. 24-6052,
the panel denied plaintiffs' motion to dismiss the appeal and
granted the Sheriff's motion to stay the district court's

---

[*] The panel unanimously concludes that case number 24-6052 is suitable
for decision without oral argument. *See* Fed. R. App. P. 34(a)(2). The
case is submitted on briefs as of the filing of the opinion.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

subsequent order granting plaintiffs' motion to enforce the preliminary injunction.

In San Francisco, a Superior Court judge may condition pretrial release on enrollment in PTEM. To enroll in PTEM, defendants must agree to rules promulgated by SFSO. Plaintiffs, three criminal defendants in San Francisco, on behalf of themselves and a putative class, challenged the constitutionality of PTEM's Rule 5, which requires enrollees to submit to warrantless searches, and Rule 11, which allows SFSO to share participants' location data with other law enforcement agencies without a warrant and to retain the data. Plaintiffs are composed of two classes: the "original rules subclass" of defendants enrolled in the program before May 2023, and the "revised rules subclass" of defendants enrolled after May 2023 procedural changes.

The panel first held that it had jurisdiction over the appeals. Abstention was not warranted because the results of the proceedings will not impact the prosecution of plaintiffs' state criminal cases nor require an ongoing federal audit of the Superior Court. Proceeding under § 1983 rather than habeas was proper because plaintiffs challenged the conditions of their pretrial release, rather than the fact or duration of their confinement.

Vacating the preliminary injunction as to the revised rules subclass in appeal No. 24-1025, the panel held that plaintiffs were unlikely to succeed on their facial challenges to Rule 11's location sharing requirement. First, as to the separation-of-powers claim under the California constitution, the panel held that the Superior Court exercises a core judicial power in imposing PTEM by admonishing participants and having them sign a court order. Using a

Sheriff-established program does not create separation-of-powers issues because the Superior Court retains discretion to order the program. Second, on the Fourth Amendment claim, the panel determined that if the Superior Court orders PTEM following an individualized determination of its reasonableness—a condition that defendants consent to in the presence of counsel—tracking and sharing location data without a warrant is reasonable under the totality of circumstances, and therefore permissible under both the Fourth Amendment and the California Constitution. Finally, addressing the California constitutional right to privacy claim, the panel concluded plaintiffs failed to demonstrate "a reasonable expectation of privacy under the circumstances."

Affirming the preliminary injunction as to the original rules subclass, the panel held that because judges failed to make a record that location sharing was a condition of PTEM enrollment, there was uncertainty as to whether location sharing has been sufficiently ordered as to the original subclass enrollees.

In related appeal No. 24-6052 from the district court's subsequent order granting plaintiffs' motion to enforce the preliminary injunction as to Rule 5's warrantless search condition, the panel, holding that it had jurisdiction because the order modified the original injunction, denied plaintiffs' motion to dismiss for lack of jurisdiction and granted the Sheriff's motion for a stay of the order for many of the same reasons that it provided in part III of its opinion pertaining to PTEM's Rule 11 location sharing provision.

Concurring in part and dissenting in part, Judge Mendoza stated that in appeal No. 24-1025, the majority erred by disregarding the standard of review for preliminary injunctions and then got the substantive law wrong, most

egregiously with regard to plaintiffs' separation of powers claim. He would affirm the preliminary injunction because plaintiffs were likely to show that San Francisco's Superior Court abdicated judicial power and function that California's Constitution and laws reserve for the judiciary. Unconstrained by judicial review, the Sheriff overstepped the boundary between branches and seized that power. In appeal No. 24-6052, Judge Mendoza concurred in denying plaintiffs' motion to dismiss for lack of jurisdiction but dissented as to the majority's grant of the Sheriff's stay motion.

---

## COUNSEL

Shilpi Agarwal (argued), Avram D. Frey, Emi Young, and Neil Sawhney, ACLU Foundation of Northern California, San Francisco, California; Olivia Rosen, Eunice Leong, and Justina K. Sessions, Freshfields US LLP, Redwood City, California; Hannah M. Kieschnick, Public Justice PC, Oakland, California; for Plaintiffs-Appellees.

Alexander J. Holtzman (argued), Steven F. Egler, and Jose Zelidon-Zepeda, Deputy City Attorneys; James F. Hannawalt, Acting Chief Trial Deputy; Jennifer E. Choi, Chief Trial Deputy; Yvonne R. Mere, Chief Deputy City Attorney; David Chiu, City Attorney; San Francisco City Attorney's Office, San Francisco, California; for Defendants-Appellants.

Scott Wm. Davenport and James R. Touchstone, Jones & Mayer, Fullerton, California, for Amicus Curiae California State Sheriffs' Association.

Arthur A. Hartinger, Ryan P. McGinley-Stempel, Renne Public Law Group, San Francisco, California, for Amici Curiae California State Association of Counties and International Municipal Lawyers Association.

Hannah Zhao and F. Mario Trujillo, Electronic Frontier Foundation, San Francisco, California; Thomas Berry and Brent Skorup, Cato Institute, Washington, D.C.; Kate Weisburd, George Washington University Law School, Washington D.C.; for Amici Curiae Electronic Frontier Foundation, Professor Kate Weisburd, and The Cato Institute.

Galia Z. Amram, Laura L. Babashoff, Lara McDonough, and Chloe Connolly, Morrison & Foerster LLP, San Francisco, California, for Amicus Curiae National Association of Criminal Defense Lawyers.

Sujung Kim, Deputy Public Defender; Matt Gonzalez, Chief Attorney; Manohar Raju, San Francisco Public Defender; San Francisco Public Defender's Office, San Francisco, California; for Amicus Curiae San Francisco Public Defender.

## OPINION

BYBEE, Circuit Judge:

In San Francisco, after an individual is arrested, booked, and placed in a local jail, he appears in front of a Superior Court judge, who decides whether, and under what conditions, the defendant should be released pending trial. Judges may condition release on enrollment in programs administered by the San Francisco Sheriff's Office ("SFSO" or the "Sheriff"). To enroll in such programs, defendants must agree to rules promulgated by SFSO.

Plaintiffs challenged the constitutionality of two of these rules on their face. In so doing, they also brought a separation-of-powers challenge to the Sheriff's authority to create such programs, generally. The district court enjoined SFSO from enforcing these rules after finding that they were imposed on criminal defendants in violation of their rights under both the United States and California constitutions. For the reasons that follow, we affirm the preliminary injunction in part and vacate in part, and remand for further proceedings.

## I.   BACKGROUND

The nature of this suit changed in response to the proceedings in the district court. As a result, we have two separate classes of plaintiffs, one class subject to the original program challenged in the complaint. The second class challenges the rules revised by SFSO during the proceedings below. We will refer to the two programs as "the original rules" and "the revised rules."

A. *Pretrial Release and Pretrial Electronic Monitoring*

    1.  The original rules

After a criminal defendant is booked into a San Francisco jail, the San Francisco Pretrial Diversion Project[1] performs a "public safety assessment." The written assessment includes a recommendation as to whether the defendant should be released pending trial, and if so, under what level of supervision. Then, a Superior Court judge considers the assessment at a hearing and makes a release determination based on the assessment and other information. After making individualized findings, the judge can order pretrial release and impose conditions, including submitting to warrantless drug testing, warrantless searches, or participation in various programs, such as anger management. One program available to Superior Court judges is the Pre-Trial Electronic Monitoring program ("PTEM"), which is governed by Program Rules established by SFSO.

As alleged in the original complaint, Superior Court judges regularly ordered defendants to be released under PTEM at a hearing without discussing the Program Rules with defendants and without making "any individualized determination concerning the reasonableness of any conditions imposed by the Sheriff's . . . Program Rules as applied to the individual at bar." If a Superior Court judge ordered a defendant released subject to participation in PTEM, the judge issued a standard form order. The standard order required defendants subject to PTEM to "obey all

---

[1] The San Francisco Pretrial Diversion Project is a non-profit organization that contracts with SFSO to operate certain programs for pretrial defendants. *See* https://sfpretrial.org/our-history/.

orders given by any [SFSO] employee(s) or contract service provider(s) and live within 50 driving miles of the Sheriff's [PTEM] office."

Defendants released on PTEM are transported to the Sheriff's Community Programs building where they are enrolled in the program and outfitted with an ankle monitor provided by Sentinel Offender Services, LLC ("Sentinel"), a private contractor with SFSO. According to the complaint, only at Sentinel's office, without counsel present, were enrollees first informed of SFSO's Program Rules that conditioned their enrollment. Defendants were asked to initial, sign, and date the Program Rules; failure to do so meant defendants would be returned to jail.

Plaintiffs challenge the constitutionality of Program Rules 5 and 11.[2] Rule 5 is a "four-way search condition," requiring the enrollees to "submit to a warrantless search of their person, vehicle, property and home by any peace officer at any time." Rule 11 requires enrollees to agree "that [GPS] tracking data may be shared with other criminal justice partners." Rule 11 allows SFSO to share participants' location data without a warrant upon the request of any other law enforcement agency. Plaintiffs also challenge SFSO's retention of PTEM participant location data.

2. The revised rules

In May 2023, approximately seven months after the complaint was filed, SFSO Undersheriff Katherine Johnson notified the district court that the procedures for ordering PTEM had changed. Johnson advised the court that she had

---

[2] Program Rule 11 was originally Rule 13 and was renumbered during the litigation below. For consistency, we refer to it as Rule 11 throughout this opinion.

conferred with the Presiding Judge and Assistant Presiding Judge from the Superior Court in San Francisco, and the Superior Court agreed to use a revised template order and admonition that would be read in court to defendants being released subject to PTEM participation. Johnson stated that the "revisions make explicit that as part of a defendant's waiver of their Fourth Amendment rights the Superior Court has imposed a warrantless search condition on persons placed on PTEM." Johnson advised the district court that "[t]he Superior Court authorized SFSO to share the information about its plans with the District Court for the Northern District of California." The Superior Court provided a revised Order and admonishment to SFSO and implemented the revised procedures around May 8, 2023.

Under the revised rules, when ordering PTEM, the Superior Court reads an admonishment during defendants' pretrial release hearing, with counsel present. It states in pertinent part:

> To participate in [PTEM], you must give up certain rights and you must agree to the following conditions:
>
> • Your person, residence, automobile, and any property under your custody or control can be searched by any [SFSO] peace officer . . . with or without a warrant, with or without your consent, and with or without reasonable suspicion or probable cause. . . .
>
> • Your movements while on [PT]EM will be continuously tracked and

> recorded, and that information will be preserved and maintained. . . .
>
> - Your GPS location dat[a] can be shared with law enforcement agencies for criminal investigations during the pendency of the case and until the case is fully adjudicated
>
> Do you understand the admonishment I have just read to you?  Have you had the opportunity to consult with your attorney about these conditions? Do you agree to these conditions?

Potential enrollees then review an updated form entitled, "Pre-Sentenced Defendant Electronic Monitoring – Court Order."[3]  The form includes a line for the defendant's signature, below which it says, "By signing here, the defendant agrees to enroll in [PTEM], follow the program rules, and have their movement tracked and recorded by the SFSO."  It also includes the four-way search condition (Rule 5) in bold text.  Like the prior order form, it states that a "defendant on electronic monitoring shall obey all orders and rules given by any SFSO employee(s) or contract service provider(s) and reside within 50 driving miles of the Sheriff's Electronic Monitoring office."  Additionally, SFSO updated the Program Rules, which are provided to defendants once they enroll in the PTEM program.  Rule 5 now reads:

> Full search ordered by the court by any peace officer.  The defendant shall submit to a

---

[3] This form is attached below as an Appendix.

> warrantless search of their (sic) person,
> vehicle, property and home by any peace
> office at any time.
> **OR**
> Defendant shall submit to a search of their
> (sic) person, vehicle, property and home at
> any time by San Francisco Sheriff sworn staff
> or any peace officer acting on behalf of and
> with the express permission of San Francisco
> Sheriff sworn staff.

Rule 11 now reads: "The participant acknowledges that tracking data may be shared with other criminal justice partners." The Program Rules require enrollees to initial the pertinent rules and sign and date the form in the presence of an SFSO employee.

B. *Procedural History*

Plaintiffs—three criminal defendants in San Francisco[4]—brought this suit under 42 U.S.C. § 1983 and various provisions of the California Constitution. They allege that the Program Rules violate their right to be free from unreasonable searches and seizures under the Fourth Amendment of the U.S. Constitution and Article I, section 1 of the California Constitution ("Fourth Amendment claim"); right to privacy under Article I, section I of the California Constitution; and right to due process under the Fourteenth Amendment of the U.S. Constitution and Article I, section 7 of the California Constitution. Further, they allege that the

---

[4] Plaintiffs brought this suit on behalf of themselves and a putative class of similarly situated individuals. Two other plaintiffs, who were San Francisco taxpayers but not criminal defendants, saw their claims remanded to state court.

Rules violate the separation of powers under Article III, section 3 of the California Constitution.  Relevant here, Plaintiffs sought to enjoin the Sheriff from imposing or enforcing both the four-way search (Rule 5) and location sharing (Rule 11) conditions, and to require the Sheriff to expunge participants' location data "as soon as their criminal case concludes."

The district court found that Plaintiffs were likely to succeed on their separation-of-powers, Fourth Amendment, and right-to-privacy claims, and enjoined the enforcement of the challenged Program Rules.[5]  When ordering the injunction, the district court divided Plaintiffs into two classes.  First, the court identified an "original rules subclass," those enrolled in the program under the original rules and, second, a "revised rules subclass," those enrolled in the program after the May 2023 updates went into effect.[6] The original rules subclass has dwindled as defendants ordered on PTEM under the prior procedure are released, adjudicated, or admonished under the revised rules.[7] As to the original rules class, the district court enjoined imposition and enforcement of the four-way search condition and the location sharing provision.  As to the revised rules subclass, the district court enjoined imposition or enforcement of the location sharing provision and restricted the Sheriff from enforcing any search condition broader than the one ordered by the Superior Court under the revised procedures.  *Simon*

---

[5] The district court declined to require SFSO to expunge data collected through PTEM.

[6] The district court granted Plaintiffs' motion for class certification as well.  That is not at issue on appeal.

[7] At the time of oral argument, the original rules class had just four members.

*v. City and County of San Francisco* (*Simon I*), No. 22-cv-5541, 2024 WL 590360, at *24 (N.D. Cal. Feb. 13, 2024). In the *Simon I* appeal (Case No. 24-1025), the Sheriff seeks review only of the portion of the injunction prohibiting imposition and enforcement of the location sharing provision.

After we held oral argument in No. 24-1025, the district court, on September 26, 2024, granted Plaintiffs' motion to enforce the preliminary injunction as to the four-way search condition, which was not at issue in the original appeal. *See Simon v. City and County of San Francisco* (*Simon II*), No. 22-cv-5541, 2024 WL 4314207 (N.D. Cal. Sept. 26, 2024). In *Simon II*, the district court found that the Sheriff "continued to impose the warrantless search condition as a blanket rule even when a judge has determined that condition to be unnecessary in a particular case." The court put the Sheriff "on clear notice that the actions described in this order violate the preliminary injunction" and kept open the possibility of contempt proceedings if violations continued.

The Sheriff appealed *Simon II* and filed a motion to stay, opening a new appeal, No. 24-6052. Plaintiffs filed a motion to dismiss the second appeal. Since the cases and issues are closely related to the first appeal, we will decide the second appeal's pending motions here, and we grant the Sheriff's motion to stay and deny Plaintiffs' motion to dismiss.

## II.    JURISDICTION AND STANDARD OF REVIEW

### A. *Jurisdiction*

The district court concluded that Plaintiffs have standing to bring this suit, and that it remains a live controversy. On appeal, the Sheriff does not challenge these conclusions. We

note that, in light of the changes in the PTEM program, there are two different classes. But even if the original Plaintiffs are no longer enrolled in PTEM, that fact "does not deprive [the court] of jurisdiction" if their claims are "transitory enough to elude review." *Nielsen v. Preap*, 586 U.S. 392, 403 (2019) (citation omitted).

Although the Sheriff does not challenge our jurisdiction under Article III, the Sheriff argues that this case is improperly brought as a civil action in federal court: the Sheriff contends that Plaintiffs should have challenged the PTEM Program Rules in their underlying criminal cases and that *O'Shea v. Littleton*, 414 U.S. 488 (1974), requires us to abstain from hearing this matter. We disagree with the Sheriff. *O'Shea* stands for the proposition that federal courts "should be very reluctant to grant relief that would entail heavy federal interference in such sensitive state activities as administration of the judicial system." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 789–90 (9th Cir. 2014). "*O'Shea* compels abstention where the plaintiff seeks an ongoing federal audit of the state judiciary, whether in criminal proceedings or in other respects." *Id.* at 790 (internal quotation marks and citations omitted).

The district court concluded that "the issues raised [here] are distinct from the underlying criminal prosecution and would not interfere with it." *Arevalo v. Hennessy*, 882 F.3d 763, 766 (9th Cir. 2018). We agree. "*O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice, but is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment." *Courthouse News Serv.*, 750 F.3d at 790. We do not believe that the results of this proceeding will impact the

prosecution of Plaintiffs' state criminal cases, nor will they require an "ongoing federal audit" of the Superior Court.

Finally, the Sheriff also suggests that Plaintiffs should have brought a petition for habeas corpus instead of this § 1983 civil action.  But this too is incorrect.  Plaintiffs are not challenging the "fact or duration" of their confinement which is the "heart of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973).  Instead, they challenge the conditions of their pretrial release, and a § 1983 claim is the "proper remedy for a state prisoner who is making a constitutional challenge" to these conditions.  *Id.* at 499.

We have jurisdiction over both cases under 28 U.S.C. § 1292(a)(1).[8]

B.  *Standard of Review*

The standards for our review of a preliminary injunction are well established.  "We review a district court's decision to grant a preliminary injunction for abuse of discretion." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 491 (9th Cir. 2023) (internal citation omitted).  "An abuse of discretion will be found if the district court based its decision on an erroneous legal standard or clearly erroneous finding of fact." *Id.* (internal quotation marks and citation omitted). "We review conclusions of law de novo and findings of fact for clear error . . . ." *Id.*

The Sheriff argues that the preliminary injunction entered by the district court in Case No. 24-1025 should be

---

[8] Plaintiffs object to our jurisdiction over the Sheriff's appeal of the order in Case No. 24-6052 granting Plaintiff's motion to enforce the preliminary injunction.  Because the jurisdictional question is closely related to the merits of the appeal in Case No. 24-6052, we will address that issue in Part IV.

subjected to enhanced scrutiny because (1) it is a mandatory rather than a prohibitory injunction, (2) it is an injunction against a state or local agency and not a federal one, and (3) it has been entered in a facial challenge rather than an as-applied challenge.  These arguments, raised in the standard of review section of the Sheriff's briefing, are not persuasive.  First, because the injunction "prevents future constitutional violations," it is a "classic form of prohibitory injunction." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017).  Second, although the Sheriff is correct to the extent that an injunction against "an agency of state government must always be narrowly tailored to enforce federal constitutional and statutory law only" and that we "scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law," this does not alter the standard of review here, since we "will defer to the district court so long as any injunctive relief it provides remains within these parameters." *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995).  Last, the Sheriff is correct that this is a facial challenge, and Federal Rule of Civil Procedure 23(b)(2) requires "that final injunctive relief . . . [be] appropriate respecting the class as a whole[.]" But, as Plaintiffs note, this argument is raised briefly only in the standard of review section, and the Sheriff does not elsewhere argue how this requirement would change the analysis.

## III.   ANALYSIS IN NO. 24-1025

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations omitted). "Likelihood of success on the merits is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020) (citation omitted).

Plaintiffs' litigation strategy impacts the likelihood of success inquiry. Plaintiffs challenge SFSO's PTEM Program (really, its Program Rules) on its face. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). This is the "most difficult challenge to mount successfully, because it requires a [plaintiff] 'establish that no set of circumstances exists under which the [policy] would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In other words, "Plaintiffs must show . . . that the [policy] is unconstitutional in every conceivable application . . . ." *Wolford v. Lopez*, 116 F.4th 959, 984 (9th Cir. 2024) (quotations and citations omitted). Therefore, we consider whether Plaintiffs are likely to show that the challenged Program Rules are unconstitutional in "every conceivable application." *Id.*

The district court held that Plaintiffs would likely succeed on the merits on three independent bases: (1) California separation-of-powers claim, (2) Fourth Amendment claim, and (3) California right-to-privacy claim. The district court's preliminary injunction relied on two key conclusions. First, the district court found that the Sheriff created PTEM's Program Rules and concluded that, by insisting that Program Rules be followed, the Sheriff

usurped the judiciary's power to determine and impose release conditions, in violation of California's separation of powers. The district court's second conclusion followed from the first. Because the Sheriff "impermissibly imposed its own intrusive conditions of release," it "disabled" the Superior Court from making an individualized determination as to which conditions of release were appropriate for a particular defendant. This meant that the Plaintiffs' Fourth Amendment and right-to-privacy claims would likely succeed. We will first consider each of these conclusions as to the revised rules subclass only—those released on PTEM after May 2023, following updates to the program. A short analysis as to the original rules subclass will follow.

A.  *Separation of Powers*

The California Constitution provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." Cal. Const. art. III, § 3. The California Constitution confers each branch's powers in separate articles. Article VI of the California Constitution vests "[t]he judicial power . . . in the Supreme Court, courts of appeal, and superior courts . . . ." Cal. Const. art. VI, § 1. The legislative and executive branches' powers are vested in Articles IV and V. *See* Cal. Const. art. IV (legislative) & V (executive).

California's "separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch." *Carmel Valley Fire Prot. Dist. v. State*, 20 P.3d 533, 538 (Cal. 2001) (citations omitted). Reflecting the structure of

our own federal system, one branch of California government may not "'accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch.'" *Kasler v. Lockyer*, 2 P.3d 581, 594 (Cal. 2000) (quoting *Mistretta v. United States*, 488 U.S. 361, 382 (1989)) (internal quotation marks and citations omitted).

Separateness is not the enemy of functionality, and the doctrine is broad enough to "recognize[] that the three branches of government are interdependent and it permits actions of one branch that may 'significantly affect those of another branch.'" *Carmel Valley*, 20 P.3d at 538 (quoting *Super. Ct. v. City of Mendocino*, 913 P.2d 1046, 1051 (Cal. 1996)). "The purpose of the doctrine is to prevent one branch of government from exercising the *complete* power constitutionally vested in another []; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch." *Younger v. Super. Ct.*, 577 P.2d 1014, 1024 (Cal. 1978) (emphasis added). California's separation of powers thus recognizes "the existence of common boundaries between the legislative, judicial, and executive zones of power . . . ." *In re Att'y Discipline Sys.*, 967 P.2d 49, 56 (Cal. 1998); *see Marine Forests Soc'y v. Cal. Coastal Comm'n*, 113 P.3d 1062, 1073 (Cal. 2005) (referring to the "substantial interrelatedness" of the branches).

The district court framed the issue as "whether the Sheriff may validly create and impose the Program Rules . . . or whether imposing conditions of pretrial release is a fundamentally judicial function under California law." In the district court's analysis, "the Program Rules do not

represent the practical implementation of enforcement of conditions that the court *itself* ordered as conditions of pretrial release." It is the Sheriff who "creates the Program Rules 'from whole cloth,'" not the Superior Court. As a result, "the Sheriff [has] impermissibly impos[ed] its own intrusive conditions of release upon [criminal defendants] on a blanket basis" and in so doing "exercise[d] an impermissible degree of control over the judicial function of setting conditions of pretrial release."

We will begin with a discussion of the PTEM process. First, we will discuss PTEM as a whole. Second, we will discuss the court order form judges use when ordering PTEM. Last, we will discuss whether the process judges use to order PTEM complies with California's written order requirement.

    1.  PTEM process

*The pretrial release process.* Let us start with some first principles. Once a person has been arrested, the decision to charge the arrestee belongs to the prosecutor; the power to charge involves purely prosecutorial functions. *See Manduley v. Super. Ct.*, 41 P.3d 3, 13 (Cal. 2002). Once the arrestee has been charged, however, the defendant is subject to the jurisdiction of the California courts. *Id.* Article I, § 12 of the California Constitution provides that, subject to certain exceptions, a "person shall be released on bail by sufficient sureties . . . ." The same section provides that a "person may be released on his or her own recognizance in the court's discretion." Cal. Const. art. I, § 12; *see People v. Standish*, 135 P.3d 32, 40–42 (Cal. 2006). The California Supreme Court has stated that, in light of this provision, a "defendant charged with a bailable offense who seeks pretrial release from custody typically has two options: post

bail and obtain release, or seek the privilege of OR ["own recognizance"] release." *In re York*, 892 P.2d 804, 807 (Cal. 1995). These are "alternative and complementary systems." *Van Atta v. Scott*, 613 P.2d 210, 226 (Cal. 1980). Section 1318 of the California Penal Code implements Article I, § 12 of the California Constitution, and provides in relevant part:

> (a) The defendant shall not be released from custody under an own recognizance until the defendant files with the clerk of the court or other person authorized to accept bail a signed release agreement which includes:
>> (1) The defendant's promise to appear at all times and places, as ordered by the court or magistrate . . . .
>> (2) The defendant's promise to obey all reasonable conditions imposed by the court or magistrate.
>> . . . .
>> (5) The acknowledgement of the defendant that he or she has been informed of the consequences and penalties applicable to violation of the conditions of release.

Cal. Penal Code § 1318(a)(1)–(2), (5). Section 1318 "does not govern a magistrate's exercise of discretion *whether to grant* or release"; "[r]ather, section 1318 prescribes the *terms* of the defendant's OR agreement." *Standish*, 135 P.3d at 39. Under the current procedures in San Francisco Superior Court, the Pretrial Diversion Program assesses whether the defendant can be released on his own recognizance pending trial and makes a recommendation to the Superior Court. *See* Cal. Penal Code § 1318.1. The court

then decides whether to grant OR release and specifies the conditions. SFSO is then responsible for supervising the conditions.

*Application to PTEM.* The question presented here is whether the Sheriff's design of PTEM encroaches on the Superior Court's responsibility to set the "reasonable conditions" for a defendant's release. *Id.* § 1318(a)(2). In theory, this encroachment could occur in one of two ways. First, the Superior Court might abandon its responsibility to specify the conditions by assigning or abdicating that core judicial responsibility to the Sheriff. For example, an order that directed the defendant to do whatever the Sheriff determines is a "reasonable condition" would be impermissibly vague and, thus, an improper delegation of the judiciary's authority to the executive branch. A court may not confer "complete discretion over a significant aspect of the court's legal control [over the defendant]." *In re D.N.*, 520 P.3d 1167, 1172 (Cal. 2022); *see People v. Smith*, 295 Cal. Rptr. 3d 182, 186 (Cal. Ct. App. 2022) ("By leaving key determinations to be decided ad hoc, a vague probation condition may also result in an impermissible delegation of authority to the probation officer." (internal citation omitted)). Second, the separation-of-powers principle would be violated if the Sheriff simply arrogated for himself the terms and conditions of the defendant's release, in derogation of the conditions set forth by the court. *See People v. Bunn*, 37 P.3d 380, 390 (Cal. 2002) ("The [California] Constitution thereby seeks to avoid . . . the overreaching by one branch against others." (internal quotations and citations omitted)); *Carmel Valley*, 20 P.3d at 538 ("The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch." (internal

citations omitted)).  In the first situation, the court has ceded its power to the Sheriff; in the second, the Sheriff has seized the judiciary's power.

In some respects, our characterization of the "poles" disguises the real issue:  whether there is an *exclusive* judicial power at issue in this case.  Our definition of "exclusive" requires some careful dissection of the term "reasonable conditions," which we conduct below.  It is sufficient for us to observe, however, that the Superior Court is indeed charged with determining the "reasonable conditions" for OR release.  And we acknowledge that the determination under § 1318 is an inherent, core judicial power under the California Constitution. *See Standish*, 135 P.3d at 41 (noting that the language in Article I, § 12 codified "a well-established practice of releasing persons accused of crimes on their own recognizance" (internal quotations and citations omitted)).  But to state the principle is not to decide this case, because the power to set the reasonable conditions of release is not the same as determining every aspect of their administration.  The California Supreme Court has stated that even "aspects of inherent judicial power may be affected by legislative enactment" without violating the separation of powers. *Id.* at 45.  Thus, "a constitutional grant of *general* authority to the courts" does not impair the ability of the other branches "to place reasonable limits upon a court's exercise of discretion in certain instances." *Id.*  It is only impaired where a branch's exercise of its own power "would defeat or materially impair the courts' exercise of judicial power . . . to grant or deny OR release under specified circumstances." *Id.*

We think that the current state of affairs in San Francisco lies somewhere between the two poles we have described. The Sheriff has designed a program (PTEM) for managing

defendants released pursuant to court order. SFSO has offered PTEM as one tool available to the Superior Court. For its part, the Superior Court decides whether a defendant may be released on OR and specifies the conditions for the defendant's release. The court decides whether PTEM is one of these reasonable conditions of release. Nothing in the design or administration of PTEM requires the Superior Court to offer it as a package of release conditions. This is generally consistent with the scheme of separated powers. "[I]t is the court's duty to determine the nature of the requirements imposed on the [releasee]," but the Sheriff can "properly specify the details necessary to effectuate the court's [release] conditions . . . ." *Smith*, 295 Cal. Rptr. 3d at 186. So long as the court has not abdicated its responsibility by issuing an "open-ended" order, "[t]he court may leave to the discretion of the probation officer the specification of the many details that invariably and are necessary to implement the terms of [release]." *People v. O'Neil*, 81 Cal. Rptr. 3d 878, 883 (Cal. Ct. App. 2008); *cf. United States v. Stephens*, 424 F.3d 876, 880 (9th Cir. 2005) (noting in the federal separation-of-powers context that the "law has, by and large, developed along the principle that, where the court makes the determination of *whether* a defendant must abide by a condition, and *how* . . . a defendant will be subjected to the condition, it is permissible to delegate to the probation officer the details of where and when the condition will be satisfied").

Some Superior Court judges object to certain PTEM Program Rules, but feel that they have no alternative. In particular, judges have objected to the two conditions challenged here: warrantless searches and location sharing. For some judges, PTEM would be an attractive condition of OR release if not for these two Rules. As the dissent has

characterized the problem, "from the Superior Court's point of view, judges' hands are tied"; it is PTEM or nothing. *See* Dissenting Op. at 79. From this perspective, our dissenting colleague, like the district court, concludes PTEM is the Sheriff's doing, and because "the Sheriff requires" certain conditions that go "beyond mere incidentals," *id.* at 80, he is "executing power delegated to him from the court," *id.* at 79.

We understand the concerns, but we think that this analysis misconceives the roles into which PTEM has cast the judicial and executive branches. PTEM is nothing more than an offer from SFSO. Nothing in PTEM limits the judicial authority of the Superior Court to order a "person . . . released on his or her own recognizance in the court's discretion," Cal. Const. art. I, § 12, subject to "reasonable conditions imposed by the court," Cal. Penal Code § 1318(a)(2). The court remains free to order whatever conditions it thinks appropriate. Once the court issues OR release with conditions, the court's work is complete. It is then up to the Sheriff to enforce the conditions of release, consistent with his other responsibilities. The Sheriff, however, is not a party to the order; that is, the Superior Court has no power to compel SFSO to enforce the terms of the order. We will be careful here: SFSO cannot get overzealous—it has no power to add to the terms imposed by the court. Any such *over-enforcement* of the conditions pronounced by the Superior Court would be usurpation by the executive branch; the executive can only enforce what the judiciary orders. But what happens if SFSO decides that it cannot enforce the terms as ordered and thus *under-enforces* the terms? Nothing in California law suggests that the court can compel the actions of the Sheriff.

It is easy to imagine a set of individualized conditions that, if enforced, would impose extraordinary costs on

SFSO.  Suppose the Superior Court imposed as a condition of release that the defendant be accompanied at all times by an SFSO officer.  The provision might well go unenforced because to comply SFSO would have to re-order its law enforcement priorities to divert officers from their regular duties to in-person monitoring.  And if SFSO decided that it could not divert its officers to such monitoring, then the court would be faced with the reality that either the defendant was effectively released without an enforceable condition, or it must decide that the condition has failed and order the defendant back to custody.  Neither of those seems to be a good option.  And the court would have no power to order SFSO to accompany such defendants without overstepping its own separation-of-powers boundaries since courts would likely have to supervise SFSO's resources or direct the legislature (a questionable proposition) to fund SFSO to accommodate its orders.

PTEM presents a standardized program that, from the Sheriff's perspective, helps promote efficiency and even-handed enforcement for pretrial releasees.  The alternative to a PTEM-like program—one in which each judge of the Superior Court designed his or her own ideal program—would promise chaos in the form of under- and over-enforcement.  Take a standard condition in Superior Court orders:  that a defendant not travel more than 50 miles from SFSO's PTEM Office.  So far as we can tell, that rule has emerged organically; it has not been specified by statute, but seems to be a generally agreed-upon term.  If the legislature has not specified the 50-mile rule, there is nothing magical about the condition.  In any particular case, the Superior Court could impose its own "reasonable" limit—say 25 miles.  Or it could impose a 75-mile limit.  By doing so, however, the court would impose additional costs on SFSO,

which has long enforced a 50-mile condition. That may result in over-enforcement of one condition (the 75-mile condition), which SFSO may not do and the defendant would have every right to protest, and under-enforcement of the other (the 25-mile condition). By standardizing the conditions of release, the courts and SFSO have worked to a reasonable accommodation.

Take a second example. One program in the array of conditions the courts can impose is anger management. We see no separation-of-powers objection to releasing a defendant subject to the condition that he enroll in an anger management program administered by the Sheriff. We do not think that Article III, § 3 of the California Constitution, and § 1318(a) of the California Penal Code require the Superior Court to micromanage the details of the program— such as deciding which medical or therapeutic group will get the contract, ordering the number of sessions per week, determining where the sessions will be conducted, and deciding whether the counselors must possess PhDs in psychology or whether licensed MFTs will do. We need not decide whether such micromanagement by the judiciary would violate the separation of powers; we need conclude here only that it would not violate California's principles to entrust the Sheriff to contract for and administer an anger management program to which the Superior Court, following an individualized assessment of the defendant's needs, could assign defendants who are released. If the court has not *abdicated* a duty to design the program in detail, we do not think the Sheriff who designed such a program and offered the program as an option for the Superior Court would have *usurped* a power committed to the judiciary by doing so. *See Stephens*, 424 F.3d at 880.

Let's consider the parade-of-horribles suggested by the dissent. What if SFSO included a body-cavity search as one of the standard conditions of participating in PTEM? *See* Dissenting Op. at 78.    Assuming for purposes of this example that such a condition would not independently violate the Fourth Amendment or California privacy guarantees, would such a condition violate separation-of-power principles? We cannot identify a separation-of-power principle that would forbid it.  Because it is an especially onerous provision, we can understand that Superior Court judges might refuse to order PTEM.  What happens then? They might order PTEM without the condition (a kind of "PTEM-Lite"), but it would then fall to SFSO to decide whether to provide it.  If SFSO refused, the court has several options—it can order PTEM in full (for this example, with the cavity search), order other conditions, allow release on OR without conditions, or deny OR outright and send the defendant to jail.  But the court does not get to tell the Sheriff how to use his resources, that would be judicial aggrandizement.  And again, SFSO, for its part, could not conduct body cavity searches if the Superior Court ordered PTEM Lite; that would be executive aggrandizement.

At best, this is a delicate dance between the judiciary a the executive.  Maybe more of a game of chicken.  There are risks here to defendants, to public safety, and to the reputation of both the court and Sheriff.  One of the challenges in the division of authority between the Superior Court and SFSO is that there is no formal mechanism in California law for the two branches to negotiate to common ground—there doesn't appear to be any opportunity for each branch to explain its perspective.  As a result, PTEM and other conditions have emerged organically.  This suit is an effort to have the federal courts arbitrate the differences

between the two branches. In some respects that effort has already been very successful, as SFSO backed down from the original PTEM Program and created a scheme in which defendants are advised early on as to what PTEM requires and asked if they will consent to participating in the Program.[9]

The Sheriff's Office has designed a program, complete with a set of clear, mandatory rules that it believes it can reasonably administer. The Sheriff therefore has some control over the set-up and administration of the PTEM program, but no control over whether the courts will actually order any defendants to participate as a condition of release. The Sheriff has not "unilateral[ly] impos[ed]" any condition of release. Dissenting Op. at 63. The Sheriff can enforce only conditions imposed by the Superior Court. For their part, the courts have full control over the individualized determination to release or not release a defendant, specifying which programs to offer, and the conditions the defendant will be subject to while on release; but short of concluding that any particular program violates individual rights provisions of the U.S. or California constitutions (a question to which we will turn in the next section), the courts must accept that SFSO will have its own view of the on-the-ground realities of the programs it is willing or able to supervise. *See O'Neil*, 81 Cal. Rptr 3d at 881 (noting that a

---

[9] The one institution that can mediate these differences directly is the California legislature. Just as it imposed general conditions of release in § 1318, it seems likely that the legislature could, for example, authorize PTEM as condition, or forbid PTEM as a condition, or create some intermedial program. By doing so, the legislature would regulate terms that could or could not be offered, but it would not encroach the "magistrate's exercise of discretion *whether to grant* OR release." *Standish*, 135 P.3d at 39.

probation condition must be consistent with both statutory and constitutional considerations).[10] The fact that there is no formal, statutory, or constitutional mechanism authorizing representatives of the executive (SFSO) and judicial (Superior Court) branches to discuss administration of a program in which both have a stake does not mean coordination between the two branches violates separation-of-powers principles.

*Interbranch coordination.* After this suit was filed, SFSO and the Superior Court met to discuss the contours of the PTEM program. In particular, the Sheriff and Superior Court discussed the revisions to the Court Order form and admonishment. SFSO advises that it "frequently discusses" the PTEM Program with the Superior Court and those "discussions include periodic revisions to orders, rules, and forms used in the PTEM Program." We see nothing inappropriate in these kinds of meet-and-confer sessions. It was a matter of mutual concern in which both sides brought their own perspective to the table. SFSO disclosed the fact of the meeting to the district court and represented that Superior Court judges had authorized SFSO to indicate the Court's willingness to change its own procedures. [11]

---

[10] As one SFSO Lieutenant explained in his declaration, because PTEM participants leave San Francisco proper, "SFSO relies on other peace officers to assist in its supervision duties" for those on PTEM and "SFSO cannot effectively monitor PTEM participants . . . if officers must develop probable cause to do so." He put it bluntly—"defendants can opt for no PTEM and stay in jail or . . . abide by the rules set forth by the courts and SFSO while being monitored."

[11] The dissent disparages the declarations SFSO submitted to the district court as "self-serving." Dissenting Op. at 64; *see id.* at 59 ("buying wholesale the Sheriff's varnished story"); *id.* at 68 (referring to "the Sheriff's rosy and self-serving explanation"). The dissent then accuses

the majority of finding our own facts. *Id.* at 59–60, 64–69. We are puzzled by the dissent's strong rhetoric and untethered accusations. With one possible exception, which we discuss below, we have readily accepted the district court's findings. Our differences with the district court are over the legal implication of those facts, not the facts themselves.

We are baffled by the dissent's cavalier dismissal of SFSO's declarations for two reasons. First, these are not self-serving declarations—at least not in the way in which we have typically used that term, which is to describe declarations that may be disregarded at summary judgment because they set forth conclusions of law rather than facts. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015). Of course the declarations are self-serving, "[a]nd properly so, because otherwise there would be no point in [SFSO] submitting [them]." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). At this stage of the proceedings, a declaration's self-serving nature goes to its credibility, not its admissibility. *Id.* That brings us to our second, and more important, point: the district court not only accepted the filing of the declarations, it credited them and discussed them at length. The district court disagreed with SFSO as to the *legal* implications of the declarations, not their truthfulness for purposes of deciding the petition for an injunction. It is the dissent's own language—"the Sheriff's varnished story," Dissenting Op. at 59, "self-serving declarations," *id.* at 62, and "rosy . . . explanation," *id.* at 68—that betrays its refusal to credit what the district court accepted. So while the dissent accuses us of "turn[ing our] head away from . . . key evidence . . . with such force that it might produce whiplash," *id.* at 62, it is the dissent that has made its own judgment on the facts. And that is inconsistent with how we proceed on a facial challenge, which requires us to see if *any* "set of circumstances exists under which [PTEM] would be valid." *Salerno*, 481 U.S. at 745.

If anyone is finding facts, it is the dissent when it says that "[w]hether the Superior Court is effectively disabled from making individualized determinations of conditions of release is a fact" and "[w]hether the Sheriff imposes his conditions-on-conditions without the Superior Court first deciding their necessity is a fact." Dissenting Op. at 66. A determination that the Sheriff has disabled Superior Court judges from exercising their power to set conditions of pretrial release or has failed to decide whether such conditions are necessary is a conclusion of law,

Nothing in California's separation of powers doctrine prevents informal coordination between the branches, but instead prevents "one branch of government from exercising the *complete* power constitutionally vested in another . . . ." *Carmel Valley*, 20 P.3d at 539.

We can draw on our own experience in the federal system.[12]  Consider federal sentencing.  A district court, "in imposing a sentence of imprisonment . . . *may* include as part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment . . . ." 18 U.S.C. § 3583(a) (emphasis added).   If a district court decides to do so, Congress has established certain conditions that district courts *must* impose when ordering supervised release.  *See* 18 U.S.C. § 3583(d); *United States v. Montoya*, 82 F.4th 640, 648 (9th Cir. 2023) (en banc) (discussing § 3583(d)).   If supervised release is ordered, the probation officer will "instruct a probationer . . . as to the conditions specified by the sentencing court," "be responsible for the supervision of any probationer," and "keep informed concerning the . . . compliance with any condition of

_____

and the district court decided as much *after* finding certain facts.  *See Simon I*, 2024 WL 590360, at 22 ("Plaintiffs have shown that this arrangement likely has resulted in the Sheriff impermissibly imposing its own intrusive conditions of release . . . on a blanket basis without individualized assessment of their necessity by a neutral decisionmaker. . . . This evidence increases the likelihood that Plaintiffs will be able to show that Defendants exercise an impermissible degree of control over the judicial function of setting conditions of pretrial release.").

[12] California has "looked to federal decisions for assistance in interpreting our state constitutional separation of powers doctrine in instances in which there were no fundamental differences between the relevant constitutional provisions." *Marine Forests Soc'y*, 113 P.3d at 1076–77 (citations omitted).

probation." 18 U.S.C. § 3603. The division of labor is such that the court decides "whether a defendant must abide by a condition, and how . . . a defendant will be subjected to the condition," and then delegates "to the probation officer the details of where and when the condition will be satisfied." *Stephens*, 424 F.3d at 880. Each of these entities exercises some degree of control over the sentencing process.

PTEM works in a similar manner. The Superior Court retains control over *whether* to grant OR and then sets the terms of release as it sees fit. But if the court wants the defendant to participate in the Sheriff's existing program, the Sheriff will *require* enrollees agree to its Program Rules.

As the dissent observed, recent transcripts from the Superior Court show that its judges are aware of the Sheriff's mandatory conditions for PTEM enrollment and some are unhappy with some of the terms. *See* Dissenting Op. at 79–80. The fact that some judges are unhappy with this state of play does not create a separation-of-powers issue because the Superior Court retains discretion over whether to require participation in PTEM in the first place; that the judge might have designed a different kind of program does not diminish the court's power to grant OR and set the terms of release (and again, judges are free to do so). In our view, the Sheriff has simply added PTEM to the already-limited menu of options the Superior Court can order from when determining the least restrictive conditions of pretrial release. *See In re Humphrey*, 482 P.3d 1008, 1015 (Cal. 2021). It provides an alternative when OR release is inappropriate and pretrial detention is unnecessary. PTEM is forced on neither the Superior Court nor defendants, although a failure of the Superior Court to order PTEM as a condition or the failure of a defendant to agree to the PTEM Program Rules could mean the least restrictive condition available to them is

detention.[13]  The Sheriff offers PTEM as a one-size-fits-all alternative to jail that is reasonable for SFSO to administer. *See O'Neil*, 81 Cal. Rptr. 3d at 883 ("There are many understandable considerations of efficiency and practicality that make it reasonable to leave to the probation department the amplification and refinement of a [probation term].").

The dissent does not disagree with our analysis in principle:  "the Superior Court can and should coordinate with the Sheriff's office to assess which conditions of release are practical . . . ."  Dissenting Op. at 75; *see id.* at 76 ("We are fortunate that judges consider the realities of what their jurisdictions can provide . . . ."); *id.* ("I agree that the Sheriff requires some autonomy . . . .").  But the dissent then adds that "[s]o long as the arrangement amounts to the Sheriff adding to the Superior Court's 'already-limited menu of

---

[13] For example, in one hearing, defendant's counsel asked for own-recognizance release.  The Superior Court refused to order that because the defendant had violated a prior court order and therefore required heightened supervision, namely location tracking.  The Court offered PTEM because it accomplished both objectives—the defendant would avoid jail and be tracked.  Although the court would have rather not imposed the also-required search condition, it acknowledged its options were limited and PTEM was the least restrictive option for release.

The dissent points to another transcript in which a Superior Court judge says, "It's not the Court that's imposing the [four way search condition]. . . . [The Sheriff is] requiring [it]."  Dissenting Op. at 79–80.

Even if we accepted the court's statement at face value—which, for the reasons we have explained above, we do not—by relying on this transcript as its evidence that the Sheriff, not the court, is dictating the terms of release, the dissent flips the facial challenge requirements on their head, arguing Plaintiffs should succeed because of one Superior Court judge's comments.  Instead, to succeed on a facial challenge, Plaintiffs (and the dissent) must explain how the "best" transcript for SFSO creates a separation-of-powers problem.  This transcript is not that.

options,'" "the separation of powers is not implicated." Dissenting Op. at 75 (quoting Maj. Op. at 34). Nothing in PTEM legally constrains the choices available to the Superior Court; the Sheriff has indeed added to the menu of options and indicated in advance how SFSO, in an exercise of its discretion and subject to its own programmatic constraints, can best enforce release conditions on a large number of releasees.

### 2. The PTEM form order

In addition to its general separation-of-powers objection to PTEM, the district court and the dissent object to one particular line in the form the court uses to grant OR release. The dissent points to a line in the middle of the form that requires defendants enrolling in PTEM "*obey all orders and rules* given by any SFSO employee(s) or service provider."[14] Dissenting Op. at 67 (emphasis added) (quoting the PTEM form order). From this the district court and dissent contend that the Superior Court has not determined the terms of release because the Sheriff may add such conditions—what the dissent calls "conditions-on-conditions," *Id.* at 60—as the Sheriff thinks proper. For the dissent, this line showcases the "abdication" of responsibility by the Superior Court, *id.* at 75, and "the Sheriff's undue influence over pretrial release conditions," *id.* at 68.

Contrary to the dissent's characterization, the form order is not a blank check for SFSO to craft any rules it pleases. The dissent's reading is inconsistent with the form when read as a whole. The form is quite detailed. Its first line states, "By checking the boxes below, the Court will indicate what supervision the San Francisco Sheriff's Office (SFSO)

---

[14] Again, this form is attached in the Appendix.

will employ . . . ."  Immediately below that, a separate section contains seven boxes for the Superior Court to check to indicate whether the defendant is subject to electronic monitoring, GPS monitoring, alcohol monitoring, or some combination, and whether the defendant is out of custody or subject to bail.  The form then reads:  "Defendant will adhere to the following court-ordered conditions" and lists five more check-the-box conditions, including warrantless search, home detention, curfew, residential treatment program, and an "other conditions" box that has a line for the judge to write additional conditions.  As the dissent notes, it does state, in small text in the middle of the form: "A defendant on electronic monitoring shall obey all orders and rules given by any SFSO employee(s) or contract service providers(s) . . . ."  The bottom of the form requires two signatures—one from the defendant and one from the judge.  Below the defendant's signature is the statement:  "By signing here, the defendant agrees to enroll in the electronic monitoring program, follow the program rules, and have their (sic) movement tracked and recorded by the SFSO." The form is replete with statements that indicate that it is the court that decides the conditions on which the defendant may be released.  Those conditions must be checked by the court, and the signatures at the bottom indicate that the judge has verified that the defendant understands the conditions ordered.[15]

_____

[15] Once a defendant agrees to the conditions of electronic monitoring, he is enrolled at the Sheriff's Office.  At his intake, he is given a list of fourteen Program Rules and six Home Detention/Curfew Considerations, and the defendant is required to initial each of the rules and considerations.  The first Program Rule is similar to the "obey all orders and rules" language to which the dissent objects.  That Rule states:

Read as a whole, the boxes checked on the court order are not "vague" as the dissent suggests, Dissenting Op. at 73, but finite, enumerated, and agreed to by the criminal defendant.  Given the specificity of the conditions set out by the court, we do not read the "obey all orders and rules" language as an invitation to SFSO to add additional conditions.  We read it as a facilitative phrase for the enumerated conditions imposed by the court (the "orders") and the general rules for PTEM participants (the "rules"). Any "orders and rules" issued by SFSO beyond that must be related to the conditions imposed by the court; they are "the specification of the many details that invariably are necessary to implement the terms of [release]." *O'Neil*, 81 Cal. Rptr. 3d at 883.  The "orders and rules" language is thus not an "open-ended" invitation to make up new terms. *Id.*  If SFSO were to attempt to add additional rules or conditions, then defendants can, and should, lodge their objection in the Superior Court.  The dissent and district court disagree, and for the dissent this is an instance of the majority "find[ing] its own facts."  Dissenting Op. at 64.

This form is really just a contract—it is signed by the offeror (the judge) and the offeree (the defendant) in the presence of counsel—and on appeal we need not accept the district court's conclusion as to what this contract means, since we interpret contractual language de novo. *See Milos Prod. Tanker Corp. v. Valero Mktg. and Supply Co.*, 117 F.4th 1153, 1158 (9th Cir. 2024).  This makes sense because we are as capable as the district court in reading this form and interpreting its effect; we need not rely on any "fact-

---

"The participant shall obey all orders given by any sworn employee or EM employee."

finding" to conclude that the PTEM enrollment form is not a blank check for SFSO to order conditions as it pleases.

If this was not sufficient, our judgment is also once again informed by Plaintiffs decision to challenge PTEM on its face, not as-applied to a particular criminal defendant. If Plaintiffs had come forward with an example of the Sheriff imposing new substantive terms of release following a defendant's PTEM enrollment, they would have grounds for an as-applied challenge *as to that defendant*. Because this is a facial challenge, the Plaintiffs must show that the "orders and rules" language is not capable of constitutional construction; in a phrase, they must show that *every* application would be unconstitutional. This they cannot do.[16] There is no reason for us to construe such a general phrase against SFSO when it is consistent with California law to permit executive branch officers to exercise "discretion" to supply the "details" to make the program effective. The California Supreme Court has said in the

---

[16] We remain puzzled as to why the dissent refuses to admit this is a facial challenge, Dissenting Op. at 63–64, especially because Plaintiffs admitted as much at oral argument. *See* Oral Argument at 22:05–22:22 ([Judge Bybee]: "But you're here on a facial challenge . . . . [Plaintiffs' Counsel]: Correct. [Judge Bybee]: So, I think we have got to assume that since this is available and some judges are giving it, I think that in order to maintain a facial challenge you're going to have to argue this on the grounds most favorable to the City. [Plaintiffs' Counsel]: Correct.").

The dissent, avoiding the facial posture, frames this dispute as: "Plaintiffs seek an injunction to prevent the Sheriff from doing things he has no power to do. That is the claim that Plaintiffs must demonstrate a likelihood of success on the merits for, and no more." Dissenting Op. at 64. This is an oversimplification. Given this is a facial challenge, we must add a key requirement—Plaintiffs must show there is no set of circumstances where the Sheriff does not exceed his powers. Plaintiffs have not pointed to a single instance of the Sheriff imposing additional conditions not specified in its Program Rules.

context of separation-of-powers challenge that "condition[s] should be given the meaning that would appear to a reasonable, objective reader." *In re D.N.*, 520 P.3d at 1174 (quotation marks and citation omitted).

### 3. California's written order requirement

We have one final point to address. Plaintiffs argue that because the Sheriff has specified the details of participation in PTEM in its Program Rules, the Superior Court has violated a California requirement that all orders be in writing to have legal effect. *See Little v. Super. Ct.*, 67 Cal. Rptr. 77, 81 (Cal. Ct. App. 1968) ("[W]hen a motion . . . is granted the order applied for must be made and entered in the minutes or in a writing signed by the court and filed."); *see also In re Marriage of Drake*, 62 Cal. Rptr. 2d 466, 486 (Cal. Ct. App. 1997); *Ketscher v. Super. Ct.*, 88 Cal. Rptr. 357, 359 (Cal. Ct. App. 1970). This argument was not developed in the district court and, accordingly, was not a basis for the court's reasoning in support of the preliminary injunction. As such, we may ignore it. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) ("We apply a general rule against entertaining arguments on appeal that were not presented or developed before the district court." (internal quotation marks and citation omitted)).

However, construing the argument as a variation of Plaintiffs' separation-of-powers argument—that by specifying the Program Rules SFSO has usurped the Superior Court's duty to set forth conditions in writing—we find it unavailing. The post-May 2023 procedure for ordering PTEM includes two writings and an admonishment that, taken together, satisfy California's written order requirement. When ordering PTEM, the Superior Court first reads the PTEM admonishment. It explains that enrollees

will have their GPS data recorded, and that it may be shared
with law enforcement agencies.  Then, both the criminal
defendant and Superior Court judge sign a form entitled,
"Pre-Sentenced Defendant Electronic Monitoring – Court
Order."  That form states that "By signing these instructions
and affixing a seal, the Court indicates that the defendant . . .
understands the restrictions ordered and stated by the Court."
It includes a box the judge can check for GPS monitoring,
and below the defendant's signature, the form states that "By
signing here, the defendant agrees to enroll in the electronic
monitoring program, follow the program rules, and have
their movement tracked and recorded by the SFSO."  The
form also states that the defendant "shall obey all orders and
rules given by any SFSO employee(s) or contract service
providers . . . ."  Then, the minute order memorializing the
hearing states that the defendant "is ordered to adhere to the
Court-ordered conditions of Electronic Monitoring" and that
defendants have stated "that they have had an opportunity to
consult with their counsel and that they accept the conditions
set forth on the record."

    Plaintiffs argue these documents are insufficient writings
because they are "completely silent" as to location sharing.
But the effect of the admonishment, Court Order form, and
minute order, "considered as a whole," *W. Greyhound Lines
v. Super. Ct.*, 331 P.2d 793, 795 (Cal. Ct. App. 1958),
"identif[ies] with reasonable certainty the order which is
made," *Cox v. Tyrone Power Enters.*, 121 P.2d 829, 833
(Cal. Ct. App. 1942); *see Roraback v. Roraback*, 101 P.2d
772, 774 (Cal. Ct. App. 1940) ("If the language of the order
be in any degree uncertain, then reference may be had to the
circumstances surrounding, and the courts intention in the
making of the same.  It is apparent from the reading of *the
entire transcript* that the trial court . . . ." (emphasis added)

(citations omitted)).    The location sharing provision is sufficiently ordered by the Superior Court.

* * *

In imposing PTEM—by first admonishing potential participants and then having them sign a Court Order form— the Superior Court exercises a core judicial power. *People v. Cervantes*, 201 Cal. Rptr. 187, 190 (Cal. Ct. App. 1984). That it does so using a program the Sheriff established and administers, and coordinates with the Sheriff in doing so, does not create a separation-of-powers issue because the Superior Court retains the discretion to order the program, or not. *See Carmel Valley*, 20 P.3d at 538–39.  We conclude that Plaintiffs are unlikely to succeed on the merits of this claim.[17]

B.  *Fourth Amendment*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

---

[17] The dissent accuses us of "grievously mishandl[ing] the separation of powers doctrine to dismiss this case before it can begin."  Dissenting Op. at 59–60.  This case is far from dead, and the dissent's suggestion otherwise underscores its confusion on the role of preliminary injunctions and our review of them.  All we decide today is that Plaintiffs do not qualify for the "extraordinary remedy" that is a preliminary injunction.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).    And although we have determined Plaintiffs are "unlikely to succeed on the merits," as to the revised rules subclass, the case is not dismissed.  As we discuss below, the injunction will remain in place as to the original rules subclass, and this case has resulted in changes to the procedure by which Superior Court judges order PTEM.

Const. amend. IV.[18]  The "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (internal quotation marks and citations omitted).  Since "the Fourth Amendment protects people, not places," when an individual "seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause."  *Id.* at 304 (internal citations and quotation marks omitted).  The district court found that Plaintiffs were likely to succeed on the merits on their Fourth Amendment claim because the Superior Court fails to make an individualized determination when determining whether the location sharing provision should be imposed as to a particular defendant.

The initial question, then, is whether GPS location tracking and sharing is a "search" under the Fourth Amendment.  Plaintiffs argue that the location sharing provision is a "serious privacy intrusion," and the Sheriff does not meaningfully dispute this.  In *Carpenter*, the Supreme Court held "that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through" cell-site location

---

[18] Plaintiffs also bring a claim under the California Constitution, but since "the right to be free from unreasonable searches under Article I, Section 13 of the California Constitution parallels the Fourth Amendment inquiry," the federal and state constitutional claims will rise or fall together.  *Sanchez v. County of San Diego*, 464 F.3d 916, 928–29 (9th Cir. 2006) (citations omitted).

information ("CSLI").  *Id.* at 310.[19]  GPS is even more intrusive than CSLI since it constantly monitors someone's location.  Therefore, since *Carpenter* deemed CSLI tracking a search, *id.* at 310, we assume the location sharing condition is a "search" under the Fourth Amendment.

Although searches typically require a warrant supported by probable cause, the parties agree a warrantless search can be deemed "reasonable" under the Fourth Amendment.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) ("As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"); *see also Samson v. California*, 547 U.S. 843, 848 (2006); *United States v. Knights*, 534 U.S. 112, 118–19 (2001).  A defendant released on pretrial bail does not "lose his or her Fourth Amendment right to be free of unreasonable [searches]."  *Cruz v. Kauai County*, 279 F.3d 1064, 1068 (9th Cir. 2002).  We have concluded that searches made pursuant to a condition of probation or pretrial release must meet this Fourth Amendment reasonableness standard.  *See United States v. Scott*, 450

---

[19] The Court described CSLI as follows:

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI).

*Id.* at 300–01.

F.3d 863, 868 (9th Cir. 2006); *United States v. Consuelo-Gonzalez*, 521 F.2d 259, 262 (9th Cir. 1975) (en banc).

In *Scott* we considered whether warrantless searches consented to by a defendant violated the Fourth Amendment. 450 F.3d at 865–75. Following Scott's arrest on drug charges, a Nevada state court conditioned pretrial release on his consent to random warrantless drug testing and warrantless searches of his home for drugs. *Id.* at 865. We found "no evidence that the conditions were the result of findings made after any sort of hearing." *Id.* Instead they "were merely checked off by a judge from a standard list of pretrial release conditions." *Id.* (internal quotation marks omitted). Relying on an informant's tip, which the government conceded did not establish probable cause, officers went to Scott's house and conducted a urine test. *Id.* After Scott tested positive for drugs, officers arrested him, searched his house, and found a shotgun, all without obtaining a warrant. *Id.* A federal grand jury indicted Scott for unlawful possession of the gun, and Scott moved to suppress the gun and his statements, arguing that the officers needed (and lacked) probable cause to justify the warrantless search. *Id.*

We held that the search condition violated Scott's Fourth Amendment rights. We pointed to two facts. First, we found that consent alone did not validate the drug test and searches under the Fourth Amendment because "[p]ervasively imposing an intrusive search regime as the price of pretrial release, just like imposing such a regime outright, can contribute to the downward ratchet of privacy expectations." *Id.* at 867. Consent "is merely a relevant factor in determining how strong [one's] expectation of privacy is and thus may contribute to a finding of reasonableness. *Id.* at 868 (internal citation omitted). Second, we found the search

condition unreasonable because the Nevada court's "assumption that Scott was more likely to commit crimes than other members of the public, without an individualized determination to that effect . . . cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody." *Id.* at 874. Further, the Nevada court imposed the conditions without "any sort of hearing" and instead "merely checked off" the conditions from a "standard list." *Id.* at 865 (internal quotation marks omitted).

*Scott* left the door open to pretrial release conditions that intrude on a defendant's privacy so long as the court makes an "individualized determination" that a defendant is "more likely to commit crimes than other members of the public." *Id.* at 874. Indeed, "if a defendant is to be released subject to bail conditions that will help protect the community from the risk of crimes he might commit while on bail, the conditions must be justified by a showing that defendant poses a heightened risk of misbehaving while on bail." *Id.* But an arrest alone will not establish this "heightened risk of misbehaving." *Id.*

We think our concerns in *Scott* are not present here. Take, for example, lead Plaintiff Joshua Simon's August 2023 Superior Court hearing. The transcript is over 12 pages and discusses whether, accused of strangling his ex-girlfriend, Simon should be released from custody and placed in a mental health diversion program with PTEM. After hearing from both sides, the judge accepted Simon into mental health diversion and ordered PTEM. The judge read the admonishment, and Simon agreed to the terms and signed the Court Order form.

SIMON V. CITY & CNTY. OF SAN FRANCISCO          47

This is not the only transcript that shows an individualized determination being made by the Superior Court. During a March 2024 hearing for another defendant, counsel asked for OR release. The government requested PTEM. The judge took OR release off the table because the defendant had violated a prior court order. The judge emphasized the importance of location monitoring because of the prior violation, leaving PTEM as the way to avoid jail but also heighten supervision. The judge offered PTEM as the least restrictive option for pretrial release after considering the defendant's history and circumstances.

The transcripts show exactly what was missing in *Scott*—an individualized determination by the judge that the "defendant poses a heightened risk of misbehaving while on bail." *Scott*, 450 F.3d at 874. In both cases described above the Superior Court considered the defendants' unique criminal history and circumstances before offering PTEM as an alternative to remaining in jail pending trial. Plaintiffs point to other transcripts which they claim demonstrate the Superior Court's failure to make an individualized determination. But this is a facial challenge, and it is Plaintiffs' burden to "establish that no set of circumstances exist under which the [challenged program] would be valid." *Salerno*, 481 U.S. at 745.

Enrollees' consent, when given at a hearing at which their counsel is present, further reduces the privacy expectations protected by the Fourth Amendment. *See Knights*, 534 U.S. at 113 (finding consent to a search provision as a condition of probation "significantly diminished" Knights's reasonable expectation of privacy); *Scott*, 450 F.3d at 873 ("Scott had a reduced expectation of privacy because he had signed a form that, on its face, explicitly waived the warrant requirement . . . ."); *York*, 892

P.2d at 814 ("Just as a probationer may be required to consent to supervisory restrictions that could not be imposed upon the general public—as a condition precedent to receiving the court's leniency—an individual who is unable to post bail and seeks OR release similarly may be required to consent to this type of restriction in exchange for receiving the leniency of an OR release." (citations and quotations omitted)). [20]    The Superior Court's individualized determination that heightened conditions of supervised release are necessary, coupled with consent, significantly reduces PTEM enrollees' privacy expectations.

The other side of the balancing test is "the degree to which [the condition] is needed for the promotion of legitimate governmental interests." *Scott*, 450 F.3d at 873 (quoting *Knights*, 534 U.S. at 118–19). *Scott* tells us that the "government's interests in surveillance and control as to a pretrial releasee are . . . considerably less than in the case of a probationer," but otherwise says little about this side of the balancing. *Id.* at 874; *see also Knights*, 534 U.S. at 120–21 (because probationers are "more likely than the ordinary citizen to violate the law," the government has a heightened interest in imposing warrantless search conditions on them (internal citation and quotation marks omitted)).

---

[20] Plaintiffs argue that they have not consented to warrantless data sharing because PTEM enrollees "are not adequately advised of the scope of the privacy intrusion." This is unsupported by the record. In the presence of counsel, criminal defendants are told about the location sharing provision when the Superior Court reads the admonishment, they then sign the Court Order form in the presence of counsel, and later, when receiving their actual ankle monitor, initial the Program Rules, one of which says that the "participant acknowledges that tracking data may be shared with other criminal justice partners."

The Sheriff argues that strong governmental interests favor SFSO's ability to track and then share location data with other law enforcement agencies, and points to situations when the warrantless location sharing provision allowed officers to respond to "fast-moving events." Plaintiffs respond that warrantless location sharing is not an "important enough" government interest to justify a privacy intrusion of this magnitude, especially because warrants are usually issued within 5–10 minutes of their request in San Francisco.

Even if San Francisco can issue a warrant in minutes, the location sharing provision helps law enforcement solve crimes quickly both in San Francisco and neighboring jurisdictions within PTEM participants' 50-mile travel radius. Plaintiffs do not dispute that live location sharing helps solve crimes faster. And although this may not be the "least intrusive search practicable," there is a strong government interest in solving crimes and sharing information quickly. *See City of Ontario v. Quon*, 560 U.S. 746, 763 (2010) (internal citations and quotation marks omitted).

We conclude that if the Superior Court orders PTEM following an individualized determination of its reasonableness, a condition that defendants consent to in the presence of counsel, then the order is consistent with the Fourth Amendment. Such a condition furthers the government's interest in solving crimes quickly. Tracking and sharing the location of PTEM enrollees without a warrant is thus reasonable under the totality of the circumstances and therefore permissible under both the Fourth Amendment and the California Constitution. Plaintiffs are unlikely to succeed on those claims.

C. *Right to Privacy*

The California Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1. To make out a claim of invasion of privacy under this provision Plaintiffs must show (1) a legally protected privacy interest, (2) a reasonable expectation of privacy, and (3) a serious invasion of privacy. *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 654–55 (Cal. 1994) (in bank). "These elements do not eliminate the necessity for weighing and balancing the justification for the conduct in question against the intrusion on privacy resulting from the conduct in any case that raises a genuine, nontrivial invasion of a protected privacy interest." *Loder v. City of Glendale*, 927 P.2d 1200, 1230 (Cal. 1997). The "legitimacy or strength of the defendant's justification for the conduct" should also be considered. *Id.* at 1230–31.

The district court found that Plaintiffs were likely to succeed on this claim because pretrial defendants have a legitimate privacy interest in their location data and, that to the extent location data is used for purposes beyond assuring future court appearances and complying with court-ordered conditions of release, an individualized determination is required.

We accept the Plaintiffs' claim that they have a legally cognizable interest in their location and that the intrusion into their privacy is a serious one. But Plaintiffs cannot show that they have "a reasonable expectation of privacy under the circumstances." *Hill*, 865 P.2d at 648. They have consented to the terms of the PTEM program following an

individualized determination by the Superior Court, and this "obviously affects the expectation of the participant." *Id*. at 655. Plaintiffs label the consent argument "unpersuasive," but otherwise do little to contest this point. We do not see how Plaintiffs can maintain their privacy claim in the face of their own acquiescence to PTEM as a condition of their release.

*          *          *

Plaintiffs are unlikely to succeed on their separation-of-powers, Fourth Amendment or right-to-privacy claims. Since likelihood of success on the merits "is a threshold inquiry and is the most important factor," and we "need not consider the other factors if a movant fails to show a likelihood of success on the merits," our analysis as to the revised rules subclass ends here. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal citations and quotation marks omitted). The injunction will be vacated as to the revised rules subclass.

As to the original rules subclass, which we were informed at oral argument has no more than four members remaining, the injunction will remain in place. Before May 2023, judges of the Superior Court did not read an admonition describing the challenged conditions to potential PTEM enrollees, and those enrollees were not required to sign the original Court Order form. The original form does not mention location sharing and the pre-May 2023 minute orders say that "Defendant shall . . . comply with all terms of release as set forth on the record and by the SFSO." The first mention of location sharing came when enrollees went to Sentinel to be fitted with an ankle monitor. Because judges failed to make a record that location sharing was a condition of PTEM enrollment, there is "uncertainty" as to

whether location sharing has been sufficiently ordered as to the original subclass enrollees. *See Von Schmidt v. Widber*, 34 P. 109, 111 (Cal. 1893) ("It is essential, however, that the action of the court be made a matter of record, in order that there may be no uncertainty as to what its action has been . . . ."). The injunction will remain in place as to the original rules subclass.

## IV. MOTIONS TO STAY AND DISMISS IN NO. 24-6052

### A. *Motion to Dismiss*

Under 28 U.S.C. § 1292(a)(1) we have jurisdiction over appeals from interlocutory orders "granting, continuing, modifying, refusing, or dissolving injunctions." Plaintiffs argue that the appeal in No. 24-6052 should be dismissed because we "lack[] jurisdiction over appeals of orders in which a district court merely enforces or interprets a previous injunction."[21] *Pub. Serv. Co. of Colo. v. Batt*, 67 F.3d 234, 238 (9th Cir. 1995) (citing *In re Complaint of Ingram Towing Co.*, 59 F.3d 413, 516 (5th Cir. 1995). The Sheriff argues that the district court modified and expanded the earlier injunction in its September 2024 order ruling on Plaintiffs' motion to enforce the injunction and this gives us jurisdiction.

The original injunction enjoined the Sheriff from "[i]mposing or enforcing any search condition broader than that stated in each class member's Superior Court order . . . ." In ruling on Plaintiffs' motion to enforce that injunction, the district court found that the Sheriff had violated this term in two ways: first, in a subset of cases,

---

[21] The Court understands the appeal in Case No. 24-6052 to apply to the revised rules subclass only, and the analysis that follows applies only to that subclass.

SFSO refused to release individuals on PTEM where Superior Court judges declined to impose a warrantless search condition; second, in another subset of cases, where judges imposed the search condition after they "indicated that they would not have done so under the facts of the case if SFSO did not require it as a prerequisite for electronic monitoring." In the latter set of cases, the district court found SFSO is enforcing the warrantless search condition ordered by the Superior Court, even though the Superior Court might not have ordered the condition in the absence of PTEM. The district court admitted that "this conduct does not violate the strict terms of the injunction because a court has ordered the search condition" and "the Sheriff's Office is therefore not technically 'imposing or enforcing any search condition broader than that stated in each class member's Superior Court order.'" Nevertheless, the district court expressed concern that by designing PTEM, the Sheriff effectively controlled the imposition of the search condition and that "violates the spirit of the injunction."

As we understand the district court's September order, SFSO is now prohibited from requiring the search condition if the Superior Court expresses doubt about it. This is true even if the Superior Court signed—perhaps begrudgingly— an order releasing the defendant on the condition that he participate in PTEM. In other words, under the district court's order, the Superior Court may order defendants released subject to PTEM but may specify that the Sheriff cannot enforce the search conditions that are part of the PTEM Program Rules. The district court put the Sheriff on "clear notice" that continued violations may result in a finding of contempt against him. This forces the Sheriff— in circumstances when the Superior Court does not desire "full throated" PTEM—to provide a "PTEM Lite." The

Sheriff responded by halting new PTEM enrollments having determined that a "PTEM Lite" would endanger its officers and the public.

Recognizing that the Sheriff may not have violated the "strict letter" of the injunction because the Superior Court is still "ordering" PTEM, the district court equivocated as to whether it was modifying the injunction or merely enforcing it. The district court stated that it "need not modify the injunction," but then added that "even if a modification were required," the court had the power to "modify injunctions on appeal as long as 'the changes preserve[] the status quo and [do] not materially alter the status of the case on appeal." *See Simon II*, 2024 WL 4314207, at *3 (quoting *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001)). For purposes of our appellate jurisdiction, we think the district court's order goes beyond merely enforcing the injunction previously issued and has the "practical effect" of modifying the original injunction. *Plata v. Davis*, 329 F.3d 1101, 1106 (9th Cir. 2003) (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981)); *see Gon v. First State Ins. Co.*, 871 F.2d 863, 866 (9th Cir. 1989) (finding that because a subsequent order "substantially changed the terms and force of the injunction as it stood . . . the change was a modification, not a mere clarification" and was "therefore appealable under 28 U.S.C. § 1292(a)(1)"). Indeed, the original injunction enjoined the Sheriff "from imposing and enforcing any search condition *broader than that stated in each class member's Superior Court order*," *Simon I*, 2024 WL 590360, at *24 (emphasis added), whereas the September 2024 order requires the Sheriff not impose the search condition if the Superior Court judge, who the district court admits is still the one "order[ing] the search condition," actually felt that the condition was "unnecessary

in a particular case," *Simon II*, 2024 WL 4314207, at \*3; *see id.* ("To the extent, [SFSO has] been uncertain about whether their conduct violated the Court's order, that uncertainty has now been resolved.").

We conclude that we have jurisdiction under 28 U.S.C. § 1292(a)(1) to hear the Sheriff's appeal of *Simon II*.  *Id.* Accordingly, Plaintiffs' motion to dismiss is denied.

B.  *Motion to Stay*

The Sheriff has filed a motion to stay the district court's order enforcing the preliminary injunction.[22]  When deciding whether to grant a stay pending appeal, we consider four factors which are similar, but not identical, to the *Winter* preliminary injunction factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (en banc) (internal citations and quotations omitted).  The standard differs from the *Winter* factors, however, because it "does not require the petitioners to show that it is more likely than not that they will win on the merits," instead, they must show that at a minimum, "there is a substantial case for relief on the merits."  *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir.

---

[22] The Sheriff filed this motion to stay directly in this Court, without first seeking relief from the district court.  Federal Rule of Appellate Procedure 8 requires a party "ordinarily" file first in the district court, unless, for example, "moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(1), (2)(A)(i).  Having reviewed the hearing transcript on the motion to enforce the preliminary injunction and the order itself, such a motion would have been futile.

2012).    The party requesting a stay has the "burden of showing that the circumstances justify" it. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

For many of the same reasons we explained in Part III, Plaintiffs are unlikely to succeed on the merits of their claims, and the Sheriff has made "a substantial case" that he is likely to succeed on his challenge to the modified injunction.[23]    First, conditioning PTEM enrollment on assent to the search condition (just like the location sharing provision) does not present separation-of-powers issues. Second, the search condition is "reasonable" under the Fourth Amendment (and California Constitution) for the same reasons the location sharing provision was deemed reasonable.    And last, because the search condition is consented to, there is no California right to privacy violation.

The order on the motion to enforce makes clear that the district court believed its injunction prevents the Sheriff from conditioning enrollment in PTEM on agreement to the search condition. The district court's order in *Simon II* cited emails from the Sheriff's Office.  In one, the Sheriff said that it "would not release a defendant without that condition," and in others the Sheriff said, "we cannot accept the client into our particular program with the order received."

The district court acknowledged that it is the Superior Court who "has ordered the [] condition," but still found this violated the injunction "because the Sheriff's Office has imposed [the condition]."  SFSO has certainly *required* the condition to participate in PTEM, but the Superior Court

---

[23] Of course, the injunction may become enforceable if the Superior Court stops giving the admonishment, using the updated Court Order form, and summarizing the hearing in a minute order—that made the updated process constitutional when the original process was not.

retains the power to *impose* the condition (or any others it deems appropriate). The district court (and our dissenting colleague) conflate the two. SFSO may require certain conditions, and reject defendants that have not agreed to abide by them. Since SFSO *can* condition PTEM enrollment on agreement to its Program Rules, the Sheriff is likely to succeed on his appeal of the district court's modified preliminary injunction. Finding otherwise would create a reverse separation-of-powers problem, with the judiciary foisting PTEM Lite on the executive. All the judiciary can do is "determine the nature of the requirements imposed," *Smith*, 295 Cal. Rptr. 3d at 186, and set out "reasonable conditions" of release, Cal. Penal Code § 1318(a)(2).

We do agree with the district court that if a Superior Court judge orders PTEM Lite, the Sheriff cannot then impose full-fledged PTEM on that defendant. The Sheriff's recourse is to either agree to offer PTEM Lite (which, taken to its extreme could become PTEM *du jour*, an administrative nightmare), or reject the defendant from the Program. The Superior Court, as its judges have acknowledged, may order "PTEM Lite" if they want, but they have no power to force the Sheriff to provide it. Transcripts from the Superior Court show its judges realize as much.

The second factor is also met. The Sheriff will be irreparably harmed absent a stay because otherwise he would be prohibited from enforcing the search condition even though there is no constitutional barrier to doing so. *See Nken*, 556 U.S. at 434 (noting the first two factors are the "most critical").

The third factor is likely met as well. A stay will not injure class members because the Sheriff stopped providing

PTEM after the order on the motion to enforce, and a return of the Program means it is yet another tool that the Superior Court can use when fashioning pretrial release.

Last, the public interest cuts both ways, but will not preclude our granting of a stay. Although the Sheriff argues that offering PTEM may reduce the number of individuals kept in custody pending trial, Plaintiffs provide evidence that the jail population has gone down since the Sheriff stopped providing PTEM. Because the other three factors weigh so heavily in favor of a stay, Defendants' motion is granted.

## V. CONCLUSION

The preliminary injunction in No. 24-1025 is **AFFIRMED** as to the original rules subclass but **VACATED** as to the revised rules subclass. In the related case No. 24-6052, Plaintiffs' motion to dismiss is **DENIED** and the Sheriff's motion for a stay is **GRANTED.**

This case is **REMANDED** for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

MENDOZA, Circuit Judge, concurring in part and dissenting in part

Judges judge and police police—and each must bend the knee to the Constitution. The separation of powers doctrine imposes a sacred boundary between the branches of government. Our vigilance securing that redline cannot be overstated. Paying lip service to this constitutional obligation, the majority frames the separation of powers mandate as the enemy of functionality. But functionality cannot trump the necessary constitutional evaluation that is required of our judicial brethren. Here, the district court had a well-founded factual basis to find a breach in that boundary and consequently issued a preliminary injunction. On the record before us, I agree with the district court that Plaintiffs are likely to show that San Francisco's Superior Court abdicated judicial power and function that California's Constitution and laws reserve for the judiciary. Unconstrained by judicial review, the Sheriff overstepped the boundary between branches and seized that power.

My colleagues in the majority have leapfrogged a boundary too, by failing to defer to the district court in factual matters. Our job in this interlocutory appeal is to review legal conclusions de novo and findings of fact for clear error. The majority finds their own facts, buying wholesale the Sheriff's varnished story of the Superior Court's own recognizance release procedures. But the district court looked at the evidence before it, peeking beneath the varnish, and doubted the Sheriff's story. Without admitting it, the majority simply disagrees with the district court's assessment of the facts; and then grievously mishandles the separation of powers doctrine to dismiss this

case before it can begin.  For these reasons, I respectfully dissent.

I.

I begin with the history of this case to highlight my disagreement with the faulty factual premise that the majority rests upon.

Before this case began, Superior Court judges decided whether criminal defendants should be released on their own recognizance while awaiting trial.  A judge could grant release subject to conditions, which could include requiring that the defendant participate in GPS tracking by ankle monitor (electronic monitoring).  If the judge did so, the defendant would go to Sentinel Offender Services, LLC ("Sentinel"), a private contractor with the Sheriff's office, and be fitted with an ankle monitor.  There—for the first time and without a lawyer present—the Sheriff (or Sentinel) would tell the defendant that he may participate in electronic monitoring only if he also agreed to a set of "Program Rules" including (1) that the Sheriff could search his person, residence, car, or property at any time and without a warrant (a "four-way search"), and (2) share his electronic monitoring data with other "criminal justice partners," also without warrant.  In short, the court would condition release upon electronic monitoring, then the Sheriff would condition electronic monitoring upon warrantless four-way searches and data sharing.  A scheme of conditions-on-conditions.

The Sheriff enforced his conditions-on-conditions through databases.  Upon a defendant's "enrollment" in the Sheriff's program, the Sheriff would update the California Law Enforcement Telecommunication System ("CLETS"), which would broadcast to California law enforcement officers that the defendant was subject to a four-way search

condition.  If law enforcement encountered the defendant on the street, CLETS would give officers a green light to search without a warrant.    Additionally, the defendant's GPS location data would be recorded and saved on Sentinel's servers, which allowed other law enforcement agencies to submit an "Electronic Monitoring Location Request" to the Sheriff.    The Sheriff would hand over the defendant's location data without a warrant or articulable suspicion.

Then Plaintiffs filed this lawsuit, accusing the Sheriff of violating the federal and California constitutions.    The Sheriff, hoping to defeat class certification, avoid a preliminary injunction, and have the case dismissed, filed declarations with the district court explaining that his office sat down with the Superior Court and—¡Bravo!—any outstanding constitutional issues were solved; nothing left to see here, folks.  According to an Undersheriff, judges now read defendants a scripted admonition that to participate in electronic monitoring, they must agree to a four-way search condition and location data tracking, recording, and sharing. She further explained that judges now enter a form order indicating a defendant "shall submit" to a four-way search condition, must agree to "have their movement tracked and recorded by the SFSO," and "shall obey all orders and rules given by any SFSO employee."  So the Sheriff posits that moving forward we can all rest assured that the conditions-on-conditions are not his doing, but are based on the Superior Court's reasoned judgment.

Plaintiffs submitted counterfactual evidence, including a transcript of a bail hearing where a Superior Court judge granted release conditioned upon home detention and imposed a four-way search condition.  That Superior Court judge remarked that "[i]t's a new sheriff's policy. *It's not the Court that's imposing* the [four-way search condition].

I'm advising [the defendant] that under the sheriff's program, if she accepts home detention, they're requiring the [four-way search condition] on every case on GPS . . . or home detention." And even after the "revised rules" went into effect, evidence demonstrated that Plaintiff Simon was made to sign "Program Rules" that imposed conditions beyond what a Superior Court judge had ordered. The majority turns its head away from this key evidence (that the district court found persuasive) with such force that it might produce whiplash.

The Sheriff's effort to defeat certification and to have the case dismissed failed below and those issues are not before us. The only item on appeal is the district court's preliminary injunction (our Case No. 24-1025 is concerned with its entry and our Case No. 24-6052 is concerned with its enforcement). All-in-all, the Sheriff filed four self-serving declarations describing his efforts to revise the rules. This is the extent of the evidence that the majority relies upon to vacate the preliminary injunction. Maj. at 9–12.

So here is the state of play for Case No. 24-1025: neither the majority nor the Sheriff want the preliminary injunction lifted for criminal defendants that were put on the Sheriff's Pretrial Electronic Monitoring program ("PTEM") *before* the Sheriff's efforts to avoid this case. Instead, the majority simply takes the Sheriff at his word (where the district court did not) that the new rules are (1) actually and ubiquitously enforced, and (2) the product of a collaborative effort between the executive and the judiciary, rather than the Sheriff's unilateral decree.

## II.

The majority opinion first errs by disregarding our standard of review for preliminary injunctions. We review

the district court's conclusions of law de novo and its findings of fact for clear error. *All. For the Wild Rockies v. Petrick*, 68 F.4th 475, 491 (9th Cir. 2023). Clear error is a high bar. Reversal under the clearly erroneous standard is appropriate only where a finding of fact is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the record." *Creech v. Tewalt*, 94 F.4th 859, 862 (9th Cir. 2024) (per curiam). Our review is "'limited and deferential,' and it does not extend to the underlying merits of the case." *Doe v. Horne*, 115 F.4th 1083, 1099 (9th Cir. 2024) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009)). "[A]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Johnson*, 527 F.3d at 1079 (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

The majority attempts to bolster its reasoning by emphasizing that Plaintiffs bring a "facial challenge" which is the "most difficult challenge to mount." Maj. at 18, 39. The majority treats the Sheriff's Program Rules, Superior Court orders, and the PTEM contract as if the documents are statutes or agency regulations, and would require that Plaintiffs show the challenged Program Rules are "unconstitutional in every conceivable application." Maj. at 18 (quoting *Wolford v. Lopez*, 116 F.4th 959, 984 (9th Cir. 2024). The majority is mistaken. The "Program Rules" are not at issue in the abstract—Plaintiffs challenge "[t]he Sheriff's *unilateral* imposition of the four-way search and data retention and sharing conditions, as described in [the Program Rules] and the related provisions of the Participant Contract . . . *absent authorizing judicial findings and orders*[.]" The challenge is to the Sheriff's authority to

freely search pretrial releasees and share their data without a court imposing those conditions of release. The Program Rules are not some codified law or policy that Plaintiffs decry as unconstitutional in every application. Plaintiffs seek an injunction to prevent the Sheriff from doing things he has no power to do. That is the claim that Plaintiffs must demonstrate a likelihood of success on the merits for, and no more.

The district court, considering that claim, found facts relevant to Plaintiffs' likelihood of success on the merits. Rather than review the district court's fact finding for clear error, the majority finds its own facts with near-complete deference to the Sheriff's self-serving declarations.[1]

To illustrate, the district court found that "the Program Rules do not represent the practical implementation or

---

[1] The majority thinks that I "cavalier[ly] dismiss[]" these declarations. Maj. at 31 n.11. I do not dismiss, accept, or otherwise consider them for the factual matter they contain, other than for the limited purpose of reviewing the district court's fact finding for clear error. *See All. For the Wild Rockies*, 68 F.4th at 491. I highlight their self-serving nature to emphasize that the district court had ample reason to reject the facts and inferences asserted therein and to do so was not abuse of discretion.

The majority also takes issue with my calling the declarations "self-serving." Maj. at 31 n.11. Obviously, there is no legal bar to considering self-serving statements and assertions at the preliminary injunction stage. *Am. Bev. Ass'n v. City & Cnty. of San Francisco*, 871 F.3d 884, 897 (9th Cir. 2017) ("A district court cannot disregard an affidavit solely based on its self-serving nature.") (quotation marks omitted)). But the fact that a declaration is self-serving is plainly relevant to its weight. *See, e.g., S. Bay United Pentacostal Church v. Newsom*, 985 F.3d 1128, 1148 (9th Cir. 2021) (remarking that a preliminary injunction movant's "assertion" was "self-serving" and thereby tending to reduce its probity). We cannot, on clear error review, second-guess an evaluation of the evidence unless it is illogical, implausible, or without support in the record. *Creech*, 94 F.4th at 862.

enforcement of conditions the court *itself* ordered as conditions of pretrial release" and that "[t]he Sheriff creates the Program Rules from whole cloth." *Simon v. City and Cnty. of San Francisco, et al.*, No. 22-cv-5541, 2024 WL 590360, at \*22 (N.D. Cal. Feb. 13, 2024). Further, the district court found that "Defendants' process disabled the Superior Court from making individualized determinations of the appropriate conditions of release[,]" citing "evidence that at least some judges on the Superior Court understand they can only place an individual on [electronic monitoring] if that individual accepts the current default search condition contained on the form court order and in the revised Program Rules." *Id.* The district court found that the evidence "increases the likelihood that Plaintiffs will be able to show that Defendants exercise an impermissible degree of control over the judicial function of setting conditions of pretrial release." *Id.*

The majority disagrees with these facts, explaining that "PTEM is nothing more than an offer from [the Sheriff]" and that "[t]he court remains free to order whatever conditions it thinks appropriate." Maj. at 26. The majority contends that "the court and [the Sheriff] have worked to a reasonable accommodation" by "standardizing the conditions of release[,]" and that "PTEM and other conditions have emerged organically." Maj. at 28–29. The majority contends that "[t]he Sheriff therefore has . . . no control over whether the courts will actually order any defendants to participate as a condition of release." Maj. at 30. It finds that "the courts have full control over the individualized determination to release or not release a defendant, specifying . . . the conditions the defendant will be subject to while on release[.]" Maj. at 30. Relying on declarations in the record, the majority concludes that the Superior Court

and the Sheriff worked together on the Program Rules and form court order, that "both sides brought their own perspective to the table," and that "defendants can opt for no PTEM and stay in jail or . . . abide by the rules set forth by the courts and SFSO while being monitored." Maj. at 31, 31 n.10.[2]

The majority thinks of these conclusions as legal, rather than factual, and contends that the district court merely disagreed with the "*legal* implications" of the Sheriff's declarations, rather than any factual content they offered. Maj. at 31 n.11 (emphasis in original). Whether the Sheriff created his Program Rules from whole cloth, rather than in concert with the Superior Court, is a fact. Whether the Superior Court is effectively disabled from making individualized determinations of conditions of release is a fact. Whether the Sheriff imposes his conditions-on-conditions without the Superior Court first deciding their necessity is a fact. The district court found that Plaintiffs were likely to establish these facts. The majority leaves us to guess how much of the district court's fact finding it deems illogical, implausible, or without support from

---

[2] A perfect example of the majority's bucking of the standard of review is found in footnote 13, where it explains that "[e]ven if we accepted the [Superior C]ourt's statement at face value—which, for the reasons we have explained above, we do not—by relying on this transcript as its evidence that the Sheriff, not the court, is dictating the terms of release, the dissent flips the facial challenge requirements on their head, arguing Plaintiffs should succeed because of one Superior Court judge's comments." Maj. at 35 n.13. We are now reviewing a preliminary injunction on a limited record—not the underlying merits—and must defer to the district court's weighing of the evidence before it. The Superior Court judge's comments serve as ample evidence for the relevant question before us: whether the Sheriff imposes his conditions-on-conditions where no Superior Court judge deemed them necessary.

inferences in the record. *See Creech*, 94 F.4th at 862. It is clear that the majority would have decided the case below differently, but that does not mean that the district court clearly erred. *See Johnson*, 527 F.3d at 1079.

In one strange example, the majority seizes the opportunity to review de novo the meaning of the revised PTEM form order, which states that "[a] defendant on electronic monitoring shall obey all orders and rules given by any SFSO employee(s) or contract service provider(s)[.]" The district court found that PTEM's additional conditions are "subject to no outer bounds or specific directives given the broad language of the Superior Court's order that releasees must 'obey all orders and rules' that Defendants issue." *Simon*, 2024 WL 590360, at *22. The majority reads the language differently, reaching the sweeping conclusion that the order does not mean what it says. Maj. at 36–39. The majority interprets the order like a contract and holds that the language "is not a blank check for SFSO to order conditions as it pleases." Maj. at 39. The interpretation is unexpected and bold, made on a scant appellate record without briefing, and implicates who-knows-how-many PTEM orders currently in force. But setting all that aside, the exercise misses the point.[3]

---

[3] Even undertaking the exercise, I cannot discern what principles of interpretation the majority applies to avoid the plain language of the order form. The majority cites to case law on interpreting probation conditions, *People v. O'Neil*, 81 Cal. Rptr. 3d 878, 882–83 (Ct. App. 2008), which should require the condition be stricken or rewritten, not interpreted to avoid constitutional error. Then the majority cites a Ninth Circuit case on interpreting a contract about freight liability under maritime law, *Milos Prod. Tanker Corp. v. Valero Mktg. & Supply Co.*, 117 F.4th 1153, 1159 (9th Cir. 2024), for the simple proposition that review of contract terms is de novo. Then a case which explained that

The question before us is whether the district court erred in finding Plaintiffs likely to show a breach of the separation of powers; the order is evidence of the Sheriff's undue influence over pretrial release conditions, to the exclusion of the Superior Court's own control over the process. This is not a contract dispute. We should not give legal effect to the language of any of those purported conditions like we would for terms in a contract. This is simply yet another instance of the majority disagreeing with the district court's fact finding; specifically, the fact that "the Sheriff impermissibly impos[es] his own intrusive conditions of release . . . without individualized assessment of their necessity by a neutral decisionmaker." *Simon*, 2024 WL 590360, at *22.

I see no failure in logic, no implausibility, and no lack of support from the record requiring us to toss out the district court's findings of fact. *See Creech*, 94 F.4th at 862. Plaintiffs offered evidence of how PTEM actually works (contrary to the Sheriff's rosy and self-serving explanation), and the district court concluded that the Plaintiffs' evidence "increases the likelihood that Plaintiffs will be able to show that Defendants exercise an impermissible degree of control over the judicial function of setting conditions of pretrial release." *Simon*, 2024 WL 590360, at *22. The "impermissibility" of the degree of control is a legal question (discussed below), but the actual degree of the control exerted is a fact. The majority vacates the preliminary injunction for the simple reason that it disagrees with the

---

probation conditions should be given "the meaning that would appear to a reasonable, objective reader." *In re D.N.*, 520 P.3d 1167, 1174 (Cal. 2022). The last one appears to be the most relevant—yet I question whether any reasonable, objective reader would read an admonishment to "obey all orders and rules" to mean anything other than he must, simply, "obey all orders and rules."

district court's assessment of the degree.  The exercise has no basis in law and directly contradicts our standard of review.

At this early stage of litigation, the district court faithfully considered Plaintiffs' likelihood of success on the record before it.  With a cold record and distance from the proceedings below, we are in no position to second guess the district court's fact finding.  The majority fails to even acknowledge they do so, much less explain why the fact finding should be set aside.  I disagree with the exercise and would affirm under the proper standard of review.

## III.

The majority also gets the substantive law wrong, most egregiously with regard to Plaintiffs' separation of powers claim.  For the sake of brevity, I limit my dissent to this single issue and decline to comment on the majority's handling of Plaintiffs' Fourth Amendment and right-to-privacy claims.  I would affirm the preliminary injunction by finding that Plaintiffs are likely to succeed on their separation of powers claim and withhold discussion on any other claims (and find in Plaintiffs' favor on the remaining *Winter* factors).[4]

Article III, Section 3 of the California Constitution explains that "[t]he powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others

---

[4] I concur in the majority's conclusion that the preliminary injunction should remain in force as to the "original rules subclass." Maj. at 51–52. I disagree that the Sheriff's opening brief should be interpreted as challenging that point at all; he seeks to lift the injunction only as to the revised rules.

except as permitted by this Constitution." *Carmel Valley Fire Prot. Dist. v. California*, 20 P.3d 533, 538 (Cal. 2001). California's "separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch." *Id.* But "[s]eparation of powers does not mean an entire or complete separation of powers or functions, which would be impracticable, if not impossible." *In re D.N.*, 520 P.3d 1167, 1174 (Cal. 2022) (citation omitted). Of course, there is room for the separate branches to intermingle and exercise similar powers, but "the doctrine is violated when the actions of one branch defeat or materially impair the inherent functions of another." *Id.* (citation omitted); *see also Superior Court v. County of Mendocino*, 913 P.2d 1046, 1051 (Cal. 1996) ("[T]he substantial interrelatedness of the three branches' actions is apparent and commonplace[.]"). "The purpose of the doctrine is to prevent one branch of government from exercising the *complete* power constitutionally vested in another . . . ; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch." *Younger v. Superior Court*, 577 P.2d 1014, 1024 (Cal. 1978) (emphasis added). The test for determining whether the boundary between branches is breached turns on comparison of the competing powers at issue, their nature and their source, and whether one branch inhibits another in the exercise of those powers. *See Kasler v. Lockyer*, 2 P.3d 581, 593–97 (Cal. 2000); *People v. Standish*, 135 P.3d 32, 43–46 (Cal. 2006); *D.N.*, 520 P.3d at 1174–76.

Starting with the Superior Court's powers: Article VI of California's Constitution vests "[t]he judicial power . . . in the Supreme Court, courts of appeal, and superior courts[.]"

Cal. Const., art. VI, § 1.  "The judicial power" includes things like testing government action for constitutionality and preserving constitutional rights from "obliteration by the majority," *Bixby v. Pierno*, 481 P.2d 242, 249 (Cal. 1971), imposing sentences and sentencing discretion, *People v. Navarro*, 497 P.2d 481, 488 (Cal. 1972), dismissing criminal charges, *People v. Tenorio*, 473 P.2d 993, 996 (Cal. 1970), holding a defendant to answer for a crime, *Esteybar v. Mun. Ct. for Long Beach Jud. Dist.*, 485 P.2d 1140, 1145 (Cal. 1971), and "the ascertainment of existing rights," *People v. Bird*, 300 P. 23, 27 (Cal. 1931).

Beyond Article VI, California's Constitution acknowledges that its courts have other powers, including (most relevantly here) with Article I, Section 12, which provides that "[a] person may be released on his or her own recognizance in the court's discretion." *See Standish*, 135 P.3d at 42.  This is "a constitutional grant of *general* authority to the courts[,]" though not one immune from legislative meddling. *Id.* at 45 (emphasis in original).  The legislature may, for example, condition own recognizance release on a defendant's signed agreement to obey court-ordered conditions. *Id.* at 44–46; Cal. Penal Code § 1318. But the decision to release remains a fundamental function of the judiciary. *See In re York*, 892 P.2d 804, 805, 807 (Cal. 1995).

The majority "acknowledge[s] that the determination under § 1318 is an inherent, core judicial power under the California Constitution," yet gives short shrift to Article I,

Section 12, and Article VI, Section 1, often framing the power as a mere statutory "responsibility."[5] Maj. at 24–25.

It is firmly constitutional.    Article I, Section 12 "acknowledges the court's authority to release persons on own recognizance" and "confers discretion" to do so, as an alternative to bail.  *Standish*, 135 P.3d at 44–46.  In the exercise of that discretion, the court may impose conditions of own recognizance release that, if violated, could land the defendant back in jail.  *See id.* at 51 (Chin, J., dissenting); *York*, 892 P.2d at 808–09, 809 n.7.  But whether conferred by statute or constitution, the relevant power is a core judicial function.  *See Esteybar*, 485 P.2d at 1145 ("the fact that a particular power has been conferred on a magistrate by statute does not prevent the exercise of that power from being a judicial act for purposes of the doctrine of separation of powers.").  Even the Sheriff concedes that the power to set conditions of release is a judicial power and argues only that the court may "delegate implementation of supervision to executive law enforcement departments."

Having discerned the source of the relevant judicial power, the analysis should proceed to how that judicial power is treated and how zealously it is guarded.  While there is little case law discussing release in the pretrial

---

[5] To be sure, Section 1318 is not the source of the court's power to grant own recognizance release or set conditions of release.  *Standish*, 135 P.3d at 39 ("[S]ection 1318 does not govern a magistrate's exercise of discretion whether to grant [own recognizance] release.").  Section 1318 only "grants the court . . . authority to require that, as a condition of [own recognizance] release, the defendant *promise to obey* all reasonable conditions."  *York*, 892 P.2d at 809 (emphasis added).  It merely "prescribes the *terms* of the defendant's [own recognizance] release agreement, including his or her required promise to obey all reasonable conditions imposed by the court."  *Standish*, 135 P.3d at 39.

context, an obvious analog is found in probation. California courts have repeatedly emphasized that it is within "the power of the trial court to set the terms and conditions of probation." *People v. Cruz*, 129 Cal. Rptr. 3d 87, 90 (Ct. App. 2011); *People v. Carbajal*, 899 P.2d 67, 70 (Cal. 1995) ("The sentencing court has broad discretion to determine whether an eligible defendant is suitable for probation and, if so, under what conditions."). Setting conditions of release are "essentially judicial functions." *People v. Cervantes*, 201 Cal. Rptr. 187, 190 (Ct. App. 1984). California appellate courts strike vague probation conditions, in part because vague conditions amount to impermissible delegations of authority to the probation officer, *i.e.*, an unconstitutional transfer of judicial power to the executive. *See People v. Smith*, 295 Cal. Rptr. 3d 182, 186 (Ct. App. 2022); *In re Sheena K.*, 153 P.3d 282, 293–94 (Cal. 2007); *see also Cruz*, 129 Cal. Rptr. 3d at 88–90 (striking a statute that granted a probation officer "sole discretion" to implement GPS monitoring, because it would deprive the trial court of the power to set terms and conditions of probation).

It is no mystery why the courts are vested with the power to set conditions of post- or pre-trial release. Conditions of release interfere with fundamental liberties and should be imposed judiciously. *See In re Humphrey*, 482 P.3d 1008, 1013 (Cal. 2021) (recognizing that California's pretrial defendants have a "fundamental right to pretrial liberty[.]"). So, courts do what courts do best—hear arguments, weigh evidence, and balance competing interests—to decide how much interference is warranted given the circumstances. *Id.* at 1018–20; *see Cruz*, 129 Cal. Rptr. 3d at 90. Or as Schoolhouse Rock! put it, "[t]he courts take the law and they tame the crimes, balancing the wrongs with your rights."

*Schoolhouse Rock!: Three-Ring Government* (ABC television broadcast Mar. 13, 1979). And courts are neutral; allowing the executive branch—who prosecutes criminal cases—to impose conditions of release is to let the catcher call balls and strikes. As California's Supreme Court has observed: "[b]ecause of its independence and long tenure, the judiciary probably can exert a more enduring and equitable influence in safeguarding fundamental constitutional rights than the other two branches of government, which remain subject to the will of a contemporaneous and fluid majority." *Bixby*, 481 P.2d at 250.

Therefore, I would hold unwaveringly that the power to set pretrial release conditions is a power firmly vested by constitution, statute, and common sense, in California's judiciary. The majority declines to engage in a fulsome analysis of the power at stake, leaving the henhouse door wide open for the fox. I emphasize the power's source and import because its weight informs the answer to the next question: whether the Sheriff's use, design, implementation, and enforcement of PTEM and all its attendant conditions-on-conditions is a permissible intrusion into that power. The majority says yes, and in doing so, commits three errors: (1) relying too heavily on convenience as the test for separation of powers, (2) mischaracterizing the powers that Sheriff attempts to exert, and (3) neglecting to discuss the nature and source of the powers that the Sheriff attempts to exert.

First, the majority suggests that the separation of powers doctrine turns on convenience. Of course, the boundary between branches of government is not so rigid as to "prohibit one branch from taking action that might affect another," and it is not so strict as to render the government

nonfunctional.  *D.N.*, 520 P.3d at 1174 (recognizing that a "complete separation of powers or functions" would be "impracticable, if not impossible" (citations omitted)).  But to conclude that the Sheriff's conditions-on-conditions are constitutional, the majority praises PTEM's "efficiency" and "even-handed[ness]," prophesying that the alternative would be "chaos."  Maj. at 27.  Most of the discussion is an explanation of why PTEM makes practical sense.  Maj. at 24-31.  The majority "imagine[s]" that a court might grant release conditioned upon the Sheriff providing the defendant a personal chauffer.  Maj. at 26–27.  Because the condition is impractical, that defendant is effectively released without conditions or must remain in custody.  Maj. at 27.  The majority says "[n]either of those seems to be a good option" so the Superior Court and the Sheriff agree to practical terms to enable an effective conditions of release program.  Maj. at 27–28.

Of course, the Superior Court can and should coordinate with the Sheriff's office to assess which conditions of release are practical.  So long as the arrangement amounts to the Sheriff adding to the Superior Court's "already-limited menu of options" (as the majority calls it), the separation of powers doctrine is not implicated.  Maj. at 34.  But here, the Superior Court instead tosses the menu aside and says "chef's choice," ordering the defendant to "obey all orders and rules given by any [Sheriff's office] employee."  That's not coordination; that's abdication.  The majority acknowledges as much, explaining that "[s]o long as the court has not abdicated its responsibility by issuing an 'open-ended' order," the arrangement is constitutional.  Maj. at 25.  The PTEM order (which the Sheriff created) is about as open-ended as you can get.  Therefore, it suffers the same

constitutional defect as vague probation conditions. *See Smith*, 295 Cal. Rptr. 3d at 186.

Returning to the majority's chauffer example, an impossible release condition should result in remand to custody. The majority sees madness but there is method in it. We are fortunate that judges consider the realities of what their jurisdictions can provide when setting conditions of release; judges use their judgment. Further, I agree that the Sheriff requires some autonomy to effectuate electronic monitoring. Decisions like proper device maintenance, the types of hardware and software to use, and when and how defendants should be fitted with the device, should not be subject to judicial micromanagement. Such discretion creeps into judicial power only to the degree necessary for the good functioning of government.[6]

Still, the relevant authority provides no indication that the separation of powers should fall to convenience. The focus should be on the branches of government, their powers, and the necessity and reasonableness of

---

[6] But even if I were to consider the functional purposes of the Program Rules at issue, what convenience does warrantless four-way searches and data sharing add to electronic monitoring? The Sheriff fails to explain what convenience his conditions-on-conditions bring; and the majority seems to rest upon the principle that, *the Sheriff demanded it, and so it shall be*. Maj. at 27–28. The conditions-on-conditions add extra steps to the process rather than improve electronic monitoring's functioning. Instead, the Sheriff highlights that his conditions-on-conditions help "to stop crimes in progress and catch individuals who have committed crimes" and bemoans that "it is not feasible to require a warrant." Indeed, obtaining warrants is usually inconvenient (keep in mind, these are pretrial defendants who remain innocent until proven otherwise). It should be a judge, rather than the Sheriff, who decides when a four-way search condition is required for any given defendant granted release. *See Cervantes*, 201 Cal. Rptr. at 190.

intermingling powers and checks-and-balances. For example, in *Standish*, there was no discussion of the convenience or functionality of Cal. Penal Code § 859b's requirement that cases be dismissed, or own recognizance granted, after a defendant remained in custody for ten days without preliminary examination. 135 P.3d at 44–46. Instead, the relevant considerations were the competing powers: the legislature's power to regulate criminal proceedings and the judiciary's power to grant own recognizance release. *Id.* The court found that the legislature may "channel the court's discretion" according to its chosen policy goals, so long as the legislature does not defeat or materially impair the court's constitutional power and function. *Id.* at 44–45. Nor was convenience discussed in *Kasler*, where the legislature delegated the decision of which weapons should be prohibited to the judiciary. 2 P.3d at 594–95. The discussion turned upon an analysis of competing powers between the branches and the nature of those powers, concluding that none of the branches are "aggrandized" or "encroached upon" by the delegation. *Id.* Convenience was not invoked in *D.N.*, where the probation department was permitted to offer community service in lieu of a judicial proceeding, and thereby "invoked a type of power that was already within the probation department's core function, and in that respect involved no delegation of any uniquely judicial authority." 520 P.3d at 1175. To the extent that the probation department "was empowered to decide how many hours of community service to offer . . . , the court's delegation to the probation department of the number of hours to offer la[id] within constitutional limits" because "[t]he court's order here gave the probation department a very limited discretionary power." *Id.* at 1175–76.

I find no case—and the majority offers no case—where one branch's invasion into the province of another was blessed because it is a practical and convenient arrangement. The majority's overreliance on functionality and convenience is an application of a faulty legal standard.

Second, the majority mischaracterizes the relevant conditions-on-conditions as mere "details" and suggests that the court should not "micromanage" such trifles. Maj. at 24, 28, 34. PTEM's Program Rules are more than a simple set of instructions on how the Sheriff intends to administer electronic monitoring. The rules infringe upon Californians' fundamental right to pretrial liberty. *Humphrey*, 482 P.3d at 1013. Four-way searches and data sharing are not mere incidents to electronic monitoring. They are separate and distinct conditions of release imposed without regard to whether any given defendant should be subject to them. The conditions-on-conditions are more than mere discretion to choose a certain type of ankle monitor over another, or to require that defendants charge and take good care of it—if the Sheriff claimed daily body cavity searches were needed to carry out electronic monitoring, should we believe him? Such conditions go beyond mere "details of the program" properly committed to the Sheriff's discretion. Maj. at 28. By reducing the conditions-on-conditions to mere trifles, the majority minimizes the nature and severity of the Sheriff's intrusion into the province of the judiciary, thereby inhibiting a proper analysis under the separation of powers doctrine.

Third, the majority errs in failing to explain where the Sheriff gets his authority to create PTEM, to write its rules, or to decide that every pretrial defendant on electronic monitoring must also be subject to his conditions-on-

conditions. [7]    The Sheriff does not argue that he is performing any power or function of his own; rather, he is executing power delegated to him from the court, and the majority simply explains (without citation) that "[the Sheriff] is then responsible for supervising the conditions." Maj. at 23.    The majority comments that California's legislature could "authorize PTEM as a condition, or forbid PTEM as a condition, or create some intermedial program." Maj. at 30 n.9.    I reach no conclusions on questions not before us, but there is certainly an argument to be made that the legislature's policy-making authority would justify its meddling in pretrial release policies; there is no concomitant executive power.    It is apparent that the Sheriff seeks to exert a power given to the judicial branch and cannot point to which of his own constitutional or statutory powers he attempts to execute in doing so.    This is a quintessential example of a "person[] charged with the exercise of one power . . . exercis[ing one] of the others," which Article III clearly prohibits. *Carmel Valley Fire Prot. Dist.*, 20 P.3d at 538.

And beyond this plain conclusion, evidence in the record clearly indicates that, from the Superior Court's point of view, judges' hands are tied.    One Superior Court judge described the four-way search condition as "a new *sheriff's* policy.    It's *not the Court* that's imposing the [four-way

---

[7] The majority explains that California's executive branch gets its powers from Article V.   Maj. at 19.   Indeed, Section 13 of Article V provides that the Attorney General of California supervises every district attorney and sheriff, subject to the powers and duties of the Governor, and is the chief law officer of the State.   Absent from Article V, and the majority opinion, is an explanation of where the Sheriff get the power to set conditions of release independent of authority delegated from the court.

search condition]. . . . *[T]hey're* requiring the [four-way search condition] on every case on GPS . . . ." Such conditions-on-conditions are not just details of a program, they are additional compulsory requirements. Their imposition is the Sheriff's arrogation of a core judicial function. *See Carmel Valley Fire Prot. Dist.*, 20 P.3d at 538.

To summarize: the proper mode of analysis requires that we first ask what powers are at issue. Here, it is the power to grant own recognizance release and to set conditions for that release; a "power constitutionally vested" in California's judiciary. *Id.* at 539. The only executive "power" (if it can be called that) at issue is, at most, a delegated power to supervise conditions of pretrial release. Then, we should balance those competing powers to determine whether the intrusion is justified or whether it goes too far. For our case, the Sheriff's PTEM Program Rules include conditions that go well beyond mere incidentals to accomplishing court-ordered electronic monitoring. When the Sheriff requires and enforces his conditions-on-conditions, he unequivocally "undermine[s] the authority and independence" of the Superior Court to decide how far a pretrial defendant's liberty ought to be curtailed to accomplish the goals of own recognizance release. *Id.* at 538. The Sheriff "defeat[s]" and "materially impair[s]" the Superior Court's exercise of judicial power when he curtails pretrial liberty beyond the degree the court decides is necessary. *Standish*, 135 P.3d at 45. As the California Supreme Court has said, "the exercise of a judicial power may not be conditioned upon the approval of either the executive or legislative branches of government." *Esteybar*, 485 P.2d at 1145. The Sheriff's conditions-on-conditions do just that, and thereby "defeat" the "inherent functions" of the court. *D.N.*, 520 P.3d at 1174. Therefore,

for the mishandling of the standard of review and the substantive law, I respectfully dissent.[8]

## IV.

For the second appeal in Case No. 24-6052, I agree with the majority that the order enforcing the preliminary injunction modifies the original preliminary injunction rather than enforces it. Therefore, I concur in denying Plaintiffs' motion to dismiss. But I dissent to the majority's grant of the Sheriff's stay motion.

The district court deemed two categories of activity violative of the preliminary injunction but did not impose sanctions for either. First, the Sheriff's refusal to release individuals on electronic monitoring where the judge had not

---

[8] One final word on the first appeal: it seems to me that the majority loses sight of what the preliminary injunction accomplishes. It preliminarily enjoins Defendants "from imposing and enforcing any search condition broader than that stated in each class member's Superior Court order and from imposing and enforcing the Program Rules' data sharing provision." It does not prevent the Superior Court from imposing data sharing as a condition, or the Sheriff from enforcing court-ordered data sharing. The majority acknowledges that the Sheriff cannot impose a condition not ordered by the Superior Court. Maj. at 42. The majority decides that, as a matter of fact, the Superior Court does order data sharing as a condition of release whenever it releases defendants on electronic monitoring. The district court thought otherwise (and I defer to that fact finding). But taking the majority's factual premise as true, the prudent thing to do would be to leave the injunction in place to make sure it remains true while the case continues to the merits. Indeed, we all agree the injunction for the original rules subclass should remain. I see no harm in allowing the injunction to extend to the revised rules subclass. If it is true that whenever the Superior Court releases a defendant on electronic monitoring, it has in fact decided that data sharing should be a further condition, there is no risk that the Sheriff could violate the injunction.

ordered a warrantless search condition. *See Simon v. City & Cnty. of San Francisco*, No. 22-cv-05541, 2024 WL 4314207, at *1–2 (N.D. Cal. Sept. 26, 2024). Second, where Superior Court judges have said they did not find a warrantless search condition necessary but chose to give the defendant over to the Sheriff's Program Rules anyway. *Id.* at *2–3.

Regarding the first category of conduct, the district court enjoined Defendants from

> imposing and enforcing, as to the original rules subclass, the Sheriff's EM Program Rules' four-way search condition (Rule 5) and data sharing provision (Rule 13); and as to the revised rules subclass, from imposing or enforcing any search condition broader than that stated in each class member's Superior Court order and from imposing and enforcing the Program Rules' data sharing provision.

I read this to simply mean that Defendants may not conduct four-way searches or share defendants' monitoring data unless a court has explicitly ordered a pretrial defendant released subject to those conditions. But the Sheriff is not necessarily compelled to effectuate electronic monitoring without his conditions-on-conditions. I concur with the majority insofar as the district court's conclusion that the Sheriff violated the injunction by refusing to do so was a modification of the injunction, rather than mere enforcement. *See* 28 U.S.C. § 1292(a)(1); *see Nat'l Wildife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 825

(9th Cir. 2018); *Public Serv. Co. v. Batt*, 67 F.3d 234, 238 (9th Cir. 1995).

But the modification is plainly warranted.  The Sheriff's ham-fisted response to the district court's order was to keep defendants in jail even though a court ordered they be released on electronic monitoring.  This action raises difficult legal and factual questions that demand more attention—the question now is simply whether Defendants have made a strong showing of likely success on the merits. *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (en banc).  As explained above, I disagree with my colleagues in the majority as to the factual and legal issues at play and would decide that question in Plaintiffs' favor.

Regarding the second category of conduct, the district court seems more frustrated with the state of affairs in the Superior Court than with the Sheriff's office.  The enforcement order largely purports to clarify the prior order—reminding Superior Court judges that they alone hold the power to set conditions of release.  Indeed, the district court directed that the order be published to Superior Court judges.  This portion of the order neither modifies nor enforces the preliminary injunction.

Turning to the other factors, I also disagree with the majority's finding of irreparable injury in the absence of the stay.  *See Duncan*, 83 F.4th at 805.  The majority finds irreparable harm because the Sheriff is not allowed to enforce the four-way search condition.  Maj. at 57.  This again begs the question—where does the Sheriff get the right to enforce the condition in the first place?  The majority offers no statutory or constitutional basis—it is a delegation of authority from the Superior Court.  Mind-bendingly, the Sheriff claims harm because he cannot carry out a condition

of release that the Superior Court did not order him to carry out, and in some instances where the judge explicitly told him not to carry it out. The Sheriff cannot be "harmed" by an injunction preventing him from doing something he never had the right to do; and even if there is harm in it, it is plainly not "irreparable." *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

As to the interest of third parties and the public interest, pretrial defendants' interest in pretrial liberty is severely threatened in the absence of the preliminary injunction. *Humphrey*, 482 P.3d at 1013. In light of the Sheriff's refusal to release individuals whom the court has granted release conditioned upon electronic monitoring—but not a four-way search condition—it is almost certain that members of the public have been denied their right to pretrial liberty. Insofar as public safety and law enforcement interests are at issue, I see no reason to second-guess the judgment of Superior Court judges in fashioning conditions of release in service of those ends. I would find that all factors weigh against granting the stay in this case.

*          *          *

The majority loses track of what the preliminary injunction imposes—the Sheriff cannot enforce its Program Rules' four-way search condition or data sharing condition. At no point does the preliminary injunction order suggest that the court could not impose such conditions, and indeed, the revised rules and subsequent developments indicate that the Sheriff is pursuing more explicit court orders on that score. But the Sheriff cannot dictate what the Superior Court will do, nor exert undue influence over the Superior Court's judgment. The people of California have a right to release subject to the court's discretion, not the Sheriff's. I am

thankful the majority clarifies that "if a Superior Court judge orders PTEM Lite, the Sheriff cannot then impose full-fledged PTEM on that defendant." Maj. at 57. But the observation begs the question, why vacate a preliminary injunction that simply keeps that principle alive during the pendency of this case?

The record indicates that the Sheriff is holding pretrial defendants' liberty hostage in order to coerce judges into ordering carte blanche subjugation to the Sheriff's conditions. This is a likely breach of the separation of powers. The majority disregards our standard of review and places the judicial imprimatur into the Sheriff's hands. A preliminary injunction during the pendency of the case to prevent the Sheriff from imposing unilateral conditions-on-conditions, while still allowing Superior Court judges to impose those conditions, if necessary, is a sufficient safeguard until the district court reaches the merits. And that is all that was done below.

I respectfully dissent.

APPENDIX

County of San Francisco Sheriff's Office / Superior Court

**Pre-Sentenced Defendant Electronic Monitoring - Court Order**

| Defendant's Last Name | Defendant's First Name | SF Number / DOB |
|---|---|---|

| Court Number(s) | Department # | Date |
|---|---|---|

By checking the boxes below, the Court will indicate what supervision the San Francisco Sheriff's Office (SFSO) will employ and the expectations the Court has of the defendant. By signing these instructions and affixing a seal, the Court indicates that the defendant has waived their 4th Amendment rights and understands the restrictions ordered and stated by the Court.

Defendant will be monitored via: ☐ GPS Only   ☐ Alcohol Monitoring Only *   ☐ GPS and Alcohol Monitoring *

\* No consuming alcohol on alcohol monitoring

☐ Coordinated Pickup **   ☐ Release Contingent on EM placement   ☐ Condition of Bail   ☐ Out of Custody

**\*\*Home Detention, Curfew, Residential Treatment Program and Collaborative Court Orders will be Coordinated Pickup only**

Defendant will adhere to the following court-ordered conditions of Electronic Monitoring until the Court orders the removal of electronic monitoring conditions.  Upon removal all issued equipment shall be returned to SFSO.

A defendant on electronic monitoring shall obey all orders and rules given by any SFSO employee(s) or contract service provider(s) and reside within 50 driving miles of the Sheriff's Electronic Monitoring office. Participants can not travel more than 50 driving miles from the Sheriff's Electronic Monitoring office without prior approval of the Court or the SFSO. **Defendant shall submit to a search of their person, vehicle, property and home at anytime by SFSO sworn staff or any peace officer acting on behalf of and with the express permission of the SFSO.**

Defendants shall obey all laws. Defendants shall report any change in residence immediately to an SFSO EM employee or contract service provider. The defendant shall charge and maintain the monitoring device(s) as instructed and not tamper with, defeat or remove the monitoring device(s). Defendants shall report any arrest, citation or law enforcement contact to an SFSO Community Programs employee within 24 hours. Defendant shall not possess or consume any controlled substance without a valid legal prescription.

☐ Submit to a warrantless search by any peace officer at anytime.

☐ **Home Detention** - remain confined within interior premises of residence unless authorized by the SFSO.
   Approved Home Detention activities : _____

☐ **Curfew** -  remain confined within the interior premises of residence during the following hours.
   List hours of confinement: _____

☐ **Residential Treatment Program** - remain enrolled and in good standing.
   Name of Program: _____

☐ Other conditions / stay away orders: _____

*In the event of a violation of any of the above court-ordered monitoring conditions, the SFSO may evaluate the violation and report to the Court, prepare an affidavit to revoke their OR or bail status or place under arrest for contempt of court.*

| Defendant's Signature | Judge's Signature |
|---|---|

*By signing here, the defendant agrees to enroll in the electronic monitoring progam, follow the program rules, and have their movement tracked and recorded by the SFSO.*

Original - Court                    Copy - SFSO                    Copy - Defendant
ER 169 /2023